```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2      _____

 3      United States of America,      ) Criminal Action
                                       ) No. 21-mj-00099-RMM-1
 4                       Plaintiff,    )
                                       ) Rule 5 - Initial
 5      vs.                            ) Appearance (via Zoom)
                                       )
 6      Riley June Williams,           ) Washington, D.C.
                                       ) January 25, 2021
 7                       Defendant.    ) Time:  2:22 p.m.
        _____
 8
            Transcript of Rule 5 - Initial Appearance (via Zoom)
 9                            Held Before
            The Honorable Judge Zia M. Faruqui (via Zoom)
10                  United States Magistrate Judge
        _____
11
                        A P P E A R A N C E S
12
        For the Plaintiff:       Mona Sedky
13      (via Zoom)               U.S. DEPARTMENT OF JUSTICE
                                 950 Pennsylvania Ave, Northwest,
14                               JC Keeney Building, Suite 600
                                 Washington, D.C. 20530
15
        For the Defendant:       A.J. Kramer
16      (via Zoom)               FEDERAL PUBLIC DEFENDER FOR THE
                                 DISTRICT OF COLUMBIA
17                               625 Indiana Avenue, Northwest
                                 Washington, D.C. 20004
18
        Also Present:            Masharia Holman (via telephone)
19                               Lori Ulrich (via Zoom)

20      _____

21      Stenographic Official Court Reporter:
        (via Zoom)               Nancy J. Meyer
22                               Registered Diplomate Reporter
                                 Certified Realtime Reporter
23                               United States Courthouse, Room 6509
                                 333 Constitution Avenue, Northwest
24                               Washington, D.C. 20001
                                 202-354-3118
25
```

1          P R O C E E D I N G S

2          (REPORTER'S NOTE:  This hearing was held during the
COVID-19 pandemic restrictions and is subject to the

3    limitations of technology associated with the use of
technology, including but not limited to telephone and video

4    signal interference, static, signal interruptions, and other
restrictions and limitations associated with remote court

5    reporting via telephone, speakerphone, and/or
videoconferencing.)

6

7          THE COURTROOM DEPUTY:  This is Magistrate Case 21-99,

8    the United States of America v. Riley June Williams.  The

9    defendant is present by video.  Mona Sedky is representing the

10   government.  A.J. Kramer is representing the defendant.

11   Pretrial services is Masharia Holman.

12          This matter is set for a Rule 5 initial appearance.

13          Ms. Williams, can you please raise your right hand.

14          (Oath administered.)

15          THE COURTROOM DEPUTY:  I'm sorry.  I didn't hear you.

16          THE DEFENDANT:  Yes.

17          THE COURTROOM DEPUTY:  Thank you so much.

18          THE COURT:  Thank you, Ms. Lavigne-Rhodes.  I

19   appreciate it.

20          Ms. Williams, thanks.  You're now sworn in.  I'm going

21   speak to your lawyer, at least who I understand initially will

22   be Mr. Kramer, but then we'll sort out the issues about counsel

23   today, as well as going forward.

24          Mr. Kramer, I just want to figure out, are you just

25   acting as pro hac on this, or are you representing

1    Ms. Williams?  How's it going here?

2          MR. KRAMER:  No.  Her financial affidavit was

3    approved, and so we've been appointed, and I'm representing her

4    today.  I think I'll be representing her, but it's not clear;

5    but, in any event, we've been appointed.

6          She agrees in light of the pandemic to appear by video.

7    She's in Harrisburg, Pennsylvania, in the federal public

8    defender's office and a federal public defender up there, Lori

9    Ulrich, who represented her at the initial appearance and

10   detention hearing is kind enough to be on the phone.  So it's

11   somebody who knows what they're doing will be able to fill

12   Your Honor in on what occurred up there in Harrisburg, if you

13   need to know.

14         THE COURT:  Thank you so much.

15         Ms. Ulrich, it's -- it's nice to meet you.  I will note

16   it's nice to also have a witness on the phone when Mr. Kramer

17   starts abusing me.  You can let me know that the federal public

18   defenders treat their magistrate judges with a great deal more

19   respect and the kindness than we receive it.

20         MS. ULRICH:  I'm happy to be a witness.

21         THE COURT:  All right.  Thank you so much.

22         And thank you, Ms. Williams, for going into the federal

23   public defender's office there.  It just -- I appreciate you

24   willing to have the hearing by video and audio.  Obviously it's

25   important for everyone's safety, but I am concerned in all of

1     these proceedings that it's just frustrating to not be able to

2     lean over the table and speak to somebody when you don't

3     understand something.  So it makes me feel a lot better knowing

4     that your counsel is there and that you can make sure you're

5     being represented.

6          I will still tell you the same thing.  As you heard, you

7     know, Mr. Kramer, who is the federal public defender down here

8     in D.C., has heard me say this before so he -- he got ahead of

9     the issue, which is just we're going to go by video today.  But

10    I will remind you, in spite of having counsel there, two

11    things.  One, we're not in a rush.  You need to take your time.

12    This is an important hearing, just as every hearing is.

13    There's not a -- a lot of substantive things that we'll get

14    into, but it's still a hearing.  It's your case.  So we will

15    take as much time as you need.  So if you need to take a pause

16    and speak to your counsel who is sitting there with you or

17    speak to Mr. Kramer, we can put you in a breakout room very

18    easily.  That's not a problem.

19          The second thing is if you don't understand something,

20    it's hard for me to know that.  You know, particularly, I

21    appreciate that you-all are being careful wearing masks, and I

22    appreciate you -- I want you to keep doing that, but I can't

23    see your expressions.  So it's hard for me to know whether or

24    not something seems perplexed and confusing.  So I just need

25    you to promise me that if you need time or if you have

1    questions, you're going to tell me; okay?

2              THE DEFENDANT:  Okay.  Thank you.

3              THE COURT:  Okay.  Thank you.

4       So, Mr. Kramer, I'll come back to you.  And I know, you

5    know, you've had several of these matters, and your staff is

6    doing an incredible job handling what is, I'm sure, just an

7    enormous caseload, and they're, as always, so thorough.

8       I want to just go over and give you kind of how I'm

9    handling these hearings.  I'm going to go ahead with asking

10   some background information to your client and then talking

11   about today:  officially getting you appointed as counsel,

12   going over conditions of release, and then set a next date.

13   Okay, Mr. Kramer?

14              MR. KRAMER:  Yes, Your Honor.  Thank you.

15              THE COURT:  Great.  Ms. Sedky, does that work for you

16   as well?

17              MS. SEDKY:  Yes, it does, Your Honor.  Thank you.

18              THE COURT:  Okay.  Great.  Thanks so much.

19       So, Ms. Williams, I'm going to start with very basic

20   background questions.  These are questions I ask everybody.

21   It's to make sure just that you are able to -- to understand

22   what's happening today and that I don't need to get maybe some

23   additional assistance to -- to help you with the proceeding and

24   that you're capable of going forward; okay?

25              THE DEFENDANT:  Okay.

1    THE COURT:  Great.  And I just need you to speak up

2    to make sure -- the court reporter is typing away.  I know it's

3    mostly "yes" or "no" questions, but she just needs to be able

4    to hear you; okay?

5    THE DEFENDANT:  Okay.

6    THE COURT:  That sounds great.  So can you tell me

7    your age, please.

8    THE DEFENDANT:  I am 22.

9    THE COURT:  Okay.  How far did you get in school?

10   THE DEFENDANT:  Just graduated from high school.

11   THE COURT:  Okay.  Great.  Thank you.

12   And have you taken any pills or medicine or drank any

13   alcohol in the last 24 hours that would make it difficult to

14   understand what's going on today?

15   THE DEFENDANT:  No.

16   THE COURT:  Okay.  That's it for now.  Thank you.

17   I'll start speaking now back again with Mr. Kramer.  So,

18   Mr. Kramer, I understand that your client -- and as you

19   identified by thankfully -- I appreciate that you have a local

20   federal public defender that your client has already had at her

21   initial appearance at another court where she was advised, for

22   instance, of her right to remain silent and her other rights;

23   is that right?

24   MR. KRAMER:  Yes, Your Honor.

25   THE COURT:  Thank you so much.

1          So let's -- let's go into the ascertainment of counsel.

2     You have -- you do have a financial affidavit in this case; is

3     that right?

4               MR. KRAMER:  Yes.  It was approved, Your Honor.

5               THE COURT:  Perfect.  Okay.  Great.

6               MR. KRAMER:  Ms. Peterson sends them over.  She

7     informed me that it had already been approved.

8               THE COURT:  Well, I'm at -- I'm at my best where my

9     colleagues and you have done the work for me.  So I'll gladly

10     go ahead and follow through on that.

11          So, Ms. Williams, you essentially submitted an affidavit

12     that indicates that you would like to have counsel appointed

13     for you and you're unable to afford counsel on your own.  I

14     will find that based on the representations by your counsel and

15     that it was approved previously that you are eligible for

16     appointment of counsel.

17          Mr. Kramer, is the federal public defender's office able

18     to represent Ms. Williams?

19               MR. KRAMER:  Yes, Your Honor.

20               THE COURT:  Okay.  Thank you.

21          So I will go ahead and formally appoint the federal

22     public defender's office to represent Ms. Williams in this

23     matter.

24          Ms. -- Ms. Williams, you're very lucky.  You have not

25     only a great office representing you -- I'm sure your local

1     office is very good too, but I am biased, speaking as a former

2     prosecutor, to say that we have a fabulous public defender's

3     office here, but you have "the" federal public defender.  And

4     so I think that you are in great hands.  He will be able to

5     represent you ably in this matter.

6          So let's talk next about the charges.  Ms. Sedky, do you

7     know, are there felony charges in this matter or are these only

8     Class A misdemeanors?

9          MS. SEDKY:  Your Honor, there are two felony charges:

10    the theft of government property in excess of a thousand

11    dollars under 6 -- 18 U.S.C. 641 and the obstruction charge --

12    and that's an aiding-and-abetting theory at this point, just to

13    put that on the record, and then the 1512 obstruction is

14    also -- 1512(c)(2) is also a felony.

15         THE COURT:  Great.  Thank you.

16         And, Mr. Kramer, the only reason I ask is just whether

17    or not I need to inform you and your client of the ability to

18    stay before magistrate judges for the substantive case, but

19    that is not applicable here.

20         So let's go to conditions of release.  Ms. Sedky, I'll

21    start with you.  Is the government seeking any modifications of

22    the current conditions of release?

23         MS. SEDKY:  Your Honor, we are, yes.

24         Ms. Williams, as it stands, in the Middle District of

25    Pennsylvania, she was placed on home confinement with an ankle

1    bracelet and her mother to serve as third-party custodian,

2    among other restrictions.  And in the ensuing -- this is a

3    fluid investigation, as I'm sure the Court can understand.  We

4    have some additional concerns about her use of the computer and

5    the internet to destroy evidence and in charge of people to do

6    the same.

7        And so we would be seeking restrictions that she cannot

8    access the internet at home or at work or anywhere else and

9    that she cannot have a web-enabled cell phone, smartphone, or

10   any kind of device in her home; that -- that she could have a

11   flip phone or a dumb phone, for lack of a better word.  But we

12   are asking for computer and internet restrictions.

13       And -- and although the -- my -- my recollection of the

14   conditions of release in the Middle District of Pennsylvania

15   are the standard mental health counseling as directed by

16   pretrial services, I don't really know how to thread this

17   needle, but if there were a way to have something more

18   proactive to address potential mental health issues, I -- you

19   know, I would like to explore that option.  I don't know

20   whether the Court would consider ordering some kind of a

21   screen to --

22               THE COURT:  Okay.  Ms. Holman, you're on the line?

23               THE PRETRIAL SERVICES OFFICER:  Yes, Your Honor.

24               THE COURT:  Thank you, Ms. Holman.

25       And so you heard from the government.  I'm hoping you

1    might be able to review what conditions -- if you're just

2    asking for the standard conditions or if you have any thoughts

3    regarding limitations of computer and internet access, anything

4    else that pretrial might have to advise.

5              THE PRETRIAL SERVICES OFFICER:  So, Your Honor, in

6    reference to the mental health, what Your Honor could impose is

7    that she complete a mental health assessment, and the Middle

8    District of Pennsylvania could refer her or assist her in

9    completing that assessment.  The assessment will hopefully

10   satisfy the government's concerns with -- if there are any

11   mental health issues.

12             MS. SEDKY:  Your Honor, may I --

13             THE COURT:  Sorry.

14             MS. SEDKY:  May I add one other suggestion?  We would

15   also ask that pretrial services be permitted to perform a

16   search of the vehicle, residence, workplace to ensure

17   compliance with the no-internet and no-computer restrictions.

18             THE COURT:  Okay.  Well, let's -- let's turn back to

19   that then, Ms. Holman.  Any thoughts regarding the computer

20   limitations and the related request to be able to search

21   vehicles and/or residence for such devices?

22             THE PRETRIAL SERVICES OFFICER:  Your Honor, that --

23   is the government asking for the search to be done by pretrial

24   services in the Middle District of Pennsylvania?

25             THE COURT:  I believe so, yes.

1          MS. SEDKY:  Yes, Your Honor.

2          THE PRETRIAL SERVICES OFFICER:  Okay.

3          MS. SEDKY:  We would be asking for further revisions

4     for the conditions of release.

5          THE PRETRIAL SERVICES OFFICER:  Correct.  So with the

6     courtesy supervision, the government -- if you could repeat.

7     You're asking for no -- I didn't get the words to put on the

8     conditions.  No internet access --

9          MS. SEDKY:  No -- no use of computers or internet --

10    internet-connected devices at home or the workplace or at any

11    locations, and no internet access.  And to permit the search of

12    her vehicle, residence, or workplace, if there is one, to

13    assist in ensuring compliance with that condition.

14         THE PRETRIAL SERVICES OFFICER:  Okay.  That seems

15    perfectly fine, Your Honor.

16         THE COURT:  Do you know if pretrial -- I want to give

17    you a moment.  I'm going to go to Mr. Kramer and come back to

18    you, if you have any thoughts or if you want to tell me right

19    now, if you have a perspective from pretrial as to whether or

20    not it's appropriate to impose such conditions.

21         Do you want me to go to Mr. Kramer and come back to you?

22    That's my -- my --

23         THE PRETRIAL SERVICES OFFICER:  No.  We've had --

24    we've had -- with -- with -- I'll say in cases -- and I'll give

25    an example, in sex offender cases where we don't want the

1    defendant to possess any type of computer or connection to the

2    internet.  And it -- it does -- we can't ask other

3    jurisdictions to do a search of the, you know -- that have

4    equipment that they can put on computers.  I don't know how

5    that would -- I don't know about -- to a car.  So that's the

6    only thing I am unsure about, but of the home, yes.  I'm just

7    unsure about the car.

8            THE COURT:  Okay.  Before I hand off the microphone

9    to you, Mr. Kramer, let me just give you kind of my thoughts

10   overall on this, and then I'm happy to -- if it's helpful or

11   unhelpful, you can tell me.

12           But, I mean, I -- I understand the government's concern

13   to be primarily that there's concern about destruction of

14   evidence or maybe that there's -- other people may be directing

15   even the defendant to do things that may not be in her best

16   interest.  I will say I think that, you know, just, generally

17   speaking, what's out in the public domain, I think there's some

18   real concerns that people have that social media has led people

19   who may have been -- this may be abnormal conduct for them but

20   that their connection to the internet is, in fact, what is

21   driving them to make poor decisions, poisonous discourse

22   online.

23           And so I do have concerns.  I want to do everything I

24   can to make sure that Ms. Williams stays within the conditions

25   of release and doesn't find herself falling back into something

1    where she can cause herself more problems.  So that's, I think,

2    twofold.  I don't want to just think about the -- the

3    destruction of evidence but also want to make sure she's not

4    getting caught into some, you know, chat rooms or groups or

5    message boards where they're leading her to making some bad

6    choices.  But, obviously, you know, that's -- it's a fine line

7    between paternalism and conditions of release.  So I'm happy to

8    hear whatever you have to say, Mr. Kramer.

9            MR. KRAMER:  So a couple of things.  I need to talk

10   to Ms. Ulrich, obviously.  This is the first I've heard of any

11   of this.  And, second of all, the mental health, I'm not clear

12   what that is or what provision that could be ordered under.

13   There's no question about her competency.  So I understand you

14   can order a competency exam, but you can't order a mental

15   health exam of a defendant because the government wants it.  So

16   that one I clearly object to, and then I need to talk to

17   Ms. Ulrich about it -- about the other -- about the computer.

18           THE COURT:  Okay.

19           MR. KRAMER:  We're going to have to go by phone.

20           THE COURT:  Yeah, we'll put you in a room.  That's no

21   problem.

22           MR. KRAMER:  Okay.

23           THE COURT:  Before you do, Ms. Sedky, I just want to

24   make sure you don't have anything to add.

25           I mean, my thought, I will say -- I mean, we've had many

1     of these cases come before us -- obviously right now with the

2     instant conduct -- but previously to this, the large part of

3     the magistrate judges' docket was people getting into the

4     White House [sic] protected grounds.  And so we are familiar

5     with this.  And frequently, unfortunately, attendant mental

6     health issues, as the federal public defender's office reminds

7     me regularly -- and I think that they're right -- is that

8     there's a difference between mental health problems and

9     competency, as I understand it.

10          My role is -- is more focused on competency.  And so

11    let's step back first and just -- and ask if you have any

12    concerns about competency.  And then if not, do you view that

13    there's a legal mechanism that compels this?  Or is it

14    something more that you're asking because you think it would be

15    helpful?

16          MS. SEDKY:  It's the latter, Your Honor.  I don't

17    have any concerns about competency.  I have no reason to think

18    there are competency issues here.  It's more my own, quite

19    frankly, just personal interest in the -- the defendant's

20    safety and well-being, to be perfectly frank.

21          THE COURT:  Okay.  So why -- Mr. Kramer, why don't we

22    do this.  We'll put you in a breakout room.  We'll -- we'll

23    pause, and then you-all can talk and take the time that you

24    need.

25          Ms. Williams, you're going to be in a private room with

1    Mr. Kramer and then also, obviously, your -- I don't want to

2    say local counsel, but you have someone -- another attorney

3    there, obviously there with you, that hopefully will be

4    helpful.  And so I know that the -- Mr. Kramer is obviously

5    representing you in this matter, but so you-all will talk in

6    this breakout room for as much time as you need.  And then

7    we'll come back and talk about whether or not, essentially, you

8    want a voluntary mental health screening, if you think that

9    would be helpful.

10            And then, second, more importantly, is my concern about

11   internet access and computer access; that if there's something

12   that we can do.  On the flip side, it sounds like the

13   government is -- agrees that the -- the conditions of release

14   in terms of, you know, your limited mobility and things right

15   here, that they're willing to ease those restrictions.  Right,

16   Ms. Sedky?

17            MS. SEDKY:  No, we're not willing to ease those

18   restrictions.

19            THE COURT:  You want her to stay --

20            MS. SEDKY:  We want her to stay on home confinement

21   with her mother as a third-party custodian.  And my

22   understanding is they don't have GPS monitoring available in

23   the Middle District of Pennsylvania.  So we settled for

24   something -- some kind of a beacon mechanism with which I'm not

25   familiar, but the maximum technical ability to do GPS -- to do

1     monitoring of her is what we're recommending.

2              THE COURT:  Great.  Thank you.

3         So, Mr. Kramer, we'll put you-all in a breakout room,

4     and you-all talk to your client and take as much time as you

5     need.

6              MR. KRAMER:  Thank you.

7              THE COURT:  I'm going to turn off my camera and

8     video.  Once you guys pop back in, I will try to jump right

9     back on.

10             MR. KRAMER:  Thank you.

11             THE COURT:  Thanks.

12        Ms. Lavigne-Rhodes, we'll hand it off to you.

13             THE COURTROOM DEPUTY:  Thank you, Your Honor.

14             (Off the record.)

15             THE COURT:  Okay.  Ms. Lavigne-Rhodes, I'm ready to

16    get started back up.  I think I might start with Ms. Sedky.

17    Ms. Lavigne-Rhodes, are we all right to get going?

18             THE COURTROOM DEPUTY:  Yes, Your Honor.

19        We're recalling Magistrate Judge Case 21-99, the

20    United States of America v. Riley June Williams.

21             THE COURT:  Thanks.

22        Ms. Sedky, so one thing I wanted to -- before we -- the

23    defendant went to a breakout room, we -- we started talking

24    about the -- whether the conditions of release would go kind of

25    higher or lower and how -- you know, what the basis is in both

1    ratcheting it up or ratcheting it down.  And one thing, I

2    think, that would be helpful is I was -- obviously, you know,

3    I've read the criminal complaint.  As the complaint has noted

4    there, there's some extremely troubling conduct.  And so

5    additionally I had thought that perhaps this would be a matter

6    in which the government in the foreign district had -- would

7    have asked for detention.  And so -- but I just want to get

8    some additional background; right?

9           You've talked about some of the concerns you had about

10   the defendant and her safety, and so I'm hoping that you can --

11   because, obviously, the allegations are extremely troubling

12   that are in the complaint.  So I just need some additional

13   facts.  I think that would also be helpful before we hear from

14   Mr. Kramer to get that better fidelity of what's going on.

15                THE PRETRIAL SERVICES OFFICER:  Your Honor --

16                MR. KRAMER:  Your Honor, I'm sorry to interrupt

17   for -- I apologize.  I have to be off this -- I have a Zoom

18   that I have to be on at 3:00.  Is there a chance we could

19   continue this until tomorrow morning and leave her on the same

20   conditions she's been on for the last several days, obviously,

21   which she doesn't have a computer.  They seized all her

22   electronics.  So she doesn't even have her computer or phone at

23   this point.

24                THE COURT:  So yeah.  Thank you, Mr. Kramer.  That

25   would be fine by me.  I guess if -- can I squeeze out my last

1    eight minutes from you, though?  Is that fine?

2              MR. KRAMER:  I mean, I have to get on it, but sure.

3              THE COURT:  I'll take six.  I'll take six.

4              MR. KRAMER:  The only reason -- the only reason I'm

5    saying that is she doesn't have the electronics in --

6              THE COURT:  No, I understand.

7              MR. KRAMER:  And I didn't realize this -- any of

8    these issues were going to arise.

9              THE COURT:  No, no, no.  Yeah, me -- me as well.  So,

10   I mean, I think the government --

11             MR. KRAMER:  One last thing.  I'm sorry.  Because --

12   because they're saying there's new evidence that warrants this

13   and there was an agreement there in Harrisburg, I think we're

14   entitled to know what the new evidence is that they're

15   alleging.

16             MS. SEDKY:  Well, let me -- let me rephrase it.  I

17   mean, I'm happy to answer that.  We -- we are -- we were

18   already aware -- and -- and, actually, I had asked the -- my

19   colleague in the Middle District of Pennsylvania to ask for

20   computer restrictions and internet restrictions, and I -- I

21   think that got lost in the shuffle, quite frankly.  I was muted

22   during the -- the hearing so I wasn't able to interject.  And

23   it is true that for now there were no devices that the

24   defendant herself has in the home, but I'm more concerned about

25   going forward.

1          And the new -- the new evidence is more -- we were aware

2     that she was deleting her own online accounts and possibly, you

3     know, switching devices.  And -- and -- and that was in the --

4     both the original complaint and in the amended complaint

5     statement of facts.  And what we -- what we have learned

6     recently was that we also think she might be telling -- we

7     have -- we have indications that she was instructing other

8     people to -- to delete messages as well.

9          And so it's not that this was -- in my view, this got

10    overlooked in the Middle District of Pennsylvania.  I had

11    certainly spoken to defense counsel -- to -- to the AUSA there

12    about it, and I think it just got lost during the hearing.  And

13    that's why I'm asking for it now.

14              THE COURT:  Okay.  Anything else?  We have a couple

15    of minutes, and I think we'll just have to continue tomorrow.

16    I assume that that works for you in terms of going to tomorrow,

17    Ms. Sedky?

18              MS. SEDKY:  Yes, it does, Your Honor.

19              THE COURT:  Why don't we first, more importantly, get

20    the scheduling done.  Mr. Kramer, what looks good for you

21    schedule-wise tomorrow?

22              MR. KRAMER:  Thank you, Your Honor.

23         Because I asked, any time is -- is okay.

24              THE COURT:  Okay.  Ms. Sedky, anything from your end?

25              MS. SEDKY:  My schedule is wide open tomorrow.

```
 1                THE COURT:  Okay.  Ms. Lavigne-Rhodes, what -- I
 2      would say I would like to get it done in the morning so we can
 3      keep things moving, as we have more potentially tomorrow
 4      afternoon.  So do you want to say 10:30?
 5                THE COURTROOM DEPUTY:  Sure.  10:30 would work fine.
 6                THE COURT:  Okay.
 7                THE COURTROOM DEPUTY:  That should work.
 8                THE COURT:  Why don't we put a pin on it, unless
 9      Ms. Sedky, there's anything else you want to add to the record.
10                MS. SEDKY:  Nothing, Your Honor.
11                THE COURT:  So, Ms. Williams, we're going to come
12      back tomorrow at 10:30.  We'll continue this proceeding.
13      You've heard the government had some additional allegations.  I
14      have some more factual questions.  I want to just kind of hear
15      about the background of your case.  I've read the complaint, as
16      I said.  I'm very concerned about allegations that are in
17      there.  The government has raised additional allegations, and
18      so I want to just hear why they're asking for the conditions
19      that they are and so we can make sure that we have, you know,
20      a -- a timely manner that we can resolve this.  I don't want
21      this to drag on.  I want to get some things moving.  I want to
22      get your case moving, frankly, because it's important.  You
23      have a right, as does the public, to a speedy trial.  So we
24      will reconvene tomorrow at 10:30.
25                Anything else from your end, Mr. Kramer?
```

1              MR. KRAMER:  No.  Thank you.

2              THE COURT:  Okay.  Thank you to all.  The parties are

3     excused.

4              (The proceedings were recessed at 2:56 p.m.)

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3            I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                          Dated this 26th day of January, 2021.

10

11                    /s/ Nancy J. Meyer
                      Nancy J. Meyer
12                    Official Court Reporter
                      Registered Diplomate Reporter
13                    Certified Realtime Reporter
                      333 Constitution Avenue Northwest, Room 6509
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25