**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-618 (ABJ)** |
| **v.** | : | |
| | : | |
| **RILEY JUNE WILLIAMS,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OMNIBUS OPPOSITION TO DEFENDANT'S MOTIONS TO
DISMISS COUNTS
ONE, TWO, FIVE AND SIX AND MOTION TO TRANSFER VENUE**

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, hereby respectfully submits this opposition to the defendant's Motions

to Dismiss Counts One, Two, Five and Six of the indictment and Motion to Transfer Venue.  The

defendant's motions should be denied in their entirety.

**PROCEDURAL HISTORY**

On October 6, 2021, the Grand Jury returned an indictment charging the defendant, Riley

June Williams, with the following offenses: civil disorder, in violation of 18 U.S.C. § 231(a)(3);

obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2); assaulting, resisting,

or impeding certain officers in violation of 18 U.S.C. § 111(a)(1); aiding and abetting theft of

government property, in violation of 18 U.S.C. §§ 641, 2; entering or remaining on restricted

building or grounds, in violation of 18 U.S.C. § 1752(a)(1); disorderly and disruptive conduct in a

restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); disorderly conduct in a

Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D); and parading, demonstrating, or

picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G).

On November 19, 2021, the defendant filed a motion to dismiss Count Two of the indictment, ECF No. 33, which charges her with obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2).  On December 13, 2021, the defendant filed a motion to dismiss Count One of the indictment, ECF No. 36, which charges her with civil disorder in violation of 18 U.S.C. § 231; a motion to dismiss Counts Five and Six of the indictment, ECF No. 37, which charges her with entering and remaining in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(1) and disorderly and disruptive conduct in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(2), respectively; and a motion to transfer venue, ECF No. 38.  For the reasons stated below, the defendant's motions are without merit and should be denied.

## LEGAL STANDARD

A defendant may move to dismiss an indictment or count for failure to state a claim prior to trial.  *See* Fed. R. Crim. P. 12(b)(3)(B)(v).  "An indictment must be viewed as a whole and the allegations must be accepted as true in determining if an offense has been properly alleged." *United States v. Bowdin*, 770 F. Supp. 2d 142, 146 (D.D.C. 2011).  The operative question is whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed.  *Id.*

Federal Rule of Criminal Procedure 7(c)(1) governs the "Nature and Contents" of an indictment. The rule states, in relevant part, that "[t]he indictment … must be a plain, concise, and definite written statement of the essential facts constituting the offense charged," and that "[f]or each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated."  Fed. R. Crim. P. 7(c)(1).

## ARGUMENT

## The Defendant's Motion to Dismiss Count Two Lacks Merit

Williams argues that Count Two, charging a violation of 18 U.S.C. § 1512(c)(2), should be dismissed because Congress's certification of the Electoral College vote is not an "official proceeding," because the statute is unconstitutionally vague as applied, and because she did not have fair notice that her actions are punishable under 18 U.S.C. § 1512(c)(2). As set forth below, and as other judges of this Court have held, these arguments lack merit.

### I.      The certification of the Electoral College vote is an official proceeding

Section 1512(c)(2) of Title 18 of the U.S. Code provides that "[w]hoever corruptly . . . obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both." The defendant argues (Def.'s Mot. ECF No. 33, 4-13) that Congress's certification of the Electoral College vote on January 6, 2021 does not qualify as an "official proceeding" for purposes of 18 U.S.C. § 1512(c)(2). As set forth below and as several judges of this Court have recently concluded, this argument lacks merit. *See United States v. Sandlin,* 21-cr-88 (DLF), 2021 WL 5865006 (D.D.C. Dec. 10, 2021); *United States v. Caldwell*, 21-cr-28 (APM), 2021 WL 6062718 (D.D.C. Dec. 20, 2021); *United States v. Mostofsky*, 21-cr-138 (JEB), 2021 WL 6049891 (D.D.C. Dec. 21, 2021); *United States v. Montgomery,* 21-cr-46 (RDM), 2021 WL 6134591 (D.D.C. Dec. 28, 2021); *United States v. Nordean,* 21-cr-175 (TJK) (D.D.C. Dec. 28, 2021).

#### A.  Background

The Constitution and federal statutory law require that both Houses of Congress meet to certify the results of the Electoral College vote. Two separate provisions in the Constitution mandate that the Vice President while acting as the President of Senate "shall, in the Presence of

the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted." U.S. Const. art. II, § 1, cl. 3; U.S. Const amend. XII.  Under the Electoral Act of 1887, a Joint Session of the Senate and the House of Representatives must meet at "the hour of 1 o'clock in the afternoon" on "the sixth day of January succeeding every meeting of the electors."  3 U.S.C. § 15.  Section 15 details the steps to be followed:  the President of the Senate opens the votes, hands them to two tellers from each House, ensures the votes are properly counted, and then opens the floor for written objections, which must be signed "by at least one Senator and one Member of the House of Representatives."  *Id.*  The President of the Senate is empowered to "preserve order" during the Joint Session.  3 U.S.C. § 18.  Upon a properly made objection, the Senate and House of Representatives withdraw to consider the objection; each Senator and Representative "may speak to such objection . . . five minutes, and not more than once."  3 U.S.C. § 17.  The Electoral Act, which specifies where within the chamber Members of Congress are to sit, requires that the Joint Session "not be dissolved until the count of electoral votes shall be completed and the result declared."  3 U.S.C. § 16.

The obstruction statute with which the defendant is charged prohibits corruptly obstructing, influencing, or impeding any official proceeding.  18 U.S.C. § 1512(c)(2).  An official proceeding for purposes of § 1512(c)(2) is defined as:

> (A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;
>
> (B) *a proceeding before the Congress*;
>
> (C) a proceeding before a Federal Government agency which is authorized by law; or
>
> (D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of

4

any person engaged in the business of insurance whose activities affect interstate commerce[.]

18 U.S.C. § 1515(a)(1) (emphasis added).

## B. Certification of the Electoral College vote is a proceeding before the Congress

### 1. Certification of the Electoral College vote is a "proceeding before the Congress"

The certification of the Electoral College vote as set out in the Constitution and federal statute is a "proceeding before the Congress," 18 U.S.C. § 1515(a)(1)(B), and, therefore, an "official proceeding" for purposes of 18 U.S.C. § 1512(c)(2). That conclusion flows principally from the obstruction statute's plain text. *See Caldwell*, 2021 WL 6062718 at * 4 ("A straightforward reading of that definition easily reaches the Certification of the Electoral College vote."). Skipping past the text, the defendant argues that Congress's intent and other language in the obstruction statute import a requirement that the proceeding be "adversarial" in nature and related to the administration of justice. Def.'s Mot. ECF No. 33, Mot. 8. That argument is incorrect. The defendant's remaining arguments—that her interpretation finds support in other cases and that interpreting the Electoral College vote certification as a "proceeding before the Congress" renders other statutes superfluous—are similarly flawed. Def.'s Mot. ECF No. 33, 8-9, 12-13.

Understanding what qualifies as an official proceeding "depends heavily on the meaning of the word 'proceeding'" because "official proceeding" is defined "somewhat circularly" as, among other things, a congressional "proceeding." *See United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013). The certification of the Electoral College vote constitutes a "proceeding" under any interpretation of that term. In its broadest and most "general sense," a proceeding refers to "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior." *Id.* (quoting *Proceeding,* Oxford English Dictionary, *available at* http://www.oed.com). The

defendant does not meaningfully contend that the certification of the Electoral College vote, which involves a detailed "series of actions" outlining how the vote is opened, counted, potentially objected to, and ultimately certified, is not a proceeding—and indeed an official proceeding—under that broad definition.   And there is good reason to construe "proceeding" as used in 18 U.S.C. § 1515 broadly.   Section 1515's text encompasses not only congressional proceedings, but judicial proceedings, grand jury proceedings, any legally authorized proceedings before federal government agencies, and proceedings "involving the business of insurance."   18 U.S.C. § 1515(a)(1); *see* S. Rep. No. 97-532, at 17 (1982) (noting that the "term 'official proceeding'" in the obstruction statute is "defined broadly").

But even if the "legal—rather than the lay—understanding" of proceeding governs Section 1515's interpretation, *see Ermoian*, 752 F.3d at 1170, the Electoral College vote certification qualifies.   This narrower definition includes the "business conducted by a court or other official body; a hearing."   Black's Law Dictionary, "proceeding" (11th ed. 2019).   Taken with its modifier "official," the term proceeding thus "connotes some type of formal hearing."   *Ermoian*, 752 F.3d at 1170; *see United States v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008) (the "more formal sense" of "official proceeding" is "correct in the context of § 1512").   For example, in cases assessing whether a law enforcement investigation amounts to an "official proceeding" as defined in Section 1515—including the cases relied upon by the defendant—courts analyze the degree of formality involved in an investigation.   *See, e.g.*, *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019) (holding that FBI investigation was not an "official proceeding" because that term "implies something more formal than a mere investigation"), *cert. denied*, 140 S. Ct. 1106 (2020); *Ermoian*, 752 F.3d at 1170-72 (same); *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009) (holding that internal investigation conducted by a review panel within the Bureau of Prisons was an "official

proceeding" because the review panel's "work [was] sufficiently formal"); *Ramos*, 537 F.3d at 463 (holding that internal investigation conducted by Customs and Border Patrol was not an "official proceeding" because that term *"*contemplates a formal environment"); *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) (holding that investigation conducted by Bureau of Alcohol, Tobacco, and Firearms was not an "official proceeding" because that term encompasses "events that are best thought of as hearings (or something akin to hearings)"); *see also United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) (holding that a "*formal* investigation" conducted by the Officer of the Inspector General at the Agency for International Development qualified as a "proceeding" for purposes of 18 U.S.C. § 1505) (emphasis added).

The formality involved in the certification of the Electoral College vote places it "comfortably within the category" of an official proceeding. *See Perez*, 575 F.3d at 169.  Few events are as solemn and formal as a Joint Session of the Congress.  That is particularly true for the certification of the Electoral College vote, which is expressly mandated under the Constitution and federal statute.  Moreover, judges of this Court have found that while not all actions occurring before Congress equate to an official proceeding, the certification of the Electoral College is an official proceeding.  *Sandlin,* 2021 WL 5865006, at *3-4 (finding that the certification of the Electoral College is an official proceeding because the "Joint Session has the trappings of a formal hearing before an official body[,]… the certificates of electoral results are akin to records or documents produced during judicial proceedings, and any objection to these certificates can be analogized to evidentiary objections."); *Mostofsky*, 2021 WL 6049891, at *10 (concluding that the certification of the Electoral College is an official proceeding within the meaning of 18 U.S.C. §§ 1515, 1512(c)(2)); *Caldwell*, 2021 WL 6062718 at * 4 ("The Certification of the Electoral College vote thus meets the definition of an 'official proceeding.'"); *Nordean,* 21-cr-175 at 11 ("the

certification is therefore a 'series of actions' that requires 'some formal convocation,' making it a 'proceeding before the Congress,' 18 U.S.C. §1515(a)(1)(B), and thus an 'official proceeding.'")

Required by law to begin at 1 pm on the January 6 following a presidential election, the certification of the Electoral College vote is both a "hearing" and "business conducted by . . . [an] official body." *See* Black's Law Dictionary, *supra*. The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election. 3 U.S.C. § 15. As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection. *Id.* And just as the judge and parties occupy specific locations in a courtroom, so too do the Members within the "Hall." *See* 3 U.S.C. § 16 (President of the Senate is in the Speaker's chair; the Speaker "immediately upon his left"; the Senators "in the body of the Hall" to the right of the "presiding officer"; the Representatives "in the body of the Hall not provided for the Senators"; various other individuals "at the Clerk's desk," "in front of the Clerk's desk," or "upon each side of the Speaker's platform"). The Electoral College vote certification, moreover, must terminate with a decision: no recess is permitted until the "the count of electoral votes" is "completed," and the "result declared." *Id.* In short, the certification of the Electoral College vote is a "proceeding before the Congress." *See* 18 U.S.C. § 1515(a)(1)(B).

### 2. The proceeding before Congress is not limited to purely "adversarial" proceedings

The defendant improperly asks this Court to add a limitation to the definition and interpret "official proceeding" to be limited to proceedings related "to a hearing before a tribunal affecting the administrative of justice." Def.'s Mot. ECF No. 33, 6-9. As an initial matter, it is difficult to imagine a proceeding more "official" than a constitutionally and statutorily prescribed Joint

Session of Congress.  Whatever the merits of the defendant's argument for other provisions in Section 1515(a)(1), moreover, it finds no textual support when applied to Section 1515(a)(1)(B), which speaks broadly of a proceeding "before the Congress."  Had Congress wanted to import a definition that more closely resembled a quasi-adjudicative setting, it needed look only a few provisions away to 18 U.S.C. § 1505, which criminalizes obstruction of "the due and proper administration of the law under which any pending proceeding is being had" by a federal department or agency.  Further, Section 1505 expressly criminalizes obstruction of "any inquiry or investigation [that] is being had by" Congress, including by congressional committees and subcommittees.  18 U.S.C. § 1505; *see United States v. Bowser*, 964 F.3d 26, 31 (D.C. Cir. 2020). If Congress wished to limit the obstruction prohibition under Section 1505 to congressional investigations, it could have done so in the text of Section 1515(a)(1)(B).  *See Russello v. United States,* 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each.  We would not presume to ascribe this difference to a simple mistake in draftsmanship.")  But it did not.  Instead, Congress enacted broader language— "a proceeding before the Congress"—to cover a broader range of proceedings than the "inquir[ies] and investigation[s]" envisioned in Section 1505.  That broader definition includes the Electoral College vote certification. *See Caldwell*, 2021 WL 6062718 at * 5 (rejecting the same argument and holding that "Congress did not intend to limit the congressional proceedings protected under section 1512(c) to only those involving its adjudicatory, investigative, or legislative functions. And the court will not add a requirement to the statute that Congress did not see fit to include."); *Sandlin*, 2021 WL 5865006, at *4 ("[T]he Court will not read an "administration of justice" requirement into "official proceeding."); *Nordean,* 21-cr-175 at *12

(holding that the certification is an official proceeding but that even if there is a quasi-adjudicative or quasi-judicial requirement, the Certification would "pass the test.").

### 3.   **Section 1512 is not limited to corporations destroying documents**

Further, rather than engage with Section 1515's text, the defendant relies on inapposite case law and unsupported legislative history to argue that the certification of the Electoral College vote is not an "official proceeding" under the misguided belief that Section 1512(c), in its entirety, is aimed at "preventing corporations from destroying records relevant to a federal hearing related to the administration of justice."  Def.'s Mot. ECF No. 33, 11.  That approach fails for several reasons.  First, it is methodologically flawed.  To determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning."  *Levin v. United States*, 568 U.S. 503, 513 (2013) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)).  In ordinary parlance, a gathering of the full Congress to certify the Electoral College vote is "a proceeding before the Congress."  Because Section 1515(a)(1)(B)'s words "are unambiguous, the judicial inquiry is complete."  *See Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation marks omitted).  The defendant offers no rationale for looking past the statute's plain text to reach for other interpretive tools.

Relying on the Supreme Court's decision in *Yates v. United States*, 574 U.S. 528 (2015), the defendant also contends that Section 1512(c)(2) targets only "corporate malfeasance" and is "aimed at preventing corporations from destroying records relevant to a federal hearing related to the administration of justice."  Def.'s Mot. ECF No. 33, 9–11.  That contention is flawed in several respects.  The statute at issue in *Yates* was 18 U.S.C. § 1519, which prohibits altering, destroying, and concealing records, documents, and tangible objects.  *See Yates*, 574 U.S. at 532 (plurality opinion).  The Supreme Court in *Yates* held that the term "tangible object" as used in Section 1519

included only an object "used to record or preserve information," and thus did not encompass the undersize red grouper that the defendant in *Yates* had discarded. *Id.* In reaching that conclusion, the plurality compared Section 1519 with Section 1512(c)(1), which similarly prohibits altering, destroying, or concealing evidence in connection with an official proceeding. Congress enacted both Sections 1519 and 1512(c) as part of the Sarbanes-Oxley Act of 2002, 116 Stat. 745, but drafted Section 1512(c)(1) to reach more broadly than Section 1519. *See Yates*, 574 at 543-45; *see also id.* at 545 n.7 ("Congress designed § 1519 to be interpreted apart from § 1512, not in lockstep with it."); *Caldwell*, 2021 WL 6062718 at *15-18 (rejecting defendants' arguments that *Yates* narrows the reach of Section 1512(c) based, in part, on the statute's title and placement within Chapter 73 of Title 18).

The statute with which the defendant is charged, Section 1512(c)(2), is broader still, expanding the obstruction prohibition beyond the focus on document destruction in Sections 1519 and Section 1512(c)(1). *See United States v. Ring*, 628 F. Supp. 2d 195, 225 (D.D.C. 2009) ("[Section] 1512(c)(2)'s application is not limited to the destruction of documents."). Its application to a defendant who "corruptly . . . otherwise obstructs, influences, or impedes any official proceeding," § 1512(c)(2), "operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific offense like document destruction, which is listed in (c)(1)." *United States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015) (affirming conviction under Section 1512(c)(2) for false statements) (quoting *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014)). Courts have repeatedly upheld its application to obstructive acts that reach beyond the impairment of financial records. *See id.* (collecting cases concerning violations of Section § 1512(c)(2) by virtue of the use of false statements); *United States v. Phillips*, 583 F.3d 1261, 1265 (10th Cir. 2009) (upholding conviction under Section 1512(c)(2) for disclosing the

identity of an undercover federal agent to thwart a grand jury investigation); *United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009) (upholding conviction under Section 1512(c)(2) for providing false testimony to a grand jury); *United States v. Cervantes*, No. 16-10508, 2021 WL 2666684, at *6 (9th Cir. June 29, 2021) (upholding conviction under Section 1512(c)(2) for the burning of building to conceal two bodies of murder victims).

Furthermore, while Section 1512(c) may have been enacted due to concerns over document destruction and corporate malfeasance, "[s]tatues often reach beyond the principle evil that animated them." *Sandlin,* 2021 WL 5865006, at *9 (finding that Section 1512(c)(2) may apply to defendants who attempted to stop the certification of the Electoral College on January 6, 2021); *see also Mostofsky*, 2021 WL 6049891 at *11 (rejecting defendant's argument that Section 1512 only applies to conduct similar to document destruction and explaining that the defendant's position "would have the Court ignore the plain meaning of the words contained in (c)(2)—to wit, 'obstructs, influences, or impedes'—which cannot be read so narrowly. The use of 'otherwise' is better understood as 'clarif[ying] that the latter prohibits obstruction by means <u>other than</u> document destruction.'") (emphasis in original); *Caldwell*, 2021 WL 6062718 at * 14 ("The natural reading of the two sections is that section 1512(c)(2) 'operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific offense like document destruction'").

### 4. <u>Defendant's remaining argument lacks merit</u>

The defendant intimates (Def.'s Mot. ECF No. 33, 12-13) that, to the extent her role in interfering with the Electoral College vote certification warranted prosecution, she should only have been charged violations of 18 U.S.C. § 231 and 40 U.S.C. § 5104 because her actions interfered with a "federally protected function" and "official business of Congress," not an "official proceeding."  In her view, charging also under 18 U.S.C. §1512 is "overkill."  Def.'s Mot.

ECF No. 33, 13.  The defendant's claims are legally and factually meritless.  First, each of the offenses that she cites contains different elements that the Government must prove beyond a reasonable doubt.  Moreover, the mere fact that multiple criminal statutes apply to an individual's conduct does not render prosecution under one (or more) of those statute suspect; indeed, "overlap" is "not uncommon in [federal] criminal statutes."  *Loughrin v. United States*, 573 U.S. 351, 358 n.4 (2014); *accord Hubbard v. United States*, 514 U.S. 695, 714 n.14 (1995) (opinion of Stevens, J.) ("Congress may, and often does, enact separate criminal statutes that may, in practice, cover some of the same conduct."); *see also United States v. Batchelder*, 442 U.S. 114, 123 (1979) ("So long as overlapping criminal provisions clearly define the conduct prohibited and the punishment authorized, the notice requirements of the Due Process Clause are satisfied.").

## II.   18 U.S.C. § 1512(c)(2) is not unconstitutionally vague and the defendant had fair notice that her actions are punishable under 18 U.S.C. § 1512(c)(2)

The defendant argues (Def.'s Mot. ECF No. 33, 13-17) that Section 1512(c) is unconstitutionally vague as applied to her.  She specifically alleges that Section 1512(c)(2) is unconstitutionally vague due to the inclusion of the word "otherwise" and that the terms "corruptly" and "official proceeding" are unconstitutionally vague.  As several judges in this district have recently concluded, this argument, too, lacks merit.  *Sandlin,* 2021 WL 5865006, *Caldwell*, 2021 WL 6062718, *Mostofsky*, 2021 WL 6049891; *Montgomery,* 2021 WL 6134591; *Nordean,* 21-cr-175.

### A.  Background

The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from "depriv[ing] any person of life, liberty, or property, without due process of law."  An outgrowth of the Due Process Clause, the "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct

it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).

The void for vagueness doctrine is narrow.  The challenger must overcome a strong presumption that duly enacted statutes are constitutional.  *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963) ("The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language.").  In addition, a statute is not void for vagueness simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010).  Rather, a provision is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application.  *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974).  The "touchstone" of vagueness analysis "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal."  *United States v. Lanier*, 520 U.S. 259, 267 (1997).

Other courts in this District have recognized the doctrine's high bar for invalidation:

[N]o void for vagueness challenge is successful merely because a statute requires a person to conform his conduct to an imprecise but comprehensible normative standard, whose satisfaction may vary depending upon whom you ask.  Instead, unconstitutional vagueness arises only if the statute specifies no standard of conduct at all.

*United States v. Gonzalez*, No. 20-cr-40 (BAH), 2020 WL 6342948, at *7 (D.D.C. Oct. 29, 2020) (internal citation and quotation omitted); *see also United States v. Harmon*, No. 19-cr-395 (BAH),

2021 WL 1518344, at *4 (D.D.C. Apr. 16, 2021) (finding that the defendant did not meet the "stringent standard" to prevail on a Rule 12 vagueness motion).

**B. The "otherwise" catch-all clause is not unconstitutionally vague as applied here.**

The defendant argues that Section 1512(c)(2) is unconstitutionally vague due to the inclusion of the word "otherwise" in Section 1512(c)(2)'s "otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so" by relying on *Johnson*. Def.'s Mot. ECF No. 33, 13-15. However, *Johnson* involved the residual clause of the Armed Career Criminal Act (ACCA) which, unlike Section 1512(c)(2), is in the same section as other examples of a violent felony and the catch all language is separated only by a comma. Section 1512(c)(1) and (2) only share two words in common – whoever corruptly – and are otherwise distinct and independent prohibitions that need not be interpreted the same way. *Sandlin*, 2021 WL 5865006, at *7 (internal quotation marks omitted); *Nordean*, 21-cr-175 at 20 (holding that the phrase "otherwise obstructs, influences, or impedes is not vague as applied" to the conduct of another Capitol riot defendant and noting that the "language is best read broadly, not as constrained by the subsection preceding it.")

Section 1512(c) consists of two provisions, which both require the defendant to act "corruptly" and is separated by both a semicolon and line break. First, Section 1512(c)(1) criminalizes "alter[ing], destroy[ing], mutilat[ing], or conceal[ing] a record, document, or other object . . . with the intent to impair the object's integrity or availability for use in an official proceeding." Section 1512(c)(2), by contrast, applies more generally to any acts that "otherwise obstruct[], influence[], or impede[]" an official proceeding. The term "otherwise," consistent with its ordinary meaning, conveys that Section 1512(c)(2) encompasses misconduct that threatens an official proceeding "beyond [the] simple document destruction" that Section 1512(c)(1)

proscribes. *United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013); *Petruk*, 781 F.3d at 446-47 (noting that "otherwise" in Section 1512(c)(2), understood to mean "in another manner" or "differently," implies that the obstruction prohibition in that statute applies "without regard to whether the action relates to documents or records") (internal quotation marks omitted); *see also Ring*, 628 F. Supp. 2d at 224 n.17 (noting that Section 1512(c)(2) is "plainly separate and independent of" Section 1512(c)(1), and declining to read "otherwise" in Section 1512(c)(2) "as limited by § 1512 (c)(1)'s separate and independent prohibition on evidence-tampering"); *Otherwise*, Oxford English Dictionary, *available at* http://www.oed.com (defining otherwise as "in another way" or "in any other way"); *see also Gooch v. United States*, 297 U.S. 124, 127-28 (1936) (characterizing "otherwise" as a "broad term" and holding that a statutory prohibition on kidnapping "for ransom or reward or otherwise" is not limited by the words "ransom" and "reward" to kidnappings for pecuniary benefit); *Collazos v. United States*, 368 F.3d 190, 200 (2d Cir. 2004 (construing "otherwise" in 28 U.S.C. § 2466 (1)(C) to reach beyond the "specific examples" listed in prior subsections, thereby covering the "myriad means that human ingenuity might devise to permit a person to avoid the jurisdiction of a court").

In this way, Section 1512(c)(2) criminalizes the same *result* prohibited by Section 1512(c)(1)—obstruction of an official proceeding—when that result is accomplished by a different *means, i.e.*, by conduct other than destruction of a document, record, or other object. *Cf. United States v. Howard*, 569 F.2d 1331, 1333 (5th Cir. 1978) (explaining that 18 U.S.C. § 1503, which criminalizes the result of obstructing the due administration of justice, provides specific means of accomplishing that result and then a separate catch-all clause designed to capture other means). Section 1512(c)(2), in other words, "operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific" obstruction offense involving documents or records

under Section 1512(c)(1).  *Petruk*, 781 F.3d at 447 (quoting *Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014); *cf. United States v. Aguilar*, 515 U.S. 593, 598 (1995) (describing similar "[o]mnibus" clause in 18 U.S.C. § 1503 as a catchall that is "far more general in scope than the earlier clauses of the statute").  Therefore, as judges on this Court recently held, the addition of the catchall language of "otherwise" in Section 1512(c)(2) does not make the section unconstitutionally vague. *Sandlin,* 2021 WL 5865006; *Nordean,* 21-cr-175.

 **C.  The word "corruptly" is not unconstitutionally vague as applied here.**

 Section 1512(c)(2) applies only where an individual "corruptly" performs one of the enumerated acts.  The defendant argues (Def.'s Mot. ECF No. 33, 15-17) that the term "corruptly" is unconstitutionally vague.  As judges on this Court have recognized, that argument is without merit.  *See Sandlin*, 2021 WL 5865006 at *10-14 (rejecting defendant's challenge that "corruptly" was unconstitutionally vague as used in Section 1512(c)(2)); *Mostofsky*, 2021 WL 604891 at *11 ("As a result, to the extent that Mostofsky argues that § 1512(c)(2) is vague on its face, such an argument cannot succeed. . . .The Court will also not dismiss the § 1512 charge as vague as applied to Mostofsky, given that mapping the statutory language on to his conduct") (emphasis in original); *Montgomery,* 2021 WL 6134591 at *20 (rejecting defendants' challenge that "corruptly" was unconstitutionally vague as used in Section 1512(c)(2) and explained that "most of the key terms of the statute are unambiguous and mean what they say); *Nordean,* 21-cr-175 (holding that the term corruptly does not render Section 1512(c)(2) as unconstitutionally vague).

 The defendant relies on *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991), which addressed a separate statute, 18 U.S.C. § 1505, that prohibited "corruptly" obstructing a congressional inquiry.  The D.C. Circuit held that the term "corruptly" was "vague … in the absence of some narrowing gloss."  *Id*. at 378.  The statute "does not at all clearly encompass lying

to the Congress," *id*., and "the term 'corruptly' [was] too vague to provide constitutionally adequate notice" as to which lies it prohibited, *Id*. at 379.

*Poindexter*[1] is inapposite, as other judges on this Court recently recognized. *Caldwell*, 2021 WL 60626718 ("Their argument is that because the court in *Poindexter* found the term "corruptly" to be vague as applied to the defendant there, so it is here, too. The court disagrees."); *Nordean,* 21-cr-175 at 21 ("In the 30 years it has been on the books, courts have not applied *Poindexter* widely to render impotent the many obstruction statues that use the word 'corruptly.' Rather, as other judges in this district pointed out recently, courts have recognized the narrow reasoning used in *Poindexter* and cabined that vagueness holding to its unusual circumstances.") (internal quotations omitted). First, the D.C. Circuit narrowly confined *Poindexter*'s analysis to Section 1505's use of "corruptly," and expressly declined to hold "that term unconstitutionally vague as applied to all conduct." 951 F.2d at 385. Five years later, in *United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996), the D.C. Circuit rejected a *Poindexter*-based vagueness challenge to 18 U.S.C. § 1512(b) and affirmed the conviction of a defendant for "corruptly" influencing the testimony of a potential witness at trial. *Id*. at 629-630. Other courts have similarly recognized "the narrow reasoning used in *Poindexter*" and "cabined that vagueness holding to its unusual circumstances." *United States v. Edwards*, 869 F.3d 490, 502 (7th Cir. 2017); *see also, e.g*., *United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998) (rejecting vagueness challenge to "corruptly" in 26 U.S.C. § 7212(a)); *United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998) (same for 18 U.S.C. § 1512(b)); *United States v. Brenson*, 104 F.3d 1267, 1280 (11th Cir. 1997) (same for 18

---

[1] *Poindexter* was also superseded in significant part by the False Statements Accountability Act of 1996, Pub. L. No. 104-292, 110 Stat. 3459. As codified at 18 U.S.C. § 1515(b), the Act provides that the term "corruptly" in § 1505 "means acting with an improper purpose, *personally or by influencing another*, including making a false or misleading statement." (Emphasis added.)

U.S.C. § 1503).  Defendant's rote incantation of *Poindexter* accordingly fails to establish that Section 1512(c) suffers the same constitutional indeterminacy.

Second, *Poindexter* predated the Supreme Court's decision in *Arthur Andersen v. United States*, 544 U.S. 696 (2005).  There, the Court explained the terms "'[c]orrupt" and 'corruptly' are normally associated with wrongful, immoral, depraved, or evil."  *Id*. at 705 (citation omitted).  In doing so, the Court "did not imply that the term was too vague."  *Edwards*, 869 F.3d at 502.

Third, courts have encountered little difficulty when addressing Section 1512(c)'s elements following *Arthur Andersen*.  *See United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011); *United States v. Gordon*, 710 F.3d 1124, 1151 (10th Cir. 2013) (same); *United States v. Watters*, 717 F.3d 733, 735 (9th Cir. 2013) (upholding jury instruction defining "corruptly" as acting with "consciousness of wrongdoing"); *United States v. Matthews*, 505 F.3d 698, 706 (7th Cir. 2007) (upholding instruction defining "corruptly" as acting "with the purpose of wrongfully impeding the due administration of justice"); Seventh Circuit Pattern Criminal Jury Instruction for § 1512 ("A person acts 'corruptly' if he or she acts with the purpose of wrongfully impeding the due administration of justice.").  Such efforts demonstrate that the statute's "corruptly" element does not invite arbitrary or wholly subjective application by either courts or juries.

 "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness."  *Parker v. Levy*, 417 U.S. 733, 756 (1974).  As the government intends to prove at trial, in this case, on January 6, 2021, the defendant unlawfully entered the Capitol and proceeded to give direction and instructions to other rioters who had also unlawfully entered the Capitol.  For example, the defendant is seen on video directing other rioters to go upstairs.  While inside of one of Speaker Nancy Pelosi's offices, she directed an individual to put a glove on while he was stealing a laptop from Nancy Pelosi's office.  Williams also entered the Rotunda, where she

engaged in repeated purposeful physical clashes and verbal altercations with federal law enforcement officers and instructed others to do the same. She was among the front line of rioters who were pushing against federal law enforcement officers who were attempting to clear and protect the Capitol. On several occasions, Williams physically pushed her back against federal law enforcement officers who were trying to clear the rioters out of the Rotunda. She instructed other rioters to "keep pushing," and "push, push, push." Indeed, the other charges in the Indictment reflect this as well—Williams is also charged with assaulting a federal law enforcement officer, civil disorder, and with aiding and abetting theft of government property.

Whatever the "uncertainty around the edges," *Edwards*, 869 F.3d at 502, Section 1512(c)'s "corruptly" element provided ample notice to the defendant that *this conduct* was criminal. Her vagueness challenge accordingly fails.

**D.  The word "official proceeding" is not unconstitutionally vague as applied here.**

The defendant further contends (Def.'s Mot. ECF No. 33, 13-14) that the Court must speculate as to the meaning of the term "official proceeding" in Section 1512(c). As explained above, no indeterminacy exists. The Joint Session of Congress qualifies as an "official proceeding" under both the "lay" and "legal" definitions of the term. *See* pp. 3-8, *supra*. It also contains the necessary "adjudicatory" features to satisfy the defendant's extra-textual construction. *Id*. at 8. For that reason, Section 1512(c) provided him with more than "a fair warning … of what the law intends to do if a certain line [was] passed" on January 6, 2021. *Arthur Andersen*, 544 U.S. at 703 (citation omitted); *see also Caldwell*, 2021 WL 6062718 at *7 (rejecting vagueness challenge to "official proceeding" in the context of Section 1512(c)).

**E. The defendant's brief survey of the government's charging decisions is flawed and irrelevant**

The defendant cherry picks five Capitol riot cases and argues that this "illustrates how vague and arbitrary the enforcement of the statute can be."  Def.'s Mot. ECF No. 33, 17-19.  This effort is flawed.

As a threshold matter, the government's charging decisions reflect clear consistency with Section 1512(c)(2)'s offense elements.  Each defendant had the intent to "corruptly"—through wrongdoing, whether by violence, force, or other means—obstruct, interfere with, and impede the certification of the Electoral College vote count.  Their obstructive methods varied: for instance, some defendants assaulted officers outside the Capitol while others entered the Senate Chamber and rifled through Senators' paperwork.  But such factual distinctions lack salience under the statute.  Each type of conduct "corruptly" "obstruct[ed], influence[d], or impede[d]" a proceeding before Congress, accordingly, comes within the statute's scope.  18 U.S.C. § 1512(c).

Moreover, the vagueness doctrine asks whether "*the statute* … provide[s] a person of ordinary intelligence fair notice of what is prohibited."  *Williams*, 553 U.S. at 304 (emphasis added).  The defendant cites no authority, and the government has found none, showing that charging decisions postdating the offense conduct have any bearing on this inquiry.  The relevant question turns on whether the statute fairly informed the defendant that he would face criminal sanction for his conduct on January 6, 2021.  The answer is yes, for the reasons articulated above.

Rather than file a motion for a bill of particulars, the defendant further states in her motion to dismiss (Def.'s Mot. ECF No. 33, 19) that "the government does not specify what 'influence' these defendants had or how exactly they 'impeded.'"  But the government does not have to describe in the charging instrument how it will prove those statutory elements at trial.  *See United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976) (*en banc*) ("[N]either the Constitution, the

Federal Rules of Criminal Procedure, nor any other authority suggests that an indictment must put the defendants on notice as to every means by which the prosecution hopes to prove that the crime was committed."). If the government fails to carry its burden on these elements at trial, the jury will say so. But that future presentation has no bearing on the question here—whether Section 1512(c)'s text provided the defendant with adequate notice.

**The Defendant's Motion to Dismiss Count One Lacks Merit**

### III.   18 U.S.C. § 231 is not unconstitutionally vague nor overbroad and the indictment provides sufficient notice

The defendant has also moved to dismiss Count One of the indictment charging her with violating 18 U.S.C. § 231. Williams asserts that (1) Section 231 is unconstitutional because it criminalizes "any act to obstruct, impede, or interfere" which "reaches the outer limits of verbal and expressive conduct without drawing any distinction that could exclude acts undertaken merely to convey a message or symbolic content." Def.'s Mot. ECF No. 36, 5; (2) the term "civil disorder", as defined in Section 231, "offers no limitation" and "there is no indication whether the defendant is required to have participated in the civil disorder, or if it is sufficient that he or she be in the general vicinity of the event." *Id.* at 6; (3) Section 231 is subject to challenge because it lacks a scienter requirement, *Id.*; (4) Section 231 is subject to challenge because it is "not limited to 'violent acts' or acts that result in bodily injury or that otherwise put persons or property in imminent danger, *Id.* at 8; and (5) Section 231 is subject to challenge because it could extend to a "bystander who yells at police to desist from an arrest, one who flips off officers to distract or encourage resistance, or one who records police activity with a cell phone." *Id.* at 9-10. None of these arguments has merit, and they were appropriately rejected by another judge on the Court in *Mostofsky*. *See Mostofsky*, 2021 WL 6049891 at *8-9.

As noted above, constitutional statutory analysis begins with the statute's plain language. *United States v. Shill,* 740 F.3d 1347, 1351 (9th Cir. 2014). Federal legislation enjoys a presumption of constitutionality that may only be overturned "upon a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison,* 529 U.S. 598, 607 (2000).

Section 231(a)(3) criminalizes any act or attempted act to "obstruct, impede, or interfere" with a law enforcement officer "lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function." The statute defines civil disorder as "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(1).

Williams's motion, and particularly her first claim that the statute could apply to conduct "undertaken merely to convey a message or symbolic content," is most appropriately cast as an overbreadth argument—that is, she contends that Section 231 criminalizes too wide an array of activity including protected speech. Overbreadth can invalidate a criminal law only if "'a substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.'" *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008), quoting *New York v. Ferber*, 458 U.S. 747, 769-771 (1982); *see also City of Houston v. Hill*, 482 U.S. 451, 458 (1987). "A statute is facially invalid if it prohibits a substantial amount of protected speech." *Williams*, 553 U.S. at 293; *see also Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972). An overbreadth challenge faces a steep climb when the statute focuses mainly on conduct, as § 231(a)(3) assuredly does. *See Virginia v. Hicks*, 539 U.S.

113, 119 (2003) (noting the "substantial social costs created by the overbreadth doctrine when it blocks application of a law to . . . constitutionally unprotected conduct").

In *United States v. Mechanic*, 454 F.2d 849 (8th Cir. 1971), the Eight Circuit rejected a similar overbreadth challenge to § 231(a)(3).  "The operative words of the statute are 'whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer.'" *Id*. 852.  "Thus, the section applies only to a person who acts to impede, obstruct, or interfere with an official described in the statute." *Id*.

In *Mechanic*, the Eighth Circuit held that "conduct involved here [the massing of a mob that threw stones at an R.O.T.C. building on a college campus to protest the Viet Nam war, followed by rock and bottle throwing at fireman who arrived to quell the disturbance] is not entitled to constitutional protection." *Id*.  As the Court explained, "[t]he First Amendment has not been extended to protect rioting, inciting to riot, or other forms of physical violence."  *Id*. (citing *National Mobilization Com. to End War in Viet Nam v. Foran*, 411 F.2d 934, 937 (7th Cir. 1969)).  Thus, Section 231(a)(3) "does not purport to reach speech of any kind. It reaches only acts to impede, obstruct, or interfere with police officers and firemen." *Id; see also United States v. Wood*, 2021 WL 3048448, at *7 (D. Del. July 20, 2021) ("This Court agrees with *Mechanic* that § 231(a)(3) applies to conduct, not speech.").

Because "the statute does not attempt to curtail speech the defendants may not challenge it as vague or overly broad if their own conduct may be constitutionally prohibited, since … one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional." *Mechanic,* 454 F.2d at 853, citing *United States v. Raines*, 362 U.S. 17, 21 (1960).   Accordingly, as the Court in *Mostofsky* found, Section 231's "plain text,

however, indicates that it is 'targeted primarily if not exclusively at conduct rather than speech'" and the defendant's overbreadth challenge was without merit. *Mostofsky*, 2021 WL 6049891 at * 8.

Williams next claims that Section 231 is subject to challenge because, according to Williams, she cannot tell whether the statute requires an individual to have participated in the civil disorder or if it is sufficient that she be in the general vicinity of the event. This argument, too, is meritless. As an initial matter, there is no doubt that Williams herself participated in the civil disorder. Moreover, the plain language of the statue makes clear that Williams's claim is unfounded. "The crime set forth by the statute is not mere presence at a civil disorder . . . but an act committed during the course of such a disorder, so 'civil disorder' simply describes the environment in which the act must be committed in order to be subject to prosecution under § 231(a) (3)." *Mechanic*, 454 F.2d at 852; *see also United States v. Howard*, 2021 WL 3856290, at *14 (E.D. Wis. Aug. 30, 2021) ("[T]he statute does not require the government to prove that the defendant created the civil disorder, or that he was participating in the civil disorder."). Moreover, "it is not just any public disturbance which is the subject of the section, but only public disturbances which (1) involve acts of violence (2) by assemblages of three or more persons, and which (3) cause immediate danger of or result in injury to (4) the property or person of any other individual." *Mechanic*, 454 F.2d at 853; *see* 18 U.S.C. § 232(1).

The defendant then claims that Section 231 lacks a scienter element which she asserts weighs further in favor of the statute's overbreadth or vagueness (Def.'s Mot. ECF No. 36, 6-7). Again, the defendant is wrong. The statute requires proof that the "act" was done "to obstruct, impede, or interfere" with a firefighter or law enforcement officer, *i.e.* the defendant's purpose or intent in performing the "act" must be to obstruct, impede, or interfere. *See Mechanic*, 854 F.2d

at 854 ("§ 231(a)(3) must be construed to require intent").  That scienter requirement substantially

undermines Williams's overbreadth claim.  *See United States v. Gilbert*, 813 F.2d 1523, 1529 (9th

Cir. 1987) (intent requirement prevents application of a statute to protected speech); *United States*

*v. Featherston*, 461 F.2d 1119, 1122 (5th Cir. 1972) (§ 231(a)(3) is not unconstitutional on its face

because the statute requires intent and "does not cover mere inadvertent conduct"); *Williams*, 553

U.S. at 294 (focusing on scienter requirement in finding that a statute was not overbroad).  Even

if the statute lacked an express scienter requirement, courts "generally interpret [] criminal statutes

to include broadly applicable scienter requirements, even where the statute by its terms does not

contain them." *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) (citation omitted); *see also*

*United States v. Cassel*, 408 F.3d 622, 634 (9th Cir. 2005) ("[E]xcept in unusual circumstances,

we construe a criminal statute to include a mens rea element even when none appears on the face

of the statute.")

In her fourth challenge to Section 231, Williams contends that Section 231 cannot be lawful

because it is not limited to "violent acts or acts that result in bodily injury or that otherwise put

persons or property in imminent danger." *See* Def.'s Mot. ECF No. 36, 8. Williams is wrong.  As

the Court in *Mostofsky* held, "the Court need not adopt a limiting construction such that § 231(a)(3)

reaches only violent conduct." *Mostofsky*,  2021 WL 6049891 at *9 (collecting cases); *see also*

*Wood*, 2021 WL 3048448, at *7 (rejecting overbreadth challenge to § 231(a)(3); "Given that the

language of the statute states 'any act to obstruct, impede, or interfere,' however, this Court does

not agree that § 231(a)(3) applies only to 'violent physical acts.'"); *see id*. ("The act need only be

one that obstructs, impedes, or interferes with law enforcement engaged in the performance of

duties incident to, and during a civil disorder.  Although it may be likely that violent conduct will

be at issue with a defendant charged under the statute, it is possible for nonviolent acts to also fall within the statute's prohibition.").

Williams also contends Sections 231's prohibitions are "extremely far-reaching" and would apply to a bystander who yells, someone who "flips off officers to distract or to encourage resistance," or "recording police activity with a cell phone[.]"  Def.'s Mot. ECF No. 36, 9-10. Williams's list of hypotheticals cannot and does not demonstrate that § 231(a)(3) is unconstitutionally overbroad.  Indeed, Judge Boasberg recently rejected this exact argument: "For starters, it is not clear that these examples would in fact rise to the level of "obstruct[ing], imped[ing], or interfer[ing]" with a law-enforcement officer." *Mostofsky*, 2021 WL 6049891 at * 8.  "But even acknowledging the potential for unlawful applications, '[t]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.'" *Id.* (quoting *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984)); *see also Howard*, 2021 WL 3856290, at *11 (rejecting overbreadth claim that "because the statute does not require a violent act or an assaultive act, the government perhaps could charge someone who yelled at an officer during a civil disorder and could argue that the yelling was an 'act' that 'attempted to obstruct' an officer performing her lawful duties".). Rather, a defendant must show a "realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984). Laws like Section 231(a)(3) that are "not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)" are far less likely to present such a danger. *Hicks*, 539 U.S. at 124. Indeed an "overbreadth challenge" to such a law will "[r]arely, if ever … succeed." *Id.*

Williams also makes a generalized claim that Section 231 is vague and therefore void. However, a judge in this district recently rejected a defendant's argument that Section 231 is vague and facially overbroad. *Nordean,* 21-cr-175 at 35. A statute is impermissibly vague if it either (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. at 732 (*citing City of Chicago v. Morales*, 527 U.S. 41, 56-57 (1999)); *see also United States v. Wunsch,* 84 F.3d 1110, 1119 (9th Cir. 1996)*.* But Section 231 is not vague; it punishes intentional conduct directed against firefighters and law enforcement officers carrying out their official duties  during a civil disorder. The statute prohibits only concrete "act[s]" that are performed with the specific purpose to "obstruct, impede, or interfere" with firefighters or law enforcement. And it prohibits not the mere presence at a civil disorder, but rather, "an act committed during the course of such disorder." *Mechanic*, 454 F.2d at 853.

The statute's intent is plain and provides ample notice; no one could credibly claim to believe that she could lawfully enter the Capitol during Congress's certification of the Electoral College vote, and then physically block, push, and press against law enforcement who were attempting to protect and clear the Capitol from a riotous mob. Section 231(a)(3) is "sufficiently clear that a normally intelligent person could ascertain its meaning and would be given fair notice of whether or not his conduct is forbidden." *Mechanic*, 454 F.2d at 854. Every court to consider vagueness challenges to § 231(a)(3) has rejected them. *E.g., Id.* at 853–54 ("§ 232, read in conjunction with § 231(a) (3), is sufficiently clear that a normally intelligent person could ascertain its meaning and would be given fair notice of whether or not his conduct is forbidden under it"); *United States v. Huff*, 630 F. App'x 471, 487-89 (6th Cir. 2015) (unpublished) ("[W]e reject Huff's void-for-vagueness argument [regarding § 231(a)(3)] in all respects"); *United States v. Banks*, 368

F. Supp. 1245, 1247 (D.S.D. 1973) (rejecting vagueness challenge to § 231(a)(3), following *Mechanic*), *abrogated on other grounds by United States v. Auginash*, 266 F.3d 781 (8th Cir. 2001); *see generally Wood*, 2021 WL 3048448, at *9 ("Defendant does not have standing to bring a facial vagueness challenge" to § 231(a)(3) because he failed to "demonstrate that [the statute]is vague as applied to his conduct").

Finally, Williams asserts that Count One of the indictment is insufficient because it "lacks *any* specifics regarding the alleged acts or circumstances and contains only conclusory allegations." Once again, Williams's claim is legally unsound and without merit. An indictment is sufficient if it contains the elements of the charged offense and enough detail to allow a defendant to prepare a defense and invoke the Double Jeopardy Clause if necessary. *Hamling v. United States*, 418 U.S. 87, 117-119 (1974); *United States v. Resendiz-Ponce*, 549 U.S. 102, 108-10 (2007*); United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) ("An indictment must contain the elements of the offense intended to be charged. But the validity of an indictment is not a question of whether it could have been more definite and certain. Rather, to be sufficient, an indictment need only inform the defendant of the precise offense of which he is accused so that he may prepare his defense and plead double jeopardy in any further prosecution for the same offense.") (cleaned up).

"[N]either the Constitution, the Federal Rules of Criminal Procedure, nor any other authority suggests that an indictment must put the defendant on notice as to every detail considered by the grand jury. Further, indictments 'must be read to include facts which are necessarily implied by the specific allegations made.'" *United States v. Cisneros*, 26 F. Supp. 2d 24, 46 (D.D.C. 1998) (quoting *United States v. Silverman*, 430 F.2d 106, 111–12 (2d Cir.1970)); *see also United States v. Berger,* 473 F.3d 1080, 1103 (9th Cir. 2007) (explaining that an indictment "should be read in

its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied.").

Following her citations to general Fifth Amendment and due process principles, Williams's only authority for her attack on the format of the indictment is *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999). But *Du Bo* is inapposite because its indictment failed to allege all elements of the offense. *Id.* at 1179-80 (concluding Hobbs Act charge was fatally flawed where it failed to "properly allege an offense"). That omission explains the Ninth Circuit's concern for whether the defendant was convicted on the basis of facts "perhaps not even presented to [] the grand jury that indicted him." *Id.* at 1179 (internal quotations omitted). But there is no reason to examine what facts the grand jury received in this case, or what facts could have been added to the indictment, because the indictment properly alleges all elements of a Section 231(a) charge. Indeed, Williams does not and could not claim otherwise. Moreover, the charging instruments and disclosures in this case—which Williams acknowledges in a footnote—make clear what Williams is charged with doing, which is likely why she did not seek a bill of particulars. The indictment properly charges her with interfering with law enforcement on January 6, 2021, during a civil disorder in violation of Section 231(a)(3).

Nothing further need be included, despite Williams's characterization of her "assembly line" indictment. Def.'s Mot. ECF No. 36,12-13. Multiple Section 231(a)(3) civil disorder cases were presented to the grand jury because the District suffered an unprecedented number of those crimes during the unlawful assault on the Capitol. Just like a spree of bank robberies by multiple, individual offenders would generate nearly identical bank robbery indictments, none of which would need to describe the specific ways in which the robbers compelled tellers to relinquish bank funds. Those indictments, like the one at issue here, would simply have to contain the elements

of the charged offense, and enough detail to allow the defendants to prepare their defense and invoke the Double Jeopardy Clause.  Taken together, the complaint, indictment and discovery fully apprise Williams of the charges and satisfy Rule 7(c).

**The Defendant's Motion to Dismiss Counts Five and Six Lacks Merit**

**IV.   The U.S. Capitol was a restricted building or grounds on January 6, 2021**

**A. 18 U.S.C. § 1752 does not require the Vice President to travel outside of the District of Columbia**

The defendant argues that since the U.S. Capitol is a federal government building, Vice President Mike Pence works and resides in Washington, D.C., has an office located within the U.S. Capitol, and was working in the U.S. Capitol on January 6, 2021, Vice President Mike Pence was not temporarily visiting the U.S. Capitol.  Def.'s Mot. ECF No. 37, 5.  That argument fails.

Section 1752 prohibits the unlawful entry into a restricted or otherwise cordoned off "building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting."  18 U.S.C. § 1752(c)(1)(B).  As the government intends to prove at trial, at the time the defendant entered the U.S. Capitol on January 6, 2021, three Secret Service protectees—Vice President Mike Pence and two immediate family members—were present.  The defendant's conduct accordingly falls within the Section 1752's plain sweep because she unlawfully entered a restricted building while the Vice President and his family were "temporarily visiting."

The defendant disputes that the Vice President was "temporarily visiting" the U.S. Capitol, but her argument defies the statute's plain terms, purpose, and structure.

As noted above, to determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning."  *Levin*, 568 U.S. at 513 (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)).  The verb "visit" means, *inter alia,* "to go to see or

31

stay at (a place) for a particular purpose (such as business or sightseeing)" or "to go or come officially to inspect or oversee."[2]

Either definition describes the Secret Service protectees' activities on January 6.  Vice President Pence was physically present at the U.S. Capitol for a particular purpose: he presided over Congress's certification of the 2020 Presidential Election, first in the joint session, and then in the Senate chamber.  Similarly, the Vice President's family members came to the U.S. Capitol for a particular purpose: to observe these proceedings.  Finally, as President of the Senate, Vice President Pence oversaw the vote certification.  Given the presence of the Vice President and his family members, the U.S. Capitol plainly qualified as a building where "[a] person protected by the Secret Service [was] … temporarily visiting."  18 U.S.C. § 1752(c)(1)(B).

The defendant stresses Section 1752's use of the term "temporarily" and provided cases where either the President or Vice President were "traveling *outside* of the District of Columbia 'visiting' that area for a 'temporary' purpose."  Def.'s Mot, ECF No. 37, 6 (emphasis in original).  First, Section 1752 does not impose a requirement that the location being temporarily visited be outside of the District of Columbia.  Second, Section 1752 does not require that the purpose of the visit be temporary but that the nature of the visit itself be temporary.  Vice President Pence and his family had traveled to the U.S. Capitol to oversee and attend the Joint Session of Congress—a proceeding of limited duration.  At the close of the proceeding, they left—confirming the "temporary" nature of their visit.

The defendant offers two further observations—both irrelevant.  First, she notes that Vice President Pence "lived and worked" in the District of Columbia.  Def.'s Mot. ECF No. 37, 5.  But Section 1752(c)(1)(B) defines the restricted area by reference to "buildings or grounds," not

---

[2] https://www.merriam-webster.com/dictionary/visit

municipal borders.  That Vice President Pence lived and worked in Washington, D.C. does not detract from the fact that he "temporarily visit[ed]" the U.S. Capitol on January 6.  Second, the defendant stresses that Vice President Pence had a permanent U.S. Capitol office.  *Id*.  Section 1752(c)(1)(B), however, defines the restricted area by reference to the location of the protectee—not his office.  When Vice President Pence traveled to the U.S. Capitol on January 6 to oversee the Joint Session of Congress, he was "visiting" the building.  And because Vice President Pence intended to leave at the close of the session, this visit was "temporar[y]."[3]

The defendant's contrary construction, taken to its logical end, would neuter the government's ability to deter and punish those individuals who seek unauthorized access to the President's or Vice President's location.  First, the defendant's argument would restrict Section 1752(c)(1)(B)'s application to only locations outside the District of Columbia—on the view that any visit by the President or Vice President to a location within municipal limits cannot be "temporary" because they reside in the District of Columbia.  Second, under the defendant's construction, Section 1752(c)(1)(B) would not apply where the President or Vice President temporarily stayed at their permanent residences in Delaware or California—on the view that such a trip would not qualify as "visiting."  No support exists for the defendant's effort to insert such large and irrational exceptions into the statute's sweep.  *See Lovitky v. Trump*, 949 F.3d 753, 760 (D.C. Cir. 2020)  (noting that courts will avoid a "statutory outcome … if it defies rationality by rendering a statute nonsensical or superfluous or if it creates an outcome so contrary to perceived social values that Congress could not have intended it") (citation omitted).

---

[3] This argument also ignores the fact that the Vice President's family did not live or work at the U.S. Capitol.  Assuming, *arguendo,* the defendant's argument that the Vice President cannot "temporarily visit" a place where he maintains an office, the charges in the Superseding Indictment remain supported because these other Secret Service protectees did not work at the U.S. Capitol or have offices there.

All told: the defendant's position defies Section 1752's clear purpose. *Cf. Genus Med. Techs. LLC v. United States Food & Drug Admin.*, 994 F.3d 631, 637 (D.C. Cir. 2021) ("[I]f the text alone is insufficient to end the inquiry, we may turn to other customary statutory interpretation tools, including structure, purpose, and legislative history.") (internal quotation marks and citation omitted). In drafting Section 1752, Congress sought to protect "not merely the safety of one man, but also the ability of the executive branch to function in an orderly fashion and the capacity of the United States to respond to threats and crises affecting the entire free world." *United States v. Caputo*, 201 F. Supp. 3d 65, 70 (D.D.C. 2016) (quoting *White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984)). To that end, the statute comprehensively deters and punishes individuals who seek unauthorized access to the White House grounds and the Vice President's residence—fixed locations where the President and Vice President live and work, 18 U.S.C. 1752(c)(1)(A); and also any other "building or grounds" where they happen to be "temporarily visiting," 18 U.S.C. 1752(c)(1)(B).

All the relevant metrics—plain language, statutory structure, and congressional purpose—foreclose the defendant's crabbed reading of Section 1752(c)(1)(B). This Court should reject it. The defendant's cited cases—involving either an arrest or conviction under Section 1752—do not discuss the "temporarily visiting" language. Def.'s Mot. ECF No. 37, 3; *see United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005); *United States v. Junot,* 1990 WL 66533 (9th Cir. May 18, 1990); *Blair v. City of Evansville, Ind.,* 361 F. Supp.2d 846 (S.D. Ind. 2005). They accordingly lack relevance to the present dispute.

### B. 18 U.S.C. § 1752 does not require the government to prove that the restricted area was restricted at the Secret Service's direction

The defendant argues that because the Capitol Police—not the Secret Service—barricaded the area around the Capitol, she should not be charged with violating 18 U.S.C. § 1752(a)(1) and

(2).  Def.'s Mot. ECF No. 37, 6-7.  Courts in this district have rightly rejected this contention.  *See United States v. Griffin*, No. 21-CR-00092 (TNM), 2021 WL 2778557 (D.D.C. July 2, 2021); *Mostofsky*, 2021 WL 6049891, *Nordean,* 21-cr-175.

In relevant part, 18 U.S.C. § 1752 ("Restricted building or grounds") criminalizes:

(a)  Whoever—

(1) knowingly enters or remains in any restricted building or grounds without lawful authority to do so;

(2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;

(c) In this section—

(1) the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

(A) of the White House or its grounds, or the Vice President's official residence or its grounds;

(B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or

(C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance.

(2) the term "other person protected by the Secret Service" means any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection.

18 U.S.C. § 1752.  In short, Section 1752 prohibits the unlawful entry into a restricted or otherwise cordoned off area where "a person protected by the Secret Service is or will be temporarily visiting." *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 98 (D.D.C. 2019), *aff'd* 831 F. App'x 513 (D.C. Cir. 2021).  Section 1752 therefore "focuses on perpetrators who knowingly enter a

restricted area around a protectee, not on how it is restricted or who does the restricting." *Griffin*, 2021 WL 2778557, at \*6.

As previously mentioned, to determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning." *Levin*, 568 U.S. at 513 (quoting *Moskal*, 498 U.S. at 108); *see also Pub. Investors Arbitration Bar Ass'n v. S.E.C.*, 930 F. Supp. 2d 55 (D.D.C. 2013) (Howell, J.). Here, the plain text of the statute is "unambiguous," so the "judicial inquiry is complete." *Babb*, 140 S. Ct. at 1177. Section 1752's text is clear. It proscribes certain conduct in and around "any restricted building or grounds." *See* 18 U.S.C. § 1752(a). The statute provides three definitions for the term "restricted buildings and grounds," *see* § 1752(c)(1), including "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting," § 1752(c)(1)(B). Through a cross-reference, Section 1752 makes clear—and the defendant does not appear to dispute—that "person[s] protected by the Secret Service" include the Vice President. § 1752(c)(2); *see* § 3056(a)(1). The proscribed conduct within a "restricted building or grounds" includes, as relevant here, knowingly and unlawfully entering or remaining, § 1752(a)(1), and knowingly and with intent to impede or disrupt government business, engaging in "disorderly or disruptive conduct" that "in fact, impedes or disrupts" government business," § 1752(a)(2).

That straightforward analysis has a straightforward application to the facts alleged in the defendant's case. The Indictment alleges that, on January 6, 2021, a protected person was present inside the Capitol building or on the Capitol grounds, and that some portion of the Capitol building and grounds was posted, cordoned off, or otherwise restricted—making it a "restricted building or grounds" under § 1752(c)(1). The indictment further alleges that the defendant knowingly and without lawful authority entered and remained in that restricted buildings and grounds. It also

alleges that the defendant, knowingly and with the intent to impede or disrupt government business, engaged in disorderly conduct that resulted in a disruption to government business.  In short, the allegations closely track the statutory language.

Looking outside Section 1752's language, the defendant urges (Def.'s Mot. ECF No. 37, 16-17) the Court to import an extra-textual requirement that the Secret Service be required to designate the restricted area.  That is so, the defendant claims, because (1) Section 1752(c)(B) defines "restricted building or grounds" as a "building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting"; and (2) it is the Secret Service who protects the President and others, so it is the Secret Service who must make the designation of a restricted area.  Those arguments fail on the merits.  Section 1752 is directed not at the Secret Service, but at ensuring the protection of the President and the office of the Presidency. *See* S. Rep. 91-1252 (1970); *see also* Elizabeth Craig, *Protecting the President from Protest: Using the Secret Service's Zone of Protection to Prosecute Protesters*, 9 J. Gender Race & Just. 665, 668-69 (2006).  "Indeed, the only reference in the statute to the Secret Service is to its protectees.  Section 1752 says nothing about who must do the restricting." *Griffin*, 2021 WL 2778557, at *7; *see also Mostofsky*, 2021 WL 6049891 at *13 ("The text plainly does not require that the Secret Service be the entity to restrict or cordon off a particular area.").

Second, the statutory history in fact undercuts the defendant's argument.  *See id.* at *4-*5 (explaining how Congress has consistently "*broadened* the scope of the statute and the potential for liability").  An earlier version of the statute explicitly incorporated regulations promulgated by the Department of the Treasury (which at the time housed the Secret Service) governing restricted areas. *See United States v. Bursey*, 416 F.3d 301, 306-07 (4th Cir. 2005) (noting that definition of restricted area required interpreting Treasury regulations); *see* Pub. L. 91-644, Title V, Sec. 18, 84

Stat. 1891-92 (Jan. 2, 1971).  Congress subsequently struck subsection (d) and did not replace it with language limiting the law enforcement agencies allowed to designate a restricted area. Pub. L. 109-177, Title VI, Sec. 602, 120 Stat. 192 (Mar. 9, 2006).  Congress was clearly aware that the prohibitions in 18 U.S.C. § 1752 could turn on decisions made by the Secret Service but chose not to include that in the revised statute.  But Congress's decision in 2006 to eliminate reference to regulations indicates that the statute no longer depends (if it ever did) on whether the Secret Service has defined an area as "restricted."[4]

The defendant's reading of the statute, which would require the Secret Service to "cordon off" a private residence "no matter how secure the location or how imposing the preexisting walls" leads to "pressing absurdities."  *Griffin*, 2021 WL 2778557 at *6.  Section 1752 sets clear limitations on where restricted areas may be established.  As relevant here, the statute only criminalizes entry into a restricted area "of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting…"  The statute does not criminalize an individual who enters an area in a building or grounds separate from where a Secret Service protectee is present, regardless of restrictions placed by law enforcement or anyone asserting themselves as law enforcement.  Accordingly, the U.S. Capitol was a restricted building on or about January 6, 2021.

---

[4] The fact that the legislative history refers to the Secret Service does not help his argument because Section 1752 is not a "regulatory statute." *Griffin*, 2021 WL 2778557, at *4.  In any event, because Section's statutory text is clear, "there is no reason to resort to legislative history." *Id.* (quoting *United States v. Gonzales*, 520 U.S. 1, 6 (1997)).

**The Defendant's Motion to Transfer Venue Lacks Merit**

**V.      Defendant's motion to transfer venue should be denied**

Nearly 45 years ago, the *en banc* D.C. Circuit rejected the argument made by Williams here: that based upon "the District of Columbia's voting record in the past two presidential elections[,]" the defendants could not receive a fair trial in this District and a change of venue was required.  *Haldeman*, 559 F.2d at 64 n.43 (*en banc*).  In that case, the defendants were former high-ranking members of the Nixon administration, and they were charged with crimes arising from the Watergate scandal, which "received extraordinarily heavy coverage in both national and local news media." *Id.* at 51, 59.  Notwithstanding the fact "that Washington, D.C. is unique in its overwhelming concentration of supporters of the Democratic Party, as opposed to the Republican Party to which the defendants . . . belonged," and that roughly 80% of the voters in D.C. voted for the Democratic Party candidate when Nixon ran for president in 1968 and 1972, *id.* at 160, the Court declared that, "[n]ot without reason, the relevance of this information seems to have escaped the prosecution, the defendants, their counsel, and the trial court," and that there was no legal support for the proposition "that a community's voting patterns are at all pertinent to venue." *Id.* at 64 n.43.

Significantly, although 93% of the Washington, D.C. population knew about the charges against the *Haldeman* defendants and 73% of those individuals had an opinion of the defendants' guilt or innocence, *id.* at 144, the Court of Appeals nonetheless held that the district court "was correct to follow this circuit's well established procedure by refusing [the defendants'] pre-voir dire requests for . . . a change of venue." *Id.* at 63-64.  And it also held that an "extensive voir dire" ultimately assured that the defendants "were tried by an unbiased jury capable of basing its verdict solely on the evidence introduced at trial." *Id.* at 70.

The same holds true here. Williams's pre-*voir dire* Motion for Transfer (ECF No. 38) should be denied as premature. As in *Haldeman* and other heavily publicized cases from this jurisdiction and elsewhere around the country, extensive pre-trial screening and voir dire will suffice to ensure that Williams receives a fair trial by an unbiased jury.  "And if an impartial jury actually cannot be selected, that fact should become evident at the voir dire. [Williams] will then be entitled to any actions necessary to assure that [s]he receives a fair trial." *Haldeman*, 559 F.2d at 63; *See Caldwell*, 21-cr-28 ECF No. 415 (APM) (D.D.C. Sept. 14, 2021) (finding that voir dire is the preferred juncture to determine if a fair and impartial jury is possible and that a presumption of prejudice pre-voir dire is limited to extreme cases, which Caldwell failed to establish).

## A.    Legal Standard

The United States Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed," Art. III, § 2, cl. 3, before a "jury of the State and district wherein the crime shall have been committed," Amend. VI.  These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958); *see United States v. Levy Auto Parts*, 787 F.2d 946, 952 (4th Cir. 1986) ("Article III, § 2 of the Constitution requires that local crimes be prosecuted locally").  And they give rise to "a general presumption that a criminal prosecution should be retained in the original district." *United States v. Bowdoin,* 770 F. Supp. 2d 133, 138 (D.D.C. 2011) (Collyer, J.).  If "extraordinary local prejudice will prevent a fair trial," however, a defendant may request that the case be transferred to another district under Federal Rule of Criminal Procedure 21(a).  *Skilling v. United States*, 561 U.S. at 378; *see* Fed. R. Crim. P. 21(a) ("Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in

the transferring district that the defendant cannot obtain a fair and impartial trial there.")  It is the defendant's burden to establish her entitlement to a transfer of venue. *See, e.g.*, *In re United States*, 273 F.3d 380, 388 (3d Cir. 2001) ("the courts have held that the criminal defendant has the burden of making the case for transfer" under Rule 21(b)); *United States v. Capo*, 595 F.2d 1086, 1090 (5th Cir. 1979) ("It has long been recognized as a general rule that a defendant, in order to establish a deprivation of due process, must show that potential jurors were actually prejudiced by the pretrial publicity.").

**B**.     **Williams's motion should be denied without prejudice as premature.**

Under longstanding D.C. Circuit precedent, the proper time for a court to evaluate a motion for a transfer of venue based upon prejudicial pretrial publicity is after *voir dire*.  In the overwhelming majority of cases, thorough juror screening and extensive voir dire are sufficient to ensure that all seated jurors can be fair and impartial and to provide a criminal defendant with the fair trial to which she is entitled. *See, e.g.*, *In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) ("[A]ny high-profile case will receive significant media attention.  It is no surprise that people in general, and especially the well-informed, will be aware of it.  Knowledge, however, does not equate to disqualifying prejudice.  Distinguishing between the two is at the heart of the jury selection process.").  As the D.C. Circuit has explained, "'[t]he ultimate question'" on a motion to transfer venue based upon prejudicial pretrial publicity "'is whether it is possible to select a fair and impartial jury, and the proper occasion for such a determination is upon the voir dire examination.' It is then, and more usually only then, that a fully adequate appraisal of the claim can be made, and it is then that it may be found that, despite earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967) (quoting *Blumenfield v. United States*, 284 F.2d 46, 51 (8th Cir. 1960)).  "If an impartial jury actually cannot be selected,

that fact should become evident at the voir dire.  The defendant will then be entitled to any actions necessary to assure that he receives a fair trial." *Haldeman*, 559 F.2d at 63.  Consistent with this approach, notwithstanding the "extraordinarily heavy coverage in both national and local news media" that the Watergate scandal received, the en banc court in *Haldeman* held that "the District Court was correct to follow this circuit's well established procedure by refusing [the defendants'] pre-voir dire requests for . . . a change of venue." *Id.* at 59, 63-64.

Other courts agree that "the preferable procedure" is for a trial court to defer decision on a motion to transfer based on prejudicial pretrial publicity until after it has conducted voir dire. *United States v. Campa*, 459 F.3d 1121, 1146-47 (11th Cir. 2006) ("Indeed, we have ruled that a trial court's method of holding its decision on a Rule 21 motion for change of venue in abeyance until the conclusion of the voir dire is clearly the preferable procedure.") (quotation marks omitted); *see also United States v. Yousef*, 327 F.3d 56, 155 (2nd Cir. 2003) ("[T]he key to determining the appropriateness of a change of venue is a searching voir dire of the members of the jury pool."); *United States v. Bakker*, 925 F.2d 728, 732 (4th Cir. 1991) ("Only where voir dire reveals that an impartial jury cannot be impanelled would a change of venue be justified."); *United States v. Poludniak*, 657 F.2d 948, 955 (8th Cir. 1981) ("This court has repeatedly held that it is preferable to await voir dire before ruling upon motions for change of venue."); *United States v. Gullion*, 575 F.2d 26, 28 (1st Cir. 1978) ("We find that the trial judge did not abuse his discretion in denying the motion for a change of venue until he could consider the effect of any pretrial publicity at the time of conducting the voir dire of prospective jurors."); *United States v. Williams*, 523 F.2d 1203, 1209 n.10 (5th Cir. 1975) ("Holding a final decision on the motion in abeyance pending the conclusion of voir dire is clearly the preferable procedure.").  As the Seventh Circuit has explained, it is "ordinarily preferable to assess the impact of the pretrial publicity through an

extensive voir dire of the prospective jurors, instead of in the vacuum of a hearing without reference to prospective jurors." *United States v. Peters*, 791 F.2d 1270, 1295 (7th Cir. 1986).

Whether or not adverse pretrial publicity can create a presumption of prejudice in a community is a question for the Court to decide *after* it conducts voir dire, *United States v. Edmond*, 52 F.3d 1080, 1097 (D.C. Cir. 1995) ("The results of the *voir dire* itself demonstrate that the community was not inflamed against the defendants."). Indeed, although Williams claims that she has been "singled out for coverage by the Washington D.C. media," (Def.'s Mot. ECF No. 38, 10),[5] it is unlikely that any significant segment of the D.C. population knows Williams by name, much less the crimes she is accused of committing. *See Edmond*, 52 F.3d at 1097 ("As we have discussed, less than a third of all prospective jurors ever *had heard* of any of the defendants from the media, much less formed an opinion about their guilt."). Even if they had, "the mere fact that trial jurors have *heard of* a defendant does not give rise to the assumption that they are *prejudiced against* the defendant except in cases of extremely prejudicial pretrial publicity." *Id.* And, as the D.C. Circuit found in *Haldeman*, it is possible in this District to select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial" even when an overwhelming percentage of the potential jurors have heard of the defendants and their crimes and have formed an opinion of the defendants' guilt. 559 F.2d at 70, 144. In any event, because the question whether it is possible to select a fair and impartial jury is one that can only be answered after a thorough voir dire, this Court should follow the D.C. Circuit's "well-established procedure" and deny

---

[5] The Defendant referenced articles by the Washington Post as illustrative examples of coverage by the "Washington, D.C. media." Notably, the Washington Post is not akin to a local or regional news outlet. Rather, the Washington Post may be considered a national news publication.

Williams's pretrial motion to transfer venue without prejudice to her ability to bring that motion again at the appropriate time.

### C.      Williams has not established circumstances so extreme as to warrant a presumption of prejudice.

The Supreme Court has recognized that there may arise a "presumption of prejudice" resulting from sufficiently prejudicial pretrial publicity, but that presumption is appropriate "only [in] the extreme case." *Skilling*, 561 U.S. at 381.  "[N]ews accounts of the crime" do not "alone presumptively deprive[ ] the defendant of due process." *Murphy v. Florida*, 421 U.S. 794, 799 (1975). That is because "[p]rominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require ignorance." *Skilling*, 561 U.S. at 381.  *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (explaining that jurors are not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case").  And "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976).  Consistent with these well-established principles, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history: Dzhokhar Tsarnaev, one of the Boston Marathon bombers; Jeffrey Skilling, a longtime Enron executive; Zacharias Moussaoui, who conspired to commit the September 11 terrorist attacks; Ramzi Yousef and others who committed the 1993 World Trade Center bombing; and, in this jurisdiction, former Attorney General John Mitchell and others charged as part of the Watergate scandal. *See Skilling*, 561 U.S. at 399; *In re Tsarnaev*, 780 F.3d at 15; *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002); *Yousef*, 327 F.3d at 155; *Haldeman*, 559 F.2d at 70.

In none of these cases did the courts apply a presumption of prejudice arising from extensive pretrial publicity of the defendants' crimes.  Indeed, as discussed below, the D.C. Circuit

appears to have never applied such a presumption. Moreover, Judge Mehta held that Caldwell, who, similar to Williams, put forth arguments related to local media attention, did "not satisf[y] his heavy burden of establishing that the jury pool in the District of Columbia is presumptively biased against him, or any other Defendant." *Caldwell,* 21-cr-28 ECF No. 415 at 11.  And the Supreme Court has done so in only three, "extreme" cases: *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Estes v. Texas*, 381 U.S. 532 (1965); and *Sheppard v. Maxwell*, 384 U.S. 333 (1966).  In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people. *See Skilling*, 561 U.S. at 379 (describing *Rideau*).  The Court presumed prejudice because, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726.  In *Estes*, "extensive publicity before trial swelled into excessive exposure during preliminary court proceedings as reporters and television crews overran the courtroom and 'bombard[ed] . . . the community with the sights and sounds of' the pretrial hearing. The media's overzealous reporting efforts . . . 'led to considerable disruption' and denied the 'judicial serenity and calm to which [Estes] was entitled.'" *Skilling*, 561 U.S. at 379-80 (quoting *Estes*, 381 U.S. at 536).  And in *Sheppard*, "a 'carnival atmosphere' pervaded the trial": "'[B]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom,' thrusting jurors 'into the role of celebrities.'" *Id.* at 380 (quoting *Sheppard*, 384 U.S. at 353, 355, 358).

Notably, in *Sheppard*, the Court found that "months" of "virulent publicity about Sheppard" and his crime—including "a three-day inquest" during which "Sheppard was examined for more than five hours without counsel" that was "televised live" and "ended in a public brawl"—

did not by itself deny the defendant his right to due process. 384 U.S. at 354; *see Skilling*, 561 U.S. at 380 ("Pretrial media coverage, which we characterized as 'months [of] virulent publicity about Sheppard and the murder,' did not alone deny due process").  Nor has either the Supreme Court or the D.C. Circuit presumed prejudice in any case in the 55 years since *Sheppard* was decided.  To the contrary, in *Patton v. Yount*, the Supreme Court held that the trial court did not err "in finding that the jury as a whole was impartial" even where "voir dire showed that all but 2 of 163 veniremen questioned about the case had heard of it, and that, 126, or 77%, admitted they would carry an opinion into the jury box." 467 U.S. at 1029, 1032 (1984).  In *Mu'Min v. Virginia*, the Court declined to presume prejudice despite "substantial" pretrial publicity that "w[as] not favorable" to the defendant. 500 U.S. 415, 429 (1991).  And in *Skilling*, the Court refused to presume prejudice notwithstanding "the magnitude and negative tone of media attention directed at Enron" because of the "large, diverse pool of potential jurors" in the Houston Area; the fact that, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight"; "over four years [had] elapsed between Enron's bankruptcy and Skilling's trial"; and "Skilling's jury acquitted him of nine insider-trading counts." 561 U.S. at 382-83.

Similarly, in *Haldeman*, the D.C. Circuit declined to find that the defendants' "due process rights were violated by the District Court's refusal to grant . . . a change of venue prior to attempting selection of a jury" notwithstanding the "massive," sometimes "hostile in tone and accusatory in content," pretrial publicity. 559 F.2d at 61-62.  The court explained that, "unlike the situation faced by the [Supreme] Court in *Rideau*," the publicity surrounding Watergate gave the court "no reason for concluding that the population of Washington, D.C. was so aroused against [the defendants] and so unlikely to be able objectively to judge their guilt or innocence on the basis

of the evidence presented at trial that their due process rights were violated[.]" *Id.*  The D.C. Circuit has similarly refused to presume prejudice in numerous other cases involving both national crimes such as Watergate and notorious local criminals such as Rayful Edmund. *See, e.g.*, *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995) (declining to presume prejudice, which "is reserved for only the most egregious cases"); *Edmond*, 52 F.3d at 1099 ("Neither the nature nor the impact of the publicity in this case presented the 'extreme circumstances' necessary to establish a presumption that a fair trial was impossible in this jurisdiction."); *United States v. Ehrlichman*, 546 F.2d 910, 916 n.8 (D.C. 1976) ("An examination of the voir dire process and its results in this case makes clear that the extreme circumstances condemned by the Supreme Court in . . . *Sheppard* . . . and *Rideau* . . . are not present here."); *United States v. Chapin*, 515 F.2d 1274, 1287 (D.C. Cir. 1975) (rejecting "the argument is that no voir dire would have been effective in rooting out the prejudices of which [the defendant] complains").

This case is nothing like the few "extreme case[s]" in which the Supreme Court has presumed prejudice based upon adverse pretrial publicity.  The news stories about Williams have "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight."  *Skilling*, 561 U.S. at 382.  Indeed, given the sheer number of people number involved in the Capitol attack, it is unlikely that more than a handful of D.C. residents could identify Williams by name, and Williams provides no reason to believe that, by the time her trial begins, D.C. jurors are likely to be able to remember and distinguish the reporting about her from that involving the many hundreds of other people charged as part of the Capitol attack.  And even if they could, "[p]rominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require ignorance." *Id.* at 381; *See Patton,* 467 at 1033 (After approximately a year and a half passed between an acquittal of the first trial and the

second trial, "voir dire testimony revealed that this lapse in time had a profound effect on the community and, more important, on the jury in softening or effacing opinion.")

The size of the District's population likewise distinguishes it from those few cases in which the Supreme Court has presumed prejudice.  The Census Bureau estimates the District's population to be around 705,000 people, *see* QuickFacts, District of Columbia, *available at* https://www.census.gov/quickfacts/DC, far more than the 150,000-person Louisiana parish at issue in *Rideau*, 373 U.S. at 724.  Indeed, the District is more populous than Clark County was in 1988, but a four-Justice plurality nonetheless concluded in *Gentile v. State Bar of Nevada* that there was a reduced likelihood of prejudice there "[g]iven the size of the community from which any potential jury venire would be drawn[.]" 501 U.S. 1030, 1044 (1991).

Additionally, given that Williams is not detained, and due to the backlog in trials for detained defendants caused by the COVID-19 pandemic, it appears unlikely that this case will be one "in which trial swiftly followed a widely reported crime[.]" *Skilling*, 561 U.S. at 383.  And although there has been substantial publicity surrounding the Capitol Attack, that reporting has largely focused on either the Capitol Attack generally or on other defendants, and it has been nationwide, not merely "local." *Id.* at 378.  *See, e.g.*, *In re Tsarnaev*, 780 F.3d at 22 ("It is true that there has been ongoing media coverage of the advent of the trial and petitioner's pre-trial motions, both locally and nationally.  But that would be true wherever trial is held, and the reporting has largely been factual."); *Haldeman*, 559 F.2d at 64 n.43 (noting that "a change of venue would have been of only doubtful value" where the pretrial publicity was nationwide in scope and where the crime was "simply not a local [one] of peculiar interest to the residents of the District of Columbia").  Finally, this Court can take measures to prevent a "carnival atmosphere" from pervading Williams's trial and denying her "judicial serenity and calm" to which she is entitled.

*See Sheppard*, 384 U.S. at 358 ("The carnival atmosphere at trial could easily have been avoided since the courtroom and courthouse premises are subject to the control of the court.").

Williams nonetheless argues that the court should transfer her case to the Middle District of Pennsylvania on the ground that that "detrimental pretrial publicity and community prejudice in District of Columbia are so likely to have affected the jury pool that the venire must be presumed as tainted," without noting that a voir dire should be conducted to evaluate whether its possible to select an impartial jury. Def.'s Mot. ECF No. 38, 1. This is so, according to Williams, because "the jury pool in her case would be comprised of those who voted nearly unanimously against Donald Trump and have been barraged with propaganda about a 'white nationalist' attack and an 'insurrection' at the Capitol… The unavoidable community prejudice, and particularized prejudice against [her], render the venire so greatly prejudiced against her that [she] cannot obtain a fair and impartial trial in Washington, D.C." Def.'s Mot. ECF No 38, 5.

As previously discussed (at 28–29), the *en banc* D.C. Circuit rejected just such an argument in *Haldeman*, 559 F.2d at 64 n.43. There, the defendants were not just vocal supporters of President Nixon, but were former high-ranking officials in his administration. *Id.* at 51. And the defendants were not among many hundreds charged in a high-profile crime of nationwide significance, but were instead just seven, nationally known figures "charged [in] what amounted to an unprecedented scandal at the highest levels of government," *id.*, that "led to the resignation of President Nixon," *id.* at 54 n.15. If "the District of Columbia's voting record in the past two presidential elections" is not "at all pertinent to venue" in a case involving high-ranking members of the president's administration, *id.* at 64 n.43, it surely has no bearing on venue here. Ultimately, the question is whether the court can select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial." *Id.* at 70. The District's voting record hardly suffices to

establish a presumption of prejudice so invidious that this Court should not even attempt to select such a jury.

To the contrary, as the nation's capital and seat of the federal government, the District has been home to its fair share of trials in politically charged cases.  High-profile individuals such as John Poindexter, Oliver North, Scooter Libby, and, more recently, Roger Stone, all received fair trials in this jurisdiction by unbiased juries.  *See Poindexter*, 951 F.2d 369; *United States v. North*, 910 F.2d 843 (D.C. Cir. 1990); *United States v. Stone*, Cr. No. 19-0018 (ABJ), 2020 WL 1892360 (D.D.C. April 16, 2020); *United States v. Libby*, 498 F. Supp. 2d 1 (D.D.C. 2007).  Indeed, in *Stone*, Judge Jackson rejected an argument similar to the one Williams makes here:

> At bottom, the defense merely posits that if you do not like Donald Trump, you must not like Roger Stone, or if you are concerned about racism on the part of some of the President's supporters, then you must be applying that label to Roger Stone because he was a supporter, too. While there is no evidence that proves this hypothesis, there is evidence that contradicts it . . . At bottom, the motion appears to be based on the defendant's assumption that the juror must have known who he was, what his relationship with Donald Trump has been over time, and what role he played in the campaign, and that since he was so central to the election, one could not possibly view him independently from the President. . . . But there is no basis to conclude that Roger Stone was a household name in . . . Washington, D.C.

2020 WL 1892360, at *30-31.  Judge Jackson went on to explain that "[t]he case law in this Circuit makes it clear that one cannot assume that people in the community — even those who follow the news — have a deep understanding of the facts of a particular case.  During the prosecutions that arose out of the Watergate and Iran-Contra investigations, the Court of Appeals repeatedly expressed its confidence that jurors with open minds could be found within the District, even though the investigations had received a great deal of public attention." *Id.* at *31.  The same is true here.

In addition to being legally unsupported, Williams's assertions are also baseless in numerous other respects.  For example, Williams claims that, among the hundreds of people

involved in the Capitol attack, she has been "singled out by the Washington D.C. media."  Def.'s Mot. ECF No. 38, 10.  Notably, the first four articles cited by Williams in her motion about that relate to her activities at the Capitol are from national or international, and not local, news sources—specifically, Yahoo!News, Politico, NPR, and ITV.  Williams then cites to five articles by a *national* newspaper, the Washington Post.  Def.'s Mot. ECF No. 38, 10.  Curiously, Williams ignores the fact that the *local* Harrisburg newspaper, PennLive, has published more than a dozen articles about Williams.  Additionally, Williams ignores the fact that some of the first results that show up in a Google search for "Riley Williams" are articles from The Philadelphia Inquirer, PennLive, in addition to articles from ABC27 and Fox43, both television station in Harrisburg, Pennsylvania – the precise place where Williams seeks to be tried.  *See* Riley Williams, woman accused of stealing Nancy Pelosi's laptop, gets internet access cut off (Jan. 26, 2021), *available at* https://www.abc27.com/news/local/riley-williams-woman-accused-of-stealing-pelosis-laptop-gets-internet-access-cut-off/; Harrisburg woman accused of stealing Nancy Pelosi's laptop during Jan. 6 riot seeks to have charge against her dropped (Nov. 30, 2021), *available at* https://www.fox43.com/article/news/crime/riley-williams-nancy-pelosis-laptop-charges/521-0aa5b0ab-d020-4b3e-88e2-f511743865ae.

Ultimately, Williams purports to evaluate the so-called "*Skilling* factors" in an attempt to demonstrate that this Court should presume prejudice and transfer her case to the Middle District of Pennsylvania without even attempting to choose an impartial jury here.  Def.'s Mot. ECF No. 38, 6.  But two of the four "[i]mportant differences" that the Supreme Court found to "separate Skilling's prosecution from those in which [it had] presumed juror prejudice" are unknown and, indeed, currently unknowable: the time elapsed between the crime and the trial, and whether the jury's verdict indicates impartiality.  *Skilling*, 561 U.S. at 381-83.  And, as previously discussed,

the remaining two factors—the size of the District's jury pool and the type of information being reported about Williams—cut against presuming prejudice. Williams's arguments to the contrary improperly rely on her claims that "[a]pproximately 93% of the voters in Washington voted against Donald Trump"; that "[t]he antipathy towards Donald Trump and his supporters in the District is obvious,"; and that "the potential jury pool in the District of Columbia is prejudiced against supporters of Donald Trump generally and the January 6th protestors specifically is a given." Def.'s Mot. ECF No. 38, 6-7.  Williams also alleges that she was "singled out" by the local media, without providing evidence of her "local" media aside for a national news publication – The Washington Post. *Id.* at 10.  Additionally, Williams has failed to identify any local news coverage that contain any "blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382.  Whether the District's residents not only can distinguish Williams from the thousands of other people involved in the Capitol attack but know her as the individual accused of "stealing Speaker Nancy Pelosi's laptop computer, with intention to sell the computer to Russian spies" (Def.'s Mot. ECF No. 38, 2), is something that only a thorough voir dire can accurately evaluate. *See, e.g.*, *Yousef*, 327 F.3d at 155 ("the key to determining the appropriateness of a change of venue is a searching voir dire of the members of the jury pool").

Courts routinely conclude that, despite significant negative pretrial publicity, defendants received a fair trial in the location where they committed their crimes.  This was true in *Skilling*, notwithstanding "the community passion aroused by Enron's collapse and the vitriolic media treatment" aimed at Skilling. 561 U.S. at 377. This was true for Dzhokhar Tsarnaev, one of the Boston Marathon bombers, notwithstanding the fact that "the reporting of the events" in that case "st[ood] unrivaled in American legal history (at least as of today)." *United States v. Tsarnaev*, 968

F.3d 24, 42 (1st Cir. 2020); *see id.* at 56 ("[I]f pressed to decide the venue question now, two of us would likely find the judge abused no discretion in finding venue proper in Boston in 2015."). It was true for Zacharias Moussaoui, who was prosecuted "in the Eastern District of Virginia, minutes by car from the Pentagon." *In re Tsarnaev*, 780 F.3d at 16; *see Moussaoui*, 43 F. App'x at 613. It was true in the World Trade Bombing case. *See Yousef*, 327 F.3d at 155. It was true in the post-Watergate prosecutions. *See Haldeman*, 559 F.2d at 70-71. And it is true here, too.

But the question whether the Court ultimately can select an impartial jury for Williams's trial is one that the Court need not answer today. Rather, the only question before the Court at this time is whether to presume that, whatever jury it picks, and whenever it picks that jury, Williams cannot possibly receive a fair trial in this jurisdiction. Because such a presumption has no legal or factual support in this case and runs counter to the D.C. Circuit's "well established procedure" against answering that question before conducting voir dire, the Court should deny Williams's Motion.

## CONCLUSION

For the foregoing reasons, and any additional reasons as may be cited at a hearing on this motion, the government respectfully requests that the defendant's motions be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      /s/    Maria Y. Fedor
Maria Y. Fedor
Attorney, detailed to the
United States Attorney's Office for the
District of Columbia

D.C. Bar No. 985823
555 Fourth Street, N.W.
Washington, DC 20530
(202) 353-7366; Maria.Fedor@usdoj.gov

Mona Sedky
Special Assistant United States Attorney
D.C. Bar. Bar 447968
555 4th Street, N.W., Rm. 4842
Washington, D.C. 20530
(202) 262-7122; Mona.Sedky2@usdoj.gov

Danielle Roseborough, Trial Attorney
U.S. Department of Justice, Criminal
Division National Security Section
950 Pennsylvania Ave, NW Room 1736
Washington, D.C. 20530

## <u>CERTIFICATE OF SERVICE</u>

On this 10th day of January 2022, a copy of the foregoing was served upon all parties listed

on the Electronic Case Filing (ECF) System.


By:     <u>*/s/    Maria Y. Fedor*</u>
Maria Y. Fedor
Attorney, detailed to the
United States Attorney's Office for the
District of Columbia
D.C. Bar No. 985823
555 Fourth Street, N.W.
Washington, DC 20530
(202) 353-7366; Maria.Fedor@usdoj.gov