## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **1:21-CR-618-ABJ** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **RILEY JUNE WILLIAMS** | **:** | |

## DEFENDANT'S REPLY TO GOVERNMENT'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COUNTS ONE, TWO, FIVE AND SIX AND MOTION TO TRANSFER VENUE

Defendant Riley June Williams, by and through her attorneys, hereby respectfully submits this reply[1] to the Government's brief in opposition to Ms. Williams' Motions to Dismiss Counts One, Two, Five and Six of the Indictment[2] and to Transfer Venue.  Ms. Williams submits that her Motions to Dismiss should be granted in their entirety, and a ruling on her Motion to Transfer Venue be deferred until a time more proximate to trial.

## I.      COUNT ONE – 18 U.S.C. § 231(a)(3) – CIVIL DISORDER

---

[1] This reply brief is filed in accordance with the Court's Minute Entry dated October 18, 2021.

[2] Since Ms. Williams' Motion to Dismiss Count Two was filed, district judges in the District of Columbia have issued decisions on similar motions to dismiss. *United States v. Caldwell et al.*, 21-CR-28 (APM); *United States v. Sandlin, Degrave*, 21-CR-88 (DLF)*; United States v. Mostofsky,* 1:21-cr-138 (JEB); *United States v. Nordean et al.,* 21-CR-175 (TJK) and; *United States v. Montgomery, Brady, Knowlton,* 21-CR-046 (RDM). Within its opposition, the Government relies on these decisions, which are non-binding on this Court, and, accordingly, are not discussed at length herein.

Section 231 criminalizes *any act,* or attempted act, to "obstruct, impede, or interfere" with an officer engaged in his lawful duties "incident to and during the commission of a civil disorder." 18 U.S.C. § 231(a)(3). Ms. Williams maintains that this statute is overbroad because it criminalizes conduct and speech protected by the First Amendment.

The Government principally relies on *United States v. Mechanic,* where the Eighth Circuit rejected an overbreadth challenge to § 231(a)(3). 454 F.2d 849, 852 (8th Cir.1971). The *Mechanic* court held that §231 "has no application to speech, but applies only to violent physical acts." This is an extremely narrow reading of §231, which has been rejected (recently) by at least one district court. *See United States v. Pugh*, 2021 U.S. Dist. LEXIS 177266 at *18 (S.D. Ala. May 13, 2021)("[t]he Court here agrees that 18 U.S.C. § 231(a)(3) applies to conduct, but not necessarily the more stringent view of the Eight[h] Circuit that it only applies to <u>violent</u> physical acts.")(emphasis in original). The *Pugh* court recognized that the "only place where violence is is in the definition of 'civil disorder,'" and observed that the Eighth Circuit's link of violence to the act of the individual is not required by the text of the statute. *Id.* at *18-19. Ms. Williams submits that the *Pugh* court was correct in holding that §231(a)(3) should be "construe[d] . . more broadly to include exactly what it says: 'any act.'" *Id.* at *19. While it is true that a wide variety of acts may be criminal, it is just as true that many acts can be

considered protected First Amendment speech.  Because §231(a)(3) can capture

protected expressive conduct and criminalize it, it is constitutionally overbroad.

Accordingly, the Court should dismiss Count One of the indictment.

## II.   COUNT TWO – 18 U.S.C. § 1512 – OBSTRUCTION OF AN OFFICIAL PROCEEDING

### A.   The Electoral Count is Not an Official Proceeding

Ms. Williams maintains that the Electoral Count[3] was not an "official

proceeding" within the meaning of 18 U.S.C. § 1512(c).  The Government argues

that the plain text defining "official proceeding," as a "proceeding before

Congress" is sufficient to conclude that the Electoral Count on January 6th is

included in this definition. The Government supports this argument by choosing

only one definition of "proceeding" from the Oxford English Dictionary, which

defines it as "the carrying on of an action or series of actions; action, course of an

action; conduct, behavior." ECF#40, Gov't Opp. at 5-6.  However, if the courts

rested on just this definition, then any event would qualify as an "official

proceeding" because every event "carries on an action or series of actions." Other

courts have not relied on this definition and have interpreted "official proceeding"

to disqualify many types of government activities even though the activities

---

[3] The Electoral Count on January 6, 2021 was a Joint Session of Congress, and Ms. Williams will interchangeably use the terms "Electoral Count" and "Joint Session" within this brief to refer to the same event.

"carried on a series of an action or series of actions" *See, e.g., United States v. Sutherland,* 921 F.3d 421, 426 (4th Cir. 2019) (FBI investigation not an "official proceeding" because that term "implies something more formal than a mere investigation") *cert. denied,* 140 S. Ct. 1106 (2020); *United States v. Dunn,* 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) (investigation conducted by Bureau of Alcohol, Tobacco, and Firearms not an "official proceeding" because the term encompasses "events that are best thought of as hearings (or something akin to hearings)").

The Government further argues that the narrower Black's Law Dictionary definition of "proceeding" would still include the Electoral Count on January 6th. *See* Gov't Opp. at 6. That narrower definition includes, "the business conducted by a court or other official body; a hearing." Black's Law Dictionary, "*proceeding*" (11th ed. 2019). This definition of "proceeding" plainly describes the word to mean "a hearing." The Government provides little support for the Joint Session on January 6th being a "hearing." The only support the Government provides is that the Joint Session is a formal environment where a decision must be made.[4] *See*

---

[4] Notably, the statute governing the Electoral Count Joint Session, 3 U.S.C.§ 15, repeatedly makes clear that the Joint Session is simply a "meeting" of both Congressional bodies:

> The Senate and House of Representatives shall ***meet*** in the Hall of the House of Representatives……..When the two Houses have voted, they shall immediately again ***meet***….

Gov't Opp. at 8-9.   Rather than explain why the Electoral Count should be considered an "official proceeding" in its own right, the Government simply analogizes the ceremonial and formulaic steps of the vote certification process to a court hearing.  Moreover, the cases the Government cites interpret "official proceeding" more narrowly by not only explaining that it must be a formal environment but that there also must be characteristics of a hearing, such as findings of fact, and having the power to issue subpoenas. *See United States v. Kelley,* 36 F.3d at 1127 (explaining the Inspector General was empowered to, and did, issue subpoenas, and compel sworn testimony in conjunction with an investigation). So, it is not just that a decision must be made in a formal environment, but rather that the characteristics surrounding the event must be "akin to a hearing." *Id.* This interpretation is consistent with the congressional intent outlined in Ms. Williams' motion to dismiss.

Although the Electoral Count is in a "formal environment," it is not a "hearing" because it does not have the characteristics associated with a typical hearing. Just because a decision must be made does not place the session "comfortably within the category of an "official proceeding" as the Government

---

3 U.S.C. § 15. (emphases added). Thus, the language of the statute governing the Joint Session plainly describes it as a "meet[ing]" rather than a proceeding.

suggests. The Government does not acknowledge the ceremonial nature of the session but instead attempts to equate it with a hearing. The Government points to 3 U.S.C. §15, which technically bestows Congress with the authority to lodge objections; however these "objections" are not the same that exist in a typical proceeding which the statute intends to cover.[5]

As explained in Ms. Williams' motion to dismiss, the session is ceremonial and the objections have no legal significance.[6]   The session is not intended to be

---

[5] The history of "objections" lodged at the Electoral Count further demonstrates the ceremonial nature of the Electoral Count. The past objections were mostly made in the 1800's because of the confusion of when new states were admitted to the union and how that impacted whether their votes should count. Objections were ultimately rejected because it was determined that the Joint Session did not have the authority to judge the proceedings already had in the states.  *See* Vasan Kesavan, "*Is the Electoral Count Act Unconstitutional?*" 80 North Carolina Law Review 1653 at 1678-94 (2002) (hereafter, "Kesavan"). In 1876, the most tumultuous election, Samuel Tilden and Rutherford Hayes were separated by one electoral vote and four states sent Congress multiple electoral returns. *Id.* Instead of the Joint Session resolving this issue (because Congress recognized that the Joint Session did not have the authority to do so), Congress formed a separate commission to sort through the chaos and decide the issues of fact and law presented. *Id*. Subsequently, to address issues like this in the future, Congress enacted the Electoral Count Act of 1887, placing on the states the responsibility to resolve disputes about electors and their appointments and certifications. Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 Fla. L. Rev. 540, 543 (July 2004). Further, in 1969, there was an objection that a vote sent up to Congress from North Carolina should not be counted because it reflected the "faithless" elector who had refused to give his vote to Richard Nixon, despite Nixon winning the popular vote in that state. The objection was rejected, and the vote at issue counted, because of the strong reminder of representatives such as R. Rarick who said "[w]e are not election supervisors nor given the discretion to re-compute the vote received from a sovereign state. The Constitution clearly proscribes our duty as to 'count the electoral votes,' the *ministerial* function of a central *collecting agency* and a *tabulating* point." *See Kesavan* at 1694 (emphases added).

[6] The vote count is entirely ministerial – it certifies vote counts that have been determined. It does not meaningfully decide any issues of fact or law because those have already been decided by the states and the courts, s*ee, e.g., Bush v. Gore*, 531 U.S. 98 (2000), and the Joint Session

adversarial and that is because, by the time it takes place, the states have certified

that there are no remaining disputes and therefore any objection would be to the

technical procedures carried out by the individual states. Simply put, the "counting

function" the Joint Session of Congress convened for the Electoral Count does not

have a "judicial" aspect to it and the "electoral vote is merely ministerial."

For all these reasons, the Electoral Count is not "a proceeding" akin to a

formal hearing. Rather, it is a ceremonial meeting of both houses of Congress.

While steeped in tradition, it decides nothing. It is a political performance

conducted in order to give the country a feeling of finality over the already final

election results. As a result, the Electoral Count does not qualify as an "official

proceeding" and Count Two of the indictment should be dismissed.

### B.    Vagueness

The Government cites to *United States v. Lanier,* 520 U.S. 259, 267 (1997),

for the premise that the "touchstone" of a vagueness analysis "is whether the

statute, either standing alone or as construed, made it reasonably clear at the

relevant time that the defendant's conduct was criminal." This common sense and

practical standard is *exactly* what the defendant submits is missing here. On

January 6, 2021, Ms. Williams could not possibly have been on notice that she was

---

does not have the power under the Constitution to actually reject the votes of any State. *See Kesavan* at 1653.

"obstructing" an "official proceeding" for several reasons. Foremost is that Ms. Williams is not accused of committing an act of obstruction. Rather, she is accused of being present at the Capitol where others allegedly committed such acts. The Government submits that it intends to prove at trial that Ms. Williams was directing rioters to go "upstairs," and that she was in Nancy Pelosi's office when a laptop was taken, but the Government does not explain how this alleged conduct obstructed the Electoral Count.  Gov't Opp. at 19.  It is not reasonable to say that Ms. Williams' conduct had the "natural and probable effect" of halting the vote when there was no particular action that Ms. Williams took that could be reasonably linked to the interference of the vote. *See United States v. Aguilar*, 515 U.S. 593, 601 (1995). For these reasons, the statute is unconstitutionally vague as applied to Ms. Williams.

### C.      Distinguishing Recent District of Columbia Cases

#### 1.      "Official Proceeding"

Four recent cases. *Caldwell*, *Sandlin, Nordean*, and *Montgomery* ruled that the vote count on January 6, 2021 was a "proceeding before Congress" and therefore qualifies as an "official proceeding" under 18 U.S.C. §1512(c)(2).  These cases, however, do not resolve the arguments raised by Ms. Williams here.  While each decision defines "official proceeding," none of the decisions consider whether

the electoral vote was a "proceeding" at all under any definition.

In *Caldwell*, for example, the district court did not address the ceremonial and predetermined nature of the electoral count, and how that predetermination is antithetical to the vote count being considered a "proceeding" or "hearing." *See Caldwell* Opinion, ECF#558. Similarly, the *Sandlin* court ruled that a "proceeding" need not be "court-like" and did not require the "administration of justice." *Sandlin* Opinion, ECF#63 at 7-9 (the *Sandlin* court did, however, rule that an official proceeding must be akin to a hearing[7]). The *Caldwell* and *Montgomery* courts ruled that an "official proceeding" means "the business conducted before an official body." *Caldwell* Opinion at 8-10; *Montgomery* Opinion, ECF#87 at 13, 19. Lastly, the *Nordean* court had the broadest interpretation, ruling that an "official proceeding" is a "series of actions" that requires "some formal convocation." *Nordean* Opinion, ECF#263 at 11.

However, in reaching its determinations, the *Caldwell*, *Nordean*, and *Mongtomery* courts left a crucial part of the definition of "proceeding" out of their

---

[7] The *Sandlin* court held that a "proceeding" must be akin to a formal hearing. *Sandlin* Opinion at 7, 9. The *Sandlin* Court reasoned that the vote count is a formal hearing because of the formal procedures it must follow pursuant to 3 U.S.C. § 15 that allow for objections and decisions, but did not address the "ceremonial and ministerial" nature of the meeting, or consider the procedures that govern the meeting in the context of the meeting's ceremonial nature. *Sandlin* Opinion at 7-9. The ceremonial nature of the vote count, however, is crucial to determining whether or not the electoral count is akin to a formal hearing and, in turn, whether it may constitute a "proceeding."

analyses.  *See Caldwell* Opinion at 9; *Nordean* Opinion at 11; *Montgomery*

Opinion at 11.  As discussed *supra,* Black's Law Dictionary defines "proceeding"

to be "the business conducted by a court or other official body; *a hearing*." (11th

ed. 2019) (emphasis added). The word "hearing," which was left out of the three

courts' definitions, provides crucial context to the definition of "proceeding" by

requiring something more than a "formal convocation" or "business conducted

before an official body."

## 2.    Vagueness

In *Sandlin,* the court refused to find the word "corruptly" vague as applied to

Sandlin because it found there was a clear nexus between the alleged conduct and

the intent to obstruct the vote.  *Sandlin* Opinion at 24-26.  In *Sandlin*, the

defendants allegedly engaged in advance planning, forcibly breached the Capitol

building, assaulted Capitol police officers inside the building, and encouraged

others to steal paperwork from the Senate Chamber. *Id.*   In contrast to *Sandlin*,

there is no nexus between Ms. Williams' alleged actions and an intent to obstruct

the vote count.

In *Sandlin*, the Court found the term "corruptly" in §1512(c)(2) to mean

"wrongfully" and "independently criminal" and therefore was not impermissibly

vague in that case because the defendants' alleged behavior was so intertwined

with their concerted efforts to obstruct the vote that it fit squarely within the term.

*Id.* at 25. *See also Nordean* at 24 (agreeing with *Sandlin*). The *Sandlin* Court noted, however, that other cases with different facts could present closer questions. *Id*. This case is a perfect example of one that presents a closer question.  Here, Ms. Williams' conduct does not fit squarely within the core coverage of "corruptly" because her actions are not inextricably intertwined with an intent to obstruct the vote count.  Ms. Williams alleged trespass into the Capitol building is a separate crime for which there is a separate *mens rea*.  That alleged trespass is not and should not be intertwined with an intent to obstruct the vote count without any further indication of that intent.  Ms. Williams did not engage in advance planning and did not take any actions to actually "impede" or "influence" the vote count. Accordingly, §1512(c)(2) is vague as to Ms. Williams.

Shortly after the *Sandlin* decision, the district courts in *Caldwell* and *Nordean* also ruled that §1512(c)(2) is not impermissibly vague.  *See Caldwell* and *Nordean* Opinions.  In *Caldwell* and *Nordean*, the district courts agreed that the term "corruptly" must be understood in its intransitive form and that is why *Poindexter* does not control in a prosecution under §1512(c)(2). *Caldwell* Opinion *at* 22-33; *Nordean* Opinion at 22.  However, it is the intransitive form of the term "corruptly" that makes it especially vague in this case.  Ms. Williams did not personally act corruptly with respect to any intent to obstruct the vote count. Furthermore, it cannot be alleged that trespass alone that is the "corrupt" act,

otherwise every single person that entered the Capitol that day would be guilty of §1512(c)(2).  It also could not have been the statements allegedly made while inside the Capitol building because none of those statements indicated a desire to stop the vote count.  Simply put, there is no alleged action that should have put Ms. Williams on notice that she was acting corruptly while allegedly trying to stop the vote count.

The district court in *Caldwell* relied on *Arthur Anderson* and other circuit decisions that interpreted "corruptly" to require the "consciousness of wrongdoing." *Caldwell* at 23-24.  The Court found that interpretation readily applied to the *Caldwell* defendants who were allegedly members of the Oath Keepers and conspired and pre-planned their January 6, 2021 activities and that (except for one) forcibly breached the Capitol.  *Id*. at 3-5 (defendants allegedly collected paramilitary gear and were armed with such gear on January 6, chatted together about plans prior to January 6, and some were allegedly part of a group that pushed through a line of officers inside the Capitol building).  With those alleged facts, none of which are present here, the Court found a logical nexus existed between the inherent "consciousness of wrongdoing" and the intent to halt the vote count. *Id.* at 23-24.  That same nexus, however, does not exist or apply to individuals like Ms. Williams.  Further, the "consciousness of wrongdoing" of the acts attributed to Ms. Williams – entering the Capitol and exclaiming dissent over

the election results– are unconnected to the intent or "consciousness" of halting a vote count.

In *Montgomery*, the Court also found that a "nexus" requirement is consistent with past decisions. *Montgomery* Opinion at 44-45 (defendants allegedly wore tactical vests, used violence on officers, and stormed the Senate). In *Montgomery*, the Court reasoned that §1512(c)(2) requires the defendant's conduct to have the "natural and probable effect of interfering with an official proceeding and the accused must have known his actions were likely to affect a particular proceeding." *Id*. (quoting *United States v. Aguilar*, 515 U.S. 593, 599 (1995). In this case, that link cannot be made. Ms. Williams was not on notice because it is not reasonable to say that her actions of protesting while entering the Capitol building had a "natural and probable effect" of halting the vote when there was no particular action that Ms. Williams took that could be reasonably linked to the interference of the vote.

For these reasons, the vagueness of the word "corruptly" still remains as applied to Ms. Williams.

## III.   COUNTS FIVE AND SIX– 18 U.S.C. § 1752 – RESTRICTED BUILDING/GROUNDS

It is evident that the Government perceives the fatal flaws in Counts Five and Six, which is why it has attempted to amend the Grand Jury's indictment in its brief in opposition to Ms. Williams' motion. To be clear, the indictment in this

case invokes §1752 on the basis that "the *Vice President* was temporarily visiting" the United States Capitol. ECF#27, Indictment (emphasis added). Now, for the first time in it its opposition brief, the Government contends that not only was the Vice President "temporarily visiting" the Capitol, but that "two [of his] immediate family members" were also "temporarily visiting" the U.S. Capitol building when Ms. Williams is alleged to have violated 18 U.S.C. § 1752. Gov't Opp. at 31.  The Government added "two immediate family members" of Vice President Pence in an obvious attempt to save the §§1752 charges from dismissal, but the Government cannot amend the indictment in a brief in opposition.[8] Accordingly, the Court should disregard any arguments the Government makes concerning the presence of Vice President Pence's family members at the Capitol on January 6th.

To be clear, the Government acknowledges that Vice President Pence lived and worked in the District of Columbia and maintained "a permanent U.S. Capitol office." Gov't Opp. at 32-33. The Government further acknowledges that Vice President Pence was at the U.S. Capitol on January 6 "as President of the Senate," "to preside[] over" and "oversee the Joint Session of Congress." *Id*. at 33.

---

[8] "After the grand jury has returned its indictment, the charges may not be broadened or amended by the court or the prosecutor - only the grand jury itself can do that." *United States v. Haldeman*, 559 F.2d 31, 164 n.18 (D.C. Cir. 1976) (citing *Stirone v. United States*, 361 U.S. 212, 216 (1960)); *see also Ex Parte Bain*, 121 U.S. 1 (1887).

Contrary to the Government's assertion, however, it is hardly "irrelevant" that Vice President Pence lived and worked in the District of Columbia and had a permanent U.S. Capitol office. *Id.* at 32. Rather, these undisputed facts demonstrate that the statute does not apply as a matter of law as the Government attempts to apply it, nor did Congress intend for the statute to apply here. The "temporarily visiting" part of the statute was promulgated specifically to address the difficulties of protecting the President "when he is outside the White House complex traveling or residing temporarily *in some other section of the country*." Auth. Of Sec'y Treasury to Ord. Closing of Certain Sts. Located Along the Perimeter of the White House, 19 Op. O.L.C. 109 (1995) ("*Authority of the Secretary*")(emphasis added).[9] In the floor debate on the bill, legislators discussed "the problems confronting the Secret Service when protecting the President *outside of Washington*." *Id.* (emphasis added).  Nonetheless, Ms. Williams does not suggest that the statute may apply only to places outside the District of Columbia. Ms. Williams simply highlights the obvious: that a person generally cannot be said to be "temporarily visiting" his own office building located approximately four miles from his residence.

Still, the Government claims that Vice President Pence was "temporarily visiting" the Capitol because he was "physically present . . . for a particular

---

[9] Available at https://www.justice.gov/file/20226/download.

purpose" and "intended to leave at the close of the session." Gov't Opp. at 32. According to the Government, then, every person who worked at the Capitol who was "physically present" that day—every Congressperson, every staffer, every U.S. Capitol Police officer—was "temporarily visiting." By that logic, only a person meandering aimlessly through the Capitol for no purpose, or a person who lived within and never left the Capitol (i.e., no one), would fall outside the scope of "temporarily visiting." The Court should reject the government's invitation to read all meaning out of an express limitation in a criminal statute. *See United States v. Wiltberger,* 18 U.S. 76, 95 (1820) ("The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself" and "is founded on the tenderness of the law for the rights of individuals . . . .").

In fact, the Government reads the words "temporarily visiting" out of the statute completely. Under the Government's limitless interpretation, the words "temporarily visiting" are meaningless and superfluous. "The Government's reading is thus at odds with one of the most basic interpretive canons, that 'a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .'" *Corley v. United States,* 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)); *see also Colautti v. Franklin,* 439 U.S. 379, 392 (1979) (discussing "elementary canon of construction that a statute should be interpreted so as not to

render one part inoperative") (citing *United States v. Menasche*, 348 U.S. 528, 538–539 (1955)). If Congress wanted to define "restricted building or grounds" to encompass anywhere a Secret Service protectee "is or will be physically present" at any given time, Congress easily could have, and would have, omitted the words "temporarily visiting" or used the words "physically present" instead in § 1752(c)(1)(B). *See Burgess v. United States,* 553 U.S. 124, 130 (2008) ("As a rule, [a] definition which declares what a term 'means' . . . excludes any meaning that is not stated.") (alteration and ellipsis in original) (quoting *Colautti,* 439 U.S. at 392-393 n. 10). "Congress did not write the statute that way." *Russello v. United States,* 464 U.S. 16, 23 (1983) (quoting *United States v. Naftalin,* 441 U.S. 768, 773–774 (1979)). Consequently, the statute simply does not restrict any government building in which a Secret Services protectee is or will be "physically present." Also, "[r]eading the statute to proscribe a wider range of offensive conduct," as the government urges, "would raise the due process concerns underlying the vagueness doctrine." *Skilling v. United States,* 561 U.S. 358, 408 (2010).

Contrary to the government's assertion (Gov't Opp. at 33), it is entirely rational that section 1752(c)(1)(B) would not apply at the President's and Vice President's "permanent residences in Delaware or California" because state criminal and property law protects all individuals on their private property and in their private residences. Congress does not have the power to federally prosecute

and punish any and all criminal conduct anywhere in the United States: Under our federal system, the "'States possess primary authority for defining and enforcing the criminal law.'" *Brecht v. Abrahamson,* 507 U.S. 619, 635 (1993) (quoting Engle v. Isaac, 456 U.S. 107, 128 (1982)); see also *Screws v. United States,* 325 U.S. 91, 109 (1945) (plurality opinion) ("Our national government is one of delegated powers alone. Under our federal system the administration of criminal justice rests with the States except as Congress, acting within the scope of those delegated powers, has created offenses against the United States"). When Congress criminalizes conduct already denounced as criminal by the States, it effects a "'change in the sensitive relation between federal and state criminal jurisdiction.'" *United States v. Enmons,* 410 U.S. 396, 411–412 (1973) (quoting *United States v. Bass,* 404 U.S. 336, 349 (1971); *United States v. Lopez,* 514 U.S. 549, 561 n. 3 (1995)). It is entirely rational and reasonable for Congress to legislate so as not to exceed the scope of its Constitutional authority.

Lastly, the Government's contention that the appropriate construction "would neuter the government's ability to deter and punish those individuals who seek unauthorized access to the President's or Vice President's location" is wholly unsupported. Gov't Opp. at 33. Section 1752 expressly delineates three definitions of the term "restricted building or grounds" pursuant to which individuals may be criminally punished. "When 'a statute includes an explicit definition' of a term,

'we must follow that definition . . . .'" *Van Buren v. United States,* 141 S. Ct. 1648, 1657 (2021) (quoting *Tanzin v. Tanvir,* 141 S. Ct. 486, 490 (2020)). In addition, section 3056(d) criminalizes obstruction and interference with a Secret Service officer's performance of his or her "protective functions." *See also Authority of the Secretary*, 19 Op. O.L.C. at 109 (opining that § 3506 "grants the Secretary broad authority to take actions that are necessary and proper to protect the President"). The Government's argument should be directed to Congress to amend the statute, not to request this Court to interpret it contrary to Congress's language. The Supreme Court has recently rejected the government's attempts to stretch and broaden the interpretation and application of federal criminal statutes. *See Kelly v. United States,* 140 S.Ct. 1565, 1574 (2020) (finding the government using federal fraud statutes to criminalize regulatory actions of government officials an impermissible and overbroad application of the statute); *Van Buren*, 141 S.Ct. at 1661 (finding the government's broad construction of the computer fraud and abuse statute would implicate a large amount of commonplace activity not meant to be covered by the statute). This Court should do the same here, and dismiss Counts Five and Six of the indictment.

## IV.    MOTION TO TRANSFER VENUE

As of this writing, Federal Public Defender's Office for the District of Columbia has retained the services of an expert to conduct a statistical study of the

District's jury pool and the study is underway.  Ms. Williams requests leave
of court to supplement her Motion to Transfer upon completion of the jury study.
Accordingly, Ms. Williams requests that the Court hold her Motion to Transfer
Venue in abeyance at this time.

## V.      CONCLUSION

Based on the foregoing arguments, Ms. Williams respectfully requests that
the Court grant her Motions to Dismiss, and defer a ruling on her Motion to
Transfer Venue.

Date:  January 24, 2022                             Respectfully submitted:

*/s/ Lori J. Ulrich*
LORI J. ULRICH, ESQUIRE
Assistant Federal Public Defender
*/s/ Amanda R. Gaynor*
AMANDA R. GAYNOR, ESQUIRE
Staff Attorney
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
Tel. No. (717) 782-2237
Fax No. (717) 782-3881
*lori_ulrich@fd.org*
*amanda_gaynor@fd.org*

*/s/ A.J. Kramer*
A.J. KRAMER, ESQUIRE
Federal Public Defender
625 Indiana Avenue, NW
Washington, D.C. 20004
Tel. No. (202) 208-7500
*a._j._kramer@fd.org*

*Attorneys for Riley June Williams*

## CERTIFICATE OF SERVICE

I, Lori J. Ulrich, Esquire, of the Federal Public Defender's Office, do hereby certify that I served a copy of the foregoing **Defendant's Reply Brief** via Electronic Case Filing, and/or by placing a copy in the United States mail, first class in Harrisburg, Pennsylvania, and/or by hand delivery, addressed to the following:

Mona Sedky, Esquire
Assistant United States Attorney
*mona.sedky2@usdoj.gov*

Danielle Sara Rosborough, Esquire
Assistant United States Attorney
*danielle.rosborough@usdoj.gov*

RILEY JUNE WILLIAMS

Date:  January 24, 2022                    */s/ Lori J. Ulrich*
                                           LORI J. ULRICH, ESQUIRE
                                           Assistant Federal Public Defender
                                           Attorney ID #55626
                                           100 Chestnut Street, Suite 306
                                           Harrisburg, PA 17101
                                           Tel. No. (717) 782-2237
                                           Fax No. (717) 782-3881
                                           lori_ulrich@fd.org
                                           *Attorney for Riley June Williams*