# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | Crim. Action No. 21-0618 (ABJ) |
| | ) | |
| RILEY JUNE WILLIAMS, | ) | |
| | ) | |
| Defendant. | ) | |

---

## <u>MEMORANDUM OPINION</u>

Defendant Riley June Williams has been charged in an eight-count indictment with the following offenses:

> Count I – civil disorder, in violation of 18 U.S.C. § 231(a)(3);
>
> Count II – obstruction of an official proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2;
>
> Count III – assaulting, resisting, or impeding certain officers in violation of 18 U.S.C. § 111(a)(1);
>
> Count IV – aiding and abetting theft of government property, in violation of 18 U.S.C. §§ 641 and 2;
>
> Count V – entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1);
>
> Count VI – disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2);
>
> Count VII – disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D); and
>
> Count VIII – parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G).

Indictment [Dkt. # 27].

Williams has filed separate motions to dismiss Count I, Count II, and Counts V and VI. *See* Def.'s Mot. to Dismiss Count I [Dkt. # 36] ("Count I Mot."); Def.'s Mot. to Dismiss Count II [Dkt. # 33] ("Count II Mot."); Def.'s Mot. to Dismiss Counts V and VI [Dkt. # 37] ("Counts V and VI Mot."). The government opposes each of them. Gov't's Omnibus Opp. to Def.'s Mots. to Dismiss Counts I, II, V and VI and Mot. to Transfer Venue [Dkt. # 40] ("Opp."). The matter is fully briefed, *see* Def.'s Reply to Gov't's Opp. [Dkt. # 41]; Def.'s Notice of Recent Auth. Relevant to Ms. Williams' Mot. to Dismiss Count II of the Indictment [Dkt. # 45] ("Def.'s Recent Auth."); Gov't's Notice of Recent Auth. Relevant to the Def.'s Mot. to Dismiss Count II of the Indictment [Dkt. # 48], and the Court held a hearing on February 18, 2022. Min. Entry (Feb. 18, 2022).

This case is one of many arising out of the events at the United States Capitol on January 6, 2021, and all of the legal challenges Williams raises in her motions have been considered and rejected by other courts in this district. *See United States v. Griffin*, 549 F. Supp. 3d 49, 52–58 (D.D.C. 2021) (18 U.S.C. § 1752(a)(1)); *United States v. Sandlin*, Case No. 21-cr-88 (DLF), 2021 WL 5865006, at *3–5, *10–13 (D.D.C. Dec. 10, 2021) (18 U.S.C. § 1512(c)(2)); *United States v. Caldwell*, Case No. 21-cr-28 (APM), 2021 WL 6062718, at *4–11 (D.D.C. Dec. 20, 2021) (18 U.S.C. § 1512(c)(2)); *United States v. Mostofsky*, Case No. 21-cr-138 (JEB), 2021 WL 6049891, at *8–13 (D.D.C. Dec. 21, 2021) (18 U.S.C. § 231(a)(3); 18 U.S.C. § 1512(c)(2); 18 U.S.C. § 1752(a)(1)); *United States v. Montgomery*, Case No. 21-cr-46 (RDM), 2021 WL 6134591, at *4–10, *18–23 (D.D.C. Dec. 28, 2021) (18 U.S.C. § 1512(c)(2)); *United States v. Nordean*, Case No. 21-cr-175 (TJK), 2021 WL 6134595, at *4–12, *14–19 (D.D.C. Dec. 28, 2021) (18 U.S.C. § 231(a)(3); 18 U.S.C. § 1512(c)(2); 18 U.S.C. § 1752(a)(1)); Order, *United States v. Reffitt*, Case No. 21-cr-

32 (D.D.C. Dec. 29, 2021) (18 U.S.C. § 1512(c)(2)); *United States v. McHugh*, Case No. 21-cr-453 (JDB), 2022 WL 296304, at *3, *22 (D.D.C. Feb. 1, 2022) (18 U.S.C. § 231(a)(3); 18 U.S.C. § 1512(c)(2)); *United States v. Grider*, Case No. 21-cr-22 (CKK), 2022 WL 392307, at *3–8 (D.D.C. Feb. 9, 2022) (18 U.S.C. § 1512(c)(2)); *United States v. Bozell*, Case No. 21-cr-216 (JDB), 2022 WL 474144, at *1–7 (D.D.C. Feb. 16, 2022) (18 U.S.C. § 1512(c)(2)); *United States v. Robertson*, Case No. 21-cr-34 (CRC), 2022 WL 969546, at *3–6 (D.D.C. Feb. 25, 2022) (18 U.S.C. § 1512(c)(2)); *United States v. Andries*, Case No. 21-cr-93 (RC), 2022 WL 768684, at *3–17 (D.D.C. Mar. 14, 2022) (18 U.S.C. § 1512(c)(2); 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2)); *United States v. Fischer*, Case No. 21-cr-234 (CJN), 2022 WL 782413, at *1–4 (D.D.C. Mar. 15, 2022) (18 U.S.C. § 231(a)(3)); *United States v. Puma*, Case No. 21-cr-454 (PLF), 2022 WL 823079, at *4–19 (D.D.C. Mar. 19, 2022) (18 U.S.C. § 1512(c)(2); 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2)); *United States v. Sargent*, Case No. 21-cr-258 (TFH), 2022 WL 1124817, at *2–6 (D.D.C. Apr. 14, 2022) (18 U.S.C. § 231(a)(3)); *United States v. McHugh*, Case No. 21-cr-453 (JDB), 2022 WL 1302880, at *2–12 (D.D.C. May 2, 2022) ("*McHugh II*") (18 U.S.C. § 1512(c)(2)); *United States v. Bingert*, Case No. 21-cr-91 (RCL), 2022 WL 1659163, at *3–11, *12–15 (D.D.C. May 25, 2022) (18 U.S.C. § 231(a)(3); 18 U.S.C. § 1512(c)(2); 18 U.S.C. § 1752(a)(1)); *United States v. Fitzsimons*, Case No. 21-cr-158 (RC), 2022 WL 1698063, at *3–13 (D.D.C. May 26, 2022) (18 U.S.C. § 1512(c)(2)).

One court has granted a motion to dismiss a charge alleging a violation of 18 U.S.C. § 1512(c)(2). *See United States v. Miller*, Case No. 21-cr-119 (CJN), 2022 WL 823070 (D.D.C. Mar. 7, 2022) (agreeing with the government that the congressional certification of Electoral College results is an "official proceeding" for purposes of the statute, but finding that the defendant's conduct did not violate section 1512(c)(2) because the provision only applies if the

defendant took some action with respect to a document, record, or other object)[1]; *Fischer*, 2022 WL 782413, at *4 (same); *see also United States v. Miller*, Case No. 21-cr-119 (CJN), 2022 WL 1718984 (D.D.C. May 27, 2022) (denying government's motion for reconsideration). The Court has considered the thoughtful reasoning in all of these opinions in reaching its decision.

## LEGAL STANDARD

The Federal Rules of Criminal Procedure require that an indictment must consist of "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).  The charging document "need only inform the defendant of the precise offense of which he is accused so that he may prepare his defense and plead double jeopardy in any further prosecution for the same offense."  *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018), quoting *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014); *see United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007).  "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished.'"  *Hamling v. United States*, 418 U.S. 87, 117 (1974), quoting *United States v. Carll*, 105 U.S. 611, 612 (1882).

A criminal defendant may move to dismiss an indictment before trial based on a "defect in the indictment," Fed. R. Crim. P. 12(b)(3)(B), including constitutional challenges.  *See United States v. Eshetu*, 863 F.3d 946, 952 (D.C. Cir. 2017), *vacated in part on reh'g on other grounds*, 898 F.3d 36 (D.C. Cir. 2018).  "When considering a motion to dismiss an indictment, a court assumes the truth of those factual allegations."  *United States v. Ballestas*, 795 F.3d 138, 149

---

1      *See also* Def.'s Recent Auth. at 2.

(D.C. Cir. 2015), citing *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952). A dismissal of an indictment "is granted only in unusual circumstances," because "a court's 'use[ ] [of] its supervisory power to dismiss an indictment . . . directly encroaches upon the fundamental role of the grand jury.'" *Id.* at 148, quoting *Whitehouse v. U.S. Dist. Court*, 53 F.3d 1349, 1360 (1st Cir. 1995).

## ANALYSIS

### I.   Count I:  Violation of 18 U.S.C. § 231(a)(3)

Williams moves to dismiss Count I, civil disorder in violation of 18 U.S.C. § 231(a)(3), on two grounds:  (1) "[t]his subsection of the civil disorder penal statute is overbroad and unconstitutionally vague because §231(a)(3)'s imprecise and subjective standards fail to provide fair notice and create significant risk of arbitrary enforcement," and (2) "several of the statute's terms are so broad and indefinite as to impose unqualified burdens on a range of protected expression."  Count I Mot. at 3.  Defendant made it clear during the hearing on February 18, 2022 that in this motion, she is challenging the provision on its face and not as applied to her conduct. *See* Draft Tr. of Mots. Hr'g at 13, United States v. Williams, Case No. 21-cr-618 (D.D.C. argued Feb. 18, 2022) ("Draft Hr'g Tr.") ("COUNSEL:  We're not making an as-applied challenge.").[2]

Section 231(a)(3) states:

> Whoever commits or attempts to commit *any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder* which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected

---

2       The Court notes that the parties have not requested a formal transcript of their arguments on the motions from the court reporter.  Accordingly, the Court's citations to the transcript are from the court reporter's rough draft of the proceeding.

> function--Shall be fined under this title or imprisoned not more than five
> years, or both.

18 U.S.C. § 231(a)(3) (emphasis added).  According to Williams, section 231(a)(3) is "replete with vague and imprecise terms that fail to provide a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited."  Count I Mot. at 5.  Further, Williams contends that the statute lacks a scienter requirement, *id.* at 6–8, and that this exacerbates the vagueness problems.  *Id.* at 7, citing *United States v. Stevens*, 559 U.S. 460, 474 (2010).

Williams tends to confuse and conflate the overbreadth and vagueness doctrines, which are legally distinct, so the Court will assess them separately.

## A. Vagueness

A law can be unconstitutionally vague if "it fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).

With respect to fair notice, "a statutory term is not rendered unconstitutionally vague because it 'do[es] not mean the same thing to all people, all the time, everywhere.'" *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017), quoting *Roth v. United States*, 354 U.S. 476, 491 (1957).  "Rather, a statute is unconstitutionally vague if, applying the rules for interpreting legal texts, its meaning 'specifie[s]' 'no standard of conduct . . . at all.'" *Bronstein*, 849 F.3d at 1107, quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (alterations in original).  "Accordingly, when the vagueness doctrine assesses a legal term's meaning to ordinary people, it is assessing meaning with the elementary rule of statutory interpretation:  [w]ords receive their plain, obvious and common sense meaning, unless context furnishes some ground to control, qualify, or enlarge it." *Bronstein*, 849 F.3d at 1108 (citation and quotation marks omitted).

As to the second aspect of the vagueness doctrine, the Supreme Court has explained that if the applicability of a statute depends upon "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings," courts may find the statute to be unconstitutionally vague on the grounds that it encourages arbitrary and discriminatory enforcement. *United States v. Williams*, 553 U.S. 285, 306 (2008).

Defendant appears to object to the statute on both grounds. *See* Count I Mot. at 3 (the law is "unconstitutionally vague because §231(a)(3)'s imprecise and subjective standards fail to provide fair notice and create significant risk of arbitrary enforcement").

1. *The phrase "any act to obstruct, impede, or interfere" is not vague.*

Williams argues that the phrase "any act to obstruct, impede, or interfere" is vague because it "reaches the outer limits of verbal and expressive conduct without drawing *any* distinction that could exclude acts undertaken merely to convey a message or symbolic content." Count I Mot. at 5 (emphasis in original). She adds that the statute's plain meaning could "fairly include . . . such diverse acts as pure speech, expressive conduct, minimal jostling, or even grievous, violent assaults." *Id.* at 5–6. This is, as the government accurately observes, an overbreadth argument, *see* Opp. at 23, which will be addressed below, but to the extent defendant also intended to complain that the language is vague, that contention is unpersuasive.

First of all, Williams lifts the words out of context. The statute prohibits "any act to obstruct, impede, or interfere *with any fireman or law enforcement officer* lawfully engaged in the lawful performance of his official duties *incident to and during the commission of a civil disorder*." 18 U.S.C. § 231(a)(3) (emphasis added). This narrows the occasions when the statute could be applied considerably.

"Challenged terms must be read in context of the regulation as a whole."  *Bronstein*, 849 F.3d at 1109, quoting *Griffin v. Sec'y of Veterans Affs.*, 288 F.3d 1309, 1330 (Fed. Cir. 2002). As other courts in this district have recently held, "[a]n ordinary person would have an intuitive understanding of what is proscribed by a ban on obstructing, impeding, or interfering with law enforcement." *McHugh*, 2022 WL 296304, at *16.  Further, "there are specific fact-based ways to determine whether a 'defendant's conduct interferes with or impedes others,' or if a law enforcement officer is performing his official duties 'incident to and during' a civil disorder." *Nordean*, 2021 WL 6134595, at *16.

Second, Williams does not point to any term in the statute that would make it infirm because it requires the officer to make a subjective judgment about the defendant's conduct.  In *City of Chicago v. Morales*, 527 U.S. 41 (1999), the Supreme Court struck down a "Gang Congregation Ordinance" that prohibited "'criminal street gang members' from 'loitering' with one another or with other persons in any public place."  *Id.* at 45–46.  The Court observed that to charge someone with a violation of that ordinance:

> First, the police officer must reasonably believe that at least one of the two or more persons present in a "public place" is a "criminal street gang membe[r]."  Second, the persons must be "loitering," which the ordinance defines as "remain[ing] in any one place with no apparent purpose."  Third, the officer must then order "all" of the persons to disperse and remove themselves "from the area."  Fourth, a person must disobey the officer's order.

*Id.* at 47.

A plurality of the Supreme Court found that the Chicago ordinance was subject to a facial challenge because it had "no *mens rea* requirement, [it] infringe[d] on constitutionally protected rights," and because "vagueness permeate[d] the text."  *Id.* at 55.  In particular, a plurality of the Court found the definition of the term "loiter" in the Chicago ordinance to be impermissibly vague:

8

"the vagueness that dooms this ordinance is not the product of uncertainty about the normal meaning of 'loitering,' but rather about what loitering is covered by the ordinance and what is not," because "loiter" was defined as remaining in one place "with no apparent purpose." *Id.* at 53, 57. In short, the problem in *Morales* was that the City of Chicago had added a subjective gloss to the normal meaning of the word "loiter" when it drafted the ordinance.

Similarly, in *Kolender v. Lawson*, 461 U.S. 352 (1983), the Supreme Court struck down a California statute that required those who "loiter or wander on the streets" to present, when asked, a "credible and reliable" identification to a police officer. *Id.* at 353. The Court found that the law "contain[ed] no standard for determining what a suspect has to do in order to satisfy the requirement to provide a 'credible and reliable' identification." *Id.* at 358. Since the statute "vest[ed] virtually complete discretion in the hands of the police to determine whether the suspect ha[d] satisfied the statute" by producing an identification that was "credible and reliable," the Court concluded that the loitering statute was unconstitutionally vague under the arbitrary and discriminatory enforcement prong. *Id.*

These cases demonstrate that the critical factor in a facial challenge based on a risk of arbitrary and discriminatory enforcement is whether the statute is drafted in such a manner that it necessarily vests the determination of whether the law has been violated upon a purely subjective judgment. *See also Coates*, 402 U.S. at 611–12, 614 (striking down a Cincinnati ordinance that proscribed "three or more persons" from "assembl[ing] . . . on any of the sidewalks . . . and there conduct[ing] themselves in a manner annoying to persons passing by," because "[c]onduct that annoys some people does not annoy others," so "no standard of conduct is specified at all"); *Armstrong v. D.C. Pub. Libr.*, 154 F. Supp. 2d 67, 77–78 (D.D.C. 2001) (striking down the District of Columbia Public Library's appearance regulation, which allowed library personnel to refuse

entry to patrons with an "objectionable appearance," because the regulation depended "only upon subjective interpretation of the term 'objectionable'").

But that concern is not present in this case, because a violation of 18 U.S.C. § 231(a)(3) does not depend upon an element that can vary with the eye of the beholder, such as "with no apparent purpose." *Morales*, 527 U.S. at 47. Here, the applicability of the statute turns on whether an individual is in fact obstructing, impeding, or interfering with a law enforcement officer who is performing official duties at a specific time: during the commission of a civil disorder. And while the statute does not specifically define the words "obstruct," "impede," or "interfere," the statutory terms are not subject to "wholly subjective judgments," *Williams*, 553 U.S. at 306; *see Morales*, 527 U.S. at 62, and therefore, the statute does not on its face authorize or encourage discriminatory enforcement.[3]

### 2. The phrase "incident to and during the commission of a civil disorder" is not vague.

Williams argues that the phrase "incident to and during the commission of a civil disorder" is also problematic. She complains that the term "civil disorder is "extremely far-reaching" with "no limitation to solve the vagueness problem because it could apply to virtually any tumultuous public gathering to which police might be called, not just large-scale protests or riots" and "there

---

3       Williams cites *Roy v. City of Monroe*, 950 F.3d 245, 252 (5th Cir. 2020), which voiced the concern that a local ordinance prohibiting "'any act [undertaken] in such a manner as to disturb or alarm the public' fails meaningfully to guide the police and thus poses a substantial risk of arbitrary or discriminatory enforcement." *See* Count I Mot. at 5. But the familiar and more targeted language in section 231(a)(3) concerning acts that obstruct or impede law enforcement is not comparable. And, in any event, the *Roy* court found that "when entertaining a facial challenge to state or municipal legislation, '[v]agueness can be ameliorated by a state court's authoritative interpretations, if they provide sufficient clarity.'" 950 F.3d at 252 (citation omitted). There are standard jury instructions on obstructing officers that have long since been approved by the Court of Appeals. *See, e.g.*, Instruction No. 6.101, Obstructing Justice, Criminal Jury Instructions for the District of Columbia (16th ed.); *see also* 2A Fed. Jury Prac. & Instr. § 48:01 (6th ed.).

is no indication . . . whether the defendant is required to have participated in the civil disorder." Count I Mot. at 6.

But defendant's hyperbole is unwarranted; the term "civil disorder" is defined in the statute to be "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual."   18 U.S.C. § 232(1).   This series of requirements belies defendant's suggestion that the term is devoid of limiting principles to guide its application; the event at issue must involve a group of three or more persons, acts of violence, *and* actual, or an immediate danger of, property damage or personal injury. *See McHugh*, 2022 WL 296304, at *15.  Further, defendant misreads the statute when she professes to be confused about whether the individual charged must have participated in the civil disorder; the reference to a civil disorder specifies the type of "official duties" the victim *officer* must be engaged in performing for an assault or interference to be actionable under this particular statute.   It does not characterize the prohibited act of the alleged perpetrator.   Thus, section 231(a)(3) is not void for vagueness.

### B. Overbreadth

Although the "overbreadth and vagueness doctrines are related," they are "distinct":   "[a] vague law denies due process by imposing standards of conduct so indeterminate that it is impossible to ascertain just what will result in sanctions; in contrast, a law that is overbroad may be perfectly clear but impermissibly purport to penalize protected First Amendment activity." *Hastings v. Jud. Conf. of the U.S.*, 829 F.2d 91, 105 (D.C. Cir. 1987).  A statue's overbreadth must be "substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292–93.

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Id.* at 293.  The second step requires the court to evaluate "whether the statute . . . criminalizes a substantial amount of protected expressive activity."  *Id.* at 297.  "Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech."  *Virginia v. Hicks*, 539 U.S. 113, 124 (2003).

Williams suggests that section 231(a)(3) is overbroad because it "reaches the outer limits of verbal and expressive conduct."  Count I Mot. at 5–6.  She also maintains that "the broadness of §231(a)(3)'s scope would presumably authorize a felony conviction for a bystander who yells at police to desist from an arrest, one who flips off officers to distract or encourage resistance, or one who records police activity with a cell phone."  *Id.* at 9–10.[4]

In the past year, at least four other courts in this district have considered whether section 231(a)(3) is overbroad on its face, and all have concluded it is not.  *See McHugh*, 2022 WL 296304, at *17; *Mostofsky*, 2021 WL 6049891, at *8–9; *Nordean*, 2021 WL 6134595, at *17; *Fischer*, 2022 WL 782413, at *3, citing *Johnson*, 576 U.S. at 595; *see also United States v. Howard*, Case No. 21-cr-28 (PP), 2021 WL 3856290, at *11–12 (E.D. Wis. Aug. 30, 2021); *United States v. Phomma*, 561 F. Supp. 3d 1059, 1067–68

---

4       Defendant also contends that section 231(a)(3) "casts far too wide a net" "[b]y expansively encompassing 'any act' that could interfere with the duties of a police officer or firefighter during a civil disorder" as opposed to "'violent acts' or acts that result in bodily injury or that otherwise put persons or property in imminent danger."  Count I Mot. at 8.  But that does not render the law unconstitutional; defendant has offered no reason why it was incumbent upon Congress to limit the statute to violence or attempts to cause personal injury when other forms of conduct could serve to obstruct or impede officers responding to the crisis.  As the *Nordean* court found, "there is no basis in the text of the statute for such a limitation."  2021 WL 6134595, at *17 n.14.

(D. Or. 2021); *United States v. Wood*, Case No. 20-cr-56 (MN), 2021 WL 3048448, at *7–8 (D. Del. July 20, 2021). The Court agrees with the reasoning in those decisions.

First, the statute plainly covers conduct, not speech, as it criminalizes "any *act* to obstruct, impede, or interfere with" a law enforcement officer engaged in the performance of official duties, and the terms "obstruct, impede, or interfere with" are all plainly understood and must be supported by the facts in any particular case. Although some "acts" could also serve an expressive function, and one could come up with a hypothetical scenario in which the alleged interference involved particularly obstreperous speech, the law does not require dismissing a charge merely because there is a possibility that the provision could reach some constitutionally protected activity. Since section 231(a)(3) does not "make unlawful a substantial amount of constitutionally protected conduct," it is not overbroad on its face. *City of Houston v. Hill*, 482 U.S. 451, 459 (1987).

## C. Scienter

Finally, defendant argues that section 231(a)(3) contains no scienter or mens rea requirement, and in light of this omission, "it is left to police, prosecutors, and judges to decide whether the statute requires knowledge or specific intent or neither." Count I Mot. at 6–7. The government argues in opposition that the statute does have a scienter requirement as it "requires proof that the 'act' was done '*to* obstruct, impede, or interfere' with a firefighter or law enforcement officer." Opp. at 25.

As defendant acknowledges in her motion, "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." Count I Mot. at 6, quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982). And criminal statutes are generally interpreted "to include broadly

13

applicable scienter requirements, even where the statute . . . does not contain them." *Elonis v. United States*, 575 U.S. 723, 734 (2015), quoting *United States v. X–Citement Video, Inc.*, 513 U.S. 64, 70 (1994) (quotation marks omitted).

Here, the statute only criminalizes acts performed "*to* obstruct, impede, or interfere with" a law enforcement officer, 18 U.S.C. § 231(a)(3) (emphasis added); in other words, the statute *requires* obstructive intent. *See McHugh*, 2022 WL 296304, at *14 ("Courts must strive to give effect to every word in a statute no matter how short—in §231(a)(3), that effort results in the conclusion that the statute includes a scienter requirement."); *see also Nat'l Mobilization Comm. to End War in Viet. v. Foran*, 411 F.2d 934, 937 (7th Cir. 1969) ("It is true that section 231(a)(3) does not specifically refer to intent, but it only applies to a person who 'commits or attempts to commit any act to obstruct, impede, or interfere' with firemen or law enforcement officers."); *United States v. Mechanic*, 454 F.2d 849, 854 (8th Cir. 1971) (agreeing with *Foran* decision "that § 231(a)(3) must be construed to require intent"). Therefore, the count will not be dismissed on that basis.

### D.  Fifth Amendment Grounds

Defendant argues in the alternative that the indictment as to Count I should be dismissed because its language does not provide adequate notice or assurance that the grand jury made the determinations required by the Fifth Amendment.  Count I Mot. at 11–13.  Defendant complains that "the charge lacks *any* specifics regarding the alleged acts or circumstances and contains only conclusory allegations," *id.* at 11–12 (emphasis in original), and "[t]he assembly-line indictments in the January 6th cases generally, and Ms. Williams' case in particular, fail to fulfill either the notice or presentment requirements of the Fifth and Sixth Amendments."  *Id.* at 13.

"[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'" *Id.*, quoting *United States v. Carll*, 105 U.S. 611, 612 (1881). While the language of the statute may be used to describe the offense, it must be accompanied with a statement of the facts and circumstances to inform the defendant of the specific offense being charged. *Id.* at 117–18.

Here, the first paragraph of the indictment comprising Count I sets forth all of the elements of section 231(a)(3). *See* Indictment at 1–2. It thereby enables Williams to prepare a defense and plead that an acquittal or conviction is a bar to future prosecutions. There has been extensive discovery in this case, but in the event there is any lingering confusion about the particular facts underlying the charged offense, the remedy would be a request for a bill of particulars, not dismissal. *See United States v. Butler*, 822 F.2d 1191, 1193 (D.C. Cir. 1987) (an indictment should be "stated with enough precision" to allow the defendant to understand the charges and prepare a defense, and if it is not, a bill of particulars may be required); *United States v. Espy,* 989 F. Supp. 17, 34 (D.D.C. 1997) (the court should grant such motions when "necessary to prevent unfair surprise at trial"); *see also Ballestas*, 795 F.3d at 148 (dismissal of an indictment is to be granted "only in unusual circumstances").

Since the Court has found that the indictment is sufficient, and that section 231(a)(3) is neither vague nor overbroad, it will **DENY** Williams's motion to dismiss Count I.

## II.    Count II:  Violation of 18 U.S.C. § 1512(c)(2)

Williams moves to dismiss Count II, which charges obstruction of justice in violation of

18 U.S.C. § 1512(c)(2), on two grounds:  (1) that "the Electoral College certification before

Congress does not constitute an 'official proceeding' for purposes of 18 U.S.C. 1512(c)(2)," and

(2) that the statute is unconstitutionally vague and does not provide fair notice of the conduct it

punishes.  Count II Mot. at 4, 13.

Section 1512(c)(2) states:  "Whoever corruptly . . . (2) otherwise obstructs, influences, or

impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned

not more than 20 years, or both."  18 U.S.C. § 1512.  The scope of the term "official proceeding"

is not left to the reader's imagination, but it is specifically defined in the statute to include:

> (A) a proceeding before a judge or court of the United States, a United States
> magistrate judge, a bankruptcy judge, a judge of the United States Tax
> Court, a special trial judge of the Tax Court, a judge of the United States
> Court of Federal Claims, or a Federal grand jury;
>
> (B) a proceeding before the Congress;
>
> (C) a proceeding before a Federal Government agency which is authorized
> by law; or
>
> (D) a proceeding involving the business of insurance whose activities affect
> interstate commerce before any insurance regulatory official or agency
> or any agent or examiner appointed by such official or agency to
> examine the affairs of any person engaged in the business of insurance
> whose activities affect interstate commerce.

18 U.S.C. § 1515(a)(1).

A. **The Electoral College certification is an "official proceeding" for purposes of
18 U.S.C. § 1512(c).**

1. *The plain text of the statute supports a finding that the certification was an "official
proceeding."*

Williams maintains that the joint session of Congress convened to certify the vote of the Electoral College in the 2020 presidential election pursuant to Article II, Section I of the United States Constitution does not constitute an "official proceeding" for purposes of the statute because "§ 1512 only criminalizes obstructive conduct related to a hearing before a tribunal affecting the administrative [sic] of justice."   Count II Mot. at 9.   But nothing in the text of the provision supports the imposition of this limiting construction.

First of all, Congress defined "official proceeding" in section 1515(a)(1) to be, among other things, "a proceeding before the Congress."   18 U.S.C. § 1515(a)(1).   The joint session to certify the vote of the Electoral College falls squarely within that definition, even if one adheres to the suggestion advanced by other courts in this district that the word "proceeding" in section 1515(a)(1) should be "defined narrowly" as the "business conducted by a court or other official body; a hearing."   *Sandlin*, 2021 WL 5865006, at *3, citing *Proceeding*, Black's Law Dictionary (11th ed. 2019) (fourth definition); *see also McHugh*, 2022 WL 296304, at *5.

When one reads the words "proceeding before the Congress" in the context of the other "official proceedings" specified in the list – "a proceeding before a judge or court . . . or a Federal grand jury," "a proceeding before a Federal Government agency which is authorized by law," and "a proceeding . . . before any insurance regulatory official or agency" – the term appears to apply to a formal gathering before the body in question, *see United States v. Ermoian*, 752 F.3d 1165, 1172 (9th Cir. 2013), which is conducted under legal auspices, and is authorized to render some sort of decision or outcome.   One would be hard-pressed to identify many other proceedings on Capitol Hill with more formality than a joint session of both houses of Congress that is called for by the Constitution itself, and over which the Vice President of the United States is required to preside.   *See* U.S. Const. art. II, § 1; U.S. Const. amend. XII.   This was not merely a

17

ceremonial gathering, as one might describe a State of the Union address, but it fits the definition of a proceeding "before the Congress" because a quorum consisting of "a Member or Members from two thirds of the States, and a Majority of all the States" was required to be there, U.S. Const. art. II, § 1, cl. 3, and there was something specific to be determined:   the outcome of the presidential election.[5]

One can also find meaning in the repetition of the word "before" in section 1515(a)(1). The court in *McHugh* found that the certification proceeding meets the definition of an official proceeding as it involves one entity appearing "before" another.   2022 WL 296304, at *6 ("Fifty-three sections of the U.S. Code use the phrase 'a proceeding before,' and in every one the phrase describes a proceeding involving more than one entity, usually in a court-like setting where one entity 'appears before' another.").   And here, the Electoral College can be identified as the second party.   Although not physically present, the Electoral College must "vote by ballot for President and Vice-President" and "transmit [the results] sealed to the seat of the government of the United States, directed to the President of the Senate."   U.S. Const. amend. XII.   Congress must then

---

5       Federal law specifies how members of Congress may challenge an electoral vote.   "Upon such reading of any such [electoral] certificate or paper, the President of the Senate shall call for objections, if any.   Every objection shall be made in writing, and shall state clearly and concisely, and without argument, the ground thereof, and shall be signed by at least one Senator and one Member of the House of Representatives."   3 U.S.C. § 15.   There are also procedures for each house to follow when debating and voting on an objection.   *See* 3 U.S.C. § 17.

formally convene to open, debate, and certify those results.[6]   *Id.*; 3 U.S.C. § 15.   The votes themselves are therefore "before" Congress.   *See Sandlin*, 2021 WL 5865006, at *4; *McHugh*, 2022 WL 296304, at *7; *Montgomery*, 2021 WL 6134591, at *10.

Given the language of the statute, then, there is nothing to support defendant's suggestion that the formal gathering must be akin to a trial.   Count II Mot. at 8–9.   The limitation would be illogical, since Congress was created in Article I of the Constitution to be the legislative branch of the tripartite government, with powers distinct from those of the other branches.   While it may hold hearings to gather information relevant to potential enactments and amendments, and to perform its oversight responsibilities, it seldom sits as an adjudicative body or as the decision maker in an adversary proceeding.   *See Andries*, 2022 WL 768684, at *6 ("[T]he text and immediate context [of 18 U.S.C. § 1515(a)(1)] yield[] nothing to suggest that 'a proceeding before the Congress' must be adjudicative in nature.   Indeed, such a requirement would be inconsistent with the text 'proceeding before the Congress.' . . . The reason is simple:   Congress hardly ever

---

6    Even before January 6, 2021, members of both the House and Senate announced their intentions to object to the vote certification.   *See* Joint Statement from Senators Cruz, Johnson, Lankford, Daines, Kennedy, Blackburn, Braun, Senators-Elect Lummis, Marshall, Hagerty, Tuberville (Jan. 2, 2021) (on file at https://www.cruz.senate.gov/newsroom/press-releases/joint-statement-from-senators-cruz-johnson-lankford-daines-kennedy-blackburn-braun-senators-elect-lummis-marshall-hagerty-tuberville); Jake Tapper, *At Least 140 House Republicans to Vote Against Counting Electoral Votes, Two GOP Lawmakers Say*, CNN (Dec. 31, 2020), https://www.cnn.com/2020/12/31/politics/electoral-college-house-republicans/index.html.

adjudicates.") (citation and quotation marks omitted).[7]   And if Congress, which presumably was aware of what its function is supposed to be, intended to restrict the obstruction statute to those infrequent trial-like proceedings within its purview, it could have easily chosen to define "official proceeding" in section 1515(a)(1)(B) as "an impeachment proceeding before the Congress."   *See Puma*, 2022 WL 823079, at *8 ("[I]f Congress had intended to limit Section 1512(c)(2) to adjudicative or court-like proceedings, it would have used different words to do so.").

Second, the provision of the criminal code at issue is extremely broad.   In section 1512(c)(2), Congress provided that one who corruptly obstructs "*any* official proceeding" is subject to punishment, 18 U.S.C. § 1512(c)(2) (emphasis added), and the Supreme Court has explained that "[r]ead naturally, the word 'any' has an expansive meaning . . . ."   *United States v. Gonzales*, 520 U.S. 1, 5 (1997); *see also Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008); *Montgomery*, 2021 WL 6134591, at *4.   Since Congress chose to use the word "any" in this provision, the Court should not presume to impose a limitation not found in the statute, as that would serve "to alter, rather than to interpret" the statutory language.   *Little Sisters of the Poor*

---

7        This is why the case cited by the defendant, *United States v. Ermoian*, 752 F.3d 1165 (9th Cir. 2013), is not only not binding on this Court, but inapposite.   The decision examined whether an FBI investigation qualified as an "official proceeding," and it found that the use of the preposition "before" in the definition contained in section 1515(a)(1)(C) – a proceeding "before a Federal agency" – "suggests an appearance in front of the agency sitting as a tribunal."   *Id.* at 1170–71.   According to the defendant, the "logic and reasoning used by the *Ermoian* court . . . applies with equal force to interpreting the term 'proceedings before the Congress,'" including the reasoning that the words surrounding the term proceeding "contemplate a legal usage of the term." Count II Mot. at 7–8.   But *Ermoian* did not purport to address a congressional hearing, or even a typical executive agency hearing; its reasoning derived from the fact that an FBI investigation "does not occur 'before a Federal Government agency' like a hearing or trial might; it is conducted 'by' the agency in the field."   *Ermoian*, 752 F.3d at 1171.   It is true that the Ninth Circuit went on to say that the provision "strongly implies that some formal hearing before a tribunal is contemplated," but again, it was opining about "a proceeding before a Federal agency," section 1515(a)(1)(C), and not the section applicable here, 1515(a)(1)(B), and it did not hold that the formal proceeding in question must be related to the administration of justice.   *Id.* at 1172.

*Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020).  This is particularly true when one takes note of the fact that Congress used "any" in section 1512(c), while selecting the articles "an" or "the" for other portions of section 1512.  *See, e.g.*, 18 U.S.C. §§ 1512(a)(1)(A)–(B), (a)(2)(A)–(B), (b)(1)–(2), (c)(1), (d)(1), (f)(1), (g)(1), (i).  For all of these reasons, the plain language of the statute supports the government's interpretation.

    2.   *Neither the legislative history nor the context of the provision within the statute or the criminal code as a whole compels a different finding.*

    When interpreting the text of a statute, a court should also consider "the specific context in which that language is used, and the broader context of the statute as a whole."  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).  Applying those principles, the defendant argues that the Sarbanes-Oxley Act, which included section 1512(c)(2), was "aimed at preventing corporations from destroying records relevant to a federal hearing related to the administration of justice," and that the surrounding statutory provisions "are related to the obstruction of the administration of justice," and therefore, section 1512(c)(2) is limited to that context.  Count II Mot. at 11–12; *see also id.* at 9 ("Nothing in the legislative history of the Sarbanes-Oxley Act supports the notion that Congress enacted [it] to criminalize the disruption of a ceremony before Congress by persons engaged in a political rally, no matter how large the crowd or how disorderly the activities of some in the crowd may have become.")

    The Court agrees with the observation of other courts in this district that the legislative history is of limited utility in this case.  *See, e.g.*, *Montgomery*, 2021 WL 6134591, at *15; *Caldwell*, 2021 WL 6062718, at *16; *McHugh II*, 2022 WL 1302880, at *12.  However, the contemporaneous comments we do have indicate that, if anything, Congress intended to broaden the scope of section 1512(c) when it amended it as part of the Sarbanes-Oxley Act.  As the court

detailed in *Caldwell*, 2021 WL 6062718, at *16, section 1512(c) was introduced "late in the legislative process."   During debate in the Senate, Senator Orrin Hatch explained that the amendment "strengthens an existing federal offense that is often used to prosecute document shredding *and other forms of obstruction of justice*" and "broaden[s] the scope of the Section 1512."   148 Cong. Rec. S6550 (daily ed. July 10, 2002) (emphasis added); *see also McHugh II*, 2022 WL 1302880, at *12 ("If Senator Hatch, for instance, thought that the new provision was only about document destruction, then his description of §1512(c) . . . would be quite strange.").[8]

Defendant directs the Court to *Yates v. United States*, 574 U.S. 528, 532 (2015), claiming that in that case, "the Supreme Court clearly telegraphed that legal terms are to be narrowly construed given the legislative history and purpose of the Sarbanes-Oxley Act," and that the Act "was not intended to apply in all circumstances where *any* government function may have been impeded."   Count II Mot. at 10–11 (emphasis in original).   But in *Yates*, the Supreme Court was considering another provision enacted as part of the Sarbanes-Oxley Act:  18 U.S.C. § 1519.   It penalizes "[w]hoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object . . . ," and the case concerned whether a commercial fishing captain could be said to have destroyed a "tangible object" when – contrary to

---

8      While courts should not look to debates in Congress as a guide to "ascertaining the meaning and purpose of the law-making body," *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 474 (1921), courts are "justified in seeking enlightenment from . . . explanations given on the floor of the Senate and House by those in charge of the measure."   *Wright v. Vinton Branch of Mountain Tr. Bank of Roanoke, Va.*, 300 U.S. 440, 463 (1937).   Senator Hatch was in charge of this amendment.   *See* 148 Cong. Rec. S6549 (daily ed. July 10, 2002) ("the amendment that Senator Hatch and I offer today is carefully crafted to hold corporate officer[s] responsible").

a federal agent's instructions – he directed that the undersized fish in his catch be thrown overboard. *Yates*, 574 U.S. at 533–34.

The Supreme Court started with the observation that, as applied to those circumstances, the provision was ambiguous:

> [W]hether a statutory term is unambiguous . . . does not turn solely on dictionary definitions of its component words.  Rather, the plainness or ambiguity of statutory language is determined not only by reference to the language itself, but as well by the specific context in which that language is used, and the broader context of the statute as a whole.

*Id.* at 537 (brackets and quotation marks omitted); *see also id.* ("In law as in life . . . the same words, placed in different contexts, sometimes mean different things.").  It therefore looked beyond the mere dictionary definitions to apply other traditional methods of statutory interpretation to construe the statute, and invoked *noscitur a sociis*, the principle that "a word is known by the company it keeps," and the need to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress."  *Id.* at 543 (citation omitted).  Since section 1519 also included the words "falsifies" and "makes a false entry in any record [or] document," the Court reasoned that it would not make sense in context to include fish in the category of "tangible objects."  *Id.* at 543–44.

The *Yates* decision also looked to the canon of *ejusdem generis*, which counsels that if "general words follow specific words in a statutory enumeration, the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the preceding

specific words." *Id.* at 545 (brackets and quotation marks omitted).  This did not bode well for the government's position on the fish either.[9]

But nothing in those lessons in Latin alters the Court's analysis of section 1512(c)(2), or, of more importance here, its reading of the definition of "official proceeding" in section 1515(a)(1)(B).  The language is not at all ambiguous when applied to the joint session of Congress prescribed by the Constitution, and even if one looks at "proceeding before the Congress" within the context of the entire series of proceedings enumerated in section 1515(a)(1), there would be no inconsistency with, or undue breadth added to, the provision.  Furthermore, the term "official proceeding" appears by itself in section 1512(c)(2), and its definition in section 1515(a)(1) does not include a series of specific terms followed by a general one either; a proceeding "before the Congress" is a specific proceeding contained in a list of other specific proceedings, so the canon of *ejusdem generis* has no bearing on the matter.

Defendant also addresses the structure of the statute and argues that because "[s]everal of the subsections of Chapter 73 explicitly relate to the administration of justice," section 1512's placement within Chapter 73 of Title 18 shows that it should only apply to the obstruction of the administration of justice.  Count II Mot. at 11–12.  This theory is undermined by the very case cited in defendant's motion.

The Supreme Court noted in *Yates* that when Congress codified the various provisions contained in the Sarbanes-Oxley Act, it directed that section 1519 – the destruction of records and

---

9       The Supreme Court did not principally rely on the rule of lenity in *Yates*, but it noted that "if our recourse to traditional tools of statutory construction leaves any doubt about the meaning of 'tangible object,' as that term is used in § 1519, we would invoke the rule that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" *Yates*, 574 U.S. at 547–48.  The Court finds it unnecessary to rely upon the rule in this instance, as the language in sections 1512(c)(2) and 1515(a)(1)(B) is unambiguous.

tangible property provision at issue in *Yates* – follow sections that "prohibit[] obstructive acts in specific contexts." *Yates*, 574 U.S. at 540.  And while Congress placed section 1519 "adjacent to these specialized provisions," according to the Court, it placed other additions to Chapter 73, including section 1512(c), "within or alongside retained provisions that address obstructive acts *relating broadly to official proceedings and criminal trials . . . .*" *Yates*, 574 U.S. at 540 (emphasis added); *see id.* at 541 ("Section 1102, 'Tampering with a record or otherwise impeding an official proceeding,' was codified as § 1512(c) and inserted within the pre-existing § 1512, which addresses tampering with a victim, witness, or informant to impede *any* official proceeding.") (emphasis added).  By differentiating section 1512 from the other "specialized provisions" in Chapter 73, the Supreme Court emphasized its breadth, and therefore *Yates* supports, and does not foreclose, this Court's interpretation.

Defendant's final textual argument is that "the government incorrectly conflated an 'official proceeding' under § 1512 with a 'federally protected function' under 18 U.S.C. § 231(a)(3) or the 'official business' of Congress under 40 U.S.C. § 5104(e)(2)(c)." Count II Mot. at 12.  The Electoral College certification, she maintains, "may be more appropriately considered the 'official business' of Congress or a 'federally protected function' rather than an 'official proceeding before the Congress' as captured by 18 U.S.C. §§ 1512(c) and 1515," and therefore "[c]harging Ms. Williams with obstruction under 18 U.S.C. § 1512(c)(2) is, quite simply, overkill." *Id.* at 13.

It is entirely unremarkable that more than one provision in the criminal code could apply to a person's conduct, and, as the lack of any case authority in the motion on this point would suggest, that would not be a basis for the dismissal of the charge the government selected.

A "federally protected function" is defined as:

any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof; and such term shall specifically include, but not be limited to, the collection and distribution of the United States mails.

18 U.S.C. § 232.  This definition appears to focus on the activities of federal agencies and law enforcement officials as opposed to Congress.  *See Caldwell*, 2021 WL 6062718, at *6.

The term "official business" as used in 40 U.S.C. § 5104(e)(2)(C) would apply to congressional actions; the provision prohibits "[a]n individual or group of individuals" from "willfully and knowingly . . . with the intent to disrupt the orderly conduct of official business, enter[ing] or remain[ing] in a room in any of the Capitol Buildings."  But defendant does not present any reasons why "official business" and "official proceeding" cannot both encompass the Electoral College certification.  *See* Count II Mot. at 12–13.  Moreover, the prohibitions in 40 U.S.C. § 5104(e)(2)(C) and 18 U.S.C. § 1512(c)(2) reach different conduct directed at a congressional proceeding:  one prohibits "enter[ing] or remain[ing] in a room in any of the Capitol Buildings" "with the intent to disrupt the orderly conduct of official business," and the other prohibits "corruptly . . . obstruct[ing], influenc[ing], or imped[ing] any official proceeding."  Since both statutes explicitly relate to Congress, "[s]ome overlap . . . is, of course, inevitable," *Marinello v. United States*, 138 S. Ct. 1101, 1107 (2018); *see also Caldwell*, 2021 WL 6062718, at *6, and that does not make either provision invalid.

In sum, defendant's attempt to narrow the reach of section 1512(c)(2) to obstructing the administration of justice in an adjudicative context is not supported by its legislative history or the structure of the statute as a whole, and it would be entirely inconsistent with the text of the prohibition against obstructing or impeding "any" official proceeding, which was expressly defined to include a "proceeding before the Congress."

26

B. **18 U.S.C. § 1512(c)(2) is not unconstitutionally vague.**

The motion to dismiss Count II also complains that the terms "official proceeding," "corruptly," and "otherwise" in section 1512(c)(2) are vague, and therefore, the statute does not provide fair notice as to the conduct it punishes.  Count II Mot. at 13.  Defendant adds that "the government's approach to charging defendants with a violation of § 1512(c)(2) arising out of the events on January 6, 2021, illustrates how vague and arbitrary the enforcement of this statute can be." *Id.* at 17.

1.  *"Official Proceeding"*

A penal statute is not void for vagueness if it "define[s] the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).  As noted above, the term "official proceeding" is defined by section 1515 to include a "proceeding before the Congress," as well as several other types of proceedings that can be readily understood.  18 U.S.C. § 1515(a)(1).  Indeed, as another court in this district pointed out, "it is difficult to fathom that a reasonable person would not believe the Electoral College certification was an official proceeding . . . this is precisely the reason why the January 6 rioters wished to stop it." *Mostofsky*, 2021 WL 6049891, at *11.  Since ordinary people using common sense could understand the nature of the conduct prohibited by 18 U.S.C. § 1512(c), the term is not impermissibly vague. *See Williams*, 553 U.S. at 304.  Nor has the defendant pointed to any word in the statute that requires the sort of subjective analysis that would create a risk of arbitrary enforcement; her argument that the statute is void on its face for

that reason is based instead on what is essentially an as-applied analysis.  *See* Count II Mot. at 17–19.

### 2.   *"Corruptly"*

Defendant argues that the word "corruptly" is vague on its face.  Count II Mot. at 15–17.  Her motion relies heavily on *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991), which she claims "acknowledged that the word 'corruptly' is vague on its face as used in a similar statute, 18 U.S.C. § 1505, that prohibits obstruction of a proceeding before departments, agencies, or congressional investigations."  Count II Mot. at 15.  But the ruling in that case was addressed to the meaning of the word as applied in its unique factual scenario, and it is not controlling here.[10]

In *Poindexter*, the former National Security Advisor John Poindexter was convicted on five felony counts arising out of his role in the Iran/Contra Affair, including a conviction for violating 18 U.S.C. § 1505.  The Iran/Contra Affair involved national security officials in the Reagan Administration who were secretly involved in facilitating the sale of arms to the Islamic Republic of Iran – which was subject to an embargo – and supporting the Contras in their attempt to overthrow the Sandinista government in Nicaragua – which was specifically prohibited by statute.  *Poindexter*, 951 F.2d at 371–72.  Poindexter was compelled to provide congressional testimony concerning his role in the events.  *Id.* at 372.  He was subsequently charged with corruptly obstructing Congress's inquiry by making false statements, participating in the preparation of a false chronology, and deleting information about the arms shipment from his computer.  *Id.*

18 U.S.C. § 1505 provides:

---

10      Indeed, at the hearing on February 18, 2022, counsel acknowledged, "I don't believe any of the courts put any weight into *Poindexter* in this district," and that *Poindexter* was "not . . . the greatest case."  Draft Hr'g Tr. at 38, 39.

> Whoever corruptly, or by threats or force, or by any threatening letter or
> communication influences, obstructs, or impedes or endeavors to influence,
> obstruct, or impede . . . the due and proper exercise of the power of inquiry
> under which any inquiry or investigation is being had by either House, or
> any committee of either House or any joint committee of the Congress . . .
> Shall be fined [or] imprisoned not more than 5 years . . . or both.

Poindexter challenged his § 1505 convictions on the grounds that "use of the term 'corruptly'
renders the statute unconstitutionally vague as applied to this conduct." *Poindexter*,
951 F.2d at 377. Although the court acknowledged that, "on its face, the word 'corruptly' is
vague," *id.* at 378, it did "not conclude that the ambiguity of the term 'corruptly' in § 1505 renders
that term unconstitutionally vague as applied to all conduct." *Id.* at 385. Rather, the court
concluded that the term "corruptly" was too vague "as used in § 1505 . . . to provide
constitutionally adequate notice that it prohibits lying to the Congress." *Id.* at 379.[11]

As the district court in *Sandlin* observed, "[c]ourts have since cabined *Poindexter*'s holding
to its facts and have not read it 'as a broad indictment of the use of the word 'corruptly' in the
various obstruction-of-justice statutes.'" *Sandlin*, 2021 WL 5865006, at *11, quoting
*United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998); *see also McHugh*,
2022 WL 296304, at *10; *Montgomery*, 2021 WL 6134591, at *18–19; *Caldwell*,
2021 WL 6062718, at *8–11; *Bozell*, 2022 WL 474144, at *6; *Nordean*,
2021 WL 6134595, at *10; *Mostofsky*, 2021 WL 6049891, at *11; *see also*
*United States v. Edwards*, 869 F.3d 490, 502 (7th Cir. 2017) (finding that discussion of the term

---

11      After *Poindexter,* the D.C. Circuit considered another challenge to the term as it appears in
18 U.S.C. 1512(b), and it found that "corruptly" was not vague as applied to defendant's attempts
to "corrupt" another person "by exhorting her to violate her legal duty to testify truthfully in court."
*United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996).

"corruptly" in *Poindexter* "does not undermine [defendant's] convictions" under 18 U.S.C. § 1512(b)(3)).

The Supreme Court's decision in *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005) has more bearing on the instant motion.  In that case, the Supreme Court examined the meaning of 18 U.S.C. § 1512(b)(2)(A) and (B), which make it a crime to "'knowingly . . . corruptly persuad[e] another person . . . with intent to . . . cause' that person to 'withhold' documents from, or 'alter' documents for use in, an 'official proceeding.'" *Arthur Andersen LLP*, 544 U.S. at 698 (alterations in original).  It found that the "natural meaning" of "corruptly" was "clear":  the term is "normally associated with wrongful, immoral, depraved, or evil" conduct. *Id.* at 705.  While the *Arthur Andersen* case did not consider the meaning of the term within the specific context of section 1512(c)(2), several circuits have since relied on the decision to conclude that "corruptly," as used in section 1512(c), requires showing "dishonesty," an "improper purpose," or that defendant acted "wrongfully."  *See United States v. Farrell*, 921 F.3d 116, 141 (4th Cir. 2019) (as applies to section 1512(c)(2), "[t]o act 'corruptly' means to act wrongfully"); *United States v. Matthews*, 505 F.3d 698, 705 (7th Cir. 2007) (upholding jury instructions defining "corruptly" to "mean[] that the defendant acted with the purpose of wrongfully impeding the due administration of justice"); *see also United States v. Delgado*, 984 F.3d 435, 452 (5th Cir. 2021) ("[A] person acts 'corruptly' under [18 U.S.C. § 1512(c)(2)] when they act 'knowingly and dishonestly, with specific intent to subvert or undermine the due administration of justice.'"); *United States v. Gordon*, 710 F.3d 1124, 1151 (10th Cir. 2013) ("Acting 'corruptly' within the meaning of § 1512(c)(2) means acting 'with an improper purpose and to engage in conduct knowingly and dishonestly with the specific intent to subvert, impede or obstruct the [proceeding].'"), quoting *United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011).

The D.C. Circuit has not yet addressed the constitutionality of the word "corruptly" in the context of section 1512(c). Given *Arthur Andersen* and the instructive decisions set forth above, the Court agrees with the determinations of the other courts in the district that the inclusion of the term does not render the statute unconstitutionally vague. *See, e.g.*, *Sandlin*, 2021 WL 5865006, at *13 (because the indictment alleged that the defendants used "obvious criminal means with the intent to obstruct an official proceeding, their conduct falls squarely within the core coverage of 'corruptly' as used in § 1512(c)(2)"). The Court will provide jurors with instructions as to the meaning of the term "corruptly." *See id.* And depending on the facts introduced at trial, the defendant may have a valid argument at the close of the government's case that the evidence was insufficient to establish the necessary element of a corrupt purpose. At this juncture, though, predictions about the state of the record at that time are not a basis to dismiss the indictment on its face. *See McHugh*, 2022 WL 296304, at *3 ("In deciding a motion to dismiss an indictment, the question before the Court is a narrow one, and the court will neither review the sufficiency of the evidence against the defendant nor craft jury instructions on the elements of the crimes charged.") (brackets and citations omitted).

3. *"Otherwise"*

Section 1512(c) reaches anyone who corruptly –

> (1) alters, destroys, mutilates, or conceals a record, document, or other object . . . with the intent to impair the object's integrity or availability for use in an official proceeding; or

> (2) *otherwise* obstructs, influences, or impedes any official proceeding, or attempts to do so . . . ."

18 U.S.C. § 1512(c) (emphasis added). Defendant argues that the use of the broad term "otherwise" renders subsection (2) ambiguous and unconstitutionally vague on its face. Count II

31

Mot. at 14.  She cites *Johnson v. United States*, 576 U.S. 591 (2015), which considered whether the "residual clause" in the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), was too vague to comport with the Fifth Amendment.  That statute imposes enhanced penalties on a defendant convicted of being a felon in possession of a firearm if he had three or more prior convictions for a "violent felony," defined as "any crime punishable by imprisonment for a term exceeding one year . . . that . . . is burglary, arson, or extortion, involves use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another*." 18 U.S.C. § 924(e)(B)(ii) (emphasis added).  The Court concluded that "the indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges," and therefore it found that increasing a defendant's sentence under the provision denied due process of law.  *Johnson*, 576 U.S. at 597.  In particular, the Court expressed concern that the residual clause "leaves grave uncertainty about how to estimate the risk imposed by a crime," *id.*, and that "it leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony."  *Id.* at 598.  The majority opinion also observed that in the nine years after the statute was enacted, there were numerous splits among the lower federal courts, reflecting "pervasive disagreement about the nature of the inquiry one is supposed to conduct and the kinds of factors one is supposed to consider."  *Id.* at 601.[12]

It is important to note, though, that the Supreme Court did not hang its hat on the appearance of the word "otherwise" – its objection was to the lack of precision in the language

---

[12]      In an attempt to strengthen the parallel, defendant refers to section 1512(c)(2) as the "residual clause" of the obstruction statute, *see e.g.*, Count II Mot. at 14, but the Court will not implicitly endorse the defendant's interpretation by adopting her terminology.  It is not at all sure that subsection (2) can appropriately be described as a "residual clause" at all since it does not purport to add a catch-all category to the list of specific types of conduct set out in subsection (1) but seems to set out a separate list of its own.

that followed.   Here, subsection (c)(1) clearly enumerates certain acts that would violate section 1512 of the U.S. Code if done corruptly, and there is nothing indeterminate about the other means of violating the statute set forth as an alternative in subsection (c)(2).   "Obstruct," "influence," and "impede" are plain terms that are easily understood.   They are found in other statutory provisions, *see, e.g.*, 18 U.S.C. §§ 231, 1503, 1505, and they have been included in long-approved jury instructions.   *See* Instruction No. 6.101, Obstructing Justice, Criminal Jury Instructions for the District of Columbia (16th ed.); *see also* 2A Fed. Jury Prac. & Instr. § 48:01 (6th ed.).   Further, there is a requirement that one must obstruct or impede *an official proceeding*. Since section 1512(c)(2) does not require a court or jury to make the sort of standard-free inquiry that troubled the majority in *Johnson* in order to determine the scope of the conduct prohibited, the use of the term "otherwise" does not render section 1512(c)(2) unconstitutionally vague.

Moreover, the decision in *Johnson* arose out of the unique context of the ACCA, and the pre-existing precedent for how its sentencing enhancements should be applied.   In accordance with the case law that preceded *Johnson*, trial courts are required to use a "categorical approach" when determining whether the offense underlying a prior conviction qualifies as a violent felony under the ACCA; that is, courts must assess a crime "in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion."   *Johnson*, 576 U.S. at 596, quoting *Begay v. United States*, 553 U.S. 137, 141 (2008).   Given this required approach, the Supreme Court explained that the ACCA's residual clause created "grave uncertainty about how to estimate the risk posed by a crime" because it tied "the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements."   *Id.* at 597.   In addition, the clause left unclear how much risk was required for a crime to qualify as a violent felony.   *Id.* at 598.

The connection between the holding in *Johnson* and the specific context of the historical requirement to use the categorical approach becomes even more clear when one reviews the Supreme Court decisions that followed.  In *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), the Court ruled that a similarly-worded residual clause in 18 U.S.C. § 16 was unconstitutional.  That statute defined a "crime of violence" to include a felony that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  *Dimaya*, 138 S. Ct. at 1211, quoting 18 U.S.C. § 16.  Relying on its analysis in *Johnson*, the Court held that this provision, which was also found to require courts to use the "categorial approach" to determine if an offense qualified as a crime of violence, had "the same two features as ACCA's, combined in the same constitutionally problematic way."  *Id.* at 1211–13.  It "call[ed] for a court to identify a crime's 'ordinary case' in order to measure the crime's risk" and presented the same "uncertainty about the level of risk that makes a crime 'violent.'"  *Id.* at 1215; *see also id.* at 1216 (explaining that like the ACCA clause, the section 16 clause required courts to "picture the kind of conduct that the crime involves in the ordinary case, and to judge whether that abstraction presents some not-well-specified-yet-sufficiently-large degree of risk") (quotation marks omitted).

Thereafter, in *United States v. Davis*, 139 S. Ct. 2319 (2019), the Supreme Court ruled that the residual clause in 18 U.S.C. § 924(c) was also unconstitutionally vague.  Section 924(c)(1) provides increased penalties for "any person who, during and in relation to any crime of violence . . . , uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm," and section 924(c)(3) defined a "crime of violence" to be a felony that

> (A)     has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

> (B)     that by its nature, involves a substantial risk that physical force
>          against the person or property of another may be used in the course
>          of committing the offense.

18 U.S.C. § 924(c)(3).  In finding the second clause of the definition vague, the Court relied on its

analyses in *Johnson* and *Dimaya* and observed that the clauses held unconstitutional in those cases

"bear more than a passing resemblance" to section 924(c)(3)(B).  *Davis*, 139 S. Ct. at 2325–27.

Indeed, in that case, the government conceded that applying "exactly the same categorical

approach that [the Supreme] Court found problematic in the residual clauses of the ACCA and

§ 16" to section 924(c)(3)(B) would make it unconstitutional.  *Id.* at 2326–27.

 Since it is clear that the holding in *Johnson* was rooted in its context – the particular

difficulties involved in applying the categorical approach to determine if offenses fell within a

broad catch-all phrase included in a statutory definition – it can be distinguished from the case at

hand.  Courts applying section 1512(c)(2) will have no cause to wrestle with the categorical

approach, and the problems that led the Supreme Court to throw in the towel on the residual clause

in the ACCA after years of uncertainty and discord are absent in this case.

Finally, while the residual clause involved in *Johnson* was meant to describe a set of

offenses that would also be included in the category being defined in the sentence as a whole –

violent felonies – the second clause of section 1512(c) does not purport to identify a category of

additional crimes that fall within those enumerated in the first clause.  Rather, section 1512(c)(2)

criminalizes a different type of conduct altogether:   section 1512(c)(1) prohibits altering,

destroying, mutilating, or concealing evidence that would be *used* in an official proceeding, but

section 1512(c)(2) directly prohibits the obstruction of an official proceeding itself.  Even if one

could imagine a scenario in which section 1512(c)(1) and (2) might overlap, this does not render

the residual clause vague or invalid.  "Congress may, and often does, enact separate criminal

statutes that may, in practice, cover some of the same conduct." *Hubbard v. United States*, 514 U.S. 695, 714 n.14 (1995).   For all of these reasons, the Court will not dismiss the section 1512(c)(2) charge on the grounds that the "residual clause" of the statute is unconstitutionally vague.[13]

---

13      One court in this district has come to the opposite conclusion, and it dismissed the 1512(c)(2) count in a January 6 indictment.  In *United States v. Miller*, the court found that "there are two plausible interpretations of [18 U.S.C. § 1512(c)(2)]: either § 1512(c)(1) merely includes examples of conduct that violates § 1512(c)(2), or § 1512(c)(1) limits the scope of § 1512(c)(2)." 2022 WL 823070, at *15.  The more plausible interpretation, the court reasoned, is the latter, and therefore it found that the indictment failed to allege a violation of 18 U.S.C. § 1512(c)(2).  *Id.*; *see also Fischer*, 2022 WL 782413, at *4 ("The Court recently concluded [in *Miller*] that the word 'otherwise' links subsection (c)(1) with subsection (c)(2) in that subsection (c)(2) is best read as a catchall for the prohibitions delineated in subsection (c)(1).").

The *Miller* court relied heavily on *Begay v. United States*, 553 U.S. 137 (2008), *abrogated on other grounds by Johnson*, 576 U.S. 591 (2015), and *Yates v. United States*, 574 U.S. 528 (2015) (plurality opinion).  In *Begay*, the Supreme Court considered whether drunk driving was a "violent felony" for the purposes of the sentencing provision imposing a mandatory minimum term on an offender with three prior convictions "for a violent felony," as that term was defined in 18 U.S.C. § 924(e)(2)(B)(ii) ("the term 'violent felony' means any crime punishable by imprisonment for a term exceeding one year . . . that-- . . . is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another").  The Court concluded that the examples listed before "otherwise" limited the scope of the residual clause to similar crimes, and that drunk driving fell "outside the scope" of the ACCA.  *Begay*, 553 U.S. at 142–48.

The *Miller* court reasoned that, because "the *Begay* majority opinion rejected the government's argument 'that the word 'otherwise' is *sufficient* to demonstrate that the examples [preceding 'otherwise'] do not limit the scope of the clause [following 'otherwise'],'" *Miller*, 2022 WL 823070, at *9 (alterations and emphasis in original), section 1512(c)(1) most likely also limits the scope of section 1512(c)(2).  *Id.* at *9–11.

This Court is not basing its determination on a finding that the mere appearance of the word "otherwise" is sufficient to answer the question and establish that the first clause, section 1512(c)(1), was not meant to serve as a limit on the second clause, section 1512(c)(2). Rather, the Court considered the language and structure of the statute, and it agrees with the reasoning in the other decisions in this district denying motions to dismiss section 1512(c)(2) counts and rejecting the *Miller* court's application of *Begay*.  *See McHugh II*, 2022 WL 1302880, at *5–6; *Bingert*, 2022 WL 1659163, at *8.

4. *Inconsistencies in Charging*

Finally, defendant argues that "the government's approach to charging defendants with a violation of § 1512(c)(2) arising out of [the] events of January 6, 2021, illustrates how vague and arbitrary the enforcement of this statute can be." Count II Mot. at 17. Defendant posits that "the

---

For one thing, the structure of section 1512(c)(2) does not parallel the structure of the ACCA, and "otherwise" in section 1512(c)(2) does not immediately follow a list of examples. And sections 1512(c)(1) and (c)(2) – which prohibit different types of conduct – do not overlap in the same way that the ACCA clauses overlapped, rendering a conclusion that what follows the term "otherwise" is an extension of the prior provision less likely. *Compare* 18 U.S.C. § 1512(c), *with* 18 U.S.C. § 924(e)(2)(B). Indeed, the Supreme Court noted in *Begay* that "the word 'otherwise' *can* (we do not say *must* . . .) refer to a crime that is similar to the listed examples in some respects but different in others . . . ." *Begay*, 553 U.S. at 144 (emphasis in original).

As the court observed in *McHugh II*, the way Congress drafted the two provisions indicates that they were intended to target different conduct:

> Rather than a continuous list with a general term at the end, § 1512(c) contains two separately numbered paragraphs, with a semicolon and a line break separating the "otherwise" clause in paragraph (c)(2) from the preceding terms in paragraph (c)(1). Furthermore, paragraph (c)(2) is grammatically distinct from paragraph (c)(1). Although the two provisions share a subject and adverb ("whoever corruptly"), paragraph (c)(2) contains an independent list of verbs that take a different object ("any official proceeding") from the verbs in paragraph (c)(1) (which take the object "a document, record, or other object"). . . . In short, rather than "A, B, C, or otherwise D," section 1512(c) follows the form "(1) A, B, C, or D; or (2) otherwise E, F, or G."

2022 WL 1302880, at *5.

As for *Miller*'s finding that "[r]eading § 1512(c)(2) alone is linguistically awkward," 2022 WL 823070, at *6, this is not the case if "otherwise" is read to "'signal[] a shift in emphasis' . . . from actions directed at evidence to actions directed at the official proceeding itself." *Montgomery*, 2021 WL 6134591, at *12, quoting *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 520 (2015). This is also not the case if "otherwise" is taken to mean "in a different way." *See McHugh II*, 2022 WL 1302880, at *4. Under either interpretation, the meaning of the statute is clear: a person can violate section 1512(c)(2) through means that differ from document destruction, and the term "otherwise" does not limit the prohibition in section 1512(c)(2) to conduct described in section 1512(c)(1).

facts and circumstances of each [January 6th case] vary drastically from each other and make it clear that the government's charging decisions are inconsistent." *Id.* at 19.

But here defendant demonstrates again that she does not understand the arbitrary enforcement prong of the void for vagueness doctrine.  One does not go about mounting a facial challenge to a criminal provision by contrasting how the statute has been applied in individual cases; the case law requires the defendant to identify language in the text that requires the arresting officer to make a "wholly subjective judgment without statutory definitions, narrowing context, or settled legal meanings." *Williams*, 553 U.S. at 306.  As the D.C. Circuit explained in *Agnew v. District of Columbia*:

> A law invites arbitrary and discriminatory enforcement when "there are no standards governing the exercise of the discretion" it grants. . . . This category includes laws whose application turns on subjective judgments or preferences either of officers or of third parties.

920 F.3d 49, 55 (D.C. Cir. 2019) (citation omitted).  Defendant points to no provision in section 1512(c)(2) that is infirm for those reasons.  *See* Count II Mot. at 17–19.

Moreover, it is not the province of the Court to oversee the executive's exercise of prosecutorial discretion; as the Supreme Court has pointed out, enforcing criminal laws necessarily "requires the exercise of some degree of police judgment." *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972), and this circumstance alone does not mean that a statute is unconstitutionally vague. *Agnew*, 920 F.3d at 55.  Also, "[i]t is not unusual for a particular act to violate more than one criminal statute, . . . and in such situations the Government may proceed under any statute that applies." *United States v. Aguilar*, 515 U.S. 593, 616 (1995) (Scalia, J., concurring in part and dissenting in part) (citations omitted); *see also Grider*, 2022 WL 392307,

at  *7;  *McHugh*,  2022 WL 296304, at *12;  *Nordean*,  2021 WL 6134595, at *12;  *Montgomery*,

2021 WL 6134591, at *23; *Sandlin*, 2021 WL 5865006, at *9; *Griffin*, 549 F. Supp. 3d at 58.

 For all of these reasons, the Court will **DENY** Williams's motion to dismiss Count II.

## III. Counts V and VI:  Violations of 18 U.S.C. § 1752(a)(1) and 18 U.S.C. § 1752(a)(2)

 Williams filed a motion to dismiss Count V, which charges her with entering and remaining

in a restricted building or grounds in violation of 18 U.S.C.  § 1752(a)(1), and Count VI, which

charges her with disorderly and disruptive conduct in a restricted building or grounds in violation

of 18 U.S.C. § 1752(a)(2), on the grounds that she was not in a "restricted building."  *See*

Counts V and VI Mot.[14]

 Section 1752(a) states:

> Whoever--  (1) knowingly enters or remains in any restricted building or
> grounds without lawful authority to do so; [or] (2) knowingly, and with
> intent to impede or disrupt the orderly conduct of Government business or
> official functions, engages in disorderly or disruptive conduct in . . . any
> restricted building or grounds when, or so that, such conduct, in fact,
> impedes or disrupts the orderly conduct of Government business or official
> functions . . . .  or attempts or conspires to do so, shall be punished.

The phrase "restricted building or grounds" is defined in the statute:

> (1) the term "restricted buildings or grounds" means any posted, cordoned
>  off, or otherwise restricted area—
>
> > (A) of the White House or its grounds, or the Vice President's
> >  official residence or its grounds;
> >
> > (B) of a building or grounds where the President or other person
> >  protected by the Secret Service is or will be temporarily
> >  visiting; or

---

[14] At the hearing on February 18, 2022, the defense informed the Court that it was conceding
the second argument in the motion:  that because "the restrictions placed on the Capitol were
created by the Capitol Police, not the Secret Service," "a necessary factual predicate to a
18 U.S.C. § 1752 offense is lacking."  Counts V and VI Mot. at 6–7; *see* Draft Hr'g Tr. at 51–52.

(C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance[.]

18 U.S.C. § 1752(c).  Williams contends that because the United States Capitol and its grounds are not included in the definition, she cannot be charged under the statute.  She also maintains that the Capitol cannot be considered to be "a building or grounds where the [Vice President] is or will be temporarily visiting" because "Vice President Pence . . . actually worked at the Capitol Building and grounds," and "had a permanent office 'within the United States Capitol and its grounds,' in his capacity as President of the Senate."  Counts V and VI Mot. at 5.  Moreover, she adds, "[o]n January 6th, Vice President Pence was working -- he was presiding in the Senate chamber to count the electoral votes."  *Id.*  Therefore, Williams argues, "§ 1752 does not apply as charged."  *Id.* at 6.

This strained interpretation is inconsistent with both the text and the structure of the statute. The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."  *Robinson*, 519 U.S. at 340.  While this determination "does not turn solely on dictionary definitions of its component words," *Yates*, 574 U.S. at 537, "dictionary definitions . . . bear consideration."  *Id.* at 538.  The Oxford English Dictionary defines "temporarily" as "[f]or a time (only); during a limited time." *Temporarily*, Oxford English Dictionary (2d ed. 1989); *see also Temporarily*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/temporarily ("during a limited time"). It defines "visit" as "a short or temporary stay at a place."  *Visit*, Oxford English Dictionary (2d ed. 1989) (definition "d."); *see also Visit*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/visit ("to go to see or stay at (a place) for a particular purpose (such as business or sightseeing)").  Taken together then, as was plain even before the dictionary was consulted, the phrase "temporarily visiting" means being somewhere for a limited period of time,

and there is no linguistic reason why the phrase could not include being there for a business purpose.

This definition obviously encompasses Vice President Pence's actions on January 6, 2021. He went to the Capitol with a discrete purpose:  to certify the Electoral College votes, a process that by law is contemplated to take one day.  *See* 3 U.S.C. § 15 ("Congress shall be in session *on the sixth day of January* succeeding every meeting of the electors.  The Senate and House of Representatives shall meet . . . at the hour of 1 o'clock in the afternoon on that day, and the President of the Senate shall be their presiding officer.") (emphasis added).  He remained in the Capitol until after the certification process concluded.  *See* Kyle Cheney, *Capitol Police:  Pence Remained on Capitol Grounds Throughout Jan. 6 Attack*, Politico (Feb. 4, 2022), https://www.politico.com/news/2022/02/04/jan-6-pence-remained-on-capitol-grounds-00005919.

Defendant insists that the Vice President could not have been "temporarily *visiting*" the Capitol on January 6th because he regularly *works* there, and because he was in fact working there on January 6th.  Counts V and VI Mot. at 5.  But defendant's simplistic assertion ignores not only the ordinary meaning of the statutory language, but also the structure of the definition in question.

A restricted building is defined to be, first, the White House or the Vice President's residence, and second, any place where those subject to Secret Service protection may be temporarily visiting.  *See* 18 U.S.C. § 1752(c)(1)(A)–(B).  This structure reflects that it is the White House and the Vice President's residence where the President and Vice President live and maintain their primary working offices, *see McHugh*, 2022 WL 296304, at *22, citing *The Vice President's Residence & Office*, The White House, https://www.whitehouse.gov/about-the-white-house/the-grounds/the-vice-presidents-residence-office/ ("[T]he Vice President's working office is in the West Wing of the White House."), but also that their duties may take them to multiple

other locations within the District of Columbia and around the world where it is equally essential that they be protected. *See McHugh*, 2022 WL 296304, at *21. While the Vice President serves as President of the Senate, this is not the Vice President's daily responsibility, *see The President of the Senate's Role in the Legislative Process*, United States Senate, https://www.senate.gov/general/Features/Part_1_VP.htm ("The vice president presides over the Senate only on ceremonial occasions or when a tie-breaking vote may be needed."); indeed, on other occasions, the Senate designates one of its own members to preside. *See The Executive Branch*, The White House, https://www.whitehouse.gov/about-the-white-house/our-government/the-executive-branch/. The mere fact that the Vice President has a "ceremonial" office available when called upon to conduct business within the Capitol building, *see Capitol Building and Grounds*, Congressional Directory 573 (1999), https://www.govinfo.gov/content/pkg/CDIR-1999-06-15/pdf/CDIR-1999-06-15-CAPITOL.pdf, does not make the stay on the Capitol grounds any less temporary, and the fact that the Vice President has constitutional duties to perform there is not inconsistent with the ordinary understanding of a "visit." *See Andries*, 2022 WL 768684, at *16 ("[T]here are situations in which it would be quite natural to say that a person "temporarily visits" a place where she has an office: consider a CEO of an international corporation who normally works from headquarters in New York, but who maintains an office for her occasional use at the firm's satellite location in London."). Defendant's reading of the statute would result in a large, entirely illogical gap in its coverage, and it is not supported by the text or by the application of common sense.

The language in 18 U.S.C. § 1752(a)(1) and (2) is plain and unambiguous: the term "restricted building or grounds" encompasses the United States Capitol, which the Vice President

was "temporarily visiting" on January 6, 2021.  The Court will **DENY** Williams's motion to dismiss Counts V and VI.

## CONCLUSION

Defendant's motions to dismiss Count I [Dkt. # 36]; Count II [Dkt. # 33]; and Counts V and VI [Dkt. # 37] will be **DENIED**.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  June 22, 2022