**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
UNITED STATES OF AMERICA,               )
                                        )
        v.                              )
                                        )          Crim. Action No. 21-0618 (ABJ)
                                        )
RILEY JUNE WILLIAMS,                    )
                                        )
                Defendant.              )
_____ )

## <u>ORDER</u>

Defendant Riley June Williams has moved for "a transfer of venue so that she may be tried

by an impartial jury as guaranteed by the Fifth and Sixth Amendments to the United States

Constitution."  Mot. to Transfer Venue and Mem. of Law in Supp. Thereof [Dkt. # 38] ("Mot.")

at 1.  She proposes that the case be tried in the Middle District of Pennsylvania, and she also

requests that the trial court "employ a jury questionnaire as a necessary precaution to screen out

bias in the jury pool."  *Id.*

Williams argued in her motion that the "detrimental pretrial publicity and community

prejudice in the District of Columbia are so likely to have affected the jury pool that the venire

must be presumed to be tainted."  *Id.*  In her supplemental memorandum, which was predicated on

a survey of "jury-eligible citizens" commissioned by the Office of the Federal Public Defender for

the District of Columbia, Ex. 1 to Def.'s Suppl. to Mot. [Dkt. # 46-1] ("Hickman Survey") at 2,

Williams posited that voir dire is "not likely to reveal or cure" these "materially prejudicial views

of the January 6 defendants as a group."  Def.'s Suppl. to Mot. [Dkt. # 46] ("Suppl.") at 1.  The

government has opposed the motion, *see* Gov't Omnibus Opp. to Def.'s Mots. to Dismiss Counts

One, Two, Five, and Six and Mot. to Transfer Venue [Dkt. # 40] ("Opp. to Mot."), and the matter

is fully briefed. *See* Def.'s Reply to Opp. to Mot. [Dkt. # 41]; Gov't's Opp. to Suppl. [Dkt. # 47] ("Opp. to Suppl.").

To date, neither this Court nor any other court in this district has granted a motion to transfer a January 6 defendant's trial to another venue in advance of voir dire, even when the motion was supported by the Hickman survey. *See United States v. Rhodes*, No. 22-cr-15 (APM), 2022 WL 2315554, at *20–21 (D.D.C. June 28, 2022); *United States v. Garcia*, No. 21-cr-0129 (ABJ), 2022 WL 2904352, at *1–*2 (D.D.C. July 22, 2022); *see also United States v. Bochene*, No. 21-cr-418, 2022 WL 123893, at *1 (D.D.C. Jan. 12, 2022); *United States v. Caldwell*, No. 21-cr-28, Omnibus Order (Sept. 14, 2021) [Dkt. # 415] at 10–11; *United States v. McHugh*, No. 21-cr-453, Min. Entry (May 4, 2022); *United States v. Fitzsimons*, No. 21-cr-158, Min. Order (Dec. 14, 2021); *United States v. Reffitt*, No. 21-cr-32, Min. Order (Oct. 15, 2021).

The Court is bound by authority that instructs that voir dire is the proper means to determine whether it will be possible for a fair and impartial jury to be selected. The defendant appears to know little about the city or its people, and she relies on a flawed survey and mere assumptions and generalizations about the jury pool. Since she has not raised concerns that cannot be addressed through voir dire, the motion to transfer venue is **DENIED**.

## BACKGROUND

Riley June Williams has been charged in an eight-count indictment with the following offenses:

>Count I – civil disorder, in violation of 18 U.S.C. § 231(a)(3);

>Count II – obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2;

>Count III – assaulting, resisting, or impeding certain officers in violation of 18 U.S.C. § 111(a)(1);

>Count IV –  theft of government property and aiding and abetting, in violation of 18 U.S.C. §§ 641 and 2;

>Count V – entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1);

>Count VI – disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2);

>Count VII – disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D); and

>Count VIII – parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G).

Indictment [Dkt. # 27].   According to the complaint filed by Special Agent Jonathan Lund, defendant is alleged to have entered the U.S. Capitol Building, and then directed other intruders up a staircase leading to the office of the Speaker of the House of Representatives, Nancy Pelosi. Statement of Facts [Dkt. # 1-1] ¶¶ 10–12.  The complaint recounts:

>In the days following the January 6, 2021, events, a witness ("W1") made several phone calls into the FBI's telephone tip line related to the U.S. Capitol attacks. . . . In them, the caller stated that he/she was the former romantic partner of RILEY JUNE WILLIAMS ("WILLIAMS"), that he/she saw WILLIAMS depicted in video footage taken on January 6, 2021, from inside the U.S. Capitol Building.  W1 stated that WILLIAMS can be seen directing crowds inside the U.S. Capitol Building up a staircase. . . . W1 also claimed to have spoken to friends of WILLIAMS, who showed W1 a

> video of WILLIAMS taking a laptop computer or hard drive from Speaker
> Pelosi's office.  W1 stated that WILLIAMS intended to send the computer
> device to a friend in Russia, who then planned to sell the device to SVR,
> Russia's foreign intelligence service.  According to W1, the transfer of the
> computer device to Russia fell through for unknown reasons and
> WILLIAMS still has the computer device or destroyed it.  This matter
> remains under investigation.

*Id.* ¶ 9.  It appeared to the Special Agent that the defendant had fled after returning home to

Pennsylvania:  her mother reported that she "packed a bag and left her home," "did not provide

her mother any information about her intended destination," "changed her telephone number and

deleted . . . her social media accounts on Facebook, Instagram, Twitter, Reddit, Telegram, and

Parler."  *Id.* ¶ 19.

Defendant was eventually arrested in the Middle District of Pennsylvania, where she

currently resides.  *See* Mot. at 1.  She argues that the Middle District of Pennsylvania is an

appropriate alternate venue for her case because she lives there, witnesses for the defense can be

found there, and the forum is not "overly inconvenient for government counsel or witness" because

of its proximity to Washington, D.C.  *Id.* at 12–13.  According to her motion, "[t]he parties are

significantly more likely to find an unbiased jury panel in a community like Harrisburg" because

"the media exposure has been more limited," "the community [was not] prejudiced by street

closures, a curfew, or National Guard presence," and "Harrisburg residents have not been warned

that domestic terrorists are threatening their hometown, nor is it overrun by D.C. politics."  *Id.*

at 13.

After initially offering nothing more than the conclusory assertion that it was a "given" that

"the potential jury pool in the District of Columbia is prejudiced against supporters of Donald

Trump generally and the January 6th protestors specifically," Mot. at 7, defendant submitted a

survey to bolster her position.  The survey was conducted as follows:

4

> [T]he Federal Public Defenders' Office for the District of Columbia commissioned Select Litigation, LLC, of Washington, D.C., to assess the federal jury pool in the District of Columbia on behalf of the many indigent clients indicted for activities arising out of the January 6, 2021, demonstrations at the U.S. Capitol building who are represented by either Assistant Federal Public Defenders or other counsel appointed pursuant to the Criminal Justice Act. To that end, Select Litigation conducted two public opinion polls, one among jury-eligible citizens of the District of Columbia, and one among jury-eligible citizens of the Atlanta Division of the Northern District in Georgia.
>
> * * *
>
> The samples for the polls were drawn from current lists including both landlines and cellular devices, and the sampling was done in a manner to ensure that every jury-eligible citizen on the lists from each of the two jurisdictions would have an equal probability of being included in the final sample. Interviewing for the polls was conducted by professional interviewers by telephone January 9-14, 2022. Respondents were interviewed on both landlines and mobile devices. The total sample size was 800 respondents comprised of 400 interviews in each jurisdiction.
>
> * * *
>
> All polls are subject to errors related to interviewing a sample of a universe rather than the entire population. The margin of estimation or sample error for a sample size of 400 is 4.9 percentage points at the 95% confidence interval. This means that in 95 out of 100 cases, the responses in these polls should be within plus or minus 4.9 percentage points of the responses that would have been obtained interviewing the entire population in each jurisdiction.

Hickman Survey at 2.[1]

## LEGAL STANDARD

The Sixth Amendment guarantees criminal defendants the right to a trial "by an impartial jury of the State and district wherein the crime [was allegedly] committed," U.S. Const. amend. VI, and Article III specifies that "such Trial shall be held in the State where the said Crimes [were

---

[1]    All citations to the Hickman Survey will be to the PDF page numbers.

allegedly] committed." U.S. Const. art. III, § 2, cl. 3; *see also id.* ("[W]hen not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.").

Federal Rule of Criminal Procedure 21 authorizes the transfer of a case to another district, though, for prejudice or for convenience. A court has the discretion to transfer "for the convenience of the parties, any victim, and the witnesses, and in the interest of justice" under Rule 21(b), but Rule 21(a) requires that upon the defendant's motion, "the court *must* transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a) (emphasis added). The Supreme Court reiterated this principle in *Skilling v. United States*, 561 U.S. 358, 378 (2010), and it recognized that transfer of the proceeding to a different district "if extraordinary local prejudice will prevent a fair trial" is a "basic requirement of due process."

The question now is whether that level of prejudice has been shown at this early stage in the proceedings. The Supreme Court went on to explain in *Skilling* that a "presumption of prejudice . . . attends only the extreme case." 561 U.S. at 381. It reviewed the cases in which it had concluded that juror prejudice could be presumed – *Rideau v. Louisiana*, 373 U.S. 723 (1963), *Estes v. Texas*, 381 U.S. 532 (1965), and *Sheppard v. Maxwell*, 384 U.S. 333 (1966) – and noted that in each, it had "overturned a conviction obtained in a trial atmosphere that [was] utterly corrupted by press coverage." 561 U.S. at 380 (internal quotation marks omitted). It took pains to caution that those "decisions . . . 'cannot be made to stand for the proposition that juror exposure to . . . news accounts of the crime . . . alone presumptively deprives the defendant of due process.'" *Id.*, quoting *Murphy v. Florida*, 421 U.S. 794, 798–99 (1975).

6

> Prominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require *ignorance*.

*Skilling*, 561 U.S. at 381 (emphasis in original).

Furthermore, the D.C. Circuit has instructed that it is preferable to conduct voir dire in the first instance to determine whether it will be possible for a fair and impartial jury to be selected. *See United States v. Haldeman*, 559 F.2d 31, 62–63 (D.C. Cir. 1976) (en banc) (per curiam) (counseling against a "pre-voir dire conclusion" that "a fair jury cannot be selected"). That is because "pretrial publicity, even if pervasive and concentrated, cannot be regarded as leading automatically and in every kind of criminal case to an unfair trial." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 565 (1976). Instead, a "thorough examination of jurors on voir dire" is the most important tool for ensuring that a defendant receives a fair and unbiased jury. *Id.* at 554; *see also Haldeman*, 559 F. 2d at 63 ("[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire.").

## ANALYSIS

I. **Voir dire is the appropriate way to assess potential juror prejudice and bias.**

Williams argues that there is "unavoidable community prejudice, and particularized prejudice" against her in this district that would render the venire so biased against her that she could not obtain a fair trial in the District of Columbia. Mot. at 5. She relies upon *Skilling v. United States*, 561 U.S. 358 (2010), a case brought in the wake of the Enron bankruptcy, in which Jeffrey Skilling, Enron's former Chief Executive Officer, was charged in a scheme to deceive investors by overstating the company's financial health. *Id.* at 367–69.

But *Skilling* is an odd place for the defendant to hang her hat. In that case, the Supreme Court *rejected* the notion that a change of venue should have been granted, even though the local

publicity had been relentless.  561 U.S. at 381–85.  Moreover, the impact of the alleged fraud was felt particularly keenly in Houston, where Enron was located, and many residents had lost their jobs or hard-earned pensions heavily invested in Enron stock.  *Id.* at 375–76.  Skilling argued that the trial court erred in refusing to move the trial to a different venue based on a presumption of prejudice given "the community passion aroused by Enron's collapse and the vitriolic media treatment aimed at him."  561 U.S. at 377 (internal quotation marks omitted); *see also id.* at 369 (Skilling maintained that "hostility toward him in Houston, coupled with extensive pretrial publicity, had poisoned potential jurors").

But the Supreme Court found that the "sheer number of victims" was not enough to trigger a presumption of prejudice; "[a]lthough the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron, the extensive screening questionnaire and followup *voir dire* were well suited to that task."  *Id.* at 384.

If it was appropriate to proceed to voir dire and attempt to seat a jury in that case, the *Skilling* decision does not do much to mandate a change of venue in this one, where (1) both the alleged objective of the charged offenses and the effects felt were largely national; (2) the media coverage of the event as a whole – while substantial – has been largely national as well; and (3) importantly, the media coverage has related to over 800 defendants and those who may have organized or inspired them, and is not personally focused on the defendant as in *Skilling*.

In *Skilling*, the Supreme Court differentiated the case before it from those where juror prejudice had been presumed, and it highlighted three relevant factors:  (1) "the size and characteristics of the community in which the crime occurred"; (2) whether pretrial publicity "contained [a] confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight"; and (3) the amount of time that had elapsed

since the alleged crime and whether the passage of time had led to "diminished" media attention. 561 U.S. at 382–84.[2]  Defendant maintains that "the *Skilling* factors weigh in favor of transferring Ms. Williams' case to the Middle District of Pennsylvania."  Mot. at 6.  But the *Skilling* decision does not mandate a change of venue here because (1) the community is large enough to include D.C. residents who do not follow the January 6 cases, and no other characteristic demonstrates the existence of extraordinary local prejudice; (2) the media coverage of the event as a whole – while substantial – has been largely national; and (3) the coverage has not been personally focused on the defendant herself.

> a.  *Size and Characteristics of the Community*

The first factor does not support a change in venue.  Washington, D.C. has approximately 700,000 residents and about 600,000 of those residents may be in the jury pool in this case.[3]  It is not a particularly large community, but it is not a small or insular one, either.  *See Skilling*, 561 U.S. at 382 (differentiating between communities with 150,000 residents and larger communities with venires of approximately 600,000 individuals), comparing *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991) (plurality opinion) and *Rideau*, 373 U.S. at 724.  The Master list of available jurors is large enough to include individuals who have paid little or no attention to

---

2      A fourth factor relevant to the post-conviction review in *Skilling* that does not bear on this motion was whether the jury's verdict reflected an absence of prejudice, and the Court took note of the fact that Skilling had been acquitted on some counts.  561 U.S. at 383–84.

3      The Jury Office reported that the Master Jury Wheel was comprised of 599,237 citizens as of January 19, 2022.  Jury Office for the U.S. District Court for the District of Columbia, Master Jury Wheel (2022) (accessed August 1, 2022) (on file with Jury Office).  The 2020 United States census estimated the District's population at 689,545.  *The District of Columbia Gained More Than 87,000 People in 10 Years*, United States Census Bureau (Aug. 25, 2021), https://www.census.gov/library/stories/state-by-state/district-of-columbia-population-change-between-census-decade.html.

the January 6 cases.[4]  It includes several hundred thousand District residents who may not be involved in policy or politics or the operation of the federal government at all; who travel to and from work or school without coming near the Capitol; and who may have never heard of the defendant.  Defendant's suggestion that D.C. residents have "been warned that domestic terrorists are threatening their hometown" and are "overrun by D.C. politics," Mot. at 13, are nothing but overgeneralizations, advanced without any citations or support, so they add little to the assessment of this factor.  In sum, while it is not the largest district in the country, the size of the Washington, D.C. jury pool weighs against transfer in this instance.

As for the characteristics of the community, defendant repeatedly points to the District's voting patterns.  *See* Mot. at 6 ("93% of voters in Washington voted against Donald Trump, rendering it the least diverse political population in the country.").  This, she maintains, goes to show that "[t]he antipathy towards Donald Trump and his supporters in the District is obvious." *Id.*  But the D.C. Circuit has already established that "a community's voting patterns are [not] at all pertinent to venue."  *Haldeman*, 559 F.2d at 64, n.43.  Defendant's assumption, presumably, is that no one who voted against Trump will be able to fairly assess whether the government has produced sufficient evidence to prove a particular January 6 offense beyond a reasonable doubt. But that overlooks the substantial numbers of individuals who did not vote at all, and in any event, that sort of bias must be shown through voir dire; leaping to conclusions will not suffice.

Defendant also argues that the jury pool is prejudiced against the January 6 defendants because D.C. residents have "engaged in both peaceful and violent protests targeted at Trump and

---

4        This conclusion is strengthened by the survey defendant provided, which indicates that only 33% of D.C. residents surveyed had seen or read "a lot" about the January 6 cases, while 25% had seen or heard "some," and 13% had seen or heard "not much" or "none at all."  Hickman Survey at 15.

his supporters." Mot. at 6.  It is not clear what leads the defendant to conclude that the counter-protesters are more likely to be local than the January 6 participants themselves.  *See State and County Tracker*, GW Program on Extremism (last updated July 18, 2022), https://extremism.gwu.edu/state-and-county-tracker (reporting that top states for people charged in January 6 cases are Florida, Texas, and Pennsylvania).  Defendant's assumption that these protests must have been comprised of D.C. residents because they took place in the District is unsupported by the article she cites, *see* Jonathan Landay & Scott Malone, *Violence Flares in Washington During Trump Inauguration*, Reuters (Jan. 20, 2017), https://www.reuters.com/article/us-usa-trump-inauguration-protests/violence-flares-in-washington-during-trump-inauguration-idUSKBN1540J7, and ignorant of the reality that protests in Washington, D.C., especially those that are directed at issues of national importance, often attract busloads of marchers from outside of the area.  Indeed, some protests have drawn crowds that would equal approximately half of the number of people who live here, and they have even been as large as the city's entire population.  *See* Tim Wallace & Alicia Parlapiano, *Crowd Scientists Say Women's March in Washington Had 3 Times as Many People as Trump's Inauguration*, N.Y. Times (updated Jan. 22, 2017), https://www.nytimes.com/interactive/2017/01/22/us/politics/womens-march-trump-crowd-estimates.html (estimating at least 470,000 people at the Women's March in Washington, D.C. in 2017); German Lopez, *It's Official:  March for Our Lives Was One of the Biggest Youth Protests Since the Vietnam War*, Axios (Mar. 26, 2018), https://www.vox.com/policy-and-politics/2018/3/26/17160646/march-for-our-lives-crowd-size-count (estimating range of 200,000 to 800,000 people at the March for Our Lives in Washington, D.C. in 2018); Jennifer Hickey, *"Life is Winning":  Pence Fired Up March for Life Crowd*, Fox News (Jan. 27, 2019),

https://www.foxnews.com/us/life-is-winning-pence-fired-up-march-for-life-crowd   (estimating

650,000 people at the March for Life in Washington, D.C. in 2013).

Therefore, the size of the Washington, D.C. jury pool weighs against transfer in this case,

and other community characteristics – including the community's voting patterns, which do not

factor into the venue analysis at all – do not weigh in favor of a transfer of venue.

### b. *Pretrial Publicity*

The January 6 cases have undoubtedly attracted nationwide media attention, but they are

not unique in this regard.  For example, in *Haldeman*, a grand jury indicted three high-level

officials in the Nixon administration for "a wide-ranging conspiracy designed to impede a grand

jury investigation into the break-in at the Democratic National Committee [] headquarters in the

Watergate Office Building," charging what was, at the time, "an unprecedented scandal at the

highest levels of government."  *Haldeman*, 559 F.2d at 51–52.  And yet, even though the case

received "extraordinarily heavy coverage in both national and local news media," *id.* at 59, juries

were successfully seated; the D.C. Circuit declined to find that the defendants' due process rights

were violated by the district court's refusal to grant a change of venue.  *See id.* at 62–64.  This is

not a unique situation; the government points to a number of high profile cases where publicity

alone did not warrant a transfer:

> [C]ourts have declined to transfer venue in some of the most high-profile
> prosecutions in recent American history:  Dzhokhar Tsarnaev, one of the
> Boston Marathon bombers; Jeffrey Skilling, a longtime Enron executive;
> Zacharias Moussaoui, who conspired to commit the September 11 terrorist
> attacks; Ramzi Yousef and others who committed the 1993 World Trade
> Center bombing; and, in this jurisdiction, former Attorney General John
> Mitchell and others charged as part of the Watergate scandal.  *See Skilling*,
> 561 U.S. at 399; *In re Tsarnaev*, 780 F.3d [14,] 15 [(1st Cir. 2015)]; *United
> States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002); [*United States
> v.* ] *Yousef*, 327 F.3d [56,] 155 [(2d Cir. 2003)]; *Haldeman*, 559 F.2d at 70.

Opp. to Mot. at 44.

In those instances, the safeguard against a biased jury has been an "extensive voir dire" with a "detailed inquiry into the sources and intensity of the [] exposure to [pretrial] publicity." *Haldeman*, 559 F.2d at 69; *see also id.* at 64 n.43 ("It is our judgment that in determining whether a fair and impartial jury could be empanelled the trial court did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel pursuant to procedures, practices and principles developed by the common law since the reign of Henry II"); *Tsarnaev*, 780 F.3d at 17 ("[C]oncerns about jurors who have fixed opinions or emotional connections to events, or who are vulnerable to improper influence from media coverage, are legitimate concerns.  The court and the parties are diligently addressing them through the voir dire process.") (brackets omitted); *Skilling*, 561 U.S. at 389 ("Inspection of the questionnaires and *voir dire* of the individuals who actually served as jurors satisfies us that . . . the selection process successfully secured jurors who were largely untouched by Enron's collapse."); *Yousef*, 327 F.3d at 155 ("[T]he District Court conducted an extensive voir dire and the jurors that were picked had either never heard of Yousef or could not remember any of the details of his alleged involvement in the World Trade Center bombing.").

Defendant points to one district court case in which a transfer was deemed necessary before voir dire due to the extraordinary prejudice within the community:  the tragic Oklahoma City bombing.  *See United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996) ("The effects of the explosion on that community are so profound and pervasive that no detailed discussion of the evidence is necessary."); Mot. at 5; Suppl. at 10.  But she is unable to point to instances in

which that precedent was followed in this district or in any other federal court, and that is because the decision arose in a unique context that bears no resemblance to the situation here.  The trial of Timothy McVeigh and Terry Nichols involved two individuals charged with blowing up the federal office building in Oklahoma City, resulting in the deaths of 168 people – including infants and children who were in a day care center on site – and injuries to hundreds of others.  While the rest of the nation was shocked and deeply saddened by news of the event, the personal impact was concentrated almost entirely in Oklahoma City, where the friends and family members of the victims resided, and for that reason, the court granted the motion for a change of venue from the Western District of Oklahoma without feeling the need to expound on the obvious reasons underlying the decision.  *McVeigh*, 918 F. Supp. at 1470.  Here the situation is reversed:  hundreds of individuals have been charged in a single incident with primarily nationwide implications, and there are a much smaller number of injured victims with ties to the community, none of whom the defendant is charged with assaulting.[5]

The rest of the *McVeigh* opinion dealt with the selection of an appropriate alternative venue, and whether the defendants could receive a fair trial in *any* district in the state of Oklahoma, which had been heavily saturated with publicity.

> The emotional burden of the explosion and its consequences has been intensified by the repeated and heavy emphasis on the innocence of the victims and the impact of their loss on their families.  The tragic sense is heightened by the deaths of infants and very young children in the day care center.

* * *

---

[5]     Of course, voir dire would include asking members of the jury panel if any of them has a close connection to a person who sustained injuries during or arising out of the events at the Capitol on January 6, 2021.

14

> The intensity of the humanization of the victims in the public mind is in sharp contrast with the prevalent portrayals of the defendants. They have been demonized. . . . All of the Oklahoma television markets have been saturated with stories suggesting the defendants are associated with "right wing militia groups."
>
>                         \* \* \*
>
> The possible prejudicial impact of this type of publicity is not something measurable by any objective standards.

918 F. Supp. at 1472–73.  As the court in *McVeigh* explained, "[a]s time passed, differences developed in both the volume and focus of the media coverage in Oklahoma compared with local coverage outside of Oklahoma and with national news coverage." *Id.* at 1471.

> Television stations conducted their own investigations, interviewing "eyewitnesses" and showing reconstructions and simulations of alleged events. Such "investigative journalism" continued for more than four months after the explosion. Perhaps most significant was the continuing coverage of the victims and their families. The Oklahoma coverage was more personal, providing individual stories of grief and recovery. As late as December 1995, television stations in Oklahoma City and Tulsa were broadcasting special series of individual interviews with family members and people involved in covering the explosion and its aftermath.

*Id.*

These is no comparable set of local concerns in this case. The media coverage of the events of January 6, while substantial, has been largely focused on the event as a whole, as defendant acknowledges. *See* Suppl. at 12–13. It has related to the over 800 defendants generally and particularly, those who may have organized or inspired them.

It is true that there have been some mentions of Williams in The Washington Post. The motion cites five articles, four of which were published within three weeks of January 6. *See* Mot. at 10 n.21, citing Christine Spolar, Hannah Knowles & Spencer S. Hsu, *Woman Charged with Helping to Steal Laptop from Pelosi's Office During Capitol Riot*, Wash. Post (Jan. 19, 2021),

https://www.washingtonpost.com/dc-md-va/2021/01/19/pelosi-laptop-riley-june-williams/;

Tonya Riley, *The Cybersecurity 202: Pelosi Laptop Theft Highlights 'Real Counterintelligence Concerns' of Capitol Riot, Lawmaker Says*, Wash. Post (Jan. 19, 2021), https://www.washingtonpost.com/politics/2021/01/19/cybersecurity-202-pelosi-laptop-theft-highlights-real-counterintelligence-concerns-lawmaker-says/; Amy Worden & Marisa Iati, *Judge Chides Suspected Pelosi Laptop Thief: 'The Constitution Prevails Here Today,'* Wash. Post (Jan. 21, 2021), https://www.washingtonpost.com/dc-md-va/2021/01/21/pelosi-laptop-theft-hearing/; Spencer S. Hsu, Rachel Weiner & Devlin Barrett, *U.S. Prosecutors Eye 400 Potential Suspects, Expect Sedition Charges 'Very Soon' in Jan. 6 Capitol Breach*, Wash. Post (Jan. 26, 2021), https://www.washingtonpost.com/local/legal-issues/pelosi-laptop-arrest-hearing-capitol-riot/2021/01/26/4ddda1ae-5ff6-11eb-9430-e7c77b5b0297_story.html; Julian Mark, *A Mother and Son Helped Steal a Laptop from Pelosi's Office on Jan. 6, Feds Say. They Have Now Been Charged.*, Wash. Post (Oct. 4, 2021), https://www.washingtonpost.com/nation/2021/10/04/rafael-rondon-capitol-riot-escape-hood/.

But the Post is not a purely local media outlet – it is available online all over the world, and it is one of the highest-circulation daily papers in the United States. *See* Pew Research Center, Newspapers Fact Sheet (June 29, 2021), https://www.pewresearch.org/journalism/fact-sheet/newspapers/. The other articles defendant cites as examples of her being "particularly villainized in comparison with other individuals charged in the fray" all come from national or international – and not local – news outlets. *See* Mot. at 2 n.1, 3 n.2 (citing Yahoo! News, Politico, NPR, and ITV News); *see also* Opp. to Mot. at 51.

It is notable that the last article about the defendant that appeared in the Post was more than ten months ago. *See Skilling*, 561 U.S. at 383 (finding that concerns about media coverage were

16

reduced given the time that had elapsed from the height of defendant's media attention and the trial). Moreover, of all of the pretrial publicity that defendant received, none of it related to a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382; *see also Haldeman*, 559 F.2d at 69–70; *cf. Rideau*, 373 U.S. at 724 (denial of venue change was a denial of due process, after defendant's "interrogation by the sheriff and admissions by Rideau that he had perpetrated the bank robbery, kidnapping, and murder" was broadcast to approximately 100,000 people over three days in a parish with a population of about 150,000).

And as in any case where there has been any coverage of an individual, voir dire will explore whether any juror has read or heard or seen anything about the defendant, and whether the juror has formed an opinion as a result.

Therefore, the second *Skilling* factor also does not necessitate a change in venue. There has been no particularly prejudicial information specific to this defendant publicized in the local media, and voir dire remains the appropriate safeguard to explore whether any juror has received information about the defendant.

       c. *Amount of Time Elapsed Since January 6, 2021*

The third factor is the amount of time that has passed since January 6, 2021, and whether the passage of time has led to "diminished" media attention. *Skilling*, 561 U.S. at 383. Although over a year and a half has elapsed since January 6, 2021, there has recently been renewed attention on the events of that day because of the widespread coverage of the congressional hearings conducted by the Select Committee to Investigate the January 6th Attack on the United States Capitol. However, the congressional hearings and the media coverage have related primarily to

the events of January 6 in general and the role that public officials and their advisors and campaigns

may have played in bringing them about, not the particular activities of any individual defendant.[6]

After the first hearing, which did include footage of the attack on the Capitol and the outnumbered

law enforcement officers trying to protect it,[7] the focus has switched to legal and political

machinations behind the scenes to substitute electors or overturn the results of the elections in

other ways, and there has been little mention of the rioters themselves.[8]   Unsurprisingly, the

defendant has not been named or singled out in any of the presentations.   So while the Court

recognizes that the events of January 6 are receiving substantial attention in the media in recent

weeks, and a rigorous voir dire will be needed to ferret out potential biases, this particular case has

not been the subject of attention, and this factor also does not weigh in favor of transferring the

case.

Finally, the Court's assessment that presuming prejudice would be unwarranted in this case

under the *Skilling* factors has been borne out by the actual experience of other courts in this district.

Courts have qualified enough jurors to empanel juries, with the requisite number of alternates, in

all January 6 cases to date.   *See Reffitt*, Min. Entry (Feb. 28, 2022) ("Minute Entry for Jury

---

6       *See, e.g.*, Domenico Montanaro, *14 Key Moments from the Jan. 6 Committee Hearings —
So Far*, NPR (July 19, 2022), https://www.npr.org/2022/07/19/1112177450/14-key-moments-
from-the-jan-6-committee-hearings-so-far.

7       *See, e.g.*, Domenico Montanaro, *New Revelations and 3 Other Takeaways from the First
Jan.      6      Committee      Hearing*,      NPR      (June      10,      2022),
https://www.npr.org/2022/06/10/1104103404/new-revelations-and-other-takeaways-from-first-
jan-6-committee-hearing (the hearing revealed "[n]ot previously publicly seen video footage from
police body cameras, Capitol hallway and office footage, as well as police radio communication").

8       *See, e.g.*, *January 6th Committee News*, N.Y. Times, https://www.nytimes.com/news-
event/jan-6-committee ("In a series of public hearings, the House committee investigating the
Capitol riot on Jan. 6, 2021, is seeking to lay out the full magnitude of former President Donald J.
Trump's attempts to remain in power after the 2020 election.").

Selection as to GUY WESLEY REFFITT held on 2/28/2022 before Judge Dabney L. Friedrich.");
*United States v. Robertson*, No. 21-cr-34, Min. Entry (April 5, 2022) ("Voir Dire commenced and
concluded with twelve jurors and two alternates selected and sworn.  Jury Trial commenced.");
*United States v. Thompson*, No. 21-cr-161, Min. Entry (April 11, 2022) ("Jury Selection as to (1)
DUSTIN BYRON THOMPSON begun and concluded on 4/11/2022 re Counts 1s,2s,3s,4s,5s,6s.
Jury panel of 14 selected but not sworn.  Jury Trial set to commence."); *United States v. Webster*,
No. 21-cr-208, Min. Entry (April 25, 2022) ("Jury Selection as to THOMAS WEBSTER held on
4/25/2022.  Panel of twelve (12) jurors and two (2) alternates selected but not sworn.  Jury Trial
set."); *United States v. Hale-Cusanelli*, No. 21-cr-37, Min. Entry (May 23, 2022) ("Jury Selection
as to TIMOTHY LOUIS HALE-CUSANELLI began and held on 5/23/2022 on Counts 1s, 2s, 3s,
4s, 5s.  Twelve (12) jurors and two (2) alternates selected, but not sworn."); *United States v.
Williams*, No. 21-cr-377, Min. Entry (June 27, 2022) ("Jury Selection began and concluded,
12 jurors and 2 alternates selected and sworn.").

There has been no indication in any January 6 trial in this courthouse that prejudice is so
widespread in the venire that the ordinary voir dire process will be insufficient to guarantee a fair
jury, and so there is no reason to transfer this case without first trying to select a jury here.  *See
Rhodes*, 2022 WL 2315554, at *21 (concluding that "[a]pplying the *Skilling* factors here does not
give rise to a presumption of prejudice" and considering the same survey presented in this case);
*Bochene*, 2022 WL 123893, at *2 ("Defendant has failed to establish such 'extreme circumstances'
here; there is no reason to believe that members of the jury venire will even know who he is or
what he allegedly did on January 6, much less that a significant number of the members of the
venire will lack the capacity to evaluate the case against Defendant based solely on the facts
of *his* case.") (emphasis in original); *Caldwell*, Omnibus Order (Sept. 14, 2021) at 10–11

(defendant moved to change venue, but there was no "proof that the residents of the District of Columbia have any preconceived notions about Caldwell specifically" and "the articles he cites as biasing the local populace against him are, for the most part, written by *national* media outlets," "consumed by *national* audiences and say[ing] nothing about the jury pool in the District of Columbia specifically.") (emphasis in original); *McHugh*, Min. Entry (May 4, 2022) ("Parties discussed trial and motion [Dkt. # 55] to change venue.  Motion heard and DENIED WITHOUT PREJUDICE.   Jury selection set for 10/18/2022 at 09:30 AM."); *Fitzsimons*, Min. Order (Dec. 14, 2021) ("For the reasons stated on the record in the December 14, 2021 hearing, it is hereby ORDERED that Defendant's [Dkt. # 47] Motion to Change Venue is DENIED without prejudice as premature."); *Reffitt*, Min. Order (Oct. 15, 2021) ("For the reasons stated during the October 15, 2021 motions hearing, the defendant's [Dkt. # 37] Motion to Change Venue is denied without prejudice.").

II.   **The Hickman Survey is flawed and does not overcome the presumption that voir dire is appropriate to overcome potential juror prejudice and bias.**

Defendant argues that the survey shows that the D.C. jury pool is incurably prejudiced against her.  *See* Suppl. at 1–2.  But the survey is fundamentally flawed, and does not supply persuasive evidence that would support a decision to transfer the case without trying the voir dire process first.

a.   *The survey is not representative of the D.C. jury pool.*

The first problem with the information the defense has provided in the Hickman Survey is that it does not target the full range of this district's jury pool.  The survey reports that it solicited the views of "juror-eligible" residents of the area by telephone, but it does not define that term or

identify the source of the respondents' phone numbers.  Hickman Survey at 2, 6.  Since the method

utilized for selecting survey participants is unexplained, there are no grounds to feel confident that

it accurately reflects the views of a cross-section of the D.C. jury pool.  And this skepticism is

borne out in the data; 99% of the D.C. respondents were "officially registered to vote in

Washington, D.C."  *Id.* at 14 (question "B").  But if this is the survey pool, then the survey

necessarily missed out on potential jurors.  The D.C. Master Jury Wheel is generated based on

three different sources:  the Registered Voters Master File of the D.C. Board of Elections, D.C.

Department of Motor Vehicles records "of individuals 18 years and older who hold a driver's

license, learner's permit, or valid identification card," and "the list of all individuals of the District

of Columbia whose income tax forms are filed with the D.C. Department of Finance and Revenue."

*See* Jury Selection Plan for the United States District Court for the District of Columbia for the

Random        Selection        of        Grand        and        Petit        Jurors,        available        at

https://www.dcd.uscourts.gov/sites/dcd/files/JurySelectionPlan2016.pdf ("Jury Selection Plan")

at 1.  This is a significant omission; the court draws from all three sources precisely because "an

even greater number of citizens will be eligible for jury service if supplemental sources are also

employed."  *Id.*  By focusing on only one segment of the pool of potential jurors, defendant

excludes many who live or work here but may have no particular political affiliation or interest.

       b.  *The survey includes flawed questions and does not support a finding of prejudice.*

      Defendant also asserts that the poll data so clearly depicts a biased venire that there would

be no point to undertaking voir dire.  But the survey questions themselves are problematic because

of their structure and leading nature.  For example, question four asked:  "[f]rom what you have

heard  or  read,  do  you  think  the  people  who  were  arrested  for  activities  related  to  those

demonstrations are guilty or not guilty of the charges brought against them?"  Hickman Survey at 15.  Question five similarly asked:  "[a]ssume you are on a jury for a defendant charged with crimes for his or her activities on January 6th.  Are you more likely to vote that the person is guilty or not guilty of those charges?"  *Id.*  The problem with these questions is that they gave the respondent an unduly constricted choice – guilty or not guilty – without any opportunity to respond, "it depends," or "I'm not sure."  The Hickman Survey advances the conclusion that these answers reveal a community unwilling to adhere to the presumption of innocence.  *See id.* at 3 ("Their bias against the defendants is evident in numerous results and is reflected in a significant prejudgment of the case:  a clear majority admit they would be inclined to vote 'guilty' if they were serving on a jury at the defendants' trial."); *id.* at 4 ("An overwhelming majority of the District of Columbia jury pool have a prejudgment about the case.").  But the respondents were informed that this was a public opinion poll, and the questions specifically asked for a prediction based on what respondents had "read or heard," or to guess about a theoretical case.  *Id.* at 15.  So the survey sheds little light on what members of a jury who have been screened for biases during voir dire and asked if they can put aside what they have read or heard, and who are specifically instructed that they may base their verdicts only on the evidence, will do when called upon to render a verdict with respect to an individual defendant.

Moreover, it is telling that even when offered a yes or no choice, 46% of respondents to question five answered that it "depends" or "don't know/refused."  Hickman Survey at 15.  This suggests, contrary to defendant's contentions, that a considerable portion of the venire would act in a manner that is consistent with the presumption of innocence and wait to hear the evidence.  If almost half of the survey participants came up with those responses on their own initiative, that suggests that an even greater percentage would have done so if given the choice.  And if one adds

the 2% of the respondents who answered that they would find the defendant not guilty to the ones

without a fixed opinion, the survey shows that there is a sizeable segment of the population – 48%

at the least – who have not already decided to convict.

c.   *The alternative venue proposed does not alleviate the concerns of pretrial publicity.*

The events of January 6 were unprecedented and serious, and there is no dispute that many

public officials and well-known media figures have described them in stark terms.   Defendant

argues that "DC jurors have been inundated" with January 6 news, and so they cannot be expected

to separate the news from their opinion of Williams.[9]   Suppl. at 12–13.

> [T]he hundreds of January 6 videos and photos circulated over the last
> 13 months capture the scene of the alleged January 6 crimes, and many of
> the alleged crimes themselves, including potential crimes committed by
> many other people easily confused with Ms. Williams.   Vivid images
> splashed across DC papers and television for the last thirteen months show
> people scaling the Capitol walls, hoisting a hangman's gallows and noose,
> waving Confederate flags, putting their feet on the desks in the Capitol,
> rifling through papers on desks in the Capitol, milling about and hanging

---

9      Of course, defendant fails to mention the thousands of statements made by other political
leaders and popular media figures minimizing the events of that day that have also been widely
publicized.   *See, e.g.*, Jonathan Weisman & Reid J. Epstein, *G.O.P. Declares Jan. 6 Attack
'Legitimate      Political      Discourse,'*      N.Y.      Times      (Feb. 4, 2022),
https://www.nytimes.com/2022/02/04/us/politics/republicans-jan-6-cheney-censure.html
(reporting on the Republican National Committee's decision to censure two Republicans for
participating in "a Democrat-led persecution of ordinary citizens who engaged in legitimate
political discourse"); Cristina Marcos & Rebecca Kheel, *GOP Downplays Jan. 6 Violence:  Like
a 'Normal Tourist Visit,'* The Hill (May 12, 2021), https://thehill.com/homenews/house/553227-
gop-downplays-jan-6-violence-like-a-normal-tourist-visit/     (quoting Representative Andrew
Clyde (R-GA) as stating:  "Watching the TV footage of those who entered the Capitol and walked
through Statuary Hall showed people in an orderly fashion staying between the stanchions and
ropes taking videos and pictures," and, "You know, if you didn't know the TV footage was a video
from Jan. 6, you'd think it was a normal tourist visit."); *Tucker Carlson: The Truth of What
Happened   on   Jan. 6   is   Still   Unknown*,   Fox   News   (June   9,   2022),
https://www.foxnews.com/opinion/tucker-truth-happened-jan-6-unknown   (Tucker   Carlson
saying, "[W]e did not think it was an insurrection because it was not an insurrection.  It was not
even close to an insurrection.").

> from the balconies in the Senate Chamber, and appearing to try to break into the House chamber, among hundreds of other scenes.

*Id.* at 12.

But the jurors defendant asks the Court to draw from Pennsylvania – like millions of citizens across the entire country – have all been potentially exposed to the same set of broadly disseminated video recordings, statements of witnesses and participants, and observations of pundits and political leaders; that experience is not unique to Washingtonians.  Thus, the motion fails to establish that D.C. jurors have been so drenched in publicity aimed at them in particular that they are presumptively incapable of being fair when compared to jurors drawn from any other district in the country.  As the First Circuit recognized in the prosecution of the Boston Marathon bomber, "[i]t is true that there has been ongoing media coverage of the advent of the trial and petitioner's pre-trial motions, both locally and nationally.  But that would be true wherever trial is held." *Tsarnaev*, 780 F.3d at 22; *see also United States v. Awadallah*, 457 F. Supp. 2d 246, 253 ("[T]he effects of the September 11 attacks were felt nationwide, and there is no reason to believe that jurors in a different jurisdiction would lack an emotional response with prejudicial effects.").

This conclusion is borne out by the very articles defendant has identified, as most are about January 6 in general and published by national sources.  For example, she highlights:  (1) a press release from the White House disseminating President Biden's comments about January 6; (2) Attorney General Garland's comments about January 6 during his confirmation hearing, as memorialized on the Senate Judiciary Committee's website; (3) an article from the Pew Research Center recounting the language Democratic politicians employed in the aftermath of January 6; (4) an article from the Pew Research Center discussing social media engagement on lawmakers' January 6 posts; (5) an article from NPR reporting on warnings made by the Department of

Homeland Security; (6) an article from MSNBC reporting comments made by Nancy Pelosi about January 6; and (7) a video depicting comments made by Representative Cori Bush (D-MO) on the floor of the House of Representatives.  Mot. at 8–10 (citations omitted).  Defendant appears to assume that simply because a person lives in Washington, they are aware of, and swayed by, the statements of political leaders.

There is certainly little reason to believe this would be the case with respect to members of Congress from other districts, and the notion that D.C. residents would be particularly influenced by the statements of national political figures is based on an uninformed stereotype about the people who live here.  The city includes, of course, local and federal government employees – the overwhelming majority of whom are not political appointees – but also teachers, health care workers, shopkeepers, cab drivers, waiters, college students, and thousands of others whose day-to-day activities have nothing to do with politics.  There is no reason to assume that they are more prone to be influenced by politicians' pronouncements than people elsewhere, let alone that any influence would render them incapable of being fair to this individual defendant.

Defendant's assumption that residents of the District of Columbia are peculiarly well-informed about January 6 when compared to others is further undermined by the Hickman Survey. For example, the survey reported that 93% of District residents were aware "that several hundred people were arrested on charges related to" January 6.  Hickman Survey at 15.  But 87% of Atlanta residents were also aware of the January 6 charges.  33% of District residents had "seen, heard, or read" "a lot" "about the demonstrations at the Capitol, the investigations, arrests, and court proceeding of individuals involved in those demonstrations."  *Id.*  But 30% of Atlanta residents had also seen, heard, or read a lot about the investigations and court proceedings.  *Id.*  The Hickman Survey asked, "Has most of the media coverage you have seen, heard, or read suggested the

defendants are likely guilty or are likely not guilty of the charges brought against them?"[10]  *Id.*

Yes, 63% of District respondents said "likely guilty," but 61% of Atlanta respondents said the

same, and importantly, 33% of District residents said "depends" or "don't know/refused," while

30% of Atlanta residents gave that response.  *Id.*  There are some deviations between the groups

in survey responses, but by and large, Atlanta and D.C. residents appear to be quite comparable in

their knowledge of the January 6 prosecutions.  And the Court has not been supplied with grounds

to believe that jurors in any other jurisdiction – much less, jurors in the Middle District of

Pennsylvania – would be any different.

In fact, notwithstanding defendant's blithe assertion that "the media exposure has been

more limited" in Harrisburg, Mot. at 13, considerably more articles have been published in local

Pennsylvania news outlets about the defendant and her case than have appeared in Washington.

While the defendant is just one of 800 alleged rioters as far as the District of Columbia is

concerned, she has been a subject of great interest in such publications as the Sentinel, "Carlisle

and Cumberland County's local newspaper," https://cumberlink.com/about, and PennLive, which

is based in Mechanicsburg, https://www.thepamediagroup.com/about, and the local Fox affiliate

has followed its hometown January 6 defendant closely.[11]  Although defendant insisted in her

---

10     This question is flawed, but because it is flawed with respect to both groups of respondents,
it still provides a useful point of comparison.

11     *See e.g.*, Keith Schweigert, *Judge Denies Riley Williams' Motion to Have Conditions of
House Arrest Lifted*, FOX43 (July 21, 2022), https://www.fox43.com/article/news/crime/riley-
williams-house-arrest-motion-denied-us-judge/521-28b13eb3-1bdd-4b04-b5c3-675cacb9828d;
Jonathan Bergmueller, *Judge Refuses to Lift Restrictions for Central Pa. Woman Accused of
Stealing      Pelosi's      Laptop*,      PennLive      (July      21,      2022),
https://www.pennlive.com/news/2022/07/judge-refuses-to-lift-restrictions-for-central-pa-woman-
accused-of-stealing-pelosi-laptop-at-capitol-riot.html; Christine Vendel, *Woman Accused of
Stealing Nancy Pelosi's Laptop Met with Man Who Planned to Shoot Up Synagogue: Prosecutor*,
PennLive (June 11, 2022), https://www.pennlive.com/news/2022/06/woman-accused-of-stealing-

nancy-pelosis-laptop-met-with-man-who-planned-to-shoot-up-synagogue-prosecutor.html;   Kim Strong, *Who They Are: 70 Pennsylvania Residents Arrested for Involvement in Capitol Insurrection*,   York   Daily   Record   (July 6, 2022), https://www.ydr.com/story/news/2022/07/06/pennsylvania-residents-among-those-arrested-u-s-capitol-insurrection/4331778001/; Bianca Garcia, *Prosecution Argues Against Easing Release Conditions of Riley Williams, Woman Accused of Participating in Jan. 6 Insurrection*, FOX43 (June 11, 2022), https://www.fox43.com/article/news/crime/riley-williams-january-6-house-arrest/521-7de911a5-85ba-4222-852d-9d3f77ac8126;   Keith   Schweigert,   *Accused Jan. 6 Participant Riley Williams Petitions Court to End House Arrest While She Awaits Trial*, FOX43 (June 8, 2022), https://www.fox43.com/article/news/crime/riley-williams-accused-jan-6-rioter-petition-house-arrest/521-b6628c96-e10a-4b8e-9a8f-5c0a046557eb;   Becky   Metrick, *5 More Pennsylvanians Sentenced for Roles in Jan. 6 Riot at U.S. Capitol*, PennLive (Feb. 9, 2022), https://www.pennlive.com/news/2022/02/3-pa-defendants-sentenced-to-prison-2-get-probation-in-connection-with-riot-in-us-capitol.html; Zack Hoopes, *Cases Still Pending for Five Area Residents Charged in Jan. 6 Insurrection*, The Sentinel (Jan. 6, 2022), https://cumberlink.com/news/local/crime-and-courts/cases-still-pending-for-five-area-residents-charged-in-jan-6-insurrection/article_ec2517c7-0021-537d-862d-6af7069b0197.html;   Matt Miller, *A Year After U.S. Capitol Riot, Some Pa. Defendants Have Been Sentenced to Prison, Dozens   of   Others   Await   Their   Fate*,   PennLive   (Jan.   5,   2022), https://www.pennlive.com/crime/2022/01/a-year-after-us-capitol-riot-some-pa-defendants-have-been-sentenced-to-prison-dozens-of-others-await-their-fate.html; Zack Hoopes, *Defense Wants Charge Dropped Against Central Pa. Woman Accused of Taking Pelosi's Laptop at Capitol Riot*, PennLive (Nov. 26, 2021), https://www.pennlive.com/nation-world/2021/11/defense-argues-for-dismissal-of-charge-in-midstate-womans-jan-6-capitol-attack-case.html; Zack Hoopes, *Defense Argues for Dismissal of Charge in Midstate Woman's Jan. 6 Capitol Attack Case*, The Sentinel (Nov.   25,   2021),   https://cumberlink.com/news/local/crime-and-courts/defense-argues-for-dismissal-of-charge-in-midstate-womans-jan-6-capitol-attack-case/article_09989389-269e-5304-8c32-bd5cdc9ba665.html; Sean Adams, *Harrisburg Woman Formally Charged with Stealing Pelosi's   Laptop   in   US   Capitol   Riot*,   PennLive   (Oct.   9,   2021), https://www.pennlive.com/news/2021/10/harrisburg-woman-formally-charged-with-stealing-pelosis-laptop-in-us-capitol-riot.html; Cale Ahearn, *Harrisburg Woman Accused of Stealing Pelosi's Laptop Pleads Not Guilty on Eight Counts Connected to US Capitol Riot*, WNEP (Oct. 8, 2021), https://www.wnep.com/article/news/crime/riley-williams-us-capitol-riot-nancy-pelosi-laptop-indictment-charges/521-22e49639-b8bf-42c4-897f-ad0d2c709e59; Matt Miller, *With 42 Arrests, Pa. Ranks 3rd in People Charged in Capitol Riots*, PennLive (Jul. 13, 2021), https://www.pennlive.com/crime/2021/07/with-42-residents-accused-pa-ranks-3rd-among-states-for-arrests-linked-to-us-capitol-riot.html; Charles Thompson, *Midstate Woman Charged in Capitol Riots Gets Home Confinement Rules Relaxed*, PennLive (May 28, 2021), https://www.pennlive.com/news/2021/05/midstate-woman-charged-in-capitol-riots-gets-home-confinement-rules-relaxed.html; Keith Schweigert, *Harrisburg Woman Accused of Stealing Pelosi's Laptop During U.S. Capitol Riot Has Hours of House Arrest Reduced*, WNEP (May 26, 2021), https://www.wnep.com/article/news/local/dauphin-county/riley-williams-accused-of-stealing-nancy-pelosis-laptop-during-us-capitol-riot-has-hours-of-house-arrest-reduced/521-fa4ba5e2-9e78-435e-bac6-4535ef82fc0b; Christine Vendel, *Online Sleuths Link*

*Harrisburg-area Woman Accused of Stealing Nancy Pelosi's Laptop to Neo-Nazi Activism*, PennLive (Mar. 2, 2021), https://www.pennlive.com/news/2021/03/online-sleuths-link-harrisburg-area-woman-accused-of-stealing-nancy-pelosis-laptop-to-neo-nazi-activism.html; Matt Miller, *Pa. Ranks No. 2 in Terms of Residents Charges in U.S. Capitol Riot*, PennLive (Feb. 8, 2021), https://www.pennlive.com/news/2021/02/pa-now-ranks-no-2-in-terms-of-residents-charged-by-feds-in-us-capitol-riot.html; Mark Scolforo, *Pa. Woman Arrested, Accused of Directing Rioters at U.S. Capitol*, PennLive (Feb. 5, 2021), https://www.pennlive.com/news/2021/02/pa-woman-arrested-accused-of-directing-rioters-at-us-capitol.html; *Lawyer Says Pelosi Laptop Hasn't Been Recovered from Harrisburg Woman Accused of Stealing It*, The Sentinel (Jan. 27, 2021), https://cumberlink.com/news/local/crime-and-courts/lawyer-says-pelosi-laptop-hasnt-been-recovered-from-harrisburg-woman-accused-of-stealing-it/article_93d71954-946d-53aa-84cf-d420cb372d3d.html; PennLive Letters to the Editor, *Here's What Should Happen to Riley June Williams*, PennLive (Jan. 27, 2021), https://www.pennlive.com/opinion/2021/01/heres-what-should-happen-to-riley-june-williams-pennlive-letters.html; Matt Miller, *Judge: Riley Williams, Harrisburg Woman Accused of Stealing Nancy Pelosi's Laptop, Must Stay Off Internet*, PennLive (Jan. 26, 2021), https://www.pennlive.com/news/2021/01/us-judge-orders-harrisburg-woman-accused-of-stealing-nancy-pelosis-laptop-to-stay-off-the-internet.html; Erin Spaht, Eric Flack & Jordan Fischer, *Capitol Rioter Accused of Stealing Pelosi's Laptop Ordered to Get a Flip Phone, Stay Off the Internet*, WNEP (Jan. 26, 2021), https://www.wnep.com/article/news/national/capitol-riots/capitol-rioter-riley-june-williams-must-stay-off-internet-get-a-flip-phone/65-e79b0e07-8cb6-40aa-b30a-a9c682f3d8dd; Harri Leigh, *FBI Affidavit Shows Social Media Posts in which Riley Williams Allegedly Admits to Stealing Nancy Pelosi's Hard Drive*, WNEP (Jan. 26, 2021), https://www.wnep.com/article/news/crime/fbi-affidavit-shows-social-media-posts-in-which-riley-williams-allegedly-admits-to-stealing-nancy-pelosis-hard-drive/521-30e90277-58a3-4380-b707-8dc67da22af7; Mark Scolforo, *Update: Harrisburg Woman Accused of Helping Steal Pelosi Laptop Freed from Jail*, The Sentinel (Jan. 21, 2021), https://cumberlink.com/news/local/crime-and-courts/update-harrisburg-woman-accused-of-helping-steal-pelosi-laptop-freed-from-jail/article_8a16e0ed-ff27-5fb1-83b5-2600237b2b36.html; Christine Vendel, *'Not That Riley Williams': Mechanicsburg Teen Mistaken for Woman Arrested in U.S. Capitol Riot*, PennLive (Jan. 21, 2021), https://www.pennlive.com/news/2021/01/not-that-riley-williams-mechanicsburg-teen-mistaken-for-woman-arrested-in-us-capitol-riot.html; *2017 Mechanicsburg Grad Likely Faces Charges in Theft of Pelosi Computer, Prosecutors Tell Judge*, The Sentinel (Jan. 19, 2021), https://cumberlink.com/news/local/crime-and-courts/2017-mechanicsburg-grad-likely-faces-charges-in-theft-of-pelosi-computer-prosecutors-tell-judge/article_d0e23e23-3f87-53d4-b0d6-991ebb78a987.html; *Harrisburg Woman in Custody After Being Sought by FBI for Involvement in Capitol Riot*, The Sentinel (Jan. 19, 2021), https://cumberlink.com/news/local/crime-and-courts/harrisburg-woman-in-custody-after-being-sought-by-fbi-for-involvement-in-capitol-riot/article_732e45c8-f144-5fdb-b738-94c500615a75.html; *PA Woman Investigated for Theft of Pelosi Computer Due in Court*, Williamsport Sun-Gazette (Jan. 19, 2021), https://www.sungazette.com/news/2021/01/pa-woman-investigated-for-theft-of-pelosi-computer-due-in-court/; Becky Metrick, *Theft Charges Added Against Harrisburg-area Woman Accused of Stealing Nancy Pelosi's Laptop*, PennLive (Jan. 19, 2021), https://www.pennlive.com/news/2021/01/theft-charges-added-against-harrisburg-area-woman-

motion that "coverage of January 6 has been extensive and persistent, particularly in the District of Columbia," and that the D.C. media has paid "particular attention on Ms. Williams," Mot. at 10, 13, she has pointed to little or nothing to support that hyperbolic claim, and she later appeared to acknowledge that it is the *local* news outlets that report on her case.  In her reply to the government's opposition to modify her conditions of release, she wrote:

> Notwithstanding the inflammatory (and untrue) nature of [the government's] allegations, the Government filed their brief openly on the docket, *although it is fully aware that the local press in the Harrisburg area follows Ms. Williams' case closely and reports on its various happenings in the news local to Ms. Williams' home*.  Unsurprisingly, the next day PennLive published a story about Ms. Williams entitled "Woman accused of stealing Nancy Pelosi's laptop met with man who planned to shoot up synagogue: prosecutor," meeting the Government's aim of trying Ms. Williams in the court of public opinion.

Def.'s Reply Brief [Dkt. # 53] at 6 (internal footnotes omitted) (emphasis added).  Thus, defendant's own submissions suggest that she is more likely to find jurors who know little or nothing about her here than in the Middle District of Pennsylvania.

Defendant suggests, though, that potential jurors in this district have been affected by more practical disruptions, pointing to road closures and limited transportation available in the "weeks and months" following January 6, the National Guard deployment to Washington, D.C., the state of emergency that was declared, and the curfew that was imposed in the District for "weeks" after.

accused-of-stealing-nancy-pelosis-laptop.html; Christine Vendel, *Capitol Laptop Theft Suspect Filed for Protection from Man Who Called FBI on Her*, PennLive (Jan. 19, 2021), https://www.pennlive.com/news/2021/01/capitol-laptop-theft-suspect-filed-for-protection-from-man-who-called-fbi-on-her.html; *Harrisburg Woman Accused of Laptop Theft From Pelosi's Office Amid Riot*, Williamsport Sun-Gazette (Jan. 18, 2021), https://www.sungazette.com/news/2021/01/pennsylvania-woman-accused-of-laptop-theft-from-pelosis-office-amid-riot/; Matt Miller, *Did a Harrisburg Woman Charged with Joining in the U.S. Capitol Riot Take Nancy Pelosi's Laptop?*, PennLive (Jan. 18, 2021), https://www.pennlive.com/news/2021/01/is-a-harrisburg-woman-charged-with-joining-in-the-us-capitol-riot-on-the-run-with-nancy-pelosis-laptop.html.

*See* Mot. at 5, 7.  For one thing, the curfew was not implemented for "weeks" – it was in place for one single night.  *See* Nick Boykin, Matt Pusatory & Jonathan Franklin, *DC Lifts Curfew After Riots at the Capitol, Public Emergency Extended for 15 Days*, WUSA9 (Jan. 7, 2021), https://www.wusa9.com/article/news/local/dc/washington-dc-curfew-amid-unrest-at-capitol-building/65-becf9868-3413-4cf8-a930-cbb8f2813f2b.  And the road closures around the Capitol did not profoundly affect the bulk of area residents; the attack on the Capitol took place during the pandemic, when most government and downtown offices were closed, and all but essential employees were working remotely.  Also, the temporary disruption in travel was short-lived and centered around the Capitol building itself, and the motion betrays defendant's ignorance of the local geography.  A substantial portion of D.C. residents do not live or work or go to school on Capitol Hill and seldom even need to drive by the area.  For these same reasons, the deployment of the National Guard around the Capitol building did not affect most residents.  Moreover, this Court has been provided with no basis to assume that District residents – who, as defendant herself observes, put up with parades, protests, and motorcades on a regular basis, *see* Mot. at 6  ("Hardly a week went by during Trump's presidency without an anti-Trump protest outside the White House, Congress, the Trump Hotel, at local universities and other District locales.") – would be so annoyed by one narrow set of street closures that they would be unable to serve as fair-minded jurors more than a year and a half after the restrictions were lifted.

In sum, of course there will be jurors in D.C. who are familiar with the events of January 6 and some of the more high-profile prosecutions that have followed.  But "[p]rominence does not necessarily produce prejudice," *Skilling*, 561 U.S. at 381, and these cases would be prominent no matter where they were transferred.  The real concern here is about potential bias surrounding the unique circumstances of January 6, not the unique characteristics of the D.C. jury pool, and that

concern must and will be addressed through voir dire, rather than by transferring the case to a district with a venire that would present the same – or more – issues.

III.   **Jury Questionnaire.**

Federal Rule of Criminal Procedure 24(a) permits a district court to examine prospective jurors either by conducting the voir dire itself or allowing the parties to conduct it.  *See Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981); *see also Hamling v. United States*, 418 U.S. 87, 139–40 (1974).   "[F]ederal judges have been accorded ample discretion in determining how best to conduct the *voir dire*."  *Rosales-Lopez*, 451 U.S. at 189; *see United States v. Littlejohn*, 489 F.3d 1335, 1342 (D.C. Cir. 2007).   The Supreme Court has specified that this discretion applies "in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias."  *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991).   The "mode and manner of proceeding" is left to the discretion of the district court.  *Littlejohn*, 489 F.3d at 1342, quoting *United States v. Robinson*, 475 F.2d 376, 380; *see United States v. Tsarnaev*, 142 S. Ct. 1024, 1034 (2022) ("We have repeatedly said that jury selection falls particularly within the province of the trial judge.") (internal quotation marks omitted).

While courts in this district have occasionally utilized questionnaires in cases involving significant publicity directed towards an individual defendant, *see e.g.*, *United States v. Khatallah*, 313 F. Supp. 3d 176, 194 (D.D.C. 2018); *United States v. North*, 713 F. Supp. 1444, 1444 (D.D.C. 1989); *United States v. Stone*, No. 19-cr-0018 (ABJ), 2020 WL 1892360, at *2 (D.D.C. Apr. 16, 2020), the practice tends to be the exception and not the rule.  *See e.g.*, *United States v. Craig*, No. 19-cr-125 (ABJ), Min. Order (D.D.C. Aug. 1, 2019) ("Upon consideration of . . . defendant's Notice of Request for Jury Questionnaire, it is ORDERED that the request is

DENIED."); *United States v. Clemens*, No. 10-cr-223 (RBW), Order (D.D.C. July 6, 2011) ("[I]t is **ORDERED** that the parties' joint motion for use of a juror questionnaire is **DENIED**.") (emphasis in original); *United States v. Quinn*, 401 F. Supp. 2d 80, 104–05 (D.D.C. 2005) ("[T]he use of defendants' questionnaire is unnecessary in this case to ensure proper juror screening."). Given the fact that courts have successfully seated juries in multiple January 6 cases without the need for a written questionnaire, and the relatively limited nature of the publicity surrounding this case in particular in this district, the Court will deny defendant's request at this time in its discretion, without prejudice to the future renewal of the motion if circumstances change.

## CONCLUSION

For all of these reasons, defendant's motion to transfer venue is **DENIED**.


AMY BERMAN JACKSON
United States District Judge

DATE:  August 12, 2022