1        IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLUMBIA
2

3   UNITED STATES OF AMERICA,

                                        CR Action
4            Plaintiff,                 No. 1: 21-CR-618

5        vs.                            Washington, DC
                                        March 23, 2023
6   RILEY JUNE WILLIAMS,
                                        9:43 a.m.
7            Defendant.
    _____/
8

9           TRANSCRIPT OF SENTENCING HEARING
              BEFORE THE HONORABLE
10   UNITED STATES DISTRICT JUDGE AMY BERMAN JACKSON

11
    APPEARANCES:
12
    FOR THE PLAINTIFF:        SAMUEL DALKE
13                            DOJ-USAO
                              228 Walnut Street, Suite 220
14                            Harrisburg, PA 17101

15                            MICHAEL MATTHEW GORDON
                              DOJ-USAO
16                            400 North Tampa Street, Suite 3200
                              Tampa, FL 33602
17
    FOR THE DEFENDANT:        LORI ULRICH
18                            Office of the Federal Public Defender
                              100 Chestnut Street, Suite 306
19                            Harrisburg, PA 17101

20

21           APPEARANCES CONTINUED ON NEXT PAGE

22
    Court Reporter:           SHERRY LINDSAY
23                            Official Court Reporter
                              U.S. District & Bankruptcy Courts
24                            333 Constitution Avenue, NW
                              Room 6710
25                            Washington, DC 20001

```
 1                         APPEARANCES CONTINUED

 2

 3    FOR THE DEFENDANT:        AMANDA GAYNOR
                                Office of the Federal Public Defender
 4                              330 Pine Street, Suite 302
                                Williamsport, PA 17701
 5

 6                              BRANDON REISH
                                Federal Public Defender
 7                              201 Lackawanna Avenue, Suite 317
                                Scranton, PA 18503
 8

 9    FOR U.S. PROBATION        HANA FIELD

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          **P R O C E E D I N G S**

2              THE COURTROOM DEPUTY:  Good morning, Your Honor.

3    This morning we have criminal case 21-618, the United States of

4    America v. Riley June Williams.

5              Ms. Williams is present and in the courtroom.  The

6    probation officer present for this morning's proceedings is

7    Officer Hana Field.

8              Will counsel for the government, please approach the

9    lectern and identify themselves for the record followed by

10   counsel for the defense.

11             MR. DALKE:  Good morning, Your Honor.  Sam Dalke on

12   behalf of the United States, joined with my cocounsel, Mike

13   Gordon, along with Tiffany Robinson and Special Agents John

14   Lund and Richard Oh.

15             THE COURT:  All right.  Good morning.

16             MS. ULRICH:  Good morning, Your Honor.  Lori Ulrich

17   for Riley Williams along with Brandon Reish and Amanda Gaynor.

18             THE COURT:  All right.  Good morning.  We are here

19   this morning for Ms. Williams' sentencing.  The final revised

20   presentence report was filed in this matter on February 15th,

21   2023.  I am pretty sure that the defendant and the defense

22   counsel have both read the presentence report.  But for the

23   record; is that correct?

24             MS. ULRICH:  That is correct, Your Honor.

25             THE COURT:  This is the point in the proceedings

1    where I usually ask if there are any factual objections to be

2    resolved.  Defense has submitted a detailed set of factual

3    objections.  It is sealed.  It is docket 145.  I have never

4    actually seen anything like it in my 12 years on the bench.  It

5    objects to the probation office's use of the government's

6    characterization of the facts with its spin on them and it

7    supplies her own.  And I want to state for the record and, in

8    fact, I said this before the submission was filed, that I am

9    not relying on paragraphs 20 through 44 as a source of

10   information as to the offense conduct.  I will not accept these

11   paragraphs undisputed for purposes of the sentencing.  Let the

12   record reflect they are disputed.

13          Nor am I relying on docket 145, the defendant's

14   docketed set of objections, which was unnecessarily

15   argumentative and sarcastic and as slanted to the defense

16   perspective as she contends the summary in the presentence

17   report was.  She objects to some undisputed facts such as the

18   fact the defendant deleted files from her computer with

19   assertions about why she may have done it.  But that doesn't

20   make it any less a fact.  Much of the submission was the

21   defense closing argument over again.  And with respect to the

22   counts of conviction, the jury did not buy them.

23          With respect to the offense conduct then, I will rely

24   solely on the evidence introduced at trial, the exhibits and

25   the testimony and my own close observation and recollection of

1   the witnesses' credibility and demeanor.  To go through the

2   other objections one by one, I will not exclude paragraphs 15

3   and 16, which do not make factual findings but simply report

4   accurately on what it was that the pretrial services agency had

5   reported.  Nor will I exclude paragraph 35 which again sets out

6   the facts about wiping her computer thoroughly and repeatedly

7   with a high degree of sophistication, accurately.  The defense

8   has argued there was another motivation besides evading arrest.

9   And that assertion is part of the record, but it doesn't

10  warrant keeping the other information out of the presentence

11  report.

12          Paragraph 35 recounts the government's request for

13  restitution.  I will deal with that at the time I impose

14  sentence.  But there is nothing inappropriate about the

15  probation office summarizing the existence of the request.

16          I am not sure it was inappropriate for the government

17  to submit information to the probation office that is in the

18  objected to paragraphs 93 and 94, given the role that Nick

19  Fuentes apparently played in the defendant's world view at the

20  time of the offense.  But I do agree that paragraph 94 is

21  irrelevant.  And I don't intend to rely upon anything in

22  paragraph 94 in connection with my sentencing today.

23          To be clear, I do not intend to and I will not rely

24  upon any information regarding Nick Fuentes and his philosophy

25  or views beyond his position on the election in connection with

1    my sentencing today.

2            The guidelines objections in paragraphs 39 and 47

3    through 65 are legal disputes and not factual disputes with the

4    presentence report.  And they will be taken up when I calculate

5    the guidelines.

6            Objections to potential conditions of supervised

7    release, discussions of potential upward variances, all go to

8    the sentence I am going to impose and not the validity of the

9    presentence report itself.  And so the objections to paragraphs

10   149, 172, 175 through 177, are noted and part of the record,

11   but I don't need to address them directly now.

12            Most important, while all of the defendant's behavior

13   in the Capitol is relevant and there were exhibits introduced

14   that show what she did and did not do in the Speaker's office,

15   I am not planning to sentence her today for the counts in which

16   the jury could not reach a unanimous verdict and which have

17   been dismissed.  But neither am I going to waste time

18   entertaining arguments about how unconscionable it was for the

19   government to pursue those counts given her own public

20   statements on the matter at the time and the evidence with

21   which the government had been provided during the early days of

22   the investigation.  It is simply not the subject of today's

23   hearing.  And it will not be productive for either side to

24   waste the time we have set aside today for the very important

25   matters we do have to address by saying a good deal more about

1    the laptop or the gavel.

2              With that, I will accept the other portions of the

3    presentence report that I did not just specifically set aside

4    or carve out as findings of fact for purposes of sentencing.

5              The next thing I generally ask is where there are

6    legal issues that need to be resolved.  The guidelines

7    calculation is disputed.  And that will be the issue I turn to

8    first, because I always calculate the guidelines before I go

9    further.

10             But before I do that, I want to state for the record,

11   that I have received additional materials concerning the

12   defendant, including the government's memorandum in aid of

13   sentencing and two memorandum from the defense, one sealed, at

14   docket 138 and unsealed at 137.  Now that I have reviewed 138,

15   while there are some references to family matters that are

16   appropriately sealed, there was a good bit of it, information,

17   for instance, about positive things that the defendant had done

18   in the past that are usually a part of the public record.  So I

19   would encourage the defense to review docket 138 and docket a

20   redacted version for the public record.

21             The memoranda supplied by the defense were supported

22   by a number of attachments, including letters from family

23   members and others.  Given the public interest in this matter

24   and what has kind of happened in other cases when people have

25   stepped forward to be supportive or not supportive, I am just

1   going to refer to them by relationship and not by name.

2          Received a letter from a couple that knew the

3   defendant for approximately a year when she worked as a

4   personal caregiver for their special needs adult daughter, the

5   defendant's stepmother, her grandmother, her father, her

6   mother, her fiance and a pastor at her church.  I read and

7   appreciated all of that material.

8          So in a criminal case, there is a statute that tells

9   me how I am supposed to go about deciding what the sentence

10  should be.  It is 18 US Code section 3553.  It lists a number

11  of important factors and the advisory sentencing guidelines are

12  one of the factors that I am required to consider in

13  determining the appropriate sentence for this offense.  I am

14  required to calculate what the guidelines would recommend in

15  every case.  And the purposes is to arrive at a recommended

16  sentencing range based on the offense and various aggravating

17  or mitigating factors and also taking her criminal history or

18  lack of criminal history into consideration.

19         So I am going to begin with that calculation.  But I

20  want to emphasize that is just the starting point.  It is not

21  the ending point of the analysis this morning.

22         The defendant was found guilty of Count 1, civil

23  disorder and violation of 18 US Code section 231(a)(3), which

24  provides for maximum sentence of up to 5 years.  She was found

25  guilty of Count 3, resisting or impeding certain officers in

violation of 18 US Code section 111(a)(1), which provides for a
maximum sentence of up to 8 years.  She was convicted of Count
5, entering and remaining in a restricted building or grounds
in violation of 18 US Code section 1752(a)(1), which provides
for maximum sentence of up to one year; Count 6 disorderly and
disruptive conduct in a restricted building or grounds in
violation of 18 US Code section 1752(a)(2), which provides for
a maximum sentence of 1 year; Count 7, disorderly conduct in a
Capitol building in violation of 40 US Code section
5104(e)(2)(D) which provides for a maximum sentence of up to 6
months; and Count 8, parading, demonstrating or picketing in a
Capitol building in violation of 40 US Code section
5104(e)(2)(G), which provides for a maximum sentence of 6
months.

        The parties seem to agree that for guidelines
purposes, we would group Counts 1 and 3 together, as both
involve the same conduct directed towards the same officers in
the rotunda of the Capitol.  Counts 5 and 6 are also grouped.
But no matter how you add those up, under the guidelines, use
the group that has the higher guideline.  And, therefore, that
would be the group consisting of Counts 1 and 3.  So that is
where this dispute rests.  Count 7 and 8 are class B
misdemeanors and they are not covered by the guidelines at all.

        So there is a lot of discussion that is about to
happen that sounds a lot more like algebra than law.  And I

1   didn't write the guidelines, but I am required to utilize them.

2   So you will be hearing about a lot of sections from the

3   guidelines and levels and going up and down.  And that is what

4   we have to do to arrive at what the commission would recommend.

5   And then we get into what all of the other factors would say

6   that I should do.  We start right off the bat with the dispute

7   regarding what the base offense level should be for the first

8   group.  If you look at Count 1 and you go to the index of the

9   guidelines, there is no particular guideline recommended at all

10  for that.  It says, therefore, you must apply the most

11  analogous guideline.  So then, the obvious choice and one that

12  is referenced in the guidelines themselves as appropriate for

13  Count 3 is section 2A2.4, the guideline for obstructing or

14  impeding officers.  That starts with the base level of 10.  If

15  the offense involves physical contact or a dangerous weapon was

16  possessed and use was threatened, it goes up by 3 levels.  And

17  if the victim sustained bodily injury, it would be increased by

18  two more.  Am I correct that the defense position would be that

19  under that guideline, we would end up at level 13?

20          MS. ULRICH:  Your Honor, I am actually opposed to the

21  3 levels.  I assume that is what the Court is giving her, the 3

22  levels there for physical contact, given what she was convicted

23  of.  So we think that offense level there would be 10.  But I

24  can understand where you are getting the additional 3 levels.

25          THE COURT:  All right.  I mean, there was physical

1    conduct by others urged by her.  And I think, therefore, within

2    that guideline, that would be appropriate.  But there is a

3    cross-reference in section 2A2.4, that says if the conduct

4    constituted aggravated assault, then you are supposed to go to

5    a different guideline section, 2A2.2 for aggravated assault.

6    So the guideline for obstructing, impeding officers explicitly

7    states that if you have an aggravated assault, then you have to

8    go to the other guidelines section, 2A2.2 instead.

9         The consequences for the guideline calculation are

10   significant and not entirely logical.  If you go to section

11   2A2.2, for aggravated assault, you start at a base offense

12   level of 14.  So we are already higher than where we just

13   started.  Then if the assault involved more than minimal

14   planning, it could go up by more than 2 levels, that is not

15   involved.  And if there was a firearm or dangerous weapon it

16   would go up by 3 more.  That is not involved.

17        If there was bodily injury to the victim, you would

18   increase it, according to the seriousness of the injury.  The

19   presentence report, which advocates using this guideline would

20   also vote for the 3-level enhancement here, because an officer

21   who was part of the line got sprayed by another rioter during

22   the course of the resistance in which the defendant

23   participated in which the evidence established she

24   significantly organized and encouraged and the officer was

25   injured.  But I don't agree that the defendant should be held

1    responsible for guidelines purposes for significant, even if

2    foreseeable escalation of the nature of the resistance

3    committed by an unknown third party as opposed to a

4    coconspirator.  So even if this base offense level is where we

5    go and this guideline applies, I am not going to enhance it in

6    that manner.  Indeed, the guideline definition of relevant

7    conduct, section 1B1.3A1A says the relevant conduct is absent

8    omissions committed or willfully caused by the defendant that

9    occurred during the commission of the offense.  So I don't

10   believe that the bodily injury enhancement is appropriate in

11   this case, no matter which guideline we are utilizing.

12         That means if you go back to the calculation under

13   the aggravated assault guideline, we are still at level 14.

14   But you can then look at victim related enhancements and under

15   section 3A1.2, 6 levels can be added because this is an

16   official victim.  That provision says if the victim was a

17   government officer or an employee and the offensive conviction

18   was motivated by that status, you can go up 3 more levels.

19   Those two certainly apply.  And then section B of that

20   guideline says if those apply and the applicable chapter 2

21   guideline is from chapter 2, part A, offenses against the

22   person, you get to increase it by 6 levels.  And those are also

23   true in this case.

24         However, the application note says don't apply this

25   adjustment if the guideline has already specifically

1   incorporated this factor, meaning the fact that the victim was

2   a federal officer.  Well, the only offense guideline in chapter

3   2 that specifically incorporates that factor is the lower

4   guideline for impeding officers under section 2A2.4, which

5   means that you can use this increase if you are under section

6   2A.2 for aggravated assault, which is already 14 to begin with.

7   And you get up to level 20 now, putting aside the question of

8   the enhancement for obstruction of justice for a moment.

9   Because that would apply or not apply no matter which offense

10  level we are using.

11          So that is a significant disparity for the same

12  conduct against federal officers.  And it is an anomaly that I

13  keep suggesting the Sentencing Commission needs to address.

14  And when I get to the application of the statutory factors in

15  my discretion, it would supply a permissible basis to vary from

16  the guideline, as the Court can do in the event of a policy

17  disagreement with the guidelines under *Kimbrough versus United*

18  *States*, 552 US 85.  It also falls within the sort of reasons

19  set out in *Rita versus United States*, 551 US 338 for rejecting

20  guideline sentences because this one would conflict with the

21  admonition in the sentencing statute to avoid unwarranted

22  disparities between sentences imposed on defendants who have

23  been convicted of similar offenses.

24          The official victim provision goes on.  And it has

25  further enhancements, if in a manner creating a substantial

1    risk of serious bodily injury, the person was a law enforcement

2    officer, and that would be another reason to enhance by 6

3    points.  But here we have the law enforcement officer.  I am

4    not sure we have the significant risk of serious bodily injury

5    by the defendant or by someone whose conduct she is accountable

6    for.  So I wouldn't impose the 6 level enhancement for that

7    reason.  But even if you start with the 14 and you add the 6,

8    you end up with a 7-level disparity between the base offense

9    level for obstructing officers and the base offense level for

10   aggravated assault.  And I think it is interesting to point

11   out, that if you looked at the base level for just plain old

12   assault, not aggravated under section 2A2.3 and involved

13   physical contact, that would get you to level 7; and if you

14   added 6 levels for the official victim, you would be at level

15   13, which is still 7 levels less than the aggravated assault

16   guideline.  So the question is, does the aggravated assault

17   guideline apply?  The government says, yes; pretrial service --

18   I mean, the probation office says, yes.

19          The definition of aggravated assault in the guideline

20   is a felonious assault that involved, A, a dangerous weapon

21   with intent to cause bodied injury; B, serious bodily injury;

22   C, strangling, suffocating or attempting to strangle or

23   suffocate; or, D, an attempt to commit another felony.

24   Clearly, neither A, B nor C apply.

25          And before we get to the question of intent to commit

1    another felony, I have to say that I find it odd to be calling

2    this an aggravated assault when the government took the assault

3    part of the charge off the table and only asked the defendant

4    to -- the jury to convict the defendant of resisting or

5    impeding officers.

6             And this is a unique situation in every other case

7    that I have dealt with, the act of the defendant at least

8    constituted an assault.  There was a punch or something much

9    worse.  So the question I have for the government is, why are

10   we talking about aggravated assault if you disclaimed any

11   notion that it was an assault at all?

12            MR. GORDON:  Your Honor, would you prefer I address

13   this from the table?

14            THE COURT:  I think you should probably come up for

15   the court reporter's benefit.

16            MR. GORDON:  Your Honor, I certainly understand your

17   question.  But I think that it is a little bit of an apples to

18   oranges comparison.  The statute 111 has the six different

19   verbs of which assault is one of them.  There is no special

20   verdict or distinction for the jury in --

21            THE COURT:  But we didn't present them all to the

22   jury.  If we presented them all to the jury, that is a good

23   argument.  Why is it a good argument in this case where you

24   took that verb off the table yourself?

25            MR. GORDON:  It was purely, Your Honor, because the

1    defense objected to it as being something that would be

2    inflaming to the jury or would be somehow -- would be a problem

3    during the trial.  So the issue of -- for judicial economy, for

4    ease of the jury, to make the trial issues clear, for all of

5    those reasons, we took that verb off because we weren't seeking

6    it there.  We weren't arguing it there.

7            THE COURT:  But you made a strategic decision that

8    you are going to ask the jury to conclude, based on the

9    evidence in the record, that she had committed an assault.

10   Let's put aside whether this was an aggravated assault.

11           MR. GORDON:  Your Honor, we were asking the jury to

12   find that she had violated 111A.  And 111A does not distinguish

13   between --

14           THE COURT:  The jury instructions never had the word

15   assault in them.  You asked for that.

16           MR. GORDON:  Agreed, Your Honor.

17           THE COURT:  I mean, you didn't have to agree to it

18   just because the defense objected.  This was a government

19   decision about how to frame its case.  The instructions we gave

20   the jury said, she is charged with resisting, impeding or

21   obstructing.

22           MR. GORDON:  Yes, Your Honor.  She is charged with

23   violating 111A.

24           THE COURT:  Okay.

25           MR. GORDON:  So any 111 --

1          THE COURT:  So your reason why it could be an

2   aggravated assault is that 111 says assault, even if her

3   verdict didn't?

4          MR. GORDON:  Yes, Your Honor.  Because 111A, no

5   matter which verb a jury finds a defendant guilty of, this is

6   the guideline we go to.  It doesn't matter.

7          THE COURT:  111A, there are two guidelines you go to.

8   It has both.  You agree to that, don't you?

9          MR. GORDON:  Yes, Your Honor.  2A2.4 or 2A2.2.

10         THE COURT:  So it can only be an aggravated assault,

11  first of all, if you go there at all, but there are still other

12  requirements.  There is nothing in the guidelines that says you

13  always start here with a 111A conviction, is there?

14         MR. GORDON:  You were saying at 2A2.4?

15         THE COURT:  Correct.  The guidelines give you both as

16  a choice.

17         MR. GORDON:  Yes, Your Honor.  If you have a 111A

18  conviction --

19         THE COURT:  You go to either place.

20         MR. GORDON:  You can go to either place, but nowhere

21  else.

22         THE COURT:  Right.

23         MR. GORDON:  So our point being that, just as you

24  laid out, no matter what the jury found in 111A, our removal of

25  assault charge is immaterial.  The jury found her guilty of

1   111A.  That put us at 2A2.4 to begin with.  And then we look at

2   the factors to see if they qualify for 2A2.2.  The titles are

3   not determinative.  The titles of the section, assault,

4   aggravated assault.  That is not the issue.  You go to 2A2.2 or

5   2A2.4.  It is whether or not any of the four aggravators that

6   you just described are present.  We agree, A through C are not.

7          THE COURT:  All right.  I don't need to hear the rest

8   of the argument right now.  I really wanted you to answer that

9   question.  And I am not sure I am persuaded, but I appreciate

10  your attempt to answer the question.

11          MR. GORDON:  Yes, Your Honor.

12          THE COURT:  All right.  If I did use the guideline,

13  as the government is suggesting I should and the probation

14  officer thought I should, then the only thing that could make

15  what we are calling an assault, an aggravated assault is the

16  attempt to commit another felony.  The government says there is

17  evidence to support a finding by preponderance of the evidence

18  that she intended to commit the section 1512(c)(2), the

19  obstruction of the official proceeding, which is an offense

20  that could be an appropriate choice, except we have the problem

21  that the jury hung on that count.

22          The government says I can find the appropriate intent

23  to commit another felony in the evidence that supported the

24  conviction on Count 5, entering and remaining in a restricted

25  building or grounds in violation of section 1752(a)(1), which

1    is a misdemeanor.  But it notes in another case, Former Chief

2    Judge Howell extrapolated an intent to commit obstruction from

3    the facts underlying the 1752 count.  But if you look closely

4    at what she was doing, she was applying the enhancement for

5    obstruction of justice under section 2J1.2A.  She was not

6    dealing with the aggravated assault guideline.  And she didn't

7    begin to answer the question we have before us.

8         We do, as I will point out when we get to the nature

9    and circumstances of the offense, have sufficient evidence in

10   the record to support a finding by a preponderance of the

11   evidence that the defendant had the intent to obstruct the

12   certification of the electoral vote, at the very least at the

13   time she climbed up into the Capitol Building and as far as I

14   am concerned earlier.  And I know that the guidelines permit

15   findings based on conduct that didn't result in a conviction.

16   And here we don't even have an acquittal, we just have a hung

17   jury.  But out of a sense of fairness and respect to the jurors

18   who were told over and over again they were the sole judges of

19   the facts, I am not going to reach that question and I don't

20   have to.  The defendant was convicted by a unanimous jury of

21   another felony beyond a reasonable doubt, the civil disorder

22   offense.

23        I am well aware that I have raised questions before

24   about whether that offense which involves the same conduct,

25   impeding officers, could properly qualify as another offense

1    intended at the time for purposes of this guideline.  It is yet

2    another aspect of the sentencing guidelines regarding

3    assaulting officers that warrant close attention.  Other courts

4    in this District though have looked at this through the lens at

5    what the elements are, a *Blockburger*-type analysis as opposed

6    to the facts or conduct underlying the offense.  And this is

7    consistent with the categorical approach the Supreme Court

8    tends to require courts to use when looking at other sentencing

9    enhancements, particularly in the determination of what a

10   violent offense is.

11           In *United States versus Creek,* 21-645 the Court found

12   that the aggravated assault guideline was the appropriate

13   guideline, because the conduct the defendant was convicted of

14   constituted an aggravated assault, which is defined as a

15   felonious assault that involved an intent to commit another

16   felony, in this case, obstructing, impeding or interfering with

17   a law enforcement officer during a civil disorder in violation

18   of section 231.  They are distinct felonies with distinct

19   elements.  And, therefore, she found it was appropriate for it

20   to be a cross-reference.  And other courts have done the same.

21   She pointed to *United States versus Languerand*, 21-353.  And

22   she also pointed to a sentencing of mine in *Leffingwell.*  To

23   the extent she relied on *Leffingwell,* that was not accurate,

24   because I didn't decide that issue in that case.  The parties

25   had agreed to the cross-reference.

1          But for the reasons the Court set out in Creek, I

2    think the application of the aggravated assault guideline could

3    be legally supportable.  But in an abundance of caution and

4    given the rule of lenity and given the unique circumstance we

5    have here that the section 111 conviction was not for assault

6    at all, the government took it off the table, did not ask the

7    jury to find that the defendant had committed an assault, the

8    jury was not instructed to find that the defendant had

9    committed an assault, I find that the appropriate calculation

10   in this case starts at section 2A.24, obstructing and impeding

11   officers.  I am not reaching the question of whether the civil

12   disorder felony can be the other felony for purposes of the

13   guidelines provision in all cases this time either.  The

14   Sentencing Commission should actually tell us whether this is

15   an elements-based determination or a conduct-based

16   determination.

17          And when I get to a case where I have to decide it, I

18   will decide it.  I think Judge Friedrich's reasoning was sound.

19   But I haven't decided it.  The impeding officer guideline was

20   more appropriate in this case for reasons that are unique to

21   this case.  There was no underlying assault to start with.  But

22   in order to fulfill my statutory duty to avoid unwarranted

23   sentencing disparities among defendants with similar records

24   who have been found guilty of similar conduct, I think it is

25   necessary to at least calculate for the record under both

1    scenarios and take both into account when I am thinking about

2    what the appropriate sentence should be in my exercise of

3    discretion under the statute.

4           The base offense level that I believe applies is

5    section 2A2.4(a).  We start at a level 10.  I believe that is

6    increased by 3 levels under section 2A2.4(b)(1) because the

7    offense involved physical contact.  There was definitely

8    physical contact with the officers as the team at the

9    defendant's direction pushed against them.

10          And she also initial personally pushed back herself,

11   but realized that was ineffective and that was why she exhorted

12   others to do it with her.

13          Also there is the question of whether this should be

14   adjusted upward for obstruction of justice under section 3C1.1.

15   The presentence report said the defendant willfully obstructed

16   or impeded or attempted to obstruct or impede the

17   administration of justice with respect to the investigation,

18   prosecution or sentencing of the incident offense.  And the

19   obstructive conduct related to her offense of conviction.  And

20   it specifically points out that immediately after January 6,

21   she deleted chats on a number of platforms, including Discord.

22   She directed others to delete their chats.  She used software

23   to wipe the contents of her computer.  She asked individuals to

24   take down videos of her.  And she got a factory reset of her

25   cell phone.

1      While some of this may well have coincided with a
2  legitimate need to escape the efforts of a stalking individual,
3  that doesn't account for the particular focus of the deletions,
4  the sophisticated and effective nature of the deletions, wiping
5  her computer six times, the instructions to others to delete
6  their chats with her or her efforts to flee as she was about to
7  be arrested.  It is also not consistent with the discussion she
8  had with her own father immediately after January 6 where she
9  said she was scared.  And he texted back, "What are you getting
10  scared about?"

11      And she said, "People getting arrested for being in
12  the Capitol."

13      And he says, "I know, just lay low.  Don't tell
14  anybody else.  If I have to, I will hide you here in Virginia
15  or at Tom's house."

16      "Thanks, Dad.  I deleted all my social media and
17  photos and got a new phone and a new number."

18      And he says, "If you get arrested, I will do
19  everything I can to get you out."  And then he says, "Good for
20  you, smart thinking."

21      So I find by a preponderance of the evidence
22  introduced at trial that the obstruction of justice enhancement
23  applies.  This bring us to a total offense level of 15.  She
24  has no adult or juvenile convictions.  That puts her in
25  criminal history category Roman numeral I.  That would

1    recommend an advisory sentencing guideline range of 18 to 24

2    months.  If you start, however, with the aggravated assault

3    guideline section 2A2.2, you start at level 14.  Under section

4    3A1.2, there a 6 level enhancement for official victim.  There

5    would be another 2 level enhancement under section 3C1.1 for

6    obstruction of the administration of justice.  That brings you

7    to a level of 22.

8            At criminal history category 1, the guidelines would

9    recommend a sentence in the range of 41 to 51 months.  There is

10   a 2-year difference at the low end and the high end, depending

11   on where you start.  I think that is very striking.  There are

12   no motions in this case for a downward departure.  So at this

13   point, we have calculated the guidelines.  And the question is

14   now, how should I apply the provisions of the sentencing

15   statute to this case?

16           Would the government like an opportunity to speak

17   regarding the appropriate sentence in this case?

18           MR. GORDON:  We would, Your Honor.  But there is an

19   unresolved government objection on Count 5.

20           THE COURT:  I'm sorry.

21           MR. GORDON:  There is an unresolved government

22   objection on the calculation for Count 5.

23           May I address that, Your Honor?

24           THE COURT:  Count 5?

25           MR. GORDON:  Yes, Your Honor.

1          THE COURT:  Don't 5 and 6 then, since either way they

2    end up being less than 1 and 3, don't the guidelines for 1 and

3    3 control?

4          MR. GORDON:  They would not, Your Honor, if you grant

5    the government's objection.  And if you counted the guideline

6    this way, in fact, the group containing 5 and 6 would have the

7    highest guideline level.

8          THE COURT:  But they are only a maximum of 12 months.

9          MR. GORDON:  Even though the sentences -- the

10   guideline level would not be.  So what would happen is

11   guideline calculation would still be at level 27, but the

12   maximum sentence would push the possible sentence lower.  That

13   doesn't change the guideline calculation.  So her guidelines

14   would still be --

15         THE COURT:  But when you calculate the guidelines,

16   you then cap the guidelines at the cap for the offense.  And so

17   if you group 5 and 6, no matter if they came up to, you know,

18   99 at the high end, you would still have to cap it at 12.  How

19   does this help you?

20         MR. GORDON:  We believe, Your Honor, the guideline

21   level coming out of that is still 27.

22         THE COURT:  Right.

23         MR. GORDON:  Because of how --

24         I understand the --

25         THE COURT:  No.  They don't just say the -- they then

1    always roll the top end of the guideline back to the maximum

2    under the statute which is what they did here with 1 and 3

3    also.

4              MR. GORDON:  It is not the ultimate prison term, Your

5    Honor.  That is -- we understand each other, but I think that

6    the impact --

7              THE COURT:  But that is what the probation office

8    does every time when they -- so tell me why -- tell me how it

9    is appropriate that we have got a guideline calculation for two

10   misdemeanors now that ends up at a level 27.  You can tell me

11   your theory about that.

12             MR. GORDON:  Yes, Your Honor.  So the trespass

13   offense essentially, calling it a trespass.  That is not the --

14   colloquially, that is not the actual offense.  The entering and

15   remaining, 1752(a)(1), has the cross-reference based

16   essentially on motivation, intent.  Why it is a -- if the

17   trespass -- if the entering or remaining was for the purpose of

18   the committing another felony, then the cross-reference says go

19   to what the guideline for that other felony would be.  As you

20   pointed out earlier in this proceeding, it doesn't matter

21   whether it is charged conduct, let alone convicted conduct for

22   calculating the guideline.  So --

23             THE COURT:  So the other felony for you is the

24   obstructing official proceeding.

25             MR. GORDON:  And the two could be applied.  It is

1    both.

2            THE COURT:  So we bulk up the misdemeanor maximum

3    sentencing guideline based on the felony, on which the jury

4    hung, to get to 27.  But then you could not possibly for those

5    offenses impose a sentence that high.

6            MR. GORDON:  Or the 231, either one.  Because both of

7    them serve as the reason why she entered the Capitol, further

8    the civil disorder or to obstruct Congress.  So, yes, both the

9    one that the jury hung on and the one the jury convicted on,

10   either one.  I recognize this is, to some degree, purely

11   academic.  But just for following procedure, it may end up

12   being the difference between whether you are imposing a

13   guideline sentence or a downward variance, from a technical

14   standpoint, I think you have to resolve the question of whether

15   the cross-reference applies on Count 5.  If it does, what the

16   impact of that is and then what the resulting guidelines range

17   is, even if it doesn't change your ultimate sentence as a step

18   by step statutory application of the sentencing procedure, I

19   think we have to do that.

20           THE COURT:  All right.  I may have to rule on that

21   after the break, because I was not prepared to rule on it now,

22   given the way I thought the guideline groupings worked and how

23   everybody agreed the guideline groupings worked.

24           Ms. Ulrich, do you want to be heard on this very

25   briefly?

1          MS. ULRICH:  I don't, Your Honor.  Because the Court

2   has already ruled you are not using the abstraction.  So it is

3   all kind of circular, going back to that.  The Court has ruled

4   with everything you have found today.  So I don't think I need

5   to.

6          THE COURT:  All right.  Okay.  So now, putting that

7   aside, and I will make sure that I rule for the record on this,

8   before I start, when I come back I would like to hear the

9   government's allocution concerning the appropriate sentence in

10  this case, applying all of the statutory factors.  I don't know

11  which one of you is teed up to do that, but this is your

12  opportunity.

13         MR. DALKE:  Good morning, Your Honor.  Sam Dalke on

14  behalf of the United States.

15         The hour between 2:00 and 3:00 on January 6, 2021 is

16  perhaps the blackest hour on one of the darkest days of the

17  nation's history.

18         THE COURT:  Mr. Dalke, I need you to act like the

19  microphone is there for you.

20         Okay.  If you could just step a little closer to it.

21  Thank you.

22         MR. DALKE:  It was in that horrific hour that Riley

23  Williams organized and led an army of violent rioters through

24  the United States Capitol.  She was squarely in the middle of

25  that chaos, the eye of the hurricane, gleefully directing

1   monstrous violence around her.

2         We are not going to play any video today.  The Court

3   has seen it over a week and a half of trial.  But it is

4   chilling when I rewatched that video in preparation for today.

5   It is chilling because she operated deftly.  She operated

6   calmly, with focus.  She wasn't lost.  She helped overtake and

7   then keep hold of the Capitol.  Where others turned back, where

8   others were deterred by barricades, by gas, by officers, by

9   warnings, by doors, by violence, Riley Williams never

10  hesitated.

11        She fought through the tear gas.  She climbed over

12  the walls to invade and then occupy the Capitol.  She organized

13  and commanded rioters.  She berated police verbally and then

14  attacked them physically.  She stole and helped others steal

15  items.  She refused to leave.  She forcibly resisted.

16  Everywhere Riley Williams went on January 6, for 90 minutes

17  inside the Capitol, as well as time outside the Capitol,

18  everywhere she went, every minute she was there, she dialed up

19  the mayhem.  She made the situation worse.

20        But Riley Williams was more than just an accelerant.

21  What is most unsettling is how Riley Williams leveraged and

22  used the mob as a weapon.  She actively sought out rioters with

23  battle gear.  She pushed them forward.  She directed and

24  mobilized others to breach, to resist.  She acted as a rudder

25  to a seemingly rudderless craft.

1    As the Court has heard and has previously been argued

2    by the government, the real danger in the January 6 mob that

3    day, the real danger was in the numbers.  It was in the crush

4    of people overwhelming the police.  And that danger was made

5    doubly dangerous when Riley Williams used that mob as a human

6    battering-ram.  It is true she didn't bring a weapon, but she

7    made her own.  She didn't bring tactical gear, but she found

8    those who did.  And in the government's estimation, that makes

9    her among the worst of the January 6 rioters, among the most

10   culpable.  And that is why a substantial upward variance is

11   appropriate in this case.

12       But as the Court is well versed in both January 6 and

13   the facts of the specific case, I want to take the remaining

14   time to focus on four points.  The first is the wholesale lack

15   of remorse and lack of accountability by the defendant for

16   anything she has done, full stop.

17       Second, as already outlined by the Court -- and I

18   will be brief on this one, are her efforts, fairly extensive

19   efforts to obstruct the FBI investigation.

20       Third, are the comparable cases in this matter.

21       And fourth and finally would be the history and

22   characteristics of this defendant.

23       I want to start with the lack of remorse.  Because it

24   is perhaps the most stunning.  It is stunning because to this

25   day, over two years after the offense, Riley Williams hasn't

1    shown a single iota of remorse, of repentance.  To this day she

2    denies responsibility.  To this day, she won't accept

3    accountability for what she did and what she did alone.

4         Instead, Riley Williams attempts to minimize her

5    conduct, tries to chalk up her heinous crimes as some sort of

6    youthful or obnoxious disobedience.  Instead of taking

7    accountability, Riley Williams repeatedly blames others.  She

8    blames her former stalking boyfriend.  She blames the people

9    snitching on her.  She blames other rioters for being more

10   violent, other rioters for taking the laptop.  She blames the

11   government for twisting her role.  She blames her friends for

12   testifying against her.  She blames the President and

13   politicians for urging the crowd to the Capitol.  She blames

14   her family for not being more supportive, for her troubled

15   childhood, for not being better role models.  She literally

16   blames everyone and anyone to escape personal accountability.

17        This is about what Riley Williams did on January 6.

18   The buck has to stop somewhere.  At some point, she has to be

19   held accountable.  And, Your Honor, that is today.

20        I submit, that the record suggests actually that

21   Riley Williams might be incapable of remorse.  And, instead,

22   remains proud, openly proud of her actions in the hours after

23   January 6, she reveled, celebrated online in the violence and

24   terror that she caused.  She bragged about her good tactic of

25   recruiting armed men to breach police lines.  She crowed about

her trophies like the gavel and the laptop.  She narrated her involvement in explicit and exacting detail accompanied by her own personal videos of the events.  She even went so far as to bemoan that the siege hadn't gone further and discussed about coming back to the Capitol on January 20th to continue the fight.

I don't know what Riley Williams is going to say today.  But this is what she previously stated and I quote:  "I have been told what I did was wrong by everyone.  But in my heart and soul, I know what we did was patriotic and was right. And anyone who says otherwise should be condemned."

There is nothing patriotic about what Riley Williams did on January 6.  She participated in domestic terrorism, plain and simple.  And I think for these reasons, specific deterrence is a very real factor in this case.

I do want to touch next on efforts to obstruct by Riley Williams.  While she was celebrating and applauding her return to the Capitol on January 20th, Riley Williams also started to realize that she could be in trouble.  And three hours after she was in the Speaker's Office urging the others with the laptop and the rest, Riley Williams stated, I -- quote, "I heard the FBI is looking for who is in her office." Three hours -- three and a half hours after literally being in one of the most sensitive and hallowed spaces in this country, she knows she is being looked for or expected.  And each and

1    every day thereafter for almost two weeks, she took affirmative
2    actions to destroy or hide evidence.  And the Court has already
3    outlined some of it.  But she deleted Telegram chats, deleted
4    Snapchat, deleted Discord, told others, instructed others to
5    delete things as well.  It is not just her.
6            She used commercial grade software to wipe her
7    computer six times, six times, completely wipe it, so that a
8    forensic examiner from the FBI can't find anything but bread
9    crumbs.  There is nothing on there.
10           She deleted her boyfriend's accounts and his
11   messages.  She factory reset her phone.  She gained a new phone
12   and account.  She contacted people online to take down photos
13   and videos of her in the Capitol.  She used the IP blocker.
14   She removed her SIM card.  She packed up her car and she left.
15           And the Court has already quoted it, so I won't do it
16   again.  But it wasn't just her father that she told about, I am
17   deleting the stuff because I am scared.  She told her friend
18   online that it was -- she is worried about the incriminating
19   evidence of me at the Capitol.  To the extent there is an
20   argument made that she was worried about the stalker boyfriend,
21   it is because he was also supplying information about her being
22   in the Capitol.  That is what she was worried about, being
23   caught.  That is what she is deleting.  She deleted --
24           You know, and this is what is wild about this case.
25   The Court has heard the week and a half of testimony and seen

1   exhibit after exhibit, text message, Discord chat.  That is the

2   stuff she didn't delete.  That is the stuff she didn't find

3   incriminating or couldn't get to.

4        I would submit we only got a little bit of what she

5   did or what she knew, what she talked about on January 6,

6   because of this extensive, calculated, tech-savvy efforts to

7   essentially wipe everything she could about January 6.  And

8   those obstruction efforts were successful.  Computer, the

9   phone, the Snapchat, the Telegram, completely gone.

10        The third point I want to touch on is the comparable

11  cases.  The defense points this Court to five cases as being

12  most analogous.  They all involve 231 conduct.  And I want to

13  be clear on this and the way the government views this case.

14  To sentence Riley Williams on a one off 231 or even one off

15  111, is not sufficient.  That doesn't encapsulate what she did

16  on January 6.  That doesn't encapsulate her conduct.  That

17  would be a miscarriage of justice.  None of the 231 cases, none

18  of those five that are cited by the defense.  None of them

19  involve trial conviction.  None of them involve wholesale lack

20  of remorse, lack of accountability.  None of them involve

21  obstruction of an FBI investigation.  None of them involve

22  coordinating and using the mob as a weapon.  None of them

23  involved leading and directing others through the Capitol.  And

24  most of them didn't even involve sensitive spaces or stealing

25  items or 90 minutes inside the Capitol, 90 minutes.

1          Riley Williams' extensive involvement and her unique
2      role in January 6 is closer to the government's comparison.
3      And we cite two of them.  And we do submit that the Jensen case
4      is the most on point.  And we do that because of his public
5      role on January 6, meaning directing others, riling up the mob,
6      pushing them forward, refusing to leave, acting like a ring
7      leader like Riley Williams.  We have even made the argument and
8      I think it is true that her conduct is worse than Jensen's.
9      The physical contact, the stealing, the destroying evidence,
10     the admitted conduct, wherever this court comes down, Riley
11     Williams is not a low end guidelines defendant.

12          THE COURT:  Remind me what the Jensen sentence was?

13          MR. DALKE:  Sixty-three months, Your Honor.

14          And the other comparable that we cited was Williams,
15     which was 60 months.

16          The final thing I want to touch on today are the
17     history and characteristics of the defendant and how it plays
18     into the sentence the Court is going to impose.

19          And the statute I think it is 3361 explicitly permits
20     consideration of this.  It is one of the factors the Court is
21     to consider.  My read on the defense arguments at trial and
22     more appropriately the sentencing memo is the defense wants to
23     portray Riley Williams as an impulsive Gen-Z gadfly, swept up
24     in the chaos, who had no impact on anything, who somehow was
25     incapable of comprehending her own role and major role in the

1    insurrection.  And that is simply not the case.  Riley Williams

2    is not the Forrest Gump of January 6.  She did not unwittingly

3    find herself immersed in some of the most critical events of

4    the day by happenstance.  Again and again, Riley Williams

5    forced her way forward.  She made deliberate and affirmative

6    choices.  It is no accident that Riley Williams found herself

7    at the front of the mob at the crypt and memorial door areas.

8    Literally hundreds of rioters streaming in after her.

9            They are all filing into the crypt.  The officers are

10   blockading, doing the best they can to stop the mob from moving

11   forward.  And at the moment when the gas is coming through and

12   the rioters are headed back into the crypt, retreating maybe

13   for the first time since entering into the Capitol -- first

14   time that I am aware of.  At that point, Riley Williams took

15   the helm and led the mob to the Speaker's Office and then

16   helped ransack it.  She didn't find the speaker, who

17   coincidentally, she had fantasized about killing before

18   January 6.  But she did find the Speaker's laptop and ordered

19   others to take it.

20           The trial contains substantial evidence of why Riley

21   Williams breached the Capitol; right?  Why she was so

22   determined and focused on January 6.  The evidence was that she

23   was obsessed with the idea the election was stolen.  She knew

24   that January 6 was about certification of votes.  She wanted to

25   stop Congress from completing the certification.  And she hated

1    both the Speaker and Vice President who were transferring power

2    to the new administration.

3              There is evidence that she was an ardent follower of

4    the Groypers and the Nick Fuentes movement, along with other

5    extremist alt-right movements.  But now, again, the defendant

6    in her re-invention of who she is, is claiming that she has

7    since found religion, notwithstanding that all of her texts are

8    littered with religious passages.  This is not new.  She is

9    claiming she has found religion.  She wants to go live a

10   pastoral lifestyle and she is innocent and this is just not

11   her.

12             But the evidence at trial from the testimony, from

13   the social media, from the phone, right, just the little bit

14   that she didn't delete, including her own statements to others,

15   about where her heart and her soul, it shows that Riley

16   Williams had a deep seated mindset, which influenced her

17   conduct on January 6, but also extends well beyond the days and

18   weeks surrounding January 6.  It is is not something isolated.

19             There is a troubling pattern here.  And it is in the

20   PSR.  I don't think it was one of the paragraphs that the Court

21   has stricken relating to other uncharged criminal conduct,

22   other heinous acts.  This might be the first time that Riley

23   Williams is standing before Your Honor or any court and being

24   sentenced, but that doesn't put her at, she hasn't committed

25   other issues.  For the first time in her life, Riley Williams

1    is facing consequences.  There is no question her conduct was a
2    direct and serious assault on the rule of law and on the
3    peaceful transfer of power.  There is also no question that she
4    played a major and public role in the insurrection and in the
5    chaos on January 6.  There is a clear message that needs to be
6    sent today to Riley Williams and to the public:  Don't do this
7    again.  Because if you do, the police, the prosecutors and the
8    judges, aren't going to stand by.  That her actions, that the
9    actions of anyone who comes into this city, into our Capitol
10   and defiles it, that has consequences.

11           I am not from DC.  I am from Pennsylvania.  I
12   dutifully drive down here, month after month to see Your Honor
13   for trial, for sentencing, for hearings.  I can't drive to DC
14   and not be struck by what the city represents, what that
15   Capitol represents and what happens there.  And I am horrified
16   what happened there, what Riley Williams did there on
17   January 6.

18           Your Honor, in this case based on the totality of the
19   conduct, an upward sentencing variance is recommended.  It is
20   appropriate.  It is justified.  And, Your Honor, Riley Williams
21   should go to jail for at least 5 years.  And the government
22   would urge the top of the guidelines, even under the aggravated
23   assault analysis of the 71 months.  That is what is
24   appropriate.

25           Thank you, Your Honor.

1          THE COURT:  All right.  Thank you, Mr. Dalke.

2          Ms. Ulrich.

3          MS. ULRICH:  Thank you.

4          Good morning, again.  The government has spent all of

5    their energy on who Riley Williams was on January 6 of 2021.

6    She has shown no remorse, they say.  She claims she is

7    innocent.  Well, are they saying that because she didn't admit

8    to taking the computer to them?  Are they saying that because

9    she didn't come in here and say, yeah, I went there to obstruct

10   justice?

11         It seems over the last two years she has been

12   punished every day of this last two years, because of what she

13   did on January 6.  And she took a trial.  And in that trial,

14   they hung on the two counts that we really argued.  So if she

15   hasn't shown remorse because she never admitted to stealing the

16   computer, it is because she didn't steal the computer.  And

17   that is not who she is today.  That woman, that girl on

18   January 6, is not that woman of today.  A lot has transpired

19   since January 6 of 2021 and today.

20         We have all seen a lot of video evidence.  We have

21   seen a lot of phone messages.  We have seen a lot.  And we know

22   more now than we know on January 6 of 2021.  Riley Williams

23   started out as the thief, the women who stole Pelosi's

24   computer.  That is who she was.  She started out as this person

25   who bragged about what a great day it was and that she had

1    stolen the computer and that she had stolen the gavels.  And

2    the government argues that all of these rants were that she was

3    an organizer and a leader of January 6 of 2021.

4            But what do we now know?  People didn't go up the

5    steps in the Capitol because she told them to.  People didn't

6    push against the police because she told them to.  Men in

7    tactical gear didn't go to the front lines because she told

8    them to.  And she didn't steal the computer and sell it to the

9    Russians.  These things would have happened that day despite

10   Riley Williams.  And the government knows that.

11           And they now know the answers to a lot of those

12   questions.  And I want to talk about role models, role models

13   that Ms. Williams had been following.  I think one of the

14   things Mr. Dalke just said.  She had this deep-seated mindset

15   that the election was stolen.  Well, Riley Williams didn't come

16   up with that on her own.  It was role models, people --

17   influential people that manipulated that message.  She is

18   indeed a defendant.  But she is also a follower, a follower who

19   was fooled and tricked into believing there was a huge

20   conspiracy to remove Trump from office.  She was being played

21   and manipulated by people at the highest levels of the

22   government, people in a position of trust.  She was just 22

23   years old, young and impressionable and was being bombarded

24   with this false narrative.  She was made to believe that if she

25   didn't act, all would be lost.

1          So who are these people -- who were and still are,

2     frankly, these people manipulating that message, then-President

3     Trump.  And I am not going to play the 52-second speech,

4     because the Court has suggested I not.  But at the end of his

5     speech on January 6, he told his followers to go to the

6     Capitol.  He is a grown man, a former president, a 2024

7     presidential candidate who to this day still claims the

8     election was stolen.

9          He invited Nick Fuentes to have lunch with him at

10    Mar-a-Lago.  Yet, Mr. Trump currently is still a free man,

11    wining and dining with no repercussions.  He wasn't the one

12    that was prohibited from social media.  He wasn't the one that

13    has been in home detention for two years.  He wasn't the one

14    who has been in jail in solitary confinement.  He didn't go in

15    there, but his fingerprints are all over this.

16         Another role model, Nick Fuentes.  Obviously, he got

17    rich over the message that the election was stolen.  He put it

18    out time and time again.  And he had a following.  And Riley

19    Williams was one of those followers.  She didn't come up with

20    the idea.  She followed these adult, grown men, men with power

21    and influence, men that continue to walk free today and still

22    say that election was stolen.  Her own representative at the

23    time Scott Perry is still claiming the election was stolen.  In

24    fact, I am going to pull up Exhibit 206, if I could.  This was

25    her representative at the time.  Right there, he is in front of

1    the Harrisburg Capitol, right behind him, all of of these Stop

2    the Steal signs.  So you can take that down.

3           Young adults look up to these people.  She had just

4    turned 22 on January 6, 2021.  But and even in -- when I am

5    talking about these are role models at the highest level,

6    people who have all of this power and influence.  And who are

7    we to tell Riley -- Ms. Williams, no, these are not good role

8    models.  Because as parents, that is what we do.  We like to

9    inform our children.  We like to mold them, so they don't

10   follow role models like them.  But she had other role models.

11   And those role models were at home, those closest to her.  And,

12   unfortunately, they were her parents.  And, you know, you saw

13   some of the tweets, here it is.  And I know her father is in

14   the courtroom.  But, you know, she went to the rally with her

15   father and his adult friends.  Those were her role models that

16   were closest to her.  So she had these very powerful,

17   influential men who are putting the message out.  They are

18   manipulating the message that the election was stolen, down to

19   the very people in her household.  And yet --

20           THE COURT:  They didn't go in.

21           MS. ULRICH:  But they did.  They did go in.  Their

22   fingerprints are all over this.  When the government says that

23   she was an accelerant, that she was this leader and that she

24   was this organizer, she was the eye of the hurricane, no.  They

25   should be pointing at these people, these role models, like

1    then-President Trump, like Nick Fuentes, like Scott Perry.

2    These are free men that are still out there stirring this pot

3    and telling everybody the election was stolen.  So why would we

4    expect a young woman who just turned 22 to do something

5    different, when she doesn't even have the role models in her

6    home telling her, this isn't right.

7            That is what we do with our children.  We are telling

8    our children, these messages are not right.  The election was

9    not stolen.  These people are crazy.  She didn't have that.

10   She didn't have the guidance at home to counteract the

11   influence of the outside world and to counteract the messages

12   from these powerful and very influential men.

13           Yes, so she followed these adults.  She followed the

14   so-called role models.  Yes, she adopted their views.  She

15   believed the election was stolen.  So the government says,

16   because she followed these powerful, influential men, let's

17   send her to jail for as long as we can.  We can't send them to

18   jail.  We can't get to them because they are very powerful and

19   rich people.  We can get her, a nobody because she doesn't have

20   millions of dollars.  Let's hold her accountable, but not the

21   individuals who really incited the whole incident.

22           In fact, I am going to -- this is the 16-second

23   speech that was more recent.  If I can pull up Exhibit 209, a

24   16-second Trump speech -- recent, who still --

25           (Video played.)

1          MS. ULRICH:  I don't believe that.  A lot of people

2   don't believe that.  But he is still out there putting out that

3   message and it is wrong.  It is wrong, but --

4          THE COURT:  What I am supposed to do about that in

5   the context of this sentencing?  If I said a word of what you

6   are saying, I would be completely overstepping my bounds as a

7   judicial officer.  So what do you want me to do with that in

8   the context of this sentencing?  I hear you, I understand what

9   you are saying.  Many people are saying what you are saying.

10   It is not up to me to say what you are saying or whether I

11   agree with it or don't agree with it.  The question is:  What

12   do you want me to do with it?

13          MS. ULRICH:  I think we are asking for a mitigated

14   sentence, Your Honor, 12 months and a day, because there -- and

15   I have other -- I mean, many -- not many, I don't want to be

16   here a long time.  But I think that is a very valid sentencing

17   factor under 3553A, the nature and circumstances of the offense

18   and her background.  And we are asking the Court to consider

19   that in imposing the mitigated sentence that we are asking for,

20   12 months and a day.

21          And I just want to put up this one Voltaire quote,

22   Exhibit 208, which I think very adequately addresses the

23   situation.  "Those who can make you believe absurdities, can

24   also make you commit atrocities."  I find that very apropos

25   today.

1          Now, the next part I want to talk about, because here
2    we are again today.  And I appreciate the Court has said that
3    you are not going to consider the evidence that she was not
4    convicted for.  But yet here again, the government got up in
5    their argument and claimed once again that she stole and helped
6    to steal Nancy Pelosi's laptop.  And they know today -- they
7    know -- they have known for over a year that she didn't steal
8    or help to steal the laptop.  The jury came back with a
9    question on that very point.  If her actions had no impact on
10   the theft of the computer, is she guilty?  And they came back
11   hung because her actions didn't have any impact on the theft of
12   the computer.

13         But I can't help believing that short of detention,
14   she got some of the most draconian conditions of pretrial
15   release, because she was the face of the theft of the computer.
16   I -- and I just think the record needs to be set straight
17   today.  She has been living in hell since January 6 of 2021,
18   because she made that fateful, awful decision to go into the
19   Capitol.  But it has been all of the more worse because of this
20   message that she stole and helped to steal that computer.  I am
21   not going to play the information that the Court saw at trial.

22         And, you know, five days after January 6, the
23   government had the Sidlo videos.  They had the CCTV videos.
24   They interviewed Rafael and Maryann Rondon in June of 2021.
25   And in those interviews, Maryann and Rafael Rondon told them

1    who took the computer.  It was -- in their description Boog

2    Boy.  At trial he was called Vibrating Hat Man.  We also called

3    him backpack guy.  That is the guy who took the computer.  And

4    I have not seen the government in any way, shape or form put

5    that out there.  Today they are still saying she stole and

6    helped to steal the computer.  And now I was going to play

7    these clips, but I know the Court didn't want to rehear things

8    from trial.  So I am not going to play them.

9          But those statements that Maryann and Rafael Rondon

10   made, they told the FBI in 2021 that Boog Boy, Backpack Guy

11   took the computer and they helped him take the computer.  When

12   the FBI showed them a video, her video, where she says take the

13   F'ing laptop, they are like, we don't know who she is.  I don't

14   remember who she is.  Yet that was in June of 2021.  And then

15   Agent Lund testified at the grand jury in September of 2021 and

16   said to the grand jury, they had no reason to believe that she

17   herself is the one that took the laptop nor any reason to

18   believe that she took the laptop or became in possession of the

19   laptop and then handed it to somebody that is Russian.

20         They filed their statement of the offense in the

21   Rondon's case, document 50.  And I am going to read it because

22   they don't even mention that Riley Williams had anything to do

23   with the theft of the computer in the Rondon case.  This was

24   their statement of the offense.  At approximately 2:33, Rondon

25   and Mooney-Rondon entered the Speaker of the House of

1    Representatives conference room, H230.  Therein, Rondon and

2    Mooney-Rondon assisted an unidentified male in the theft of the

3    laptop located on the conference room table.  Rondon assisted

4    in the theft by disconnecting cables from the laptop and

5    placing the laptop into a bag belonging to the unknown male.

6            So to make things --

7            THE COURT:  So we will not sentence her for taking

8    the laptop.

9            MS. ULRICH:  And I appreciate that.

10           THE COURT:  It is part of the circumstances of the

11   offense that she was thrilled with the notion that someone was

12   and that she at the very least encouraged him to do it.

13           MS. ULRICH:  Well --

14           THE COURT:  That is part of the record that is

15   undeniable also.  And when she was initially arrested and when

16   she was -- and conditions were imposed and she was not detained

17   one day, until she was convicted, the very first complaint had

18   all of the evidence in it about her shouting directions to

19   people to go upstairs and about her behavior in the rotunda and

20   about her attempts to flee and about the hiding of the

21   evidence.  And all of that, led the magistrate judge to impose

22   conditions on her release.  So I understand that the defense

23   has been frustrated by and chagrined by the connection of the

24   defendant to the laptop and it still is.  But it isn't what I

25   am going to sentence her for.  It isn't why she had conditions

1    of release.  There is a lot else going on at the same time.

2         And I appreciate your umbrage on her behalf about

3    this issue.  But given the severity and the serious nature of

4    the counts for which she was convicted, which were the

5    overarching focus of the entire calculation I just heard, I

6    just don't know what telling me one word about the Rondons and

7    the person you called all of those names has to do with my

8    sentence today.

9         MS. ULRICH:  And I understand that and that is fine.

10   I am going to do two more things.  I am not trying to aggravate

11   the court.  I am just trying to do my 3553A.  I wouldn't have

12   done it but for the government coming up today and saying she

13   stole and helped to steal the computer.  They didn't get up

14   here and say, she didn't steal the computer, but she encouraged

15   it.  They came up and said today, a couple of times, she stole

16   and helped to steal the computer.  So I am just going to -- I

17   am almost done with this part of my allocution or my argument.

18        I am pulling up Exhibit 200.  That is the man that

19   took the computer.  And you can see him coming out on the

20   picture in the right with a backpack where the computer is.

21        Can you take that down and pull up Exhibit 201.  And

22   that is Maryann and Rafael Rondon.

23        THE COURT:  Who didn't take it either.

24        MS. ULRICH:  They helped him take it, to which they

25   admitted to.

1       You can take it down.

2       Now you ask why am I even saying this?  Because this

3  is why I am saying it, because that is something that is going

4  to follow her for the rest of her life.  When she is 30 years

5  old and applying for a job and an employer Googles her name, it

6  is going to come up that she stole Pelosi's computer or she is

7  the woman accused of stealing Pelosi's computer.  That is a

8  life label that she will never shake.  When we Googled her

9  name, 600,000 hits came up when we Googled Riley Williams

10  laptop.  That is something she is never going to shake.  It is

11  a life label.  And it will never be taken back.  That is

12  punishment that will never end.  So I understand the Court's

13  point, but that is why we feel that it is something the Court

14  should consider as a mitigating factor.  That is a life

15  sentence.  That is a life label that will follow her.

16       Now, the government also said that she is for the

17  first time in life facing consequences.  And that is not true

18  either.  Because she has been punished since January 6 of 2021

19  for her actions.  First off, they spent a lot of time talking

20  about obstruction of justice and how she deleted her accounts.

21  And we are not denying that.  We know she did that.  And I am

22  not going to go into any detail.  The Court has our arguments.

23  But this stalker was sending nude photographs of her to her

24  employer, to her family.  He called her employer pretending to

25  be somebody else and said really awful things about her to her

1   employer.  And he accessed her phone and her accounts to reach

2   out to her contacts to get them to do the same thing.  So,

3   yeah, he was a witness and the government is trying to downplay

4   the stalker part of this, but he was -- he took the stuff off

5   her phone -- and very embarrassing things and sent them to her

6   employers and family and friends.  So while I understand the

7   Court gave her the enhancement for obstruction, there is that

8   aspect of it.  And I know the Court had -- we gave the Court

9   the exhibits, the call with Jonah Thompson.  That was all about

10  Jonah Thompson given -- stop talking to Prodanov.  He is like

11  out to get me.  We know that she had to file a PFA because he

12  was physically abusive.

13          And there is one other thing I wanted to say.  But

14  anyway -- and there was a police report as well that the Court

15  saw.  So, I mean, it wasn't all obstruction to run from this.

16  I am not denying it was in part, but she had this stalker who

17  is going after her in very personal ways.

18          And when the government says, you know, this is the

19  first time in her life she is facing consequences.  Well, when

20  I look back, in January 2021, she was placed on pretrial with

21  22 conditions.  She has been on in-home detention -- she was on

22  in-home detention for 22 months.  It was no ordinary home

23  detention.  She was subject to location monitoring.  She

24  couldn't have an iPad.  She couldn't have a smart phone.  She

25  couldn't have access to the internet.  She had to get a flip

1    phone.  So going from, 100 to zero -- and 100 because she was

2    on social media a lot before January 6 to zero, was not an easy

3    thing for her.  But for the most part, I think she did it

4    successfully.  And I think in the long run probably it helped

5    her.

6              But that was a very difficult 22 months.  You know,

7    all she could do was go to work.  We appreciated the few

8    instances the Court let her out.  But, otherwise, she was home

9    or she was at work.  And so that was not an easy 22 months.

10   That in and of itself was punishment.  After trial, of course,

11   the Court remanded her.  And so she has been in custody now for

12   four months.  But she has been in solitary confinement for four

13   months.  And not because she is a behavior problem at the

14   prison, it is simply because of her, quote, J6 status.

15             And so what does that mean?  What has that meant for

16   the last four months?  She gets out -- her time out -- they

17   wake her up at 2:00 in the morning.  And then she is allowed

18   out from 2:00 a.m. to 4:00 a.m.  They put her in another cell

19   with a TV and she is allowed to shower.  That is her time out

20   from 2:00 a.m. to 4:00 a.m.

21             THE COURT:  I just want to state for the record, that

22   number one, is it not up to the Court where she gets

23   designated.  Number two, it is not up to the Marshal Service or

24   the Court how she is housed when she is there.  But number

25   three, no one has brought this to my attention until this

1    second.

2              MS. ULRICH:  Well, I was hoping --

3              THE COURT:  I am just saying --

4              MS. ULRICH:  It is not the Court's fault.  I bring it

5    up --

6              THE COURT:  I assure you it would be --

7              MS. ULRICH:  I thought about it --

8              THE COURT:  -- proclaimed by others that it is.  And

9    I just want to make it clear that this is the first that I have

10   heard of it.

11             MS. ULRICH:  And I am bringing it up, because I think

12   that is a significant punishment.  It is cruel punishment for

13   four months.  And I think that is another factor that the Court

14   should consider in imposing the sentence, in mitigating the

15   sentence today.  So she has suffered, unlike the government

16   says, first time she faces consequences, that is not so.  She

17   has been labeled a thief, not an ordinary thief.  She has done

18   two years of very difficult home detention.  She has suffered

19   job losses, loss of relationships, loss of her liberty.  She

20   has suffered greatly since January 6.  So while the government

21   claims she is not remorseful, I don't believe that to be a

22   fact.  And you are going to be hearing from her momentarily.

23             The government has described her at a moment in time

24   and that is back in January of 2021, a young 22-year-old girl

25   that had no prior record -- no prior record, got caught up in

1    listening to powerful, influential men and did things that she

2    shouldn't have done.  And that is what brings her here today.

3    I am not going to reiterate everything that the Court has read

4    in the sentencing memos.  But we are asking the Court to impose

5    a sentence of 12 months and one day.

6              THE COURT:  All right.  Thank you.

7              Ms. Williams, this is your opportunity if there is

8    anything you would like to say, you can come and stand at the

9    lectern with your lawyer.

10             MS. ULRICH:  Do you mind if I stand here?

11             THE COURT:  I appreciate if you would.

12             THE DEFENDANT:  Thank you, Your Honor.

13             I want to first apologize to the Court, those working

14   at the Capitol and the police that had to deal with my behavior

15   on January 6.  I was disrespectful, hateful and angry at

16   innocent people who didn't deserve it.  It has been an

17   incredibly humbling and humiliating experience, rewatching one

18   of my lowest and most embarrassing moments on repeat for hours

19   in front of the public.  There is no justification or excuse

20   for my conduct inside the Capitol.  But what motivated me was

21   the acceptance of my peers and family and the impulse to follow

22   the crowd.

23             At my age, two years feels like a lifetime.  And I

24   barely recognize the young and stupid girl who is yelling at

25   police in those videos.  But today, Your Honor, I stand before

1    you, a responsible woman who admits she made a mistake.  Like

2    most people my age, I have been addicted to the internet since

3    before I can remember.  But after over two years without it and

4    all its noise, along with therapy and home confinement, I am on

5    the path to healing mentally and emotionally.

6              I am a different person who takes responsibility and

7    care for my actions.  I found peace in a quiet life.  And I

8    could never imagine myself repeating such behavior today.  I am

9    hopeful, motivated and excited for my future.  I am ready to

10   put all of this behind and finally start my life.

11             Thank you.

12             THE COURT:  All right.  Thank you.  What I am going

13   to do at this point is take a break to absorb everything I just

14   heard.

15             And, Mr. Gordon --

16             MR. GORDON:  I apologize, Your Honor.  I do have to

17   add one thing to the sentencing issue before you retire to make

18   sure it is clear.

19             THE COURT:  All right.

20             MR. GORDON:  So first, Your Honor, the PSR states at

21   paragraph 54 and the government agrees that all counts were --

22   so the group is not -- there is not two groups, one with Counts

23   1 and 3 and one with 5 and 6.  It is one group with Counts 1, 3

24   5 and 6.  What the PSR does in paragraph 52 is say 1 and 3

25   grouped together -- I'm sorry -- 53 says that.  And 54 says and

1    1 and 3 then group with 5 and 6.  So we have one big group.

2            From a technical standpoint, what has to happen then

3    is under the grouping analysis and the unit analysis, the

4    offense level -- the highest offense level in the group sets

5    the offense level for the whole group.  So if there is one

6    group that contains 1, 3, 5 and 6, and the offense level for 5

7    is 27, regardless of what the max sentence is, then the offense

8    level for the group is 27, which makes the total possible

9    prison term different for each of the counts in the group based

10   on the statutory maximums.

11           So for Count 1, because the statutory maximum is 5

12   years, regardless of what the offense level for the group is,

13   the maximum sentence for Count 1, within the group would be 60

14   months, et cetera down the line, whereas 5 and 6, you're right

15   have a stat max of 12 months.  It doesn't change the offense

16   level for the group.

17           THE COURT:  What is the cross-reference that makes

18   the misdemeanor offense level higher?  What are you

19   cross-referencing?

20           MR. GORDON:  So it is 2X1.1 is the -- well, backing

21   up.  It is 2B2.3(c)(1), is the misdemeanor that says go to the

22   cross-reference.  And that cross reference is 2X1.1.

23           THE COURT:  If you entered someplace you are not

24   supposed to enter with the intent to commit another felony?

25           MR. GORDON:  Yes, Your Honor.  So then applying -- so

1    that carries us back to the assault guidelines questions.  If

2    you apply --

3                THE COURT:  If you commit a felony or another felony?

4                MR. GORDON:  It says to commit a felony offense.

5                THE COURT:  All right.

6                MR. GORDON:  So what would shake out is it becomes

7    a --

8                THE COURT:  I understand how you are getting there.

9    I am not entirely sure this is how the presentence report did

10   it.  It is certainly not what I am remembering about how the

11   presentence report did it.  I will look at it.  I will

12   calculate it.  I will let you know after the break, where I

13   really didn't think I was going to be thinking about the

14   sentencing guidelines, what the answer to this question is.

15               MR. GORDON:  Thank you, Your Honor.

16               THE COURT:  And then what I'd like to do is to do

17   what I was about to do and take a break, and think about the

18   thing that I have to think about today, which is one of the

19   things that actually has been discussed the least, which is

20   what is the appropriate sentence for what we know the defendant

21   did and what she was convicted of.  And that is what I am going

22   to think about, applying all of the factors under 18 US Code

23   section 1353 in this break.  And then I will come back and I

24   will impose sentence and resolve the outstanding guidelines

25   issue.

1        Given that, I think it is not reasonable for me to

2    predict that I am going to be back in the usual 10 minutes.  I

3    would imagine that it is going to be longer than that.  So just

4    for everybody's convenience, I am going to say that we will

5    resume at 11:45.  Thank you.

6        (Recess taken.)

7        THE COURTROOM DEPUTY:  Your Honor, recalling criminal

8    case 21-618, the United States of America versus Riley June

9    Williams.  Ms. Williams is present in the courtroom represented

10   by Ms. Ulrich, Mr. Reish, Ms. Gaynor.  Government counsel in

11   the courtroom represented by Mr. Dalke and Mr. Gordon.

12   Probation officer is Officer Field.

13       THE COURT:  All right.  I am going to start with the

14   guidelines issue.  It is correct that in the presentence report

15   in paragraph 54, the probation office indicated that the

16   grouping of Counts and 1 and 3 get grouped with Counts 5 and 6

17   also.  But she said it was because they share a specific

18   offense characteristic and that is, quote, physical injury to a

19   person in order to obstruct the administration of justice.  So

20   one problem I have with that is that I found no physical injury

21   here.

22       Also, the presentence report did not compute the

23   guidelines for Count 5, which is where I derive the impression

24   that she concluded that that would have been lower than the

25   ones for 1 through 3.  But I respect the fact that the

1   government has brought this other calculation to my attention

2   and I should have dealt with it initially.

3          The government wants me to move from the trespass

4   guideline section 2B2.3 at (c)(1), which would produce a much

5   lower guideline calculation than we are talking about for

6   Counts 1 and 3 to section 2X1.1, which you ask do if the entry

7   into the restricted building was with the intent to commit a

8   felony.  I already said that I was not going to use the felony

9   of obstructing an official proceeding to be the other felony

10  for purposes of my guidelines calculations, notwithstanding the

11  evidence that is consistent with that given the jury's

12  inability to get there.

13         The government says, well, you can look at the civil

14  disorder felony.  But that would require proof that when she

15  entered, she entered with the intent to resist or impede

16  officers performing their duty in the course of a civil

17  disorder.  And I am not sure we have evidence -- we have

18  evidence that she did that when she got there.  I am not sure

19  that we have evidence that that was her intent when she walked

20  in.

21         And I find that there is something very much of the

22  tail wagging the dog to have a 12-month misdemeanor drive the

23  guideline calculation into the range that the government is

24  arguing.  Plus, if you follow the government's logic, and you

25  start as they tell me to do with 2X1.1, which is kind of the

1    enhancer, if the trespass is for some other reason, 2X1.1

2    doesn't have any base offense levels of its own.  It says you

3    look at the applicable offense, the appropriate offense.  And

4    the one the government tells me to go to, is 2J1.2(b)(1)(B).

5    And that says, an offense -- it requires a showing of causing

6    or threatening to cause physical injury to a person or property

7    in order to obstruct the administration of justice.  And I

8    don't think that is what we have in this case is causing or

9    threatening to cause physical injury to person or property even

10   if the obstruction of the administration of justice includes

11   obstructing the official proceeding as it does under that

12   particular provision.  So I don't think it applies.  I will

13   overrule the government's objection.

14        I believe the trespass guideline should not be the

15   one that increases the calculation.  And I believe that we have

16   the more appropriate calculations to take into account for

17   sentencing purposes today that doesn't again answer the

18   question of whether I am going to vary as the government is

19   asking me or as the defense is asking me to.  But that is

20   rubric that I think I am operating under.

21        So I started out by saying there were factors that

22   the statute needs me to think about.  And I am going to go

23   through each of them.  I am going to go through each of them in

24   detail, as each of you have.  So I have a lot to say, but I am

25   going to ask counsel and the defendant to please come to the

1    lectern.

2            All right.  I am supposed to start with the nature

3    and circumstances of the offense.  Much of it was summarized in

4    detail when we had the hearing on the post-trial motions.  And

5    I believe the government has it largely correct in its

6    memorandum notwithstanding the disdain expressed by the

7    defense.  It does not matter if the defendant didn't arrive

8    armed.  I agree with the government that once she got there,

9    she deliberately took repeated and affirmative steps to get

10   inside, starting by climbing up the front of the building and

11   then once inside.  There is no question that when she got

12   there, she spent considerable time and energy devising and

13   executing ways to utilize the size and strength of others to

14   move herself and others through the building.  And that she

15   did, in fact, organize them for that purpose, that she gave

16   directions to others about where to go and how to behave from

17   the minute she got inside.

18           This was, whether the defense chooses to acknowledge

19   it or not, so much more than what they described as an

20   obnoxious 22-year-old yelling obscenities at law enforcement.

21   She could have done that outside.  People she drove to the

22   Capitol with stayed outside.  Thousands of individuals

23   effected -- deeply effected and deeply angered and incensed by

24   the false claims about the election stayed outside or they

25   stepped in and they stepped back out.  They were not there for

1    90 minutes.  She could have gone in and left when she was asked

2    to, instead of organizing the crowd in the rotunda to keep from

3    being forced to leave.  She extended not only her stay in the

4    building, but the stay of the others in the building and

5    extended the time when the official business of the US

6    Congress, the certification of the election that the president

7    had decried and that had been in progress when she climbed up a

8    bike rack to gain unlawful entry into the building could not

9    resume.  And there is absolutely no question that she

10   celebrated afterwards notwithstanding the defense

11   dissatisfaction with the government's use of that word.  She

12   was positively exultant.

13           And I reject completely the notion that she did not

14   know where she was or what she was doing.  It is true that once

15   she referred to the iconic white marble building with columns

16   as the White House.  But it is clear from her communications

17   before during and after January 6 that she knew exactly where

18   she was and why.  First of all, as soon as she got in, she

19   urged the others to return when the first attempts with

20   chemical spray turned them away.  A lot of people did turn

21   away, but she stayed.  Where did you go?  She went straight to

22   the Speaker's Office.  And she knew she was in the Speaker's

23   Office.  She didn't seem to think she was in the President's

24   home.  Indeed, if as the defendant would have me believe, she

25   had no plans to go the Capitol at all when she arrived in DC

62

1    and made an instantaneous decision and got swept up after she

2    heard the President speak, he didn't invite everybody back to

3    his home for a protest.  He specifically directed them to walk

4    to the Capitol where Congress was and where Vice President

5    Pence was and where the count was going on.  That is where she

6    went, but she already knew this.

7            The testimony of Michael Dalton and the record of the

8    kind of materials she saved on her computer reflects that she

9    was tracking the daily statements of Nick Fuentes.  Mr. Dalton

10   was an extremely credible witness who seemed quite reluctant to

11   say anything that could hurt the defendant, a former

12   girlfriend.  And his testimony was corroborated.  The

13   defendant's mother was not called as a witness, but the record

14   of this case when you go back to the very first statement of

15   the facts and support of the complaint, reflects that even

16   defendant's mother told reporters that the defendant was

17   interested in Trump's election and far right message boards.

18   So what Mr. Dalton said is undeniable.

19           And there were even Fuentes videos saved on the

20   defendant's computer.  We were careful to withhold the content

21   of many communications from the jury in order to protect the

22   defendant from any unfair prejudice that could arise out of his

23   blatant anti-Semitic and racist, white supremacist views.  We

24   couldn't attribute that to her.  And that wasn't relevant to

25   the charged offenses in any event.  But there was one thing

1   that Nick Fuentes was all about and that was about stopping the

2   certification of the electoral college vote.  The defendant

3   went to not one, but two Fuentes Stop the Steal rallies

4   including coming all of the way to Washington, DC for one where

5   she was proudly photographed with him before January 6.

6         She listened to his daily podcast.  She dressed as a

7   member of his army on January 6.  She was there to stop the

8   steal, not because her dizzy little head was confused about

9   which building in Washington was which or why she was there.

10  And her extremely as the government called it tech-savvy

11  efforts to cover her tracks afterwards add further strength to

12  that inference.  Also, there was the very credible testimony of

13  Ryan Patrick Myers at trial who said many things the defense

14  replied upon, such as the fact that she didn't say much of

15  anything on the trip to DC with him and her father and others.

16  And that contrary to the pre-trip discussions about what

17  weapons who was going to bring where, they did not discuss

18  plans to attack the Capitol in the car.

19        But he also said, quite credibly, and wasn't

20  impeached by any other evidence on this point, question, "Where

21  did you go after the end of the speech?"

22        "It was just down towards the Capitol.  I don't know

23  what street that was.  I just remember the President said walk

24  down there and make your voices heard or whatever because they

25  were certifying the election."

1      Question:  "So tell me, let me ask you this:  Did you

2   go down towards the Capitol?"

3          "Yes."

4          "When you got to the Capitol were you with the

5   defendant at that time?"

6          "Yes.  We were all together as we approached the

7   Capitol.  And she broke off and said she knew other people

8   there she was going to meet up with.  And it was me Rick and

9   Cyrus for a period of time.  And then they got separated from

10   me as well.  And I was just kind of by myself on the side of

11   the Capitol."

12      We don't know if she actually -- there was no

13   evidence that we saw her meeting up with anyone in there.  But

14   she very well could have thought that the other Groypers are

15   going to be in there, Fuentes is going to be in there.  At any

16   rate, she didn't say, I am now going to go check out the White

17   House.  And to the extent we want to pluck a few words out of

18   the bellicose speeches that morning and say what they were all

19   doing was at the Former President's direction and that what he

20   said was, walk peacefully to the Capitol to protest, that is

21   not what she did.

22      You do not keep moving forward through tear gas and

23   climb up the face of a government building by accident or

24   because anybody made you.  You have to be determined.  She

25   moved well beyond standing outside to protest under her own

1    power and on her own volition.  You do not gain entry where

2    windows have just been illegally broken and you knew that

3    because you watched it and filmed yourself and not know full

4    well that you are not supposed to be there.  If she was still

5    unsure, am I supposed to be here, it became clear quite quickly

6    when the officers inside tried to turn the crowd away with

7    spray.  And many people, people just as riled up by the

8    election as she was turned around to leave right then.  But who

9    was it who said, "No, come back"?  You can see her pointing and

10   directing others on video and in photographs, "Line up this

11   way.  You big guys block for me."  She was taking control

12   already.  She is not just a little waif blowing in the wind.

13           She takes credit for afterwards.  She says, "This is

14   us once we got inside and entered the main area of the crypt.

15   The police were in there and we wanted to push everybody on top

16   of each other so the police would budge.  We used that tactic

17   for the rest of the night.  I ran around to all of the men I

18   could find in gear or a helmet and point them in the direction

19   and told them to get to the front.  And once I found everybody,

20   join them, pushing the person in front of you so hard until the

21   police have no choice but to allow us in."  She describes this

22   as an excellent tactic.  And the defense called it bragging

23   nonsense.  When you watch the video, it is exactly what she is

24   doing.  She is handpicking the men who have the gear, who have

25   the size, who are protected.

1          And we know exactly what the videos show and don't

2   show regarding her actions in Speaker Pelosi's office.  At the

3   very least, she poured fuel on the fire of the theft in

4   progress.  Whose voice is it that rings out?  Who do we hear?

5   Again, it is the defendant.  "Take that fucking laptop, dude.

6   Dude, put on gloves."  I don't recall the former president in

7   his speech encouraging anyone to engage in that sort of

8   behavior.

9          It is no one's fault but the defendant's that she

10  then bragged about the theft and added information about a

11  gavel and it turned out one was actually missing.  She is the

12  one who said, "I sold shit from Nancy Pelosi.  I took her gavel

13  hammer thing.  I took Nancy Pelosi's hard drive.  I stormed the

14  building and took her hard drive.  All they did was pepper

15  spray me and take the gavel I stole from her office.  LOL.  I

16  still have the hard drive.  I stole some things from her, Nancy

17  Pelosi's office, her gavel and hard drive."

18         Blaming the fact that she would be forever linked to

19  the laptop on the government, makes no sense.  It is no one's

20  fault but her own.

21         Then she gets to the rotunda and this tiny person I

22  am supposed to believe just got caught up in someone's else

23  protest and rhetoric is quite vocal.  She berates the besieged

24  officers.  "Fuck you.  We will remember your fucking face.  You

25  are a traitor.  You are a traitor to this country."  No one

made her say those words.  The officers advance with batons.
They are held horizontally.  No one is attacking our petite
protestor with weapons.  But still, she is having none of it.
She tries to press backwards against them so they can't move
her.  And she is small, she can't hold the line herself, so she
gets creative.  As she put it, "I was right in front of the
police calling them traitors.  And they pushed against me.  I
just turned around and put my back against them and grabbed the
guy in front of me and told him to push against me."  Her
words.

There are various videos that are striking in this
case.  But the most striking of all to me was the view looking
down from the ceiling of the rotunda.  You can see a row of
large people doing the work, but there is only one voice
calling out the instructions, "Push, back up, push, lock arms,"
keeping a steady beat, like a coxswain on a crew team.  And
like a cox, her small size was an asset.  And she used the
power of her voice to mobilize and encourage the mob.  And to
stoke its anger and stoke its resistance to authority, to keep
the mob in place longer, to make the mob more dangerous.

And she wasn't even done.  When she left, she told
people on the way in, if you push hard enough, they will budge.
And after 90 minutes inside, she is up on top of the roof of a
police car.  Her conduct from start to finish was outrageous.
It was intentional.  And it cannot be marginalized with the

1    kind of sentence that would be appropriate and that has been

2    handed down in this courthouse in the case of the mere parading

3    misdemeanor.

4              And unlike a number of protesters who got chastened

5    when they saw the videos of the destruction and violence on TV

6    that night, this defendant was not.  She was proud.  She

7    boasted about her good tactics.  She told her father they

8    needed to return and finish the job on January 20th.  This

9    person who supposedly didn't even understand politically what

10   was happening, knew the date they were supposed to be back.

11   This person who supposedly didn't understand the significance

12   of what was taking place that day called Vice President Pence a

13   fucking traitor and even a week later announced, "I have been

14   told what I did was wrong by everybody, but in my heart and

15   soul, I know what we did was patriotic and what is right.  And

16   anybody who says otherwise should be condemned."  And then when

17   you add in what she did and insisted that others do to cover

18   her tracks, those are the nature and circumstances of the

19   offense.

20             I am also supposed to consider the history and

21   characteristics of the defendant.  And much of the defense

22   memorandum says over and over again, she is not the monster the

23   media made her out to be.  I really don't know what the media

24   has had to say about her other than what the defense keeps

25   sending in my direction.  And even if some articles have come

1    to my attention because they come up in the searches the court

2    personnel do for when my name appears in something, they are

3    not part of the record of this case.  I am only interested in

4    what happened on January 6.  And what the presentence report

5    and the letters submitted by the defendant tell me about her

6    character and characteristics.  It doesn't matter to me what

7    the media has said about her to the extent I even know about

8    it.  I do understand from what I have read and what you have

9    provided that she was a rebellious teenager and somewhat

10   immature into her twenties as well.  Some of that may have been

11   due to the challenging family circumstances I have been told

12   about.  And I don't need to detail them on the public record.

13   They are unfortunate and she has had to endure a lot and

14   suffered some hard losses.  Although, it does seem that the

15   defendant has reconciled with both parents to some extent,

16   which is good.

17           But there is one thing the defense has been hammering

18   over and over again.  It was a theme in front of the jury.  It

19   didn't seem to impress the jury much and it never occurred to

20   me that I would have to talk about it.  So I have been

21   surprised by the ongoing emphasis on the defendant's age and

22   her height.  But given the repeated references and heavy

23   reliance on all of that, you have put me in the position I have

24   to address it.

25           And I have to say, I find it extremely unpersuasive.

1   It is inconsistent and a little insulting to me and

2   Ms. Williams to insist that she is intelligent and responsible

3   and fully ready to be a wife and mother and that she was

4   intelligent and responsible even before January 6 and a

5   contributing member of society, responsible for the care of

6   others, and yet somehow she is not responsible for her

7   intentional actions on that day.

8            I am sure the defense team is well aware of how many

9   young men, tall or short, bulky or scrawny and even younger

10   than 22 are held criminally responsible day in and day out,

11   even though it all started by getting swept up with the bad

12   influences of people in their neighborhood.  We even treat

13   juveniles as adults.  But, yet, I am being told she is a little

14   girl.

15            It is true that judges frequently do and should,

16   notwithstanding the fact that guidelines say it is irrelevant,

17   take note of the fact that some defendants are particularly

18   young or impressionable or grew up in such constrained,

19   disadvantaged circumstances, they had no other options.  They

20   had no models to follow.  But the argument here is being so

21   blown out of proportion and exaggerated when we are talking

22   about a high school graduate, someone who grew up with a mother

23   who was employed.  And I just have to reject what appears to be

24   the suggestion that she was just a child who shouldn't be held

25   responsible her actions.  I can't treat her differently than

1   anyone who else who commits a serious offense and she committed

2   several, just on the basis of her age, her gender or her

3   height.

4          On January 6 she was 22 years old.  You can enlist in

5   the military at age 17 with parental consent and at 18 without.

6   She was old enough to already have finished a tour of duty in

7   the Army.  You can be legally married in Pennsylvania at 18 and

8   possess a firearm at 18.  She was old enough to vote.  She was

9   old enough to hold a job.  She was old enough to have completed

10   post-graduate courses.  She was old enough to be one of the

11   police officers she resisted.  You are eligible to join the US

12   Capitol Police and the Metropolitan Police Department at 21

13   years old.

14          There have been members of the US Olympic team who

15   were teenagers.  Kobe Bryant was drafted into the NBA when he

16   was 17.  The late representative John Lewis became one of the

17   original freedom fighters in the South at age 21.  The youngest

18   member of the Pennsylvania House of Representatives, Alec

19   Ryncavage is 21 years old.  We have a 25-year-old member of

20   Congress.

21          It is particularly interesting when the defense

22   insisted that I should consider the fact that this defendant

23   followed adult, grown men -- said that over and over again

24   including the Former President, Rick Scott and Nick Fuentes.

25   If Wikipedia is correct, Nick Fuentes, just like the defendant

1    was born in 1998, which means he was exactly the same age she

2    was when he was urging her and others to stop the steal.  I

3    don't hear anyone suggesting that he was a mere child.

4           Amanda Gorman, the young poet who on January 20th

5    stood proudly on the same West Terrace of the Capitol the

6    defendant chose to breach.  But instead of spouting profanity,

7    inspired a nation, was born in the same year the defendant was.

8    She was only 22 years old that day.  Oh, and she is -- and,

9    again, this is approximate since I am relying on information on

10   the internet, also just 5, 4 inches tall.

11          The defense seems to think this is a relevant

12   statistic.  She is such a little thing, what sort of trouble

13   could she get up to?  Marjorie Taylor Greene is reportedly

14   5'3" inches tall.  So is Elizabeth Cheney.  Each is a force in

15   her own way.  Justice Ketanji Jackson is approximately 5'1"

16   tall, another force.  Muggsy Bogues, the shortest player in the

17   NBA was a successful point guard for 14 years and he was 5'3".

18   The shortest player in the WNBA, Shannon Bobbit, was

19   5'2" inches tall.  So I'm sorry, but Riley June Williams was

20   old enough and tall enough to be held accountable for her

21   actions.

22          And to the extent her appearance gives the impression

23   that she was fragile or weak, it all goes away the second she

24   opens her mouth and you hear the way she conducted herself then

25   and on the phone.

1          Counsel also brings up the fuzzy zebra bag

2    continually.  I think it is completely irrelevant.  I am not

3    exactly sure what her funky or quirky fashion sense, which was

4    also on full display throughout the trial, has to do with

5    anything.  The only piece of clothing that sent a message was

6    the one that no one wants us to talk about when she says that

7    he is with Groyper, that she is with Fuentes.  It is true that

8    she was manipulated and influenced and used by people who knew

9    then and know now that their message was false.  I am not sure

10   it exonerates her, because her behavior went beyond the bounds

11   of legitimate protest, well beyond where thousands of others

12   who were equally angry had the sense not to go.  You talked

13   about people making her do this.  No one made her do this.  And

14   actually she said it the best when she said there is no

15   justification or excuse for my behavior.

16          And those facts, if they bear on the sentence, bear

17   also on the need for deterrence.  Because we are not just

18   talking about specific deterrence here, we are talking about

19   general deterrence, deterring other people from taking these

20   actions again.  And the fact this is still being said and the

21   fact that so many people fell for it and the fact that so many

22   people acted in accordance with it, they need to get the

23   message that this was wrong.

24          But having said all of that, it is very important for

25   me to say -- and I strongly agree that the events of January 6

are not all there is to you.  I was particularly impressed by

your compassionate care of and devotion to a young woman with

significant physical and mental disabilities.  The level of

responsibility you undertook, your work ethic and the personal

commitment to go the extra mile were all very impressive.  It

says a great deal about you.  And it shows that there is an

important niche that you can fill in the world, because not

everybody has patience or empathy to perform that kind of

essential work.  You can put the struggle to find out who you

are and what you stand for that your mother told me you have

been going through to rest with that.

You have also been a big help to older family members

dealing with illnesses, helping them around the house, sharing

your love for gardening with them.  You showed that love for

gardening again when you were a reliable worker at the nursery.

That is also a reliable option for your future.  I believe or

at least hope that you and your family members are sincere

about the changes in you and the lessons learned, you revived

commitment to your faith.  Given your age, you have much more

time ahead of you than you have behind you.  And you will

continue to have considerable time ahead of you after this

sentence is served.  There is no reason why you won't be able

to have the family, the farm, the quiet life that you say

attracts you now.  And there is a lot of other good that you

could do as well.

1             The sentencing statute also says that I am required
2    to impose a sentence that is sufficient but not greater than
3    necessary to accomplish a number of purposes.  I must consider
4    the need for the sentence imposed to reflect the seriousness of
5    the offense, to promote respect for the law and to provide just
6    punishment.  And I am supposed to afford adequate deterrence to
7    criminal conduct, not just whether you are going to do it
8    again, but other people watching.  I am also supposed to
9    protect the public from further crimes of the defendant.  I am
10   not sure that is a significant problem at the moment.  And I am
11   supposed to provide you with educational, vocational treatment
12   in the most effective manner.  I am not sure that is critical.
13   But I am also supposed to think about the need to avoid
14   unwarranted sentencing disparities among defendants with
15   similar records who have been found guilty of similar conduct.
16   That means your sentence has to be fair when I compare it to
17   the sentences that other people got.

18             To say something on that point, the government
19   treated me to the plea agreement entered into in another case,
20   *United States versus Rodriguez* and I am not sure why.  First of
21   all, it is just a plea agreement.  I have not even sentenced
22   him yet.  Second of all, the facts are not comparable in any
23   way.  So I am not sure it did anything to support the
24   government's request for a 7 year or more sentence to show me
25   that case.  Also, the facts and the criminal histories related

1    to the others who were involved in the vicious assault on the

2    same Metropolitan Police Department officer are not comparable

3    to this case.  And I don't see them as guideposts.

4              For her part, the defense points me to sentences of a

5    year or less in which defendants accepted responsibility and

6    pled guilty.  Some facts were comparable, many were not.  Most

7    involved solo confrontations with officers, different

8    guidelines, different calculations.  We weren't dealing with

9    guilty verdicts for a section 111 violation, in addition to

10   section 231.  And we didn't have the rallying and use of other

11   people.

12             I have thought about this a great deal since the

13   trial and the conviction and the ruling on post-trial motions.

14   Given the statutory requirement the sentence must reflect the

15   seriousness of the offense and it must provide for just

16   punishment and deter not just you, but other people.  I cannot

17   say that 2 years of release on conditions, even if they were

18   stringent went far enough to serve those ends such that the

19   year and a day requested, which is only about six months could

20   be sufficient.

21             I frankly thought that the year and a day was not a

22   serious suggestion.  It is a more appropriate suggestion for

23   the disorderly conduct in a public building count.  And it

24   doesn't reflect the seriousness of the resistance to the law

25   enforcement officers at all.

1          Defendant's conduct in the Capitol was utterly

2    reprehensible.  It not only impeded the officers, but it

3    increased the dangerousness and the risks already inherent in

4    the work they were doing that day when they were badly

5    outnumbered and the tools available to them were limited.

6          Yes, the defendant spent a long period of time

7    subject to conditions of release.  And there was a lot she

8    couldn't do.  I believe that those who have been detained

9    pending their trials might scoff at the notion that she spent

10   two years in hell and not having access to social media was a

11   punishment.  It is true that she had conditions and they were

12   more onerous than for everyone who was on release.  But she was

13   permitted to leave the house to go to work.  I let her travel

14   to retreats when she asked to.  And she was quite able to

15   sustain and deepen a relationship with a person who is now her

16   fiance, as well as with the church, notwithstanding the fact

17   that she had hours that she had to be at home.

18         The conditions that were in place were repeatedly

19   deemed necessary to ensure her appearance in court and

20   consistent with the Bail Reform Act.  They were not imposed for

21   purpose of punishment.  So those years don't factor in, but I

22   will take into consideration the fact that the last 3 months

23   have been extremely harsh.

24         The guidelines are supposed to serve the function of

25   avoiding unwarranted sentencing disparities.  But I have

1    already detailed a number of reasons why they fall short when

2    you deal with those offenses.  There is a 2-year difference in

3    the recommended sentencing guideline range applicable to

4    whether you start with the obstruction or impeding officers or

5    you start with the aggravated assault on officers.  And that

6    underscores my overall impression based on all of the factors

7    that the correct sentence is somewhere in the middle.

8           Finally, the guidelines tell me I am supposed to

9    recognize and order restitution to any victims of the offense.

10   I recognize that the defendant's own statements and the fact

11   that they overlap with the report by Pelosi's office that just

12   like those the defendant claimed to steal were, in fact,

13   missing could support a restitution order.  But the conduct for

14   which she was convicted has supported a restitution order of

15   $2,000 towards the close to $3 million worth of damage to the

16   building that day for other people convicted of felonies due to

17   the actions of the mob in which she was an enthusiastic member

18   and that will be what she is ordered to pay to the Architect of

19   the Capitol.

20          In an exercise of my discretion after considering all

21   of the statutory factors, including what would be sufficient

22   but not greater than necessary, the sentence to be imposed is

23   as follows:  It is the judgment of the Court that you are

24   hereby sentenced to a period of 36 months on each of Counts 1

25   and 3 to run concurrently to each other; to 12 months on each

1    of Count 5 and 6; and 6 months on each of Count 7 and 8, also

2    to be served concurrently.  This 36-month term would be my

3    sentence if we were using either section 2A2.4 or section 2A2.2

4    as the base offense level for the group 1 counts or if we were

5    looking at the government's proposed calculation for group 5.

6    In one case, the 2A2.2, based on the application of the

7    statutory factors and the nature and circumstances of the

8    offense, as well as my concern with the guidelines as a policy

9    matter, I would have had to vary upwards in my discretion.  And

10   in other, the aggravated assault guideline, I would have had to

11   vary downwards.  I have grave policy differences with the

12   guidelines and the anomalous and inconsistent approaches they

13   take to these very grave offenses.  The advisory sentencing

14   guideline range applicable under section 2A2.4 alone does not

15   begin to give sufficient weight to the fact that the victims in

16   this case were law enforcement officers and the conduct was

17   motivated by that status, nor would it take into account the

18   particular conduct here, the fact that the defendant's conduct

19   was directed towards not one, but a large number of officers at

20   the same time.  And it happened while they were performing

21   their official duty, attempting to quell a civil disorder of

22   which she was also convicted.

23          But, on the other hand, the guideline range

24   applicable under section 2A2.2, overstates the severity of the

25   defendant's conduct given the fact that there was no actual

1    assault and the overlap of the only conduct underlying the two

2    felonies.  So that is where I come out.

3            You are further sentenced to serve a 36-month term of

4    supervised release.  I find the defendant does not have the

5    ability to pay a fine, I will therefore waive the imposition of

6    a fine.

7            You are required to pay $100 assessment on each

8    felony count and $25 on each misdemeanor count, for a total of

9    $300.  The special assessment is immediately payable to the

10   Clerk of the Court for the US District Court for the District

11   of Columbia.  If you change your address, within 30 days of

12   that you have to notify the Clerk of the Court until such time

13   as the financial obligation is paid.  While you are

14   incarcerated, you can make payments on the assessment through

15   your participation in the Bureau of Inmates Financial

16   Responsibility Program.

17           It is also required by Federal law that for all

18   felony offenses, you must submit to the collection and use of

19   DNA identification information while incarcerated at the Bureau

20   of Prisons or at the direction of the probation office.

21           While you are on supervision, you shall not possess a

22   firearm or other dangerous weapon.  You shall not use or

23   possess an illegal controlled substance.  And you shall not

24   commit another federal, state or local crime.

25           I will suspend the mandatory drug testing condition

as there appears to be nothing in the record that points to a
substance abuse issue.  You must also abide by the general
conditions of supervision adopted by the US Probation Office,
which were set out in paragraph 158 on pages 31 to 32 of the
presentence report.  And so you have been on notice of them, as
well as the following special conditions:  Beginning 60 days
after your release from detention, you must pay the balance of
any restitution owed at a rate of no less than $100 per month.
You must provide the probation officer access to any requested
financial information and authorize the release of any
financial information so they can ensure compliance with the
restitution condition.  And the probation office may share that
information with the US Attorney's Office.  You must not incur
new credit charges or open lines of credit without the approval
of the probation office until such time as the restitution has
been paid.

          I will decline to impose the recommended contact and
social media restrictions, since we don't have evidence of
concerted action with terrorists or seditious individuals or
groups.  But if the defendant answers a call from a Nick
Fuentes or a disappointed candidate for any officer from any
party or anyone else to rise up and do anything that falls
outside of the boundaries of legitimate First Amendment
activity and she violates the law, for example, by entering a
closed building without authority to do so or impeding or

1   interfering with law enforcement officers and defying their

2   lawful authority or threatening a public official, that will be

3   a violation of her supervised release.

4           You must perform 150 hours of community service in

5   the first 18 months of your release.  The probation office will

6   supervise your participation in the program by approving the

7   program.  And you must provide written verification of the

8   hours to the probation office.  Also given everything I have

9   been told about what the defendant has gone through at various

10  phases in her life and whether she has gotten assistance for

11  that that she may have needed, as well as all of the conduct

12  that has been detailed in this case before, during and after

13  January 6, I think it is appropriate and prudent to order that

14  you must participate in a mental health assessment as directed

15  and under the supervision of the probation office.  And if any

16  treatment or counseling is indicated, at the discretion and

17  under the direction of the probation office, you must comply

18  with that treatment plan, including any individual or group

19  sessions with a qualified provider indicated by the probation

20  office.  And you must sign any releases necessary to enable the

21  probation office to monitor that compliance.

22          Within 60 days of the commencement of supervision,

23  the US Probation Office supervising you must submit a progress

24  report to the Court.  Upon release of the progress report, I

25  will determine if your appearance is required at a reentry

1    hearing or whether we should set up a video conference or

2    something like that for that purpose.

3              Supervision of your supervised release will be

4    transferred to the jurisdiction in which you reside.  But

5    jurisdiction over this case will remain with me.

6              Ms. Ulrich, are there any objections to the special

7    conditions?

8              MS. ULRICH:  Not to the special conditions, no.

9              THE COURT:  All right.  Also the probation office is

10   ordered to release the presentence investigation to all

11   appropriate agencies in order to execute the sentence.  And

12   they must return it upon her completion or termination from

13   treatment.

14             Ms. Williams, you have the right to appeal your

15   conviction and your sentence in this case.  If you choose to

16   appeal, you must file any appeal within 14 days after that

17   Court enters judgment.  If are unable to afford the cost of an

18   appeal, you may request permission from the Court to file an

19   appeal without cost to you.

20             Ms. Ulrich, is there anything else I need to take up

21   on behalf of the defendant?  Is there any particular location

22   you would like to ask me to recommend that she be designated?

23             MS. ULRICH:  Yes, Your Honor.  We would ask for

24   recommendation at Danbury, Connecticut.

25             THE COURT:  Okay.  Is there a reason why that is

84

1    better than --

2          MS. ULRICH:  Yes, there is a couple of reasons.  They

3    have some vocational programming.  They have horticulture.  It

4    is between where her boyfriend will reside and her family.  So

5    I think that would be a good recommendation.

6          THE COURT:  All right.  I think they always try to

7    make it as close to family as possible.  So I was thinking that

8    was pointed in a different direction, but I am happy to put

9    that recommendation into the judgment and commitment order.  It

10   is a recommendation.  They don't always do what I say.  But

11   they do take it into consideration.  I will do that.

12         Anything else I need to do on behalf of the defendant

13   at this time?

14         MS. ULRICH:  No.  Just a few things I have to put on

15   record because the record will be reviewed, it might be

16   appealed.  We do object as part of your sentence, you did

17   mention Nick Fuentes and the whole she went to two Stop the

18   Steal rallies and that was something used against her.

19         THE COURT:  It was used against her for the purpose

20   of disputing the allegation that she did not know she was at

21   the Capitol, did not know what was going on, that the election

22   was not the purpose.  It was not to tie her to anything else

23   about Nick Fuentes.  I want to make that perfectly clear.

24         MS. ULRICH:  I know.  But you understand I have to

25   object to preserve my issues for appeal.  You also mentioned,

1     you know, a couple of times she was with Groyper.  I think

2     those are First Amendment issues.  And the fact that they put

3     out this message that election was stolen.  It is not a white

4     supremacist message.  It is not a Nazi.  It is wrong.  And it

5     is -- all of us will agree it is very aggravating.  But it

6     shouldn't be a basis to impose the sentence, because it is

7     First Amendment protected.  I am just putting the objection on

8     the record.  My appellate lawyers will decide what the appeal

9     issues are, but they come after me if I don't object.

10              THE COURT:  I am using it only to show her knowledge

11    of what was happening at the Capitol that day.

12              Go ahead.

13              MS. ULRICH:  And I am also objecting to the upward

14    variance.

15              THE COURT:  All right.  Anything else?

16              MS. ULRICH:  That is it.  Thank you.

17              THE COURT:  All right.  So is there anything further

18    I need to take up on behalf of the government right now?

19              MR. DALKE:  No, Your Honor.

20              THE COURT:  All right.

21              MR. DALKE:  Thank you.

22              THE COURT:  All right.

23              MS. FIELD:  Your Honor, may I address the Court?

24              THE COURT:  Yes.

25              MS. FIELD:  If the court reporter can hear me --

1           THE COURT:  Why don't you come all of the way to the

2    lectern.

3           MS. FIELD:  Thank you.  Did the Court and I apologize

4    if I misheard.  Did the Court set an amount to the restitution,

5    a total amount?

6           THE COURT:  $2,000.

7           MS. FIELD:  And does the Court have a position on

8    interest, paying interest?

9           THE COURT:  I will waive the interest and penalties

10   on that.

11          MS. FIELD:  Lastly, Your Honor, the special

12   assessment -- I believe the Court mentioned 300.

13          THE COURT:  I may have added it up wrong.

14          MS. FIELD:  My understanding is it is 270.  Two of

15   the counts are $10.

16          THE COURT:  All right.  So the special assessment

17   will be $270 and not $300.

18          MS. FIELD:  Thank you, Your Honor.

19          One more thing, Your Honor.  The Court mentioned 36

20   months supervised release.  The misdemeanors carry a maximum of

21   12 months.

22          THE COURT:  The 36 months is on the 1 and 3 and then

23   whatever the maximum --

24          MS. FIELD:  5 and 6 is 12 months and.

25          THE COURT:  That will be concurrent with the 36

1   months for the Counts 1 and 3.

2              MS. FIELD:  Okay.  Thank you.

3              THE COURT:  All right.  Thank you very much,

4   everyone.  I want to say that this case from beginning to end

5   was handled very forcefully, but also very ably by both sides.

6              MS. ULRICH:  Thank you.

7              THE COURT:  I appreciate having lawyers of your

8   caliber in my courtroom.  And I want to thank everybody for the

9   thought that went into everything that was submitted to me.

10          (Proceedings adjourned at 12:40 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        **C E R T I F I C A T E**

2

3              I, SHERRY LINDSAY, Official Court Reporter,

4     certify that the foregoing constitutes a true and correct

5     transcript of the record of proceedings in the above-entitled

6     matter.

7

8                        Dated this 24th day of March, 2023.

9

10                       _____

11                       Sherry Lindsay, RPR
                         Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25