# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| _____ ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Crim. Action No. 21-618 (ABJ) |
| ) | |
| RILEY JUNE WILLIAMS, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## <u>MEMORANDUM OPINION</u>

Defendant Riley June Williams has filed a motion seeking a reduction of her sentence based on the recent amendment to the U.S. Sentencing Guidelines providing for a reduction in the offense level of a defendant with no criminal history points. *See* Def.'s Mot. for Relief Under 18 U.S.C. § 3582(c)(2) [Dkt. # 154] ("Mot.").

The new section 4C1.1 ("Adjustment for Certain Zero-Point Offenders") provides for a two-level reduction in offense level for defendants who meet all of the following criteria:

(1) the defendant did not receive any criminal history points from Chapter Four, Part A;

(2) the defendant did not receive an adjustment under section 3A1.4 (Terrorism);

(3) the defendant did not use violence or credible threats of violence in connection with the offense;[1]

---

[1]    For purposes of U.S.S.G. § 4C1.1, "'[o]ffense' means the offense of conviction and all relevant conduct under section 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." *Id.* § 1B1.1 cmt. n.1(I); *see id.* § 4C1.1(b)(1). Relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," as well as certain acts of others when done as part of "a jointly undertaken criminal activity." *Id.* § 1B1.3(a)(1).

(4) the offense did not result in death or serious bodily injury;

(5) the instant offense of conviction is not a sex offense;

(6) the defendant did not personally cause substantial financial hardship;

(7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(8) the instant offense of conviction is not covered by section 2H1.1 (Offenses Involving Individual Rights);

(9) the defendant did not receive an adjustment under section 3A1.1 (Hate Crime Motivation or Vulnerable Victim) or section 3A1.5 (Serious Human Rights Offense); and

(10)   the defendant did not receive an adjustment under section 3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848.

U.S.S.G. § 4C1.1(a).

After a trial by jury, defendant was convicted of two felony counts: Count One – Civil Disorder in violation of 18 U.S.C. § 231(a)(3) and Count Three – Assaulting, Resisting or Impeding Certain Officers with the intent to commit Count One (a felony) in violation of 18 U.S.C. § 111(a)(1), as well as 4 misdemeanors.[2]  *See* Judgment [Dkt. # 152] at 1.  The jury hung on two counts: obstructing an official proceeding in violation of 18 U.S.C. §1512(c)(2) and aiding and abetting the theft of government property in violation of 18 U.S.C. §§ 641, 2.  *See* Minute Entry (Nov. 21, 2022).  On March 23, 2023, she was sentenced to concurrent terms of 36 months on the

---

2      Defendant's misdemeanor convictions include Count Five – Entering and Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1); Count 6 – Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2); Count Seven – Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D); and Count Eight – Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).  *See* Judgment at 2.

two felonies, and concurrent terms on the misdemeanors.  Sentencing Tr. [Dkt. # 150] at 78:23–79:2.

The U.S. Sentencing Commission subsequently promulgated amendments to the Guidelines in April 2023, which took effect November 1, 2023.  The government contends that the defendant is ineligible for consideration for the new zero-point offender reduction on the grounds that she used violence or credible threats of violence in connection with the offense.  *See* Gov.'s Opp. to Def.'s Mot. for Reduction in Sentence [Dkt. # 155] at 9.

## LEGAL STANDARD

 "[T]he government bears the burden of proof in seeking sentencing enhancements under the Guidelines, but the defendant bears the burden in seeking sentencing reductions."  *United States v. Keleta*, 552 F.3d 861, 866 (D.C. Cir. 2009).  Facts relevant to sentencing must generally be established by a preponderance of the evidence.  *See* U.S.S.G. § 6A1.3 cmt.; see also *United States v. Watts*, 519 U.S. 148, 156 (1997) (per curiam).

Neither section 4C1.1 nor any other provision of the Sentencing Guidelines defines the terms "use violence" or "use  . . . credible threats of violence," and the D.C. Circuit has yet to provide guidance as to the meaning of a similar term, "threat to use violence," used in section 2D1.1(b)(2).  *See United States v. Johnson,* 64 F.4th 1348, 1352 (D.C. Cir. 2023).  Under those circumstances, other courts in this district have looked to the plain meaning of the term at the time the provision was enacted, *see* Mem. Op. at 6, *United States v. Yang*, No. 23-cr-100 (JDB) (D.D.C. Feb. 9, 2024) (ECF No. 38), and the Court will follow that approach.

The most recent version of Black's Law Dictionary defines "violence" as "[t]he use of physical force, usu[ally] accompanied by fury, vehemence, or outrage; esp[ecially], physical force unlawfully exercised with the intent to harm."  *Violence*, Black's Law Dictionary (11th ed. 2019).

The Oxford English Dictionary defines the term as "[t]he deliberate exercise of physical force against a person, property, etc.; physically violent behaviour or treatment;" or, in the legal context, "the unlawful exercise of physical force, intimidation by the exhibition of such force." *Violence*, Oxford English Dictionary, https://www.oed.com/dictionary/violence_n?tl=true (last visited Mar. 18, 2024). *See also Violence*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/violence ("the use of physical force so as to injure, abuse, damage, or destroy . . . .") (last visited Mar. 18, 2024).

## ANALYSIS

Applying that guidance, and considering the plain meaning of the new Guideline, the Court finds that Williams fails to meet the third criterion for the application of section 4C1.1: that "the defendant did not use violence or credible threats of violence in connection with the offense."

The Court notes at the outset that defendant Williams was convicted of not only the civil disorder offense, entering and remaining in a restricted building, and disorderly and disruptive conduct in the building, but, significantly, resisting or impeding officers in violation of 18 U.S.C. 111(a)(1). It is an element of this offense that the defendant acted "forcibly," and the jury unanimously found her guilty beyond a reasonable doubt after being instructed as follows:

> The second element requires you to find . . . that the defendant resisted, impeded, intimidated, or interfered with the officer or officers "forcibly." **This means you must find that she used force, attempted to use force, or threatened to use force against the federal officer or officers.** A threat to use force at some unspecified time in the future is not sufficient to establish that the defendant acted forcibly.

Final Jury Instrs. [Dkt. # 122] at 33 (emphasis added).  That finding goes a long way towards disqualifying the defendant since the definitions of "violence" involve the deliberate use of force.[3]

A careful examination of the facts underlying the conviction leads to the same conclusion. After being present at the ellipse to hear the former President speak, the defendant and others who travelled with her headed straight to the Capitol, where she departed from her companions, purportedly to meet up with others.  It was apparent from the barricades, the announcements, and the pepper spray and other substances in the air that protestors were not permitted to proceed into the Capitol, but the defendant was not deterred.  Along with others, she helped turn a bike rack sideways and used it as a ladder to climb up to the next level of the building, eventually making her way to the Senate Wing door, where – after she watched others breaking windows – she was one of the first rioters to enter.  When the group encountered police officers attempting to block their passage through the building, she devised a strategy to get past the obstruction that she proudly described in messages that evening:

> I ran around looking for guys with shields or gear and point them in the direction and tell them we need them in the front they couldn't hurt the guys up there because they had shields and goggles and gear and the police would budge we did it over and over until we had access to the whole place it was such a good tactic.

Gov. Trial Ex. 17.3.  When others were turned away from a corridor filled with spray, the defendant did not exit with them, but she made her way up the stairs to the offices of the Speaker of the House.  There, she filmed and shouted out to an unidentified man stealing a laptop off a conference table, and she posted the video and boasted about stealing it and other items later on social media.

---

3       The parties have not briefed and the Court need not decide whether the "forcible" element means that anyone convicted of a violation of section 111 is necessarily disqualified.

Eventually, the defendant ended up in the Rotunda, where law enforcement officers were making an effort to clear the building. As the Court observed when summarizing the nature and circumstances of the offense at sentencing:

> Then she gets to the Rotunda and this tiny person I am supposed to believe just got caught up in someone else's protest and rhetoric is quite vocal. She berates the besieged officers. "Fuck you. We will remember your fucking face. You're a traitor. You're a traitor to this country." No one made her say those words. The officers advance with batons. They are held horizontally. No one is attacking our petite protester with weapons. But still, she is having none of it. She tries to press backwards against them so they can't move her. And she is small, she can't hold the line herself, so she gets creative. As she put it, "I was right in front of the police calling them traitors. And they pushed against me. I just turned around and put my back against them and grabbed the guy in front of me and told him to push against me." Her words.
>
> There are various videos that are striking in this case. But the most striking of all to me was the view looking down from the ceiling of the Rotunda. You can see a row of large people doing the work, but there is only one voice calling out the instructions, "Push, back up, push, lock arms," keeping a steady beat, like a coxswain on a crew team. And like a cox, her small size was an asset. And she used the power of her voice to mobilize and encourage the mob. And to stoke its anger and stoke its resistance to authority, to keep the mob in place longer, to make the mob more dangerous.

Sentencing Tr. at 66:21–67:20.[4]

---

[4]     Defendant urges the Court to reject the government's characterization of the facts in its memorandum, *see* Def.'s Reply in Supp. of Mot. for Reduction in Sentence [Dkt. # 163] ("Reply") at 2, but her submission is equally hyperbolic in many respects. In the Court's view, in most instances, the government summarizes the record fairly. In any event, the Court can assure defendant that this ruling has not been shaped by the government's choice of adjectives. It attended the trial and took its own careful notes, and it has reviewed the evidence, the notes, and the factual summaries it prepared for sentencing and the ruling on the Rule 29 motion in connection with this opinion. So it is those observations that will be quoted here rather than either party's overwrought prose.

The Court's decision that the defendant used violence or credible threats of violence appears to be consistent with decisions of other courts in this district that have addressed the applicability of the amendment in the January 6 context. Courts found that the defendants met the necessary criteria in *United States v. Yang,* No. 23-cr-100 (JDB) (D.D.C.)*,* and *United States v. Hernandez,* No. 21-cr-445 (CKK) (D.D.C.), but the courts in *United States v. Dillard*, 23-cr-49 (JMC) (D.D.C.), and *United States v. Bauer*, No. 21-cr-386-2 (TNM) (D.D.C) found the defendants ineligible for the reduction because they engaged in violence. None of these cases is on all fours with this one, but their reasoning is instructive, and it is notable that the defense has not pointed the Court to a case involving a reduction for a defendant found guilty of violating section 111.

The *Dillard* case, like this one, involved a conviction for violating section 111. The court sentenced the defendant after 4C1.1 took effect, and it rejected the defendant's request to apply the reduction to him. Statement of Reasons at 1, *United States v. Dillard*, No. 23-cr-49 (JMC) (D.D.C Nov. 30, 2023) (ECF No. 43) ("Dillard Reasons") (stating defendant's guideline range as 12 to 18 months, rather than the 8 to 14 that would have resulted from applying section 4C1.1). As part of his guilty plea, the defendant stipulated that as a crowd gathered on the east side of the Capitol, he "went to the front of the crowd at the East Rotunda Doors, where he used a metal tool to smash a window of the doors." Statement of Offense ¶ 9, *United States v. Dillard*, No. 23-cr-49 (JMC) (D.D.C July 18, 2023) (ECF No. 27). Then he "forced his way past officers attempting to close the East Rotunda Doors," before he grabbed one such officer "from behind and threw him to the ground." *Id.* ¶ 10.

7

*United States v. Bauer* involved a defendant who was convicted of obstructing an official proceeding in violation of 18 US.C. § 1512(c)(2), along with the four misdemeanor counts involved here.  *See* Judgment at 2–3, *United States v. Bauer*, No. 21-cr-386-2 (TNM) (D.D.C. May 31, 2023) (ECF No. 187).  She was sentenced to 27 months (Count 1), two terms of 12 months (Counts 2 and 3), and six months (Counts 4 and 5), with all terms to run concurrently.  *Id.* at 3.  The defendant sought a reduction under section 4C1.1, but the court found her to be ineligible.  *See* Mem. Order at 1, *United States v. Bauer*, No. 21-cr-386-2 (TNM) (D.D.C. Jan. 29, 2024) (ECF No. 195) ("Bauer Mem. Order").  The court referred to the Black's Law Dictionary definition of violence "to fill the gap" for purposes of the Sentencing Guidelines' definitions, noting that, in order to enter the Capitol, Bauer passed police barricades and "forced her way through the Columbus doors on the east front."  *Id.* at 2, 4.  After proceeding to the Rotunda, she "yelled repeatedly at police officers" screaming, "Bring them out or we're going in," "They need to hang," "Bring that fucking bitch out here," and "We want Nancy Pelosi!"  *Id.* at 2.  She also "accosted at least one police officer," who testified that she was "aggressive" and "push[ed] back against [his] baton."  *Id.* (internal citation and quotation marks omitted).  The court therefore found the defendant "both used violence when she shoved [the officer] and made credible threats of violence when she incited the mob to 'hang' Speaker Pelosi."  *Id.* at 4.  The court further noted that her "vehement tone and abusive language emphasized the seriousness of her physical actions" against the officer, undermining her claim that this force was only an immediate reaction to his confrontation.  *Id.* at 5–6.  But the *Bauer* court explicitly rejected the government's contention that she was "ineligible for an adjustment under section 4C1.1 based on her mere participation in the Capitol riot," explaining that the court "must evaluate with particularity whether a defendant used violence or made credible threats of violence."  *Id.* at 8.

It is true that Williams did not engage in the physical contact involved in *Dillard*.  The facts in her case are more similar to those in *Bauer*, but Bauer, too, was denied the reduction for the combination of her threatening language and aggressive conduct in pushing back against the police baton herself.  The facts in this case are even more egregious, though, as the defendant organized others to push back along with her.

The court in *United States v. Hernandez* adopted *Bauer*'s definition of "violence" but determined that the defendant did qualify for an adjustment.  Mem. Op. & Order at 1, 5, *United States v. Hernandez*, No. 21-cr-445 (CKK) (D.D.C. Jan. 31, 2024) (ECF No. 65) ("Hernandez Mem. Op.").  In his plea to obstructing an official proceeding, Hernandez stipulated that when other protesters "pushed down the bicycle barricades," the defendant "came around the bike racks just moments after . . . and made his way with the mob to the base of the Center Steps of the East Plaza."  Statement of Offense ¶ 9, *United States v. Hernandez*, No. 21-cr-445 (CKK) (D.D.C. Sep. 21, 2022) (ECF No. 46).  "At approximately 2:06 pm, protesters breached the line of U.S. Capitol police at the Center Steps of the East Plaza.  Defendant Hernandez was part of the crowd making its way up the stairs and pushing towards the Rotunda door."  *Id.* ¶ 10.  He made his way to the Senate Gallery, took a few selfies, and left after having been inside for approximately fourteen minutes. *Id.* ¶ 11.

Since the defendant in *Hernandez* did not make any physical contact with law enforcement, cause others to have contact with them, or even disrupt the barricades, and there were not any facts showing that he confronted the officers verbally, the court drew a clear distinction between Hernandez's mere taking "advantage of the violence of others to gain access to the Capitol" and those whose own conduct was violent.  Hernandez Mem. Op. at 6.  *Hernandez* is easily

distinguished from the instant case, as Williams was markedly more verbally and physically aggressive.

Finally, in *United States v. Yang,* the court found the defendant eligible for a reduction under section 4C1.1 even though Yang had made physical contact with the officers.  Mem. Op. at 7, 10, *United States v. Yang*, No. 23-cr-100 (JDB) (D.D.C. Feb. 9, 2024) (ECF No. 38) ("Yang Mem. Op.").  But *Yang* involved a plea to the civil disorder charge, and not a conviction under section 111.  *Id.* at 3.  And the court found that the physical contact "was not made with an intent to harm . . . [n]or was [the] contact accompanied by 'fury, vehemence, or outrage,' or the like."  *Id.*  at 7.  The moments of contact were "brief and reactive," and otherwise, the defendant's body language was "overtly nonconfrontational, with his hands raised in the air."  *Id.* at 8.

This case is distinguishable from Yang's. While, as here, the defendant's physical contact with the police did not cause physical harm, the court made a point of observing that Yang's conduct was not "accompanied by 'fury, vehemence, or outrage,' or the like."  Yang Mem. Op. at 7.  Riley June Williams, by contrast, was the pure embodiment of fury, vehemence, and outrage on January 6.  Moreover, she used it to whip up the others who were physically stronger than she was, and to extend and intensify the mob's resistance and refusal to comply with the officers' directives.  Plus, she was using what strength she did have to push back against the police herself.

The Court agrees with the admonition in *Bauer* that the applicability of the Guideline should turn upon the conduct of the defendant.  But pointing to defendant's own affirmative use of larger, stronger rioters to accomplish her goal is not the same thing as merely attributing the acts of others to her.  The defense states repeatedly that the issue before the Court is whether the defendant "used violence *herself*," Reply at 2 (emphasis in original), but "offense" is specifically defined in the Guidelines to include "relevant conduct," U.S.S.G. § 1B1.1 cmt. n.1(I), and

"relevant conduct" includes "all acts and omissions committed, *aided, abetted, counseled, commanded, induced, procured, <u>or</u> willfully caused* by the defendant." *d.* § 1B1.3(a)(1) (emphasis added).

Holding Williams responsible for stoking mass resistance on the part of the angry mob and for her own deliberate orchestration of a joint effort to use physical force against the officers is not at all akin to unfairly saddling her with responsibility for the acts of others based solely on her presence in the crowd.[5]

---

5    Defendant persists in comparing herself to Maryann Mooney-Rondon and her son, Rafael, who also interacted with the person who walked out of Speaker Pelosi's office with a laptop.  Mot. at 16 n.12.  While defendant offered encouragement ("Dude – take that fucking laptop!" "Dude, put on gloves!"), the Rondons directly assisted the thief by providing him with gloves to use while handling the device, helping to disconnect it, and helping him load it into his backpack.  Defendant has repeatedly informed the Court that her subsequent comments about stealing the laptop and/or trying to sell it were nothing more than immature boasting, and that the Rondons bear more responsibility for the missing laptop than she does.  But this recurring theme has absolutely nothing to do with the pending motion.

Defendant was not convicted of, or sentenced for, playing a part in the theft of the laptop.  And the Rondons were not charged with, convicted of, or sentenced for forcibly resisting law enforcement officers in violation of section 111(a) or for interfering with officers engaged in the performance of their duties during a civil disorder in violation of section 231.

Rafael Rondon entered an early plea to obstruction of an official proceeding in violation of 18 U.S.C. §1512(c)(2), *see* Plea Agreement, *United States v. Rondon*, No. 21-cr-722-1 (JMC) (D.D.C. Dec. 5, 2022 ) (ECF No. 49), in which he admitted to assisting in the theft in the Speaker's suite, entering the Senate Gallery, and making off with an escape hood, or "filtering respiratory protective device" maintained in the Capitol for Members and staff.  Statement of Offense at 4, *United States v. Rondon*, No. 21-cr-722-1 (JMC) (D.D.C. Dec. 5, 2022) (ECF No. 50).  He was eventually sentenced to a 5-year term of probation.  Judgment at 2, *United States v. Rondon*, No. 21-cr-722-1 (JMC) (D.D.C. Dec. 14, 2023) (ECF No. 93).  After a stipulated trial, Maryann Rondon was found guilty of the 1512(c)(2) felony as well as theft of government property.  *See* Statement of Facts for Stip. Trial, *United States v. Rondon*, No. 21-cr-722-2 (JMC) (D.D.C. Mar. 27, 2023) (ECF No. 57) (admitting to aiding and abetting the theft of the laptop and taking an escape hood).  She was sentenced to two concurrent terms of 5 years' probation.  Judgment at 2, *United States v. Rondon*, No. 21-cr-722-2 (JMC) (D.D.C. Dec. 18, 2023) (ECF No. 95).

Therefore, they did not serve as useful comparators at the time of the original sentencing, and their cases are entirely unhelpful again now.

In sum, in the Court's view, the Sentencing Commission could not possibly have had Riley June Williams's conduct in mind when it enacted guidelines recommending a reduced advisory Sentencing Guideline range for non-violent offenders with no prior criminal history.[6]

However, given the lack of circuit authority on the interpretation of the amendment, and since the facts of this case are not entirely analogous with any other, the Court believes it would also be worthwhile to set out what its ruling would be if the provision did apply, *i.e.*, if the fact that the defendant did not personally strike, knock down, or cause physical harm to any particular law enforcement officer means that she "did not use violence or credible threats of violence" in connection with the offense. If she were technically eligible for consideration under section 4C1.1, the Court would be required to determine the reduced offense level and corresponding recommended sentencing range, and then to determine, in its discretion, whether a reduction in the sentence imposed would be appropriate, taking into consideration all of the factors in 18 U.S.C. § 3553(a). *See* 18 U.S.C. §3582(c)(2).

As the parties may recall, at sentencing, the Court found over the government's objection that it was section 2A2.4 – the obstructing officers guideline – and not section 2A2.2 – the higher

---

6      Defendant purports to explain what the Commission did have in mind:

The United States Sentencing Commission enacted Amendment 821 after performing years of research on recidivism of federal offenders. The outcome of that research led the Commission to determine that a reduction in offense level was appropriate for offenders … who have "*not been convicted of a crime of violence or an otherwise serious offense*" and have no criminal history, because those offenders are not likely to reoffend.

Reply at 7 (emphasis added), citing U.S. Sentencing Comm'n, *2023 Amendments in Brief* 3, https://www.ussc.gov/sites/default/files/pdf/amendment-process/amendments-in-brief/AIB_821R.pdf (last visited Mar. 20, 2024). Defendant is not one of those offenders.

aggravated assault guideline – that supplied the appropriate offense level under the unique circumstances of this case. *See* Sentencing Tr. at 79:3–80:2. But in order to fulfill its statutory duty to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, the Court found it appropriate to calculate the markedly divergent advisory sentencing ranges under both scenarios and take both into account when imposing sentence. The lower guideline produced an offense level of 15 and an advisory sentencing range of 18 to 24 months, and calculating the aggravated assault guideline led to an offense level of 22 and an advisory sentencing range of 41 to 51 months. The government was of the view that additional enhancements applied, and it urged the Court to impose a sentence of 87 months. *See* Gov. Sentencing Mem. [Dkt. # 139] at 1, 27.

If one were to find the defendant eligible for the zero-point offender reduction, the offense level under section 2A2.4 would be reduced to Level 13, and the advisory Sentencing Guidelines range would be 12 to 18 months. And for comparison purposes, it would be notable that the offense level under section 2A2.2 would be reduced to Level 20, and the advisory Sentencing Guidelines range would be 33 to 41 months.

The Court finds that a sentence within the range of 12 to 18 months would not be at all sufficient to satisfy the statutory sentencing goals. And in its discretion, after full reconsideration of all the section 3553(a) factors, it would decline to reduce the sentence even if plaintiff qualified for consideration under section 4C1.1.

At the time of sentencing, after reviewing all the section 3553 factors, the Court found it necessary to vary upwards from the applicable recommended sentencing guideline range of 18 to 24 months. As it explained:

This 36-month term would be my sentence if we were using either section 2A2.4 or section 2A2.2 as the base offense level for the group 1 counts [Counts I and III] or if we were looking at the government's proposed calculation for group 5. In one case, the 2A2.[4], based on the application of the statutory factors and the nature and circumstances of the offense, as well as my concerns with the guidelines as a policy matter, I would vary upwards in my discretion. And in the other, the aggravated assault guideline, I would have had to vary downwards.

I have grave policy differences with the guidelines and the anomalous and inconsistent approaches they take to these very grave offenses. The advisory sentencing guideline range applicable to section 2A2.4 alone does not begin to give sufficient weight to the fact that the victims in this case were law enforcement officers and that the conduct was motivated by that status, nor would it take into account the particular conduct here, the fact that the defendant's conduct was directed towards not one, but a large number of officers at the same time. And it happened while they were performing their official duty, attempting to quell a civil disorder of which she was also convicted. But, on the other hand, the guideline range applicable to section 2A2.2 overstates the severity of the defendant's conduct given that there was no actual assault and the overlap of the only conduct underlying the two felonies.

Sentencing Tr. at 79:2–80-2.

For all of the same reasons, the sentencing range applicable after the zero-point offender reduction would give too little weight to the defendant's utter contempt for law enforcement on January 6, and it would not recognize the seriousness of, or be just punishment for, her belligerent conduct, which  made the situation in the Rotunda more intractable and dangerous for the officers. By organizing the others in the mob, she helped to extend their unlawful stay in the building and to extend the time when the official business of the U.S. Congress – the certification of the election that the President had decried and that had been in progress when defendant climbed up a bike rack to gain unlawful entry into the building – could not resume.

Moreover, while it is the defendant's conduct directed towards police officers at the Capitol that is the basis for the finding that she does not meet the criteria for the amendment, the sentence was also based on a number of aggravating circumstances that factored into the 3553(a) analysis. For instance, the Court found that she "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the offense of conviction," *see* U.S.S.G. § 3C1.1, by deleting chats on multiple social media platforms; directing others to delete chats with her and to take down photographs or videos of her at the Capitol; using sophisticated software to wipe the contents of her computer, not once, but six times; and obtaining a factory re-set and new number for her cell phone.  Sentencing Tr. at 32:16–33:14.  Also, the evidence showed that at one point, defendant packed up to flee and attempt to evade arrest, having removed the SIM card from her phone.  *Id.*  While in the Capitol, she – at the very least – urged others not only to forcibly resist officers, but to steal government property, and afterwards, she continued to exult in the events of the day instead of recognizing the wrongfulness of her actions.  *See* Gov. Trial Ex. 17.2 ("I've been told what I did was wrong by everybody but in my heart and soul I know what we did was patriotic and what is right and anybody who says otherwise should be condemned.").

The observations made at sentencing are equally true today:

> Defendant's conduct in the Capitol was utterly reprehensible. It not only impeded the officers, but it increased the dangerousness and risks already inherent in the work they were doing that day when they were badly outnumbered and the tools available to them were limited.
>
> Her conduct from start to finish was outrageous. It was intentional. And it cannot be marginalized with the kind of sentence that would be appropriate and that has been handed down in this courthouse in the case of the mere parading misdemeanor.

16

Sentencing Tr. at 77:1-5; 67:24-68:3.

For all of these reasons, defendant's motion [Dkt. # 154] will be **DENIED**.  She does not satisfy the criteria for a reduction of her sentence under section 4C1.1, and even if it were determined that she does, a reduced sentence would not be sufficient to satisfy the purposes of a criminal sentence that are enumerated in 18 U.S.C. § 3553(a).

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: March 22, 2024